**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

1199SEIU, UNITED HEALTHCARE          :
WORKERS EAST,                        :
                                     :
                    Plaintiff,       :
                                     :        07 cv. 04816 (GBD)
        -against-                    :
                                     :
RITE AID CORPORATION and             :
THE JEAN COUTU GROUP (PJC), INC.,    :
THE JEAN COUTU GROUP USA, INC.,      :
d/b/a BROOKS ECKERD DRUG STORES,     :
                                     :
                    Defendants.      :
-----------------------------------------------------------X

## DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE
## FOR A PRELIMINARY INJUNCTION

Scott B. Gilly (SG-6861)
THOMPSON WIGDOR & GILLY LLP
The Empire State Building
350 Fifth Avenue, Suite 5720
New York, NY 10118
Telephone:  (212) 239-9292
Facsimile:  (212) 239-9001

- and –

Stephen M. Silvestri (*Motion to Admit Pro Hac
Vice Pending*)
Stefan J. Marculewicz (*Motion to Admit Pro
Hac Vice Pending*)
Laura Pierson-Scheinberg (*Motion to Admit Pro
Hac Vice Pending*)
MILES & STOCKBRIDGE, P.C.
10 Light Street
Baltimore, MD 21202
Telephone:  (410) 727-6464
Facsimile:  (410) 385-3700

Counsel for Defendants

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................... i

I. PRELIMINARY STATEMENT .................................................................1

II. STATEMENT OF FACTS.........................................................................2

    A. The Existing CBA .............................................................................2

    B. The Union's Campaign Conduct.......................................................3

    C. Coutu's Alleged Conduct .................................................................5

    D. Rite Aid's Alleged Conduct .............................................................5

III. ARGUMENT .........................................................................................6

    A. The Union's Motion Must Be Dismissed Because The Union Has Not
    Demonstrated Any Basis In Fact Or Law For Pendente Lite Relief.......................6

        1. The Injunction Should Not Issue Because the Underlying Grievance
        Is Not Valid.......................................................................7

            a. There is no "neutrality clause" to prevent Rite Aid from
            communicating with Brooks and Eckerd employees......................7

            b. The Union's grievance seeking application of the CBA to
            Brooks and Eckerd employees is illegal .......................................10

        2. The Union Has Not Demonstrated That Rite Aid Has Engaged In
        Union Avoidance Conduct...............................................12

        3. The Union Cannot Demonstrate That Maintenance Of The Status
        Quo Action Is Necessary ................................................12

    B. The Union's Request for An Injunction Should Also Be Denied Because
    It Has Not Satisfied The Traditional Requirements For That Equitable Relief...13

        1. The Union Has Failed To Establish That Irreparable Harm Will
        Result Absent Injunctive Relief .......................................13

        2. The Union's Request for Status Quo Relief Must Be Denied Because
        It Has Engaged In Its Own Non-Neutral Conduct ...................................15

    C. The Motion For Status Quo Relief Against Coutu Must Be Dismissed

Because It Does Not Have A Contract With The Union ......................................16

CONCLUSION..............................................................................................................17

## I.    PRELIMINARY STATEMENT

Plaintiff, 1199SEIU, United Healthcare Workers East ("Union" or "1199SEIU") claims

it is entitled to an injunction, pendent lite, prohibiting the Defendants from engaging in a "union

avoidance campaign" during the pendency of an arbitration in which the Union seeks to (1)

unlawfully apply an existing collective bargaining agreement between it and Defendant Rite

Aid Corporation ("Rite Aid") to 3,500 employees of Brooks and Eckerd drug stores; and (2)

prevent Rite Aid from communicating with Brooks and Eckerd drug store employees based

upon a contract provision that does not exist.  The Union is not entitled to such an extraordinary

remedy because:

1.    The Union seeks to have an arbitrator issue an award that is illegal and unenforceable.

2.    There is no provision in the 1199SEIU/Rite Aid agreement that requires Rite Aid to remain silent or neutral in the face of a union organizing campaign.

3.    The Union has no facts to show Rite Aid engaged in a union avoidance campaign either before or after purchasing the Brooks and Eckerd stores.

4.    There is no subject matter jurisdiction over Co-Defendants The Jean Coutu Group (PJC), Inc. and The Jean Coutu Group USA, Inc. (collectively "Coutu") because neither is party to a collective bargaining agreement with the Union.

Because this is a preliminary proceeding, the Union must show sufficient cause to

support issuance of a preliminary injunction pendente lite against Defendants pending potential

arbitration.  The Union has no basis in law or in fact to support its claims for preliminary relief,

now or at any time, and therefore does not meet the high standard for an award of such

extraordinary relief.  Moreover, both Rite Aid and Coutu are filing Motions to Dismiss this

lawsuit for the same reasons that a preliminary injunction is not warranted here.[1]

---

[1] Coutu will be moving to dismiss all claims against them for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure because they are not a party to any collective bargaining

## II.    STATEMENT OF FACTS

### A.    The Existing CBA

Rite Aid is a party to a collective bargaining agreement ("CBA") with the Union,

covering a number, but not all, of its stores.  Vallone Aff. at ¶11, Exh. 1.  Coutu is not now, and

never has been a party to the collective bargaining agreement with the Union.  Declaration of

Dale Dudik ("Dudik Decl.") at ¶ 5.

The CBA designates the Union as the exclusive bargaining representative of "all of the

professional and nonprofessional Associates of the Employer in the drug stores" listed in the

geographic scope of the CBA.  Vallone Aff. at ¶11, Exh. 1, p. 4.  The CBA also contains the so-

called "after acquired stores clause," which provides that the CBA be applied:

> "to drug stores hereafter owned by Rite Aid Corporation
> (including, but not limited to those in which the Employer
> directly or indirectly acquires an interest of 50% or more in
> existing stores)."

Vallone Aff. at ¶11, Exh. 1, p.2.[2]

On June 4, 2007, Rite Aid completed the purchase of Brooks and Eckerd drugstores and

six (6) distribution centers from Defendant, the Jean Coutu Group (PJC), Inc.  Declaration of

Niels Hansen ("Hansen Decl.") at ¶12.

There is no provision in the CBA restricting communications by either party with

existing or new employees regarding union representation.  Such a contract is commonly

referred to in the labor relations field as a "neutrality clause."[3]  Rite Aid's agreement with the

---

agreement with the Union.  Rite Aid will be moving to dismiss all claims against it for lack of subject matter
jurisdiction pursuant to Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6).
[2] It is unlawful for either an employer or a union to extend recognition, and coverage of a contract to a group of
employees without first establishing that a majority of employees want to have the Union represent them.  Kroger,
219 NLRB 388 (1973).
[3] Examples of neutrality clauses appear at fn. 7, infra.

Union has no neutrality clause, and Rite Aid has never agreed to neutrality with respect to the Brooks and Eckerd stores. Vallone Aff. at ¶11, Exh. 1; Hansen Decl. at ¶ 9.

### B.    The Union's Campaign Conduct

Before the sale, the Union began reaching out to the Brooks and Eckerd employees. Dudik Decl. at ¶¶ 7-9. These communications have continued to date. <u>Id</u>.

Prior to closing of the Rite Aid acquisition, the Union told Brooks and Eckerd employees that they were members of the Union and that the CBA would apply to them "when the Rite Aid sign goes up." Affidavit of Vallone, Exh. 11 (statement of Michael Rifkin, Union Executive Vice President). The conduct of the Union in furtherance of these efforts included the following:

- According to the Union itself, on April 30 and May 1, 2007, the Union "waged a successful two-day <u>campaign,</u> talking to several hundred Brooks and Eckerd Pharmacy chain workers in 14 NJ and NY counties, throughout New York City, Long Island, and north through the Hudson Valley and Albany areas." Hansen Decl. at ¶7, Exh. 2. During that two-day <u>campaign,</u> the Union distributed copies of the pamphlet and other materials to Brooks/Eckerd employees. Dudik Decl. at ¶ 8.

- The Union published on its website, a press release dated May 10, 2007. in which it introduced the Brooks/Eckerd employees to the Union. The press release announced that <u>when Rite Aid took over the Brooks/Eckerd stores,</u> Brooks/Eckerd employees would "'have the legal right to enjoy the same contract, benefits, protections and resources that the Rite-Aid corporation provides to other 1199SEIU employees.'" Hansen Decl. at ¶7, Exh. 2.

- Linked to the press release was a pamphlet in which the Union proclaimed and again in more detail that the Brooks/Eckerd employees were to become members of the Union and covered under the CBA immediately upon the purchase of the Brooks and Eckerd stores by Rite Aid. Hansen Decl. at ¶8, Exh. 3. Examples of such statements in the pamphlet include:

  o "Our newest members will be you, thousands of Eckerd and Brooks employees whose drug stores will soon become Rite Aid." Id.

  o "Welcome to all Eckerd and Brooks Employees!" Id.

  o The Union included a copy of the after acquired stores clause from the contract in the pamphlet. Id. There were no statements that the employees would have any choice in the matter.

  o "You will soon have a legal right to enjoy the same benefits, advantages and job security as thousands of 1199 pharmacy chain members in the Greater New York and New Jersey metropolitan area." Id.

  o "Former Eckerd and Brooks employees will automatically be 1199SEIU members…" Id.

There have been at least 140 campaign visits to the Brooks and Eckerd stores in New York, and at least 55 visits to the stores in Northern New Jersey. The Union has also mailed campaign materials to at least 87 Brooks and Eckerd locations in the Manhattan and surrounding areas extending to the lower Hudson Valley. Dudik Decl. at ¶ 9. Many of the Union's visits were similar. The Union representatives would hand out their literature to cashiers, pharmacy technicians and pharmacist (See Dudik Decl. at ¶9), and while saying things like, "Welcome Aboard," "You're Part of 1199," "Welcome to the Family," and "Did you know you will be a part of the Union's family in a couple of weeks?". Dudik Decl. at ¶ 9.

### C.    Coutu's Alleged Conduct

On or about May 3, 2007, Coutu prepared a communication for store managers to deliver to their associates. The communication was designed to tell associates about the Union's activities and to set the record straight. There is nothing in Coutu's communication that violates Federal Labor Law. Dudik Decl., Exh. C at ¶12. It is protected speech under the National Labor Relations Act.

Coutu also prepared and presented union awareness training to educate District Managers, Pharmacy Supervisors, Store Managers, and Pharmacists. Non-supervisory employees were not part of these meetings. Dudik Decl., Exh. C at ¶13.

Coutu's activities with respect to its employees were conducted on its own behalf and were not directed or controlled by Rite Aid. Hansen Decl., ¶6; Dudik Decl. ¶ 13.[4]

Coutu does not have any contractual relationship with the Union, and since all of its employees have now become Rite Aid employees, there is no basis for enjoining Coutu's conduct.

### D.    Rite Aid's Alleged Conduct

The Union's supporting evidence in this preliminary proceeding is comprised in toto of two "facts" it ascribes to Rite Aid. The first fact is in paragraph 19 of Vallone's Affidavit. She states

> In or around early April 2007, a Rite Aid employee told me that Rite Aid's Labor Relations Director, Niels Hansen, told Eckerd store managers to strictly enforce Eckerd's no solicitation policy against 1199 staff, to take any Union literature from employees

---

[4] As set forth infra, the conduct of Coutu prior to the purchase is simply irrelevant to the Motion because prior to the purchase, Coutu's employees were not represented by the Union, and Coutu had no labor contract with the Union. Prior to the purchase, Coutu was free to exercise its right under Section 8(c) of the National Labor Relations Act, 29 U.S.C. § 158(c) to express its opinion to employees concerning whether they would benefit from selecting a union to represent them.

and throw it out, to instruct employees to not sign Union
authorization cards, and to make efforts to dissuade employees
from supporting the Union.

Vallone Aff. at ¶ 19.[5]   Second, in paragraph 21 of her Affidavit, Vallone claims that Director of

Labor Relations and Labor Counsel, Niels Hansen, told her that:

he had conducted a meeting with Eckerd store managers at
Eckerd's headquarters in Melville, New York prior to the
purchase "to direct store managers on the union free business
model that Rite Aid intended to apply to these to-be-acquired
stores."

This is not <u>evidence</u> of any "union avoidance campaign" directed to Brooks and Eckerd

employees by Rite Aid.[6]

III.   <u>ARGUMENT</u>

    A.    **The Union's Motion Must Be Dismissed Because The Union Has Not
Demonstrated Any Basis in Fact Or Law For <u>Pendente</u> <u>Lite</u> Relief.**

In <u>Niagara Hooker Employees Union v. Occidental Chem. Corp.</u>, 935 F.2d 1370 (2d

Cir. 1991) the appeals court sets forth the standard applicable to this case.  The Union bears a

heavy burden to support a request for extraordinary injunctive relief in this matter.  In that case,

the Second Circuit concluded that:

A union may establish a status quo injunction against an
employer when the employer's action has the effect of frustrating
the arbitral process, or rendering it a 'hollow formality.'

935 F.2d at 1377, <u>quoting</u> <u>Lever Bros. v. International Chem. Workers Union, Local 217</u>, 554

F.2d 115, 123 (4th Cir. 1976).  In addition, "the injunction must also satisfy the traditional

---

[5] Vallone's statement is hearsay from an unnamed source.  There is no corroboration.  Such a statement is an insufficient basis for preliminary relief in this case.  29 U.S.C. § 101, 107, <u>et seq</u>.
[6] While not germane to this Response, Rite Aid denies all assertions in paragraphs 19 and 21 of the Vallone Affidavit.  Rite Aid, including Hansen, did not in any way dictate Coutu's labor relations, or was involved in communications to Brooks Eckerd stores prior to June 4, 2007.

requirements of equity." 935 F.2d at 1377, citing Hoh v. Pepsico, Inc., 491 F.2d 556, 561 (2nd

Cir. 1974). The Union cannot satisfy either of these necessary showings.

1. **The Injunction Should Not Issue Because the Union's Underlying Grievance Is Invalid.**

   a. **There is no "neutrality clause" to prevent Rite Aid from communicating with Brooks and Eckerd employees.**

In this status quo proceeding, the Court must go beyond deciding whether the Union's

grievance is arbitrable. In Hoh v. Pepsico, a case heavily relied upon by the Union, the Second

Circuit concluded that the court must evaluate not only the: "likelihood of success in

compelling arbitration, but in obtaining the award in aid of which the injunction is sought."

Hoh v. Pepsico, 491 F.2d at 561. (emphasis added). The Hoh court also noted that the

Supreme Court's directive to construe liberally agreements to arbitrate does not extend to

ancillary relief. Id., citing Steel Workers Triology, 363 U.S. 564, 574 (1960):

> It would be inequitable in the last degree to grant an injunction
> pending arbitration which was costly to a defendant on the basis of a
> claim which although arguably arbitrable was plainly without merit.

Hoh v. Pepsico, 491 F.2d at 561 (emphasis added).

The status quo relief demanded by the Union is the very same relief it would be entitled

to if it won its underlying grievance. Therefore, a grant of status quo relief would give the

Union victory on its grievance.

Notably, the Union cites no CBA provision concerning neutrality. That is because there

is none. There is no language whatsoever requiring either party to remain neutral concerning a

purchased store's employees' selection of a bargaining representative. The CBA is totally

silent on the subject.

The Union has not cited a single case supporting the proposition that a court could impose a neutrality obligation status quo when there is contractual requirement to do so. Moreover, the Union has not identified a single fact to support its claim that Rite Aid must remain neutral. The Union's concession that the CBA lacks a neutrality clause is further emphasized by its argument that the neutrality requirement should be implied from the mere existence of after acquired stores language through the "covenant of good faith and fair dealing." Union's Brief at 9-10.

As with its failure to cite any case permitting the imposition of neutrality status quo when there is no contractual requirement to maintain neutrality, its covenant of good faith and fair dealing argument is without legal support. Our research reveals no case in which a court

has forced an employer to arbitrate based on an implication of neutrality drawn from some other term of a collective bargaining agreement.[7]

Through the Union's demand for this injunction, the Union seeks to have this Court impose a neutrality obligation where none exists. Taken to its logical conclusion, were the Union allowed to have its way here, any dispute between an employer and a union would be enjoinable regardless of whether there is any contractual language from which the arbitrator can draw its essence. This is directly contrary to rulings of the Supreme Court in the Steelworkers Trilogy, 363 U.S. 564 (1960).

It is antithetical to the principles of collective bargaining to permit a party to infer that the existence of one contract clause somehow implies the creation of another clause that carries

---

[7] Indeed, the absence of any neutrality language here distinguishes this case from other cases where arbitration was compelled, including those the Union relies upon. In those other cases, there is no question that the labor contracts contained specific neutrality obligations, some of which were quite detailed. For example, in Hotel & Restaurant Employees Union, Local 217 v. J.P. Morgan Hotel, 996 F.2d 561 (2d Cir. 1993), the neutrality agreement the court permitted the parties to arbitrate was one where

> "the parties contracted that Local 217 could solicit support from a designated bargaining unit of 90 hotel employees, not previously represented by any union. Local 217 undertook to forego the right to picket authorized under the Act… in turn the hotel promised the union access to its employees in non-public areas of the hotel. Local 217 pledged it would notify the hotel in advance of visits by its representatives and that during those it would not coerce or threaten hotel employees or interfere with hotel operations. The employer agreed not to interfere with the organizing effort or to mount a campaign with its employees opposing the union." Id. at 563.

In Amalgamated Clothing & Textile Workers Union v. Facetglas, Inc., 845 F.2d 1250 (4th Cir. 1988) the neutrality agreement read as follows: "[the employer] would 'be neutral in the election and let any selection be strictly up to its employees,' and would hire employees 'without regard to whether or not [they] joined the union or [were] in favor of it.'" Id. at 1251. "Attached to the election agreement was a collective bargaining agreement… which would be implemented in the event the employees selected the Union as their collective-bargaining representative." Id.

None of the cases cited by the Union address a neutrality obligation. Moreover, the court's analysis in Aeronautical Indus. Dist. Lodge 91 IAM v. United Technologies Corp., 87 F.Supp.2d 116 (D. Conn. 2000), aff'd 230 F.3d 569 (2d Cir. 2000), is directly applicable in this case because it directly refutes the Union's argument. In that case, the Court rejected an attempt by the union to use the covenant of good faith and fair dealing to alter a term of the underlying contract. There, the union sought to expand a side agreement regarding an agreement not to close facilities for the life of a contract into that promised to employ bargaining unit members in its facilities in East Haven was an agreement to employ a specific number of bargaining unit employees for the life of the CBA. The Court rejected the Union's theory that the company violated the implied covenant of good faith and fair dealing and the Union's argument that the conduct "evades the spirit of the agreement." The court noted, "the Union cannot infer a 'spirit' to continue the CBA beyond its expiration" when the parties expressly agreed otherwise. The court further found that, "The Union could have extracted a promise . . . but did not." Id. at 128. Here, the Union is attempting the same thing by trying to imply a neutrality term where there is none. The Union could have "extracted a promise" for neutrality at the bargaining table. It did not. Id.

with it an entirely separate set of rights and obligations.  To allow an interpretation doctrine

such as the "covenant of good faith and fair dealing" to create a distinct contract term which did

not exist, renders the four corners of the CBA irrelevant, and permits a party to a collective

bargaining agreement to arbitrate anything.

     The agreement of neutrality is one that the parties here could have negotiated, but did

not.  Requiring neutrality through status quo injunction where there is no such obligation in the

CBA is inappropriate.

      **b.**      **The Union's grievance seeking application of the CBA to**
               **Brooks and Eckerd employees is illegal.**

     An employer and a union can only apply the terms of an existing collective bargaining

agreement to newly acquired stores when there is proof that a majority of the employees in an

appropriate unit designate the union as their exclusive bargaining representative.  <u>Kroger</u>, 219

NLRB 388 (1975).[8]  Proof of majority status is required in "additional stores provisions [of

collective bargaining agreements] **as a matter of law**."  <u>Raley's</u>, 336 NLRB 374, 378 (2001).

     To give the Union automatic application of the contract to 3500 employees who have

not designated it as their representative would violate the law.  <u>Welch Scientific Co. v. NLRB</u>,

340 F.2d 199 (2d Cir. 1965).  "'[A]n employer commits the unfair labor practices of interfering

with employees' § 7 rights and supporting a union in violation of § 8(a)(1) and (a)(2) when it

---

[8] Small groups of employees can also be brought into an existing unit through what is called an "accretion." An accretion is a mechanism where the NLRB, for administrative convenience, permits a <u>small</u> number of unrepresented employees to be added into a larger preexisting unit of represented employees without the benefit of an election through which the employees would have the opportunity to choose for themselves. <u>Staten Island Univ. Hosp. v. NLRB</u>, 24 F.3d 450, 455 (2d Cir. 1994). Here, the group of employees the Union seeks to include under the contract is approximately 3500, and is far too large a group to constitute an accretion, particularly where they have historically been unrepresented. <u>Geo V. Hamilton, Inc.</u>, 289 NLRB 1135 (1988).  Moreover, that these employees could also be configured into a multitude of different bargaining units, and have their own group identity, also precludes an accretion here.  <u>Save Mart of Modesto, Inc.</u>, 293 NLRB 1190 (1989).  Consistent with that fact, the Union is not seeking a determination from the arbitrator of whether there is an accretion.  It's demand makes no such reference, and it acknowledges that only "some" Brooks and Eckerd employees will be accreted into the unit, leaving employees out in "most cases." Union's Memorandum at 10.

imposes on employees of one unit the contract and bargaining agent of another unit.'" <u>Local One, Amalgamated Lithographers of America v. Stearns & Beale, Inc.</u>, 812 F.2d 763, 769 (2d Cir. 1987)(quoting <u>Sperry Systems Management Division v. NLRB</u>, 492 F.2d 63, 69 (2d Cir. 1974)); <u>See</u> <u>also</u>, <u>Cal-Fin</u>, 217 NLRB 871, 874 (1975); <u>NLRB v. Masters-Lake Success, Inc.</u>, 287 F.2d 35 (2d Cir. 1961)(finding an employer to have committed an unfair labor practice by applying an existing collective bargaining agreement to a new store's employees without allowing them to make their own free choice of representative).  Because the Union has asked for an arbitrator to do what cannot be done as a matter of law, the matter is not arbitrable.

Even if the matter were arbitrable, "[w]hen an arbitrator's award is against a public policy, which is well defined and dominant, the award is unenforceable." <u>Local One, Amalgamated Lithographers of America v. Stearns & Beale, Inc.</u>, 812 F.2d 763, 769 (2d Cir. 1987).  The NLRA is such a public policy.  <u>Id</u>.  (citing <u>Perma-Line corp. of America v. Sign Pictorial and Display Union, Local 230</u>, 639 F.2d 890, 894-95 (2d Cir. 1981)).  The Courts will not confirm an arbitrator's award that is repugnant to the Act.  <u>See also</u>, <u>Bevona v. Field Bridge Associates</u>, 1993 WL 498042, 90CV5191 (RJW) (S.D.N.Y. Dec. 1, 1993).

Without question, the Union's demand that an arbitrator issue an award that applies its contract with Rite Aid to Brooks and Eckerd employees is repugnant to the NLRA because it would nullify the essence of the statute – employees are entitled to make their own decision as to whether or not to select a union as their representative.  29 U.S.C. § 157.  Such a result "'is so plainly unreasonable that… it can be seen in advance that no award to the Union could receive judicial sanction.'" <u>Emery Air Freight Corp. v. Local Union 295</u>, 786 F.2d 93, 99 (2d Cir. 1986)(citations omitted).

The Union's efforts to obtain an illegal and therefore unenforceable award in a grievance arbitration is hardly a situation which warrants preliminary relief.

**2.      The Union Has Not Demonstrated that Rite Aid Has Engaged in Union Avoidance Conduct.**

The Union argues that:

> "without a preliminary injunction, Defendants will proceed with the Union Avoidance Campaign, making it virtually impossible for the Union to secure the necessary majority support among the former Eckerd employees, <u>thereby depriving those employees of their right to union representation and contractual benefits, and depriving the Union of the benefit of its bargain.</u>"

Union Brief at p. 11.  Even assuming a neutrality clause existed, the Union has no evidence that Rite Aid breached it.  There is no evidence from any Brooks or Eckerd employees supporting the Union's contention that any Rite Aid conduct has had a permanent effect on the choice of bargaining representative.  The Union cannot demonstrate that Rite Aid issued any communication to Eckerd employees pre or post purchase that coerced their free choice or was anti union.  To obtain the extraordinary relief they request against Rite Aid, the Union needs to produce facts, and it has produced none.

**3.      The Union Cannot Demonstrate That Maintenance of The Status Quo Ante Is Necessary.**

The Union cannot demonstrate that the arbitral process would be rendered a "hollow formality" or "meaningless ritual" in the absence of neutrality status quo relief.  <u>Hooker</u>, 935 F.2d at 1377.  An arbitrator could fashion a remedy for violation of a neutrality obligation.  Where appropriate, the remedies can range from an order to cease and desist from engaging in such conduct, to taking affirmative action to dispel the effects of prior conduct, including postings of notices, disavowals, statements of management, and ordering that Rite Aid provide the Union access to its premises for purposes of meeting with employees to discuss

representation.  In fact, the National Labor Relations Board routinely issues such remedies as appropriate in coercion cases.  See NLRB Case Handling Manual, Part 3 (Compliance Proceedings), ¶ 10514 (Negative Provisions) and ¶ 1056 (Affirmative Provisions); see e.g., Sumo Container Station, 317 NLRB 383 (1995) (broad cease and desist order against employer); Teamsters Local 945, 232 NLRB 1 (1977) (broad cease and desist order against coercive actions of union).  None of the cases cited by the Union in its brief support its request for status quo injunctive relief.  Additionally, the Union fails to demonstrate why the alleged conduct of Rite Aid would render the arbitral process a futile gesture.  Indeed, the Union cannot make such a demonstration given the lack of substantial evidence of Rite Aid conduct supporting its claim.

**B.    The Union's Request For An Injunction Should Also Be Denied Because It Has Not Satisfied The Traditional Requirements For that Equitable Relief.**

In addition to overcoming the Norris-LaGuardia Act's strong presumption against injunctive relief, the Union must also satisfy the traditional requirements for injunctive relief. See, e.g., Boys Markets, 398 U.S. 235, 254 (1970); Niagara Hooker, 935 F.2d at 1377.  "[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter."  Reuters, Ltd. v. United Press Int'l., 903 F.2d 904, 907 (2d Cir. 1990).

**1.    The Union Has Failed To Establish That Irreparable Harm Will Result Absent Injunctive Relief.**

Under traditional equity practice in the Second Circuit, a showing of likely irreparable harm is an indispensable prerequisite for obtaining preliminary injunctive relief.  See, e.g., JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990); American Postal Workers Union v. United States Postal Serv., 766 F.2d 715, 723 (2d Cir. 1985), cert. denied, 475 U.S. 1046; Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (per

curiam); Lanvin, Inc. v. Colonia, Inc., 739 F. Supp. 182, 192 (S.D.N.Y. 1990). The Second

Circuit has described irreparable harm as the "single most important prerequisite for the

issuance of a preliminary injunction." Citibank v. Citytrust, 756 F.2d 273, 75 (2d Cir. 1985).

Likewise, this Court has frequently described irreparable harm as the "linchpin" in the

determination of whether to grant preliminary injunctive relief. See, e.g., Seide v. Crest Color,

Inc., 835 F. Supp. 732, 735 (S.D.N.Y. 1993); Emons Indus., Inc. v. Liberty Mut. Ins. Co., 749

F. Supp. 1289, 1291 (S.D.N.Y. 1990); Firemen's Ins. Co. of Newark v. Keating, 753 F. Supp.

1146, 1150 (S.D.N.Y. 1990).

   "[I]rreparable harm must be shown by the moving party to be imminent, not remote or

speculative." Reuters, Ltd., 903 F.2d at 907. A preliminary injunction, therefore, should not be

granted upon a showing that irreparable harm is a mere "possibility." JSG Trading, 917 F.2d at

79; Kraft Gen. Foods, Inc. v. Allied Old English, Inc., 831 F. Supp. 123, 136 (S.D.N.Y. 1993);

Firemen's Ins., 753 F. Supp. at 1150.

   The Union has not demonstrated that it will suffer irreparable harm if the Company

engaged in an alleged union avoidance campaign pending the arbitration. There is no

irreparable harm where the remedies available in an underlying arbitration could address the

alleged conduct and provide the Union with ample opportunity to convince employees that

union representation of them is beneficial. That is the case here

   The possibility of harm identified by the Union here is far different from that involved

in the only case on which it relies. The Union cites Teachers Ass'n of the Japanese Educ.

Institute of N.Y., Inc. v. Japanese Educ. Institute of N.Y., 724 F. Supp. 188 (S.D.N.Y. 1989).

In that case, the employer sought to radically change the format of contractually required

monthly discussions, which were "not only a series of meetings but also an institution" in place

for more than 25 years.  Id. at 190.  The portion of the opinion quoted in the Union's brief

reveals why Teachers Ass'n is distinguishable from the instant case.  See Union Brief. at 12-13.

 The court concluded an arbitrator could not remedy the harm created by the failure to

hold monthly meetings pending arbitration of the dispute.  Teachers Ass'n, 724 F.Supp. at 193.

The court, therefore, focused on the arbitrator's inability to "turn back time" and recapture the

events of months gone by as the basis for its ruling that the arbitral process would be rendered

futile unless it preserved the status quo.  Id.  In this case, there is no doubt that an arbitrator has

the ability to "turn back time" through compelling retraction, or imposing other affirmative

obligations onto Rite Aid or the Union.

 Moreover, there is no deadline for organizing the Brooks and Eckerd employees that is

at risk of passing before the arbitration issue is ultimately resolved.  It hardly seems necessary

to order the status quo to be preserved when, in fact, it exists presently.

  **2. The Union's Request For Status Quo Relief Must Be Denied Because It Has Engaged In Its Own Non-Neutral Conduct.**

 Acceptance of the Union's request for status quo relief would sanction the Union's own

coercive conduct which prompted Coutu to issue the very responsive statements which are the

subject of this Motion.  The Union's conduct is what prompted Rite Aid to file unfair labor

practice charges with the NLRB.  "[A] litigant who seeks equity must do equity."  In Re: U.S.

Lines, Inc., 318 F.3d 423, 437 (2d Cir. 2003).  See also, Kenyon v. Weissberg, 240 F. 536, 537-

38 (S.D.N.Y. 1917)(applying the principle "he who has not done equity cannot have equity" to

deny preliminary injunction).  It is unfair for the Union to use this court's injunctive authority

to silence Rite Aid while it continues to coerce employees into believing that union

representation is a fait accompli.

Granting the relief sought in this case would tip the scales of neutrality in favor of the Union because it would be allowed the Union to continue its coercive conduct toward Rite Aid's new employees.

### C.    The Motion For Status Quo Relief Against Coutu Must Be Dismissed Because It Does Not Have A Contact With The Union.

The Brooks and Eckerd stores were not part of Rite Aid until June 5.  The alleged "union avoidance campaign" conduct alleged before that date occurred when they were owned by Coutu and Coutu had no contractual privity with the Union to enable it to invoke jurisdiction of this court under § 301.

Section 301 allows "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a).  "'[S]ection 301 does not extend to suits brought against defendants who are not parties to the contract whose breach is alleged'" Duane Reade v. Allied Trades Council, 2005 U.S.Dist. LEXIS 29690, 04CV3542(BSJ), *14 (S.D.N.Y. October 7, 2005)(quoting Smith v. Hickey, 482 F.Supp. 644, 647 (S.D.N.Y. 1979)); See also, Cement and Concrete Workers Dist. Council Welfare Fund v. Atlas Concrete Corp., 2007 U.S.Dist. LEXIS 9817, 04CV0915(CPS), *15 (E.D.N.Y. Feb. 13, 2007).  The Union has not, and cannot allege, that either Coutu company is, or ever has been, a party to the Contract that it wants this Court to enforce under § 301.  "In order to state a [LMRA § 301(a)] claim against [defendant] **the complaint must allege that [defendant], was a signatory to the collective bargaining agreement**." Id. (quoting Cruz v. Robert Abbey, Inc., 778 F.Supp. 605, 610 (E.D.N.Y. 1991)(emphasis added)); Tuvia Convalescent Center, Inc. v. National Union of Hospital and Healthcare Employees, 717 F.2d 726 (2d Cir. 1982).

Accordingly, there is no legal predicate for enjoining Coutu, and the Motion as to these Defendants must be denied.

## CONCLUSION

For all of the foregoing reasons, Rite Aid respectfully requests that the Court deny the motion for a preliminary injunction.

Dated: June 14, 2007
   New York, New York

        Respectfully submitted,

        THOMPSON WIGDOR & GILLY LLP

By:       
        Scott B. Gilly (SG-6861)

        The Empire State Building
        350 Fifth Avenue, Suite 5720
        New York, New York 10118
        Telephone: (212) 239-9292
        Facsimile: (212) 239-9001
        E-mail: sgilly@twglawyers.com

        - and –

        Stephen M. Silvestri (*Motion to Admit Pro Hac Vice Pending*)
        Stefan J. Marculewicz (*Motion to Admit Pro Hac Vice Pending*)
        Laura Pierson-Scheinberg (*Motion to Admit Pro Hac Vice Pending*)
        MILES & STOCKBRIDGE, P.C.
        10 Light Street
        Baltimore, MD 21202
        Telephone:  (410) 727-6464
        Facsimile:  (410) 385-3700

        Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Defendants' Response to Order to Show Cause for a Preliminary Injunction, Affidavit of Niels Hansen, and Affidavit of Dale Dudik were served via hand delivery, e-mail, and ECF, this 14th day of June 2007, upon the following counsel for Plaintiff:

> Allyson L. Belovin, Esq.
> Levy Ratner, P.C.
> 80 Eighth Avenue, 8[th] Floor
> New York, NY 10011