EXHIBIT A

*British Journal of Industrial Relations*
44:4 December 2006 0007–1080 pp. 651–675

# The Union Avoidance Industry in the United States

*John Logan*

## Abstract

*This paper analyses the development of the union avoidance industry in the United States during the past half-century. Focusing on one leading example from each group, it examines the activities of the four main actors that constitute that industry: consultants, law firms, industry psychologists and strike management firms. Although these firms have experienced a fall in business as unions have declined in strength and numbers — a development that the union avoidance industry has contributed to — they continue to play an important role in the US system of industrial relations. Over three-quarters of employers hire consultants when confronted by organizing campaigns, and large union avoidance firms are increasingly seeking export markets for their expertise.*

## 1. Introduction

Over the past three decades, US employers have waged what *Business Week* has called 'one of the most successful anti-union wars ever' with spectacular results — private-sector union membership now stands at just 7.9 per cent, its lowest level since the 1920s. But they have not conducted this campaign alone. They have been assisted by an extensive and sophisticated 'union avoidance' industry, which is now worth several hundred million dollars per year. Several studies have demonstrated that employers who recruit the services of union avoidance experts are more likely to defeat organizing campaigns than those who do not (Kleiner 2001; Lawler 1984, 1990; Peterson *et al.* 1992). And this industry has not only enabled employers to resist unionization; it has also allowed them to undermine union strength, or unload existing unions.

For more than two decades, scholars have identified employer hostility as a significant cause of the 'slow strangulation of private-sector unions' in the United States (Freeman and Medoff 1984; Kochan *et al.* 1986), but they have

John Logan is at the Industrial Relations Department, London School of Economics.

© Blackwell Publishing Ltd/London School of Economics 2006. Published by Blackwell Publishing Ltd, 9600 Garsington Road, Oxford OX4 2DQ, UK and 350 Main Street, Malden, MA 02148, USA.

652    *British Journal of Industrial Relations*

paid little attention to the techniques through which employer anti-unionism has been implemented. Nor have they examined the development of a powerful industry, independent from management, dedicated to enabling US firms to operate union free. The few studies that examine the impact of union avoidance experts on the outcome of organizing campaigns treat these experts as a tool of management, rather than as autonomous actors, and fail to provide a three-dimensional account of the actors themselves. Based on research in primary and secondary sources,[1] this paper analyses the main actors that constitute the union avoidance industry. Using one leading example of each actor — the consultant firm Burke Group, the law firm Jackson Lewis, industrial psychologist Charles L. Hughes, and the 'strike management' firm Vance International (VI) — it illuminates the activities of these experts and examines the development of the union avoidance industry over the past half-century. The principal actors in the union avoidance industry are not, strictly speaking, 'new'. Strikebreaking firms have operated since the nineteenth century, industrial psychologists since the early twentieth century, and union avoidance consultants and law firms since the post-Second World War years. The tremendous growth in the size, scope and sophistication of the union avoidance industry since the 1970s, however, is a recent development — and one that has contributed significantly to the current crisis of organized labour in the United States.

In the 1950s, when the union avoidance industry was in its infancy, consultants and others were, in essence, part of the arsenal of employers seeking to remain non-union. Consultants claimed, with some justification, that they were simply providing the services demanded by a growing number of firms (Shefferman 1961). By the 1970s and 1980s, in an altogether more hostile political and economic climate for organized labour (Brudney 2005a; Dark 1999: 99–11; Farber and Western 2002; Godard 2003), the union avoidance industry had developed into a multimillion-dollar concern that profited from promoting adversarial labour–management relations, and consultants had become important industrial relations actors in their own right. They were no longer simply responding to employer demands for their services, but were actively and aggressively creating that demand by encouraging management to fear the allegedly catastrophic consequences of unionization — in terms of higher labour costs, reduced profits, and a loss of control of their organization — and to fight it with all the resources at their disposal. In the 1950s and 1960s, employers were hiding their anti-union campaigns behind consultants; within a couple of decades, the situation reversed, as consultants concealed their increasingly aggressive and sophisticated activities behind management and supervisors. Several union avoidance firms operate internationally, but only in the US has this industry developed into a multimillion-dollar concern that operates throughout the country and in every sector of the economy. And only in the US do employers, policy makers and (to a lesser extent) the general public consider the activities of union avoidance experts a legitimate part of mainstream industrial relations.

© Blackwell Publishing Ltd/London School of Economics 2006.

## 2. Management consultants

An August 2005 article in the *Wall Street Journal* reported that, in addition to the problems of the disappearance of unionized jobs, hostile employers, weak legal protection and bad PR, unions are facing a 'new' problem: sophisticated union avoidance consultants (Maher 2005). Consultants have played a key role in the development and popularization of many tactics and delivery mechanisms that have become standard features of modern union avoidance campaigns, including customized videos and web sites, 'vote no' committees, and campaign literature stressing the alleged futility of, and risks associated with, unionization. While sophisticated union avoidance consultants pose a serious threat to unions, they are not a new threat. Modern-day consultants have operated in the United States since the immediate post-war decades. After the National Labor Relations Act (NLRA) established the right to organize and the Second World War solidified the position of the new industrial unions, firms seeking to operate union free could no longer resort to the bare-knuckle anti-union tactics of old. They needed more subtle and sophisticated tactics to forestall unionization, which consultants were able to provide.

In the 1950s, Nathan Shefferman's LRA became the first nationally known firm to specialize in union avoidance. LRA was the largest consultant agency in the nation — with offices in Chicago, Detroit and New York, over 20 full-time consultants and an income of over $1 million per year — and Shefferman was the 'founding father' of the modern union avoidance industry (Jacoby 1997: 130–44; Sheridan 1980). Several of the tactics he developed (such as employee 'vote no' committees) have subsequently become staple features of union avoidance campaigns. LRA consultants committed numerous illegal actions, including bribery, coercion of employees and racketeering. Congressional hearings into its activities effectively forced LRA out of business in the late 1950s. But the firm provided a training ground for other union avoidance gurus such as Louis Jackson and Robert Lewis of the law firm Jackson Lewis, Herbert Melnick of Modern Management Methods (3M), and John Sheridan of John Sheridan Associates. In the 1960s, this new generation of union avoidance experts extended consultant activities into the financial, insurance and hospitality sectors.

Until the 1970s, however, union avoidance consultants were relatively small in number — there were only about 100 firms in the 1960s, compared with over 10 times that number in the mid-1980s — and consultant activity was not yet part of mainstream industrial relations. Most employers were cautious about hiring consultants and attending union avoidance seminars. In the late 1970s, one consultant recounted that a decade earlier: 'Employers used to sneak into [union avoidance] seminars . . . They were as nervous as whores in church. The posture of major company managers was, "Let's not make the union mad at us during the organizing drive or they'll take it out at the bargaining table."' That mindset changed dramatically in the 1970s and 1980s, a period of significant expansion for the union avoidance industry, when most employers no longer believed in the inevitability of unionization

© Blackwell Publishing Ltd/London School of Economics 2006.

and shed their inhibitions about recruiting consultants, attending union avoidance seminars, and fighting organizing campaigns (Flint 1979; Longworth 1979; Nicholson *et al.* 1980).

In the context of a growing union/non-union wage differential, heightened international and domestic non-union competition, deregulation, changes in the structure of corporate governance that elevated the importance of short-term share value, and increasing employer demands for flexible work practices, many firms started to resist unionization more vigorously (Jacoby 2001; Lawler 1990: 94). One prominent consultant estimated that the size of the union avoidance industry increased tenfold in the 1970s (U.S. House of Representatives 1979), as employers sought out firms that could help them defeat organizing campaigns or unload existing unions. Consultants such as 3M, West Coast Industrial Relations Associates, Management Science Associates, and John Sheridan Associates orchestrated hundreds of union avoidance campaigns and developed reputations for no-holds-barred opposition to unionization. Consultants started to operate in areas of growing importance to unions: healthcare, airlines, education, white-collar employees, public-sector workers and smaller companies.

National political developments also benefited consultants. After the defeat of the Labor Law Reform Act in 1977–1978 (Estlund 2002), unions turned their legislative attention to union avoidance consultants. But the election of Ronald Reagan in 1980 derailed any hope of enacting legislation regulating consultant activities, and the Reagan National Labor Relations Board (NLRB) significantly expanded the scope for consultant campaigns (Flynn 2000; Goldfield 1987: 180–221; Gross 1995: 242–77; Logan 2006). In the 1980s, consultants advised employers that they now enjoyed, not only the opportunity to defeat organizing campaigns, but to get rid of the union threat once and for all. One consultant wrote in the *Wall Street Journal* that the 'current [Reagan] government and business climate presents a unique opportunity for companies . . . to develop and implement long-term plans for conducting business in a union-free environment.' The 'critical test', he insisted, was whether management had the 'intellectual discipline and foresight to capitalize on this rare moment in our history' (Raleigh 1984). Other consultants were actively promoting the 'morality of a union-free environment' and complained that some US employers 'mistakenly believe there is something "wrong" — or even worse, something "immoral" — about fighting to maintain union-free status.'[2]

By the 1990s, the union avoidance industry had developed into a multimillion-dollar concern and consultant campaigns had become a standard feature of recognition campaigns, with over two-thirds of employers recruiting consultants when faced with a union drive (Bronfenbrenner 1994; Bronfenbrenner and Hickey 2004). Consultants mostly operate on a contract-by-contract basis — which means they do not have to worry about any long-term negative consequences of their activities — and range from locally-based practitioners to large firms that employ dozens of consultants and operate nationally (and sometimes internationally). They often develop specialties in specific

© Blackwell Publishing Ltd/London School of Economics 2006.

industries, such as healthcare, gaming, hospitality, publishing, non-profit and education, or in dealing with particular groups of employees, such as Latinos, African-Americans, or women (Logan 2002). In recent years, consultants have become ever more brazen about encouraging employers to fight unionization to the bitter end and confident in their ability to preserve a union-free environment. Several consultant firms go so far as to offer to protect employers' 'right' to operate union free, and one even offers a 'money back guarantee' in the event that one of their clients becomes unionized (Logan 2006).

The Burke Group, headquartered in Malibu, California (with regional offices in New York, Washington, Minneapolis, Houston, New Haven and Louisville), is the largest consultant agency in the United States specializing in union avoidance campaigns. The firm 'directs' over 60 full-time consultants — who are more akin to independent contractors than employees — boasts over 1,300 clients, and has conducted over 800 counter-organizing campaigns since its establishment in 1981, the heyday of the union avoidance industry. The Burke Group maintains a 'strategic relationship' with several other union avoidance firms, including Houston-based PTI Labor Research, a firm that specializes in union avoidance research and videos, and Labor Relations Institute, Inc., which produces union avoidance campaign materials. In June 2000, the Burke Group acquired Minneapolis-based Alpha Associates, a consultant firm with links to 3M and John Sheridan Associates and over three decades of union avoidance experience (Levitt 1993: 52). In common with many consultants, the founder, president and CEO of the Burke Group, David J. Burke, has previously worked in personnel management at large non-union organizations. After receiving a law degree from the University of Baltimore, Burke worked as vice president of personnel relations for Johns Hopkins Medical Institute and as labour relations manager for General Electric, a firm with a long history of antipathy towards unions and New Deal labour policy (Northrup 1964; Schatz 1987).

The Burke Group advises employers throughout the country and operates in most sectors of the economy. It claims to have served 1,300 clients in 50 industries throughout 10 countries. The firm's consultants live in 23 different states, thereby allowing it to dispatch consultants efficiently to any 'trouble spot'. The Burke Group, which claims a 96 per cent success rate, boasts that its consultants specialize in 'tough' campaigns (i.e. campaigns in which a majority of employees have signed union authorization cards before its engagement). Burke consultants are paid US$180–250 per hour plus expenses. The firm's clients have included Blue Shield, Coca-Cola, K-Mart, SBC Pacific Bell, Children's Hospital of Los Angeles, Honeywell, NBC, Mazda, General Electric, Heinz, Bellagio-Las Vegas, Caesar's Palace, California Steel Industries, DuPont, MGM Grand, Lockheed Martin, Telemundo, Baltimore Gas & Electric, Mars Inc., and University of California-Los Angeles.[3]

Typical consultant campaigns involve several consultants and last approximately 10 weeks, but some campaigns last several years. Small campaigns cost tens of thousands of dollars; large campaigns cost millions of dollars. Two recent Burke Group campaigns demonstrate the sometimes enormous

© Blackwell Publishing Ltd/London School of Economics 2006.

656   *British Journal of Industrial Relations*

cost of union avoidance campaigns. Financial records filed by Catholic Healthcare West (the largest private hospital chain in California and a major recipient of state Medicaid funds) show that a campaign against Service Employees International Union (SEIU) in Sacramento and Los Angeles in 1998 cost over US$2.6 million in direct payments to the Burke Group. (Other significant costs include employee time off to attend captive audience meetings and management time off to conduct group and individual meetings.) In the aftermath of the Catholic Healthcare West campaign, the California state legislature passed a law prohibiting the use of public funds for anti-union activities. Over-riding a previous decision that the law was pre-empted by federal labor law, the Court of Appeals upheld California's 'labor neutrality' law in September 2006 (*Chamber of Commerce v. Lockyer, No. 03-55166, D.C. No. CV-02-00377-GLT*). Between 1994 and 2000, the Burke Group conducted a union avoidance campaign for Baltimore Gas & Electric (BGE) against the International Brotherhood of Electrical Workers (IBEW). According to the IBEW, BGE spent over US$50 million dollars fighting three NLRB elections — all of which the union lost — in 1996, 1998 and 2000. The American Federation of Labor-Congress of Industrial Organizations (AFL-CIO) used the acrimonious BGE campaign to persuade the Clinton Labor Department to impose stricter financial reporting regulations on consultants and the employers that hire them. After taking office in 2001, however, the Bush Administration quickly rescinded these new rules (*Daily Labor Report* 1998, 2001; Logan 2007).

In recent years, the Burke Group has been active in organizing campaigns involving multicultural and multilingual workforces. In the 1970s and 1980s, union avoidance was an overwhelmingly white, male business, and relatively few firms employed multilingual or minority consultants. In recent years, however, many consultant firms have diversified their personnel, as campaigns involving immigrant workers now constitute a greater portion of their workload. The Burke Group, which claims that over half of its consultants are women or minorities, employs consultants fluent in Spanish, Portuguese, French, Tagalog, Creole and several dialects of Chinese. The 'Burke team', it boasts, is the 'most diverse' in the union avoidance industry, thus enabling it to 'gain access and acceptance in virtually any employee group.'[4] In addition to its multilingual capabilities, the firm employs several African-American consultants who conduct persuader campaigns involving predominantly black employees (Logan 2004b).

The Burke Group is also the largest union avoidance firm operating in the healthcare sector. Since Congress extended collective bargaining rights to most private-sector healthcare employees in 1974, healthcare has proved a lucrative sector for the union avoidance industry. The most notorious consultant firm of the 1970s and 1980s, Modern Management Methods, specialized in union avoidance campaigns at hospitals and nursing homes. The Burke Group has continued this focus on healthcare campaigns. In 1998, the firm established a separate healthcare division in response to heightened union organizing activity in healthcare and it has since surpassed

© Blackwell Publishing Ltd/London School of Economics 2006.

Missouri-based Management Science Associates as the most active firm operating in the sector. The firm's web site lists over 30 recent successful healthcare campaigns, and its consultant roster includes eight former healthcare industry executives, five registered nurses, and Susan Harris, a former president of the healthcare union, the California Nurses Association, who is currently president of its healthcare division.

As private-sector union decline in the United States has continued apace, several consultant firms have sought to export their union avoidance expertise. Since 2000, the Burke Group has established an international division, TBG, which operates in Canada, Mexico, Puerto Rico, US Virgin Islands, United Kingdom, Belgium, France and Germany. It tells clients that TBG enjoys an international reputation for 'eliminating union incursions.'[5] In recent years, TBG has conducted several campaigns in the UK, including those at T-Mobile, Amazon.co.uk, Virgin Atlantic, Honeywell, GE Caledonian, Eaton Corporation, Calor Gas and Silberline Ltd. In all of its campaigns, the Burke Group prefers to operate 'beneath the radar', using local management and supervisors to implement its tactics. Thus, most of the UK unions that have encountered Burke campaigns have been oblivious to the firm's presence. The British union involved in the organizing drive at Amazon, the Graphical Print and Media Union (GPMU), stated that the company had mounted the most aggressive union avoidance campaign it had ever encountered, accusing it of sacking one union activist and committing other illegal practices. 'We had never faced this level of serious professional resistance before', reported the union's lead organizer, after the GPMU had received fewer votes than it had members in a company-sponsored ballot (Overell 2004). GPMU officials were unaware that TBG was running Amazon's campaign, as were two academics who subsequently provided an otherwise insightful analysis of the organizing drive (Kelly and Badigannavar 2004: 44–8). In June 2004, employees at GE Caledonian in Prestwick delivered a 'humiliating snub' to Amicus after a five-year organizing campaign. Union officials (who, like the GPMU, were unaware of the presence of TBG) stated that they had been 'blown out of the water' and had no idea why employees had rejected the union (*Evening Times* 2002). And after defeating an Amalgamated Engineering and Electrical Union (AEEU) organizing campaign in October 2001, the general manager at Honeywell-Cheadle enthused: 'Congratulations are due to the team at TBG who gave us tremendous guidance and support through the whole process.'[6]

At least one US-based consultant firm, Employment Relations Advisors, Ltd. (ERA), set up a (short-lived) London office. Established by an ex-Burke consultant, Brent Yessin, ERA — whose services include union vulnerability assessments, remaining union free, regaining a union-free workforce and effective strike management — claimed to be the 'first UK consultancy of its kind'. Yessin, who led the Burke campaign at Amazon.co.uk, believes that Britain's union recognition law is more 'employer-friendly' than most companies realize and there is 'really no excuse for losing' an organizing campaign (Overell 2004). In response to such developments, the former general

© Blackwell Publishing Ltd/London School of Economics 2006.

secretary of the Trades Union Congress, John Monks, has criticized consultants for promoting a 'dubious approach' to union recognition, one 'far more suited to the aggressive nature of US industrial relations.' However, unlike in the United States, where no-holds-barred union avoidance campaigns are the norm, in the UK, the evidence to date suggests that consultants still play a relatively minor role (Heery and Simms 2003; Moore 2004). The president of one US consultant firm, John Herman of Labor Relations Services, Inc., told how he had been invited by a group of UK labour attorneys to 'discuss our 30 years knowledge and experience in developing successful counter union organizing strategies.' But Herman lamented that the use of consultants was a 'foreign concept' to the UK attorneys (Herman 2005). The Confederation of British Industry, likewise, claims there is 'little evidence of US-style union busting', and David Burke himself believes that it is too early to tell if there will be a significant market for union avoidance consultants in the UK (Overell 2004). If union avoidance consultants fail to take root to any significant degree in Britain, it will likely be because, in the words of one prominent industrial relations scholar, employer opposition among UK employers 'pales in comparison to the deep anti-union culture that historically and currently pervades US management' (Kochan 2003).

## 3. Union avoidance law firms

In recent years, as the US system of union recognition has become vastly more legalistic, management law firms have played an even more important role in the union avoidance industry than have consultants (Kaufman and Stephan 1995). In the 1970s, large law firms such as New York-based Jackson Lewis, Chicago-based Seyfarth Shaw, San Francisco-based Littler Mendleson, Nashville-based King & Ballow, Atlanta-based Fisher & Phillips, New Orleans-based Kullman & Lang, and Greenville, South Carolina-based Ogletree Deakins became the nation's first law firms to conduct aggressive union avoidance campaigns (*National Law Journal* 1979; Thorner 1980). Prior to the 1970s, this type of work had been conducted largely by consultants rather than by law firms. Lawyers are much less likely than consultants to conduct 'direct persuader activity' (i.e. have face-to-face contact with employees), and, thus, large law firms often work closely with consultants that are known for conducting persuader activity. Union avoidance law firms have grown enormously in size over the past few decades. Seyfarth Shaw's labour and employment law section, for example, employs 300 attorneys (out of a total of 600). Many lawyers who specialize in union avoidance have previously held positions with the national or regional offices of the NLRB. Although he lacked formal legal training, Nathan Shefferman headed the Philadelphia office of the pre-NLRA labour board, and LRA employed lawyers who had previously worked for the NLRB.

Described by one AFL-CIO official as the 'devil incarnate' (Braverman 2002), Jackson Lewis is one of the oldest and largest law firms specializing in

© Blackwell Publishing Ltd/London School of Economics 2006.

union avoidance. The firm employs 378 attorneys in 23 offices throughout the country, and publishes several newsletters (including one devoted entirely to union avoidance, *union kNOw*). Jackson Lewis lawyers have written dozens of papers on how to remain union free. In 1972, Jackson Lewis partners Robert Lewis and William Krupman published the union avoidance handbook, *Winning NLRB Elections*, which, now in its fourth edition, is probably the best-known guide to defeating organizing campaigns (Lewis and Krupman 1997). Jackson Lewis runs union avoidance seminars throughout the country, which typically last two to three days and cost over US$1,000 to attend. In the 1970s and 1980s, its lawyers appeared at hundreds of seminars alongside other union avoidance 'gurus', such as psychologist Charles Hughes and lawyer Alfred DeMaria. Calling itself 'management's number 1 choice for union avoidance training', the firm uses its seminars to solicit new clients, stressing that 'militant organizing unions' such as SEIU are targeting firms in hitherto union-free sectors of the economy.

According to its web site, Jackson Lewis has placed 'a high premium on preventive strategies' for over 45 years, and has 'assisted many employers in winning NLRB elections or in avoiding union elections altogether'. Jackson Lewis lawyers charge US$200–300 per hour for their services, and their campaigns frequently cost between tens of thousands to several million dollars. The firm's clients have included several of the nation's largest and best-known corporations (McManus 1997; Rudmin 2004). Between 70 to 80 per cent of the firm's practice consists of employment-related litigation. The firm has been involved in several campaigns involving allegations of unfair labour practices, such as the infamous *New York Daily News* campaign in the mid-1990s. As part of an industry that profits from promoting conflict in labour–management relations, Jackson Lewis, in common with many union avoidance firms, has used militant anti-union rhetoric when marketing its services to employers. It has encouraged employers to treat union organizers like they would treat a 'contagious disease' and to inoculate their employees against the 'union virus' (Jackson Lewis 2003). Since 2001, the firm has been running seminars titled, 'Union Avoidance War Games'. Alongside a graphic of a bomb dropping, the seminar brochure warns employers not to be 'lulled into a false sense of security — *this is war*'. It states that participants will experience 'first-hand the *battlefield conditions* of union organizing', and suggests that, when dealing with the union 'threat', 'War is hel . . . pful' (Jackson Lewis 2001).

London-born lawyer, Louis Jackson, formed the firm together with New York-born Robert Lewis in 1958. According to one veteran labour arbitrator, Jackson and Lewis were 'anti-union from the start. And they win' (Braverman 2002). Jackson learned his union avoidance trade with Nathan Shefferman's LRA, heading the firm's New York office. After it became the subject of congressional investigations, Jackson left LRA in 1957 and quickly recruited several of LRA's consultants, including his New York assistant, Robert Lewis, and its client base. The firm added two additional partners, Thomas Schnitzler and William Krupman, in the 1960s and 1970s (Thorner 1980).

© Blackwell Publishing Ltd/London School of Economics 2006.

660    *British Journal of Industrial Relations*

Like many union avoidance firms, Jackson Lewis expanded significantly in the 1970s and 1980s, a period when employers aggressively opposed efforts to organize non-union workplaces, rolled back union gains and, in some cases, unloaded existing unions. The decisions of the Reagan NLRB in the 1980s expanded both the scope for employer campaigns and the influence of union avoidance law firms such as Jackson Lewis (Brudney 2005a; Coleman 1987; Flynn 2000; Gross 1995: 242–77). One of the nation's first law firms to specialize in union avoidance, Jackson Lewis conducted hundreds of campaigns at hospitals and nursing homes in the 1970s and 1980s, and quickly developed a reputation for no-holds-barred campaigns (*National Law Journal* 1979; Thorner 1980). In more recent years, the firm has run union avoidance campaigns in, among others, the non-profit, hospitality and gaming industries.

While conducting its healthcare campaigns, Jackson Lewis has been paid millions of dollars by employers who receive public funds. In the late 1970s, Jackson Lewis received hundred of thousands of dollars of state Medicaid funds to orchestrate union avoidance and strike-breaking campaigns at several nursing homes in New York State. As a result, the New York State Legislature held hearings into the public subsidy of union avoidance activities, but declined to pass legislation restricting the practice (New York State Legislature 1981). More recently, the Center for Cerebral Palsy in Albany, NY, another major recipient of state Medicaid funds, hired Jackson Lewis to fight a UNITE organizing drive. This campaign led indirectly to the enactment of New York State's 'labour neutrality' law in December 2002, which prohibited the use of public funds for the payment of union avoidance law firms and consultants. In May 2005, in a ruling that Jackson Lewis called 'an enormous victory for employers', a district court judge struck down New York's labour neutrality law as pre-empted by the NLRA (*Healthcare Association of New York State, Inc. v. Pataki, N.D.N.Y., No. 1:03-CV-0413, 5/17/05*).

In late 2004, Jackson Lewis made headline news when one of its clients, EnerSys, a multinational manufacturer of industrial batteries, accused the company of malpractice and of advising it to engage in an illegal anti-union campaign (Greenhouse 2004). After an eight-year campaign against the International Union of Electrical Workers (IUE) at its Sumter, South Carolina battery plant, the company agreed to a US\$7.75 million-dollar settlement with the union. Federal officials had accused the firm of committing 120 labour law violations. According to the IUE, Jackson Lewis was 'pretty much running the plant' when management sacked union supporters, illegally assisted a decertification campaign, fired supervisors unwilling to carry out illegal activities, improperly withdrew union recognition and moved production to non-union plants in retaliation for union support. The company had paid Jackson Lewis US\$2.7 million for its services. The EnerSys case has provided a rare insight into the behind-the-scenes role of union avoidance law firms because the company revealed detailed information about Jackson Lewis's campaign (Thirteenth Judicial Circuit, State of South Carolina 2004). At the end of Jackson Lewis's eight-year campaign against the IUE, one

© Blackwell Publishing Ltd/London School of Economics 2006.

ex-EnerSys employee stated: 'After all this . . . I don't think you could pay the people here to join a union' (Greenhouse 2004).

## 4. Personnel psychologists

Industrial psychologists have played an important role in the union avoidance industry since the 1960s. Industrial-organization psychologists in the United States have a long history of antipathy towards organized labour, and unions have repeatedly criticized their obeisance to management (Gillespie 1993; Gordon and Burt 1981; Zichar 2001, 2004). In the 1930s–1960s, in-house and academic psychologists and other behavioural scientists played a key role in developing the personnel policies of leading non-union corporations such as Sears, Roebuck & Co (Baritz 1960; Jacoby 1997: 95–11). In the 1950s, Nathan Shefferman — who had worked as Sears' internal union avoidance expert — introduced some basic psychological techniques into the union avoidance industry, such as surveys and aptitude tests designed to reveal the union sympathies of potential employees. But Shefferman had little formal training in the behavioural sciences and employed psychological techniques in a mechanistic and unsophisticated manner (Jacoby 1997: 130–142; Shefferman 1961). In the 1960s and 1970s, a new generation of professionally trained industrial/ personnel psychologists, more overtly focused on combating unionization than their predecessors, introduced sophisticated behavioural and social science techniques into the union avoidance industry and provided the industry with greater legitimacy. Industrial psychologists developed techniques that have allowed employers to screen out potential union supporters, identify hotspots vulnerable to unionization, and structure the workplace to facilitate the maintenance of a non-union environment. They provided employers with detailed 'psychological profiles' of likely union supporters and opponents, and conducted regular 'audits' to determine a firm's vulnerability to unionization (Stagner 1981). Although not as influential today as they were in the 1960s–1980s, industrial psychologists have left an indelible mark on the union avoidance industry, and, together with human resource experts and lawyers, many large consultant firms employ psychologists among their personnel.

One of the leading psychologists specializing in union avoidance in recent years is Dr. Charles L. Hughes, co-founder of the Dallas-based Center for Values Research (CVR). After gaining a doctorate in management psychology from the University of Houston, Hughes worked in labour relations for IBM and Texas Instruments, both known for their determined and sophisticated opposition to unionization. Hughes worked as a corporate management consultant at IBM headquarters from 1959 to 1964 and with Texas Instruments (TI) in several roles, from 1964 to 1974, including director of personnel and organizational development, and manager of corporate industrial relations and compensation. As the nation's third largest non-union firm in the 1970s (after IBM and Eastman Kodak), TI was one of organized labour's top targets. When it came to its hourly paid employees, TI was a typical 'low road'

© Blackwell Publishing Ltd/London School of Economics 2006.

662   *British Journal of Industrial Relations*

employer that paid substandard wages and benefits and experienced extremely high turnover rates. By the late 1970s, the United Auto Workers and International Association of Machinists had spent 25 years and over US$3 million trying to organize the firm's 46,000 employees in 15 US plants, but had failed to organize a single department in any TI plant. The Teamsters had written off TI as a 'hopeless cause'. Hughes' successor as corporate labour relations at TI explained, 'TI has a no union policy with a capital P' (Nissen 1978).

As firms grew more confident about resisting unionization in the early 1970s, Hughes was spending an increasing amount of his time explaining TI's union-free philosophy and practices to visiting personnel managers from other companies. Hughes assured these visitors that the experience of firms such as TI, IBM and Eastman Kodak confirmed that unionization was 'not inevitable'. With the encouragement of a former American Management Association official who established Executive Enterprises, Inc. (a firm that organizes union avoidance seminars), Hughes left TI to establish his own consultancy business. Along with accountant and fellow TI consultant, Dr. Vincent S. Flowers, Hughes established CVR in 1974 'to assist organizations that choose to be union free'. A decade later, CVR had trained over 27,000 managers and supervisors to 'make unions unnecessary' and had surveyed the attitudes of over a quarter of million employees in over 400 organizations. CVR claimed that Hughes was 'internationally recognized for his 30 years as the leader of the union free movement', and Hughes boasted, 'We have never had a union free client become unionized' (Hughes 1984). Today, Hughes claims that 4,000 organizations and almost one million employees have participated in CVR surveys, seminars, and consulting, and that he has had only one client fall victim to unionization, an auto parts supplier that was organized by the United Auto Workers (interview with Charles Hughes, August 7, 2005).

Hughes is best known for his union avoidance manual, *Making Unions Unnecessary*, which is now in its third edition and has sold over 140,000 copies (Hughes 2000; email message from Charles Hughes to author, August 17, 2005). He has published several other guidebooks, pamphlets, and a monthly newsletter, *Hughes Views*, on remaining union free. In the 1970s and 1980s, under the auspices of Executive Enterprises, Inc., Hughes has conducted hundreds of seminars throughout the country for employers seeking to remain union free or unload existing unions, along with lawyers from Jackson Lewis and other prominent union avoidance lawyers, such as New York-based Al DeMaria (author of *The Complete Guide to Decertification*) and Philadelphia-based Stephen Cabot (Martin 1979). In recent years, Hughes has conducted seminars in Dallas four times per year and in-house seminars for many of his clients. In addition to his US clients, Hughes works for several foreign multinational corporations operating in the United States, and for non-union companies in Canada and Mexico, part of his business that has grown since the launch of the North American Free Trade Alliance (NAFTA) in January 1994. Over the past three decades, CVR clients have included

© Blackwell Publishing Ltd/London School of Economics 2006.

dozens of well-known corporations, such as Mercedes-Benz, MasterCard, Best Buy, Borg-Warner, Hershey Chocolate, Hyundai Motor, Iams, International Paper, Johnson Controls, and Nabisco (interview with Charles Hughes, August 7, 2005).

Most union avoidance consultants and law firms pay lip service to 'preventive' or 'positive' labour relations (i.e. solving workplace problems so that unions are rendered unnecessary). In reality, however, the vast majority of their work consists of running union avoidance campaigns, as employers hire them only when confronted by organizing drives. Hughes, in contrast, tries to ensure that his clients never face, and he prefers not to work on, union organizing campaigns (email message from Charles Hughes to author, August 17, 2005). While Hughes still works for a few electronics firms, most of his clients are now in heavy manufacturing, distribution and mining. Several CVR clients are auto parts vendors — a predominantly non-union sector — that supply both union and non-union assembly companies. In recent years, auto parts suppliers have become one of the principal organizing targets of the United Auto Workers Union (UAW).

Hughes believes that his clients know exactly why they want to remain union free before they contact CVR. These firms believe that, from a cost and flexibility viewpoint, it is essential that they remain non-union, but are more concerned about the 'control gap' than the 'wage gap' (Bonner 1975). Employer anti-unionism in the United States is grounded in rational economic and job-control considerations. In both wages and benefits, unionized employees do better than their non-union counterparts, and, in a system of decentralized collective bargaining with low union density in most sectors, employers have significant financial incentives to oppose unions (Flanagan 1999; Jacoby 1991). In manufacturing, the so-called union mark-up has increased as the unionized proportion of the workforce had decreased (Hirsch and Schumacher 2001; Strauss 1995). But even more important than the wage gap, Hughes believes, is the 'control gap', i.e. the fact that in the United States, unlike most liberal democracies, absent a union, employers enjoy virtual unilateral control of the workplace. The form of 'job-control unionism' that has developed in the United States over the past half-century entails a significant loss of managerial authority, thereby heightening the incentives for employers who are unaccustomed to sharing control over the workplace to resist unionization. Hughes believes that his clients' fear of the competitive disadvantages associated with unionization in terms of increased costs and reduced flexibility is so intense that, if one of their plants were the subject of a *failed* organizing campaign, the company would fire the plant manager, line manager and HR manager (email message from Charles Hughes to author, August 17, 2005).

Approximately two-thirds of CVR's work consists of conducting Employee Attitude Surveys (EAS) for its non-union clients. Prominent non-union firms such as Sears, Roebuck & Co. first used EAS in the 1930s–1960s (Jacoby 1986). Developed by the University of Chicago Sociology Department, EAS allowed firms to identify unionization vulnerabilities, and firms using EAS

© Blackwell Publishing Ltd/London School of Economics 2006.

664    *British Journal of Industrial Relations*

often knew more about their workers' attitudes towards unionization than did the unions attempting to organize them. EAS experienced a lull in popularity in the immediate post-Second World War decades, but demand for them grew again in the 1970s and 1980s. By 1981, 45 per cent of manufacturing firms were conducting EAS, up from 21 per cent 20 years earlier (Jacoby 1988). This surge in popularity is in part attributable to a growing hostility towards unionization among American managers and their belief in the utility of the EAS in defeating organizing campaigns (Foulkes 1980: 263; Hammer and Smith 1978). Hughes claims that CVR was the first union avoidance firm to introduce in 1974 a more specialized version of the EAS, the Union Vulnerability Audit (UVA), which allows management to pinpoint potential unionization hotspots with greater accuracy, and that it has the only EAS with a 'proven' UVA. Hughes, who first worked with the EAS during his tenure at IBM and TI, says that many of his clients are attracted to the CVR primarily by the UVA and its role in counteracting unionization. By the 1990s, UVA had become popular with several prominent non-union corporations.

Hughes' non-union philosophy is clearly evident in his many publications on union avoidance. Hughes believes that management, employees and the general public all benefit from union-free organizations: 'The only groups that don't benefit from a union-free operation are the unions themselves . . . Their third party function is eliminated, and their service charges stop' (Hughes 1984). Like many union avoidance practitioners, Hughes equates unionization with poor management and bad employee relations policies. Indeed, Hughes claims to have coined the phrase, 'Any management that gets a union deserves it.'[8] While Hughes accepts that many union avoidance practitioners are motivated by an anti-union animus, he rejects suggestions that his own activities are in any way related to union busting. Unions have accused Hughes and other industrial psychologists of using subtle forms of manipulation and intimidation to ensure that employees are prevented from organizing. But Hughes sees things differently: 'If the goal is to fight unions . . . it could be called union busting. If the goal is good employee relations and the side effect is a union-free organization, I would call it class management. Take your choice . . . The message is not anti-union. Its theme is simply, "Unions are unnecessary for those who work in our organization"' (Hughes 1984).

Hughes recommends that companies state explicitly their dedication to a union-free environment. He suggests that, from the point that employees are first hired, firms tell them: 'This is a union-free operation, and it is our desire that it always will be that way' (Hughes 1984; Hughes and DeMaria 1984). Hughes stresses that managers and supervisors must be willing and able to convey the firm's union-free philosophy. Indeed, he views this as a proxy for his or her loyalty to the firm: 'Every person in a leadership role must accept the union-free responsibility as part of the job, or leave . . . Disagreement with or deviation from this goal cannot be tolerated on the part of any manager or supervisor.' As to what to do with those who are unwilling or unable to commit to the firm's union-free goals, Hughes suggests that employers 'place

© Blackwell Publishing Ltd/London School of Economics 2006.

them with your competitors . . . Either they share in the belief system or they cannot be managers in your organization' (Hughes 1984). In the 1970s–1990s, a growing number of corporations issued explicit statements of their union-free philosophies. Reflecting the growing popularity of union-free statements, the National Association of Manufacturers' Council on a Union-Free Environment published a booklet, *Union-Free Position Statements — Samples from 50 Companies* (by Edward J. Dowd, Jr.).

Hughes reports some drop in business over the past two decades as unions have declined in strength and numbers and many employers have become less concerned about the threat of unionization. According to one recent survey, almost half of HR managers believe that there is little or no concern about unions at their organizations.[9] However, because his main business is in manufacturing, where the unionization rate is considerably higher than in services and agriculture, Hughes remains confident that he will have enough business for the foreseeable future (interview with Charles Hughes, August 7, 2005).


## 5. Strike management firms

Strikebreaking firms have existed in the United States since the era of the Pinkerton Detective Agency in the nineteenth century, and played key roles in the upheavals of the post-First World War and the Great Depression eras (Huberman 1966). In the past three decades, a new generation of 'strike management firms' has played an often-critical function in economic disputes, largely due to an increase in the number of strikes involving permanent replacements. US employers have enjoyed the right to permanently replace economic strikers since the Supreme Court's 1937 *MacKay Radio & Telegraph* decision. Prior to the 1970s, however, strikes involving permanent replacement workers were relatively rare and for the most part restricted to the South and other regions where unions were weak (Logan 2004a).

By the 1970s, several factors — technological innovation, the rise of the multi-plant conglomerate, and a growing number of workers willing to take the jobs of strikers — had facilitated production during strikes. But sophisticated strike management firms that provide employers with replacement workers and workplace security have also shifted the balance of power in economic disputes in management's favour. Firms such as VI, Special Response Corporation, Wackenhut, M.I. Services, Inc., BE&K, and Alternative Workforce have played key roles in dozens of high-profile economic strikes since the 1970s, including many of the most acrimonious disputes of recent years (Logan 2004a). As they provide security during both organizing campaigns and strikes, many of these firms have developed close relationships with consultants and law firms specializing in union avoidance. Like consultants and law firms, strike management firms have benefited from national political developments. Ronald Reagan's decision to replace striking air traffic controllers in 1981 encouraged employers who were seeking to replace their

© Blackwell Publishing Ltd/London School of Economics 2006.

own striking employees and boosted the entire strike management industry (Lambert 2005: 150–66; Logan 2004a).

Perhaps the best-known strike management firm of recent years is Oakton, Virginia-based VI, which claims to be the nation's 'largest and most respected provider of labor disruption security' (Vance International, Inc. 2001). The firm — which has regional offices in Los Angeles, Minneapolis, Ottawa, Mexico City, London, and Sao Paulo — boasts that it has more than 20 years experience handling strikes and picket lines. Through its Asset Protection Team (APT) subsidiary, which protects 'people and property during . . . strikes, union organizing drives, and plant closings,' Vance is the 'undisputed leader in the field of labor unrest.'[10] The principal figure in VI is Charles Vance, the president and founder of the company. The former son-in-law of US President Gerald Ford, Vance started a career in law enforcement with the Los Angeles Police Department after graduating from the University of California at Berkeley. He then moved to the US Secret Service, where he remained until 1979. That year Vance founded a security firm, MVM, Inc. in Anaheim, California. In 1984, he sold his interest in MVM and formed Vance International. Vance began recruiting security guards through advertisements in the *National Rifle Association* magazine, *Soldier of Fortune*, *Air Force Times*, and other military and mercenary periodicals. The company relies heavily for personnel on retired and off-duty policy officers, former drugs enforcement agents, armed-forces veterans, retirees from the military's Special Forces divisions, and 'other prestigious federal and municipal law enforcement organizations' (Vance International, Inc. 2001).

Most strike management firms specialize exclusively in workplace security during disputes. A smaller number of firms specialize in providing replacement workers. Vance International provides both workplace security and replacement labour. Vance has been providing workplace security since 1985. In 2000, in response to its clients' requests for a 'single trustworthy' strike management source, Vance created its 'Secure Distribution Team', which specialized in supplying replacement distribution and warehouse workers during strikes. As it 'broadened its capabilities' in the area of replacement labour, however, the subsidiary was renamed the 'Workforce Staffing Team' (WST). The WST subsidiary has manufactured tiles for the aviation industry, assembled motor parts, moved heavy equipment, driven truckloads of groceries, and each month it adds new categories to its 'roster of specialties' (Vance International, Inc. 2001).

Although troubled by the activities of all strike management firms, unions have viewed Vance's high-level connections to the intelligence and law enforcement communities as a particular threat to their activities. His standing and credibility among federal law enforcement agencies, combined with his secret service training, puts Vance in a strong position to stimulate criminal investigations against union members, as well as to provide evidence to companies that wish to litigate against unions. Vance's APT claims to have 'reinvented' strike security by 'using photography and video to document unfair union practices' (Vance International, Inc. 2001). Critics contend that

© Blackwell Publishing Ltd/London School of Economics 2006.

*The Union Avoidance Industry in the USA*    667

it operates as a private army and strikebreaking service, and the operations of Vance's APT subsidiary on behalf of management are not unlike those of a mini-police force. But the firm has also introduced a new level of sophistication into the strike management industry. Its security guards are outfitted with high-tech, state-of-the-art law enforcement equipment. In the 1980s and 1990s, Vance allegedly operated a paramilitary training 'farm' where he prepared his security forces for action. In the late 1980s, the firm charged US$150–200 a day for each agent in the field (*U.S. News & World Report* 1989). Vance states that its security team acts as a 'peace-keeping force' during potentially disruptive situations, while unions call them a 'renegade bunch of thugs'. They consider VI and other 'twenty-first century Pinkertons' as 'provocateurs of violence' and 'high-tech goon squads', and have accused Vance of inciting violence at Pittston Coal, Detroit Newspaper, and other acrimonious strikes.

For much of the firm's early career, Vance International managed to maintain a low profile. The firm's first strike security job was in the Appalachian coalfields in 1985. It now claims to have provided workplace protection to more than 900 clients, including at the sites of several major strikes in recent years: Caterpillar, Bridgestone-Firestone, McDonnell Douglas, UPS, Seattle Times, and 'hundreds of small situations that were nonetheless crucial to the businesses involved'. VI first attracted national media attention during the Detroit newspaper strike in the mid-1990s, when nearly 2,500 workers in five unions at the *Detroit Free Press* and *Detroit News* went on strike for 583 days. As a result of additional work conducted during the Detroit newspaper and Caterpillar strikes, Vance posted record revenues of US$90 million in the fiscal year 1996. By 1998, it was a US$75 million-a-year business with 2,000 employees and a 20 per cent annual growth rate (Hoover 1997; Munson 1998). Although the vast majority of Vance's strike work has been in the United States, it also provides workplace security for firms in Ontario and has maintained a Canadian subsidiary since 1995, shortly after the launch of NAFTA.

By the late 1980s, strike management was, according to one account, 'one of the fastest-growing specialties in the security industry' (*U.S. News & World Report* 1989). But strike management firms have become victims of their own success. As firms such as VI have helped transform economic strikes into a virtually suicidal tactic for US unions, their business has suffered accordingly. In 2005, there were just 22 strikes in the United States involving 1,000 or more workers, down from 424 major strikes in 1974 (Bureau of Labor Statistics 2006). As strike rates in the United States have plummeted to historic low levels, the demand for strike management firms has also declined. Labour disputes now constitute a smaller proportion of the overall business of security firms such as VI. In addition to its strike work, Vance provides executive protection, investigates current and prospective employees, and consults on security matters for corporations, governments and wealthy individuals around the world. However, Chuck Vance still considers labour disputes the core of his business and strike management firms continue to play an often-critical role in large industrial disputes. In the 2003–2004 southern California

© Blackwell Publishing Ltd/London School of Economics 2006.

668    *British Journal of Industrial Relations*

supermarket strike. one veteran of the strike management business, Clifford Nuckols (founder of Cincinnati-based Nuckols & Associates and Personnel Support Systems, Inc.), provided replacements and security for truck drivers who crossed the picket lines of striking United Food & Commercial Workers (UFCW) members (Cleeland and Fulmer 2003). The ability to continue with stock deliveries was critical to the companies' victory in the four-and-a-half month long dispute, which involved over 70,000 grocery workers. VI provided security during the landmark 91-day Northwest Airlines' dispute in 2005. Northwest hired 1,900 replacement mechanics and spent over 18 months in elaborate preparations for the strike. which ended in a resounding defeat for the union (Maynard 2005).

## 6. Conclusion

Following the lead of Nathan Shefferman's LRA in the 1950s, virtually all consultant firms have claimed over 90 per cent victory rates. Consultants' reputations, and thus their business success, depend on their claims of success in virtually all organizing campaigns, *especially* those in which a majority of employees desire union representation prior to their engagement. While it is unlikely that any union avoidance firm enjoys that level of success (Imberman 1980), the union avoidance industry has contributed to the formidable obstacles facing organized labour in the United States. However, it appears that, as unions have continued to decline in strength and numbers, consultants and lawyers have become alarmed at their apparent success. After all, if private-sector unions were to disappear altogether, they would have no business left. Firms like the Burke Group and Jackson Lewis have used the split in the AFL-CIO in 2005 to caution employers that it is critical that they take preventive measures to prepare for a divided, but reinvigorated, labour movement before it is too late. The Eastern Division President Burke Group recently warned its clients: 'Now is the time to be proactive . . . Meet with a consultant and have them come to give your business a check up, before the wolf is at your door' (Zigray 2005). Jackson Lewis has cautioned that the split in the AFL-CIO would have an 'immediate impact': 'The widely reported dispute within organized labor . . . should not lull employers into thinking this is a death knell for unions. In fact, the most likely results of the current rift will be an increase in union organizing activity.' Jackson Lewis partner William Krupman argues that the division within the labour movement 'should not be a reason for employers to breathe more easily — indeed, just the opposite is true . . . On the whole, the most noticeable effect for many employers will be greater anxiety over remaining union free' (Krupman 2005). Industrial psychologist Charles Hughes reports some decline in business, as employers have become less concerned, and more complacent, about the threat of unionization. But Hughes remains confident about recruiting and retaining clients in the relatively highly unionized manufacturing sector. Strike management firms may also have been too successful for their own

© Blackwell Publishing Ltd/London School of Economics 2006.

good. As they have helped transform strikes into a suicidal weapon for unions and economic strikes have declined precipitously in number, strike management firms have either started to specialize in organizing hotspots such as healthcare or have sought to diversify and internationalize their businesses.

But one should not exaggerate the 'crisis' faced by the union avoidance industry in the United States. According to *Fortune Magazine*, most American employers 'greet the prospect of unionization with the enthusiasm that medieval Europeans reserved for an outbreak of the Black Death' (Murphy 2004). While there are complex historic and cultural reasons why American employers are more hostile to unions than are employers in other developed nations (Adams 2006; Estlund 2002; Godard 2002; Jacoby 1991), union avoidance experts have contributed to the intensely adversarial nature of industrial relations in the United States. Union avoidance experts have not been the major cause of union decline in the United States in the past half-century; nor have they been the sole source of the intensification of employer opposition to unionization since the 1970s. And employers do not unthinkingly or uncritically adopt the attitudes and advice of union avoidance experts (Sturdy 1997, 2004; Wright 2002; Wright and Kitay 2004). But they have contributed to the transformation of organizing campaigns into all-out struggles to the death. By developing and popularizing effective union avoidance strategies, consultants and others have made themselves an indispensable component of employers' anti-union arsenal (Logan 2002).

Partly in response to the tactics of union avoidance experts, the past decade has witnessed a 'paradigm shift' in union organizing strategies (Brudney 2005b), which one scholar has called the 'newest civil rights movement' (Hartley 2001). In response to the impact of aggressive and sophisticated employer opposition, unions have increasingly turned to card check recognition and neutrality agreements during organizing campaigns (Eaton and Kriesky 2001; Hartley 2001), both of which minimize the role of consultants and other union avoidance experts. Unions such as the UAW and UFCW pioneered card check/neutrality agreements in the 1970s and 1980s, and many more unions have embraced this tactic in recent years. But even the most sophisticated of unions have been unable to counteract the impact of union avoidance experts altogether. Three-quarters of employers still retain the services of consultants when confronted by an organizing campaign, and consultants and lawyers have harnessed digital technologies to advertise their services and implement their tactics more effectively. High-profile strikes such as the 2004 California supermarket strike and the 2005 Northwest Airlines strike demonstrate that there is still a strong demand for the services of strike management firms. And if the experience of the Clinton Administration is a guide, any attempt by unions to change the rules on consultant and employer reporting under a future Democratic presidency will likely meet with vigorous resistance from employer organizations. It appears that union avoidance experts will continue to play an important role in US industrial relations for some time to come.

Final version accepted on 13 September 2006.

© Blackwell Publishing Ltd/London School of Economics 2006.

670   *British Journal of Industrial Relations*

## Acknowledgements

The author would like to thank the editors and anonymous referees of this journal for comments on a previous draft of the paper.

## Notes

1. Primary sources consulted include the records of the industrial union, organizing, public policy and legislative departments of the American Federation of Labor-Congress of Industrial Organizations (AFL-CIO), Washington, DC, and the Los Angeles and Orange Counties Organizing Committee, AFL-CIO, Los Angeles. The paper also draws on consultant publications, government records, trade journals, other secondary sources, and interviews with union officials and union avoidance practitioners.
2. John Grant, Director, Advanced Management Research. 'How to Stay Union-Free' (no date; filed in AFL-CIO Industrial Union Department records in December 1979).
3. Burke Group website at: www.djburke.com. Access to most of the firm's web site is now password controlled.
4. Labor Information Services (the division of the Burke Group that conducts 'persuader' activity) web site at: www.laborinformationservices.com/
5. Burke Group web site at: www.tbglabor.com/press6.htm
6. Burke Group web site at: www.djburke.com/clients.aspx?view=testimonials
7. John Monks, General Secretary, Trades Union Congress, letter to Keith James, Chairman, Eversheds, July 4, 2000.
8. According to consultant John Sheridan, Nathan Shefferman first popularized the notion that employees vote not for the union, but for or against management (Sheridan 1980).
9. In a recent survey of 557 HR managers of large companies by Business and Legal Reports, 43 per cent of respondents said there was no concern about union activities at their company; a further quarter described the level of concern as 'low'. Only seven per cent reported that there was a high level of concern (*Washington Post* 2005).
10. Vance International web site at www.vanceglobal.com

## References

Adams, R. (2006). 'America's union-free movement in light of international human rights standards'. In R. Block, S. Friedman, M. Kaminski and A. Levin (eds.), *Justice on the Job: Perspectives on the Erosion of Collective Bargaining in the United States*. Kalamazoo, MI: W. E. Upjohn Institute for Employment Research, pp. 215–30.

Baritz, L. (1960). *The Servants of Power: A History of the Use of Social Science in American Industry*. Middleton, CT: Wesleyan University Press.

Bonner, R. (1975). Firms encourage unions. *Dallas Times Herald*, March 4, D-7.

Braverman, P. (2002). 'Manhandled'. *The American Lawyer*. Available at http://www.law.com/jsp/law/LawArticleFriendly.jsp?id=1024079079379.

© Blackwell Publishing Ltd/London School of Economics 2006.

Bronfenbrenner, K. (1994). 'Employer behavior in certification elections and first contract campaigns: implications for labor law reform'. In S. Friedman, R. Hurd, R. Oswald and R. Seeber (eds.), *Restoring the Promise of American Labor Law*. Ithaca, NY: Cornell University Press, pp. 75–89.

Bronfenbrenner, K. and Hickey, R. (2004). 'Changing to organize: a national assessment of union organizing strategies'. In R. Milkman and K. Voss (eds.), *Rebuilding Labor: Organizing and Organizers in the New Union Movement*. Ithaca, NY: Cornell University Press, pp. 17–61.

Brudney. J. (2005a). 'Isolated and politicized: the NLRB's uncertain future'. *Comparative Labor Law and Policy Journal*, 26: 221–60.

—— (2005b). 'Neutrality agreements & card check recognition: prospects for changing paradigms'. *Iowa Law Review*, 90: 819–86.

Bureau of Labor Statistics (2006). 'Work stoppages involving 1,000 or more workers, 1947–2005'. Washington, DC: Bureau National Affairs. Available at http://www.bls.gov/news.release/wkstp.t01.htm.

Cleeland, N. and Fulmer, M. (2003). 'Veteran strikebreaker helps keep Ralphs supplied'. *Los Angeles Times*, 19 December: A–1.

Coleman, F. (1987). 'The new, "new" Reagan National Labor Relations Board and the outlook for the future'. *Federal Bar News and Journal*, 34: 255–65.

Daily Labor Report (1998). 'IBEW, Baltimore gas agree to hold rerun election, settle NLRB claims'. Washington, DC: Bureau National Affairs. 16 June, AA–1.

—— (2001). 'Broadened LMRDA reporting requirements for labor relations consultants rescinded'. Washington, DC: Bureau National Affairs. 11 April, AA–1.

Dark, T. (1999). *The Unions and the Democrats: An Enduring Alliance*. Ithaca, NY: Cornell University Press.

Eaton, A. and Kriesky, J. (2001). 'Union organizing under neutrality and card check agreements'. *Industrial and Labor Relations Review*, 55: 42–59.

Estlund, C. (2002). 'The ossification of American labor law'. *Columbia Law Review*, 102: 1527–612.

Evening Times (2002). 'Aerospace workers vote against union recognition'. 4 June.

Farber. H. and Western. B. (2002). 'Ronald Reagan and the politics of declining union organization'. *British Journal of Industrial Relations*, 40: 385–401.

Flanagan, R. (1999). 'Macroeconomic performance and collective bargaining: an international perspective'. *Journal of Economic Literature*, 37: 1150–75.

Flint, J. (1979). 'A new breed — professional union breakers'. *Forbes*, 25 June.

Flynn. J. (2000). 'A quiet revolution at the labor board: the transformation of the NLRB'. *Ohio State Law Journal*, 61: 1361–1455.

Foulkes, F. (1980). *Personnel Policies of Large Nonunion Companies*. Englewood Cliffs, NJ: Prentice-Hall, Inc.

Freeman, R. and Medoff, J. (1984). *What Do Unions Do?* New York: Basic Books.

Gillespie, R. (1993). *Manufacturing Knowledge: A History of the Hawthorne Experiments*. Cambridge: Cambridge University Press.

Godard, J. (2002). 'Institutional environments, employer practices, and states in liberal market economies'. *Industrial Relations*, 41: 249–86.

—— (2003). 'Do labor laws matter? The density decline and convergence thesis revisited'. *Industrial Relations*, 42: 458–92.

Goldfield. M. (1987). *The Decline of Organized Labor in the United States*. Chicago, IL: University of Chicago Press.

Gordon, M. and Burt, R. (1981). 'Industrial psychology's relationship with American unions'. *International Review of Applied Psychology*, 30: 137–56.

672  *British Journal of Industrial Relations*

Greenhouse, S. (2004). 'How do you drive out a union? South Carolina factory provides a textbook case'. *New York Times*, 14 December, A–1.

Gross. J. (1995). *Broken Promise: The Subversion of American Labor Law, 1947–1994*. Philadelphia, PA: Temple University Press.

Hammer, W. and Smith, F. (1978). 'Work attitudes as predictors of unionization activity'. *Journal of Applied Psychology*, 63: 415–21.

Hartley. R. (2001). 'Non-legislative labor law reform & pre-recognition labor neutrality agreements: the newest civil rights movement'. *Berkeley Journal of Employment and Labor Law*, 22: 369–408.

Heery, E. and Simms, M. (2003). *Bargain or Bust? Employer Responses to Union Organising*. London: Trades Union Congress, Organising the Future Series.

Herman, J. (2005). 'What is a registered persuader?' *PTI Power Source Newsletter*. Available at http://www.djburke.com/news.aspx?newsID=88.

Hirsch, B. and Schumacher, E. (2001). 'Private sector union density and the wage premium: past, present, and future'. *Journal of Labor Research*, 22: 487–518.

Hoover. K. (1997). 'Vance gets piece of action at UPS'. *Washington Business Journal*. Available at http://www.bizjournals.com/washington/stories/1997/08/18/story2.html.

Huberman. L. (1966). *The Labor Spy Racket*. New York: Monthly Review Press.

Hughes, C. (1984). *Union Free: A Systematic Approach*. Dallas, TX: Center for Values Research, Inc.

—— (2000). *Making Unions Unnecessary*. Dallas, TX: Center for Values Research, Inc.

Hughes. C. and DeMaria, A. (1984). *Managing to Stay Nonunion*. New York: Executive Enterprises, Inc.

Imberman, W. (1980). 'Hocus pocus in union avoidance'. *Journal of Labor Research*, 1: 275–83.

Jackson Lewis. (2001). 'War is hel...pful: union avoidance training'. *union kNOw*. Available at http://www.jacksonlewis.com/legalupdates/articleprint.cfm?aid=237.

—— (2003). 'Inoculate your employees to the union virus early'. *union kNOw*. Available at http://www.jacksonlewis.com/legalupdates/articleprint.cfm?aid=474.

Jacoby, S. (1986). 'Employee attitude testing at Sears, Roebuck and Company, 1938–1960'. *Business History Review*, 60: 602–32.

—— (1988). 'Employee attitude surveys in American industry: a historical perspective'. *Industrial Relations*, 27: 74–93.

—— (1991). 'American exceptionalism revisited: the importance of management'. In S. Jacoby (ed.), *Masters to Managers: Historical and Comparative Perspectives on American Employers*. New York: Columbia University Press, pp. 173–87.

—— (1997). *Modern Manors: Welfare Capitalism Since the New Deal*. Princeton, NJ: Princeton University Press.

—— (2001). 'Employee representation and corporate governance: a missing link?' *University of Pennsylvania Journal of Labor and Employment Law*, 3: 449–90.

Kaufman, B. and Stephan, P. (1995). 'The role of management attorneys in union organizing'. *Journal of Labor Research*, 16: 439–54.

Kelly, J. and Badigannavar, V. (2004). 'Union organizing'. In J. Kelly and P. Willman (eds.), *Union Organization and Activity*. London: Routledge, pp. 32–50.

Kleiner, M. (2001). 'Intensity of management resistance: understanding the decline of unionization in the private sector'. *Journal of Labor Research*, 22: 519–40.

© Blackwell Publishing Ltd/London School of Economics 2006.

Kochan, T. (2003). 'A US perspective on the future of unions in Britain'. In H. Gospel and S. Wood (eds.), *Representing Workers: Union Recognition and Membership in Britain*. London: Routledge, pp. 166–77.

Kochan, T., Katz, H. and McKersie, R. (1986). *The Transformation of American Industrial Relations*. New York: Basic Books.

Krupman, W. (2005). 'Labor day observance is marked by dramatic changes in future direction of organizing efforts'. Available at http://www.jacksonlewis.com/legalupdates/article.cfm?aid=39.

Lambert, J. (2005). '*If the Workers Took a Notion: The Right to Strike and American Political Development*'. Ithaca, NY: Cornell University Press.

Lawler, J. (1984). 'The influence of management consultants on the outcome of union certification elections'. *Industrial and Labor Relations Review*, 38: 38–51.

—— (1990). *Unionization and Deunionization*. Columbia, SC: University of South Carolina Press.

Levitt, M. (1993). *Confessions of a Union Buster*. New York: Crown Publishers.

Lewis, R. and Krupman, W. (1997). *Winning NLRB Elections: Avoiding Unionization Through Preventive Employee Relations Programs*. Chicago, IL: CCH, Inc.

Logan, J. (2002). 'Consultants, lawyers and the "union free" movement in the United States since the 1970s'. *Industrial Relations Journal*, 33: 197–214.

—— (2004a). 'Labor's "last stand" in national politics? The AFL-CIO's striker replacement campaign, 1990–1994'. In B. Kaufman and D. Lewin (eds.), *Advances in Industrial and Labor Relations*, 13: 191–244.

—— (2004b). 'The fine art of union busting'. *New Labor Forum*, 13: 77–91.

—— (2006). 'Union free — or your money back'. *International Union Rights*, 13: 6–7.

—— (2007). 'Lifting the veil on anti-union activities: consultant and employer reporting under the LMRDA, 1959–2001'. In B. Kaufman and D. Lewin, (eds.), *Advances Industrial and Labor Relations*, 15: 305–43.

Longworth, R. (1979). 'Business is booming for union avoidance'. *Chicago Tribune*, 20 September.

Maher, K. (2005). 'Unions new foe: consultants'. *Wall Street Journal*, 15 August, B–1.

Martin, D. (1979). 'Labor nemesis: when the boss calls in this expert, the union may be in real trouble'. *Wall Street Journal*, 19 November.

Maynard, M. (2005). 'Well-laid plan kept Northwest flying in strike'. *New York Times*, 22 August. A–1.

McManus, T. (1997). 'Unionizing need not be cause of major division'. *Crain's Chicago Business*, 10 November.

Moore, S. (2004). 'Union mobilization and employer counter-mobilization in the statutory union recognition process'. In J. Kelly and P. Willman (eds.), *Union Organization and Activity*. London: Routledge, pp. 7–30.

Munson, C. (1998). 'The way we work: a look at offices of area executives'. *Washington Business Journal*. Available at http://www.bizjournals.com/washington/stories/1998/08/17/focus5.html.

Murphy, R. (2004). 'The persuaders'. *Fortune Magazine*, 22 May.

National Law Journal (1979). 'The firm that wars on unions'. 16 July.

New York State Legislature, Standing Committee on Labor of the Assembly of the State of New York (1981). *The Use of State Medicaid Funds to Encourage and Protract Labor Disputes*. Albany, NY: New York State Legislature, 26 February.

Nicholson, T., Willenson, K. and Morris, H. (1980). 'The union busters'. *Newsweek*, 28 January.

© Blackwell Publishing Ltd/London School of Economics 2006.

674   *British Journal of Industrial Relations*

Nissen, B. (1978). 'At Texas Instruments, if you're pro-union, firm may be anti-you'. *Wall Street Journal*, 1 July, 1.

Northrup, H. (1964). *Boulwarism*. Ann Arbor, MI: University of Michigan Bureau of Industrial Relations, Graduate School of Business.

Overell, S. (2004). 'Consultants do battle with the brotherhoods'. *Financial Times*, 26 April.

Peterson, R., Lee, T. and Finnegan, B. (1992). 'Strategies and tactics in union organizing campaigns'. *Industrial Relations*, 31: 370–81.

Raleigh, T. (1984). 'Adapting to a union-free environment'. *Wall Street Journal*, 22 October.

Rudmin, K. (2004). 'The law firms of choice: who represents America's biggest companies?' *Corporate Council*, 11: 108.

Schatz, R. (1987). *The Electrical Workers: A History of Labor at General Electric and Westinghouse, 1923–1960*. Champaign-Urbana, IL: University of Illinois Press.

Shefferman, N. (1961). *The Man in the Middle*. Garden City, NY: Doubleday and Company, Inc.

Sheridan, J. (1980). 'Management consultants'. *Proceedings of the New York University Conference on Law*, 33: 121–43.

Stagner, R. (1981). 'Training and experiences of some distinguished industrial psychologists'. *American Psychologist*, 36: 497–505.

Strauss, G. (1995). 'Is the New Deal system collapsing? With what might it be replaced?' *Industrial Relations*, 34: 329–49.

Sturdy, A. (1997). 'The consultancy process — an insecure business?' *Journal of Management Studies*, 34: 389–413.

—— (2004). 'The adoption of management ideas and practices: theoretical perspectives and possibilities'. *Management Learning*, 35: 155–79.

Thirteenth Judicial Circuit, State of South Carolina (2004). EnerSys . . . Complaints of Defendants Jackson Lewis LLP . . . Filed in the Court of Common Pleas, Civil Action No. 2004-CP-23-2685, 23 April.

Thorner, J. (1980). 'Specialization pays off for aggressive Jackson Lewis'. *Legal Times of Washington*. 24 November, 23–28.

US House of Representatives (1979). *Pressures in Today's Workplace: Oversight Hearings. Testimony of Herbert Melnick of Modern Management Methods*. House Education and Labor Committee, Report of the House Subcommittee on Labor-Management Relations, Committee on Education and Labor. Washington, DC: US Government Printing Press.

US News and World Report (1989). 'The new lions who guard the gates'. 24 July, 107: 46.

Vance International, Inc. (2001). 'Workforce Staffing Team'. Company brochure.

Washington Post. (2005). 'Union woes'. 3 August.

Wright, C. (2002). 'Promoting demand, gaining legitimacy and broadening expertise: the evolution of consultancy-client relationships in Australia'. In M. Kipping and L. Engwall (eds), *Management Consulting: Emergence and Dynamics of a Knowledge Industry*. Oxford: Oxford University Press, pp. 184–202.

Wright, C. and Kitay, J. (2004). 'Spreading the word: gurus, consultants and the diffusion of the employee relations paradigm in Australia'. *Management Learning*, 3: 271–86.

Zichar, M. (2001). 'Using personality inventories to identify thugs and agitators: applied psychology's contribution to the war against labor'. *Journal of Vocational Behavior*, 59: 149–64.

© Blackwell Publishing Ltd/London School of Economics 2006.

—— (2004). 'An analysis of industrial-organizational psychology's indifference to labor unions in the United States'. *Human Relations*, 57: 145–67.

Zigray, T. (2005). 'Look in the mirror'. *PTI Power Source Newsletter*. Available at http://www.tbglabour.com/news.aspx?newsID=78.

© Blackwell Publishing Ltd/London School of Economics 2006.