# Undermining the Right to Organize:
## Employer Behavior During Union Representation Campaigns

December 2005

Chirag Mehta
Nik Theodore
Center for Urban Economic Development
University of Illinois at Chicago

A Report for American Rights at Work

# ACKNOWLEDGEMENTS

We would like to thank Kate Bronfenbrenner, Fred Feinstein, Kimberly Freeman, Julie Martínez Ortega, and Mary Beth Maxwell for their comments on earlier drafts of this report. We would also like to thank Kate Bronfenbrenner for reviewing the design of the research methodology used for this study. In addition, we thank Amanda Becker, Sarah Beth Coffey, and Marc Doussard for their research assistance.

The authors also gratefully acknowledge all of the union representatives and workers who dedicated countless hours to provide accurate and thorough information that made this investigation possible.

Finally, we acknowledge American Rights at Work and the Rockefeller Foundation for their financial assistance, without which this study could not have been completed.

Additional copies of this report can be downloaded online from the Center for Urban Economic Development website at www.uic.edu/cuppa/uicued.

Please direct questions or requests for further information to:

Nik Theodore
Director
Center for Urban Economic Development
University of Illinois at Chicago
400 S. Peoria St. (MC 345)
Chicago, IL 60607
theodore@uic.edu
312-996-6336

# TABLE OF CONTENTS

Forward ........................................................................................................................4

Executive Summary ......................................................................................................5

Introduction..................................................................................................................6

Employer Interference During Representation Campaigns ..........................................8

Employer Use of Outside Consultants Has Standardized the Message and Tactics ...........................14

The NLRB and Its Failure to Regulate Employer Conduct..................................17

Conclusion ................................................................................................................24

References ..................................................................................................................25

Appendix A: Research Methodology and Sample Characteristics..........................27

Appendix B: Organizing Workers Using an NLRB Election ................................28

Appendix C: Workers' Rights Under the NLRA ..................................................29

Appendix D: Anti-Union Materials..........................................................................31

# FORWARD

By law, employers are prohibited from intimidating, coercing, or firing employees for exercising their right to form unions. Yet each year in the United States, more than 23,000 workers are fired or penalized for union activity. Aided by a weak labor law system that fails to protect workers' rights under the law, employers manipulate the current process of establishing union representation in a manner that undemocratically gives them the power to significantly influence the outcome of union representation elections.

The findings of *Undermining the Right to Organize* confirm that union membership in the United States is not declining because workers no longer want or need unions. Instead, falling union density is directly related to employers' near universal and systematic use of legal and illegal tactics to stymie workers' union organizing.

As a national labor policy and advocacy organization, American Rights at Work commissioned this report to advance public knowledge and understanding of this reality as a crisis in need of immediate redress.

This study contributes to a growing body of research that exposes the erosion of the right of workers to freely and fairly form unions. In 2000, the results of a national survey were published in a paper titled *Uneasy Terrain* by Cornell University professor Kate Bronfenbrenner. This widely referenced and highly respected report provided groundbreaking statistics that defined the scope of unionbusting in the American workplace. *Undermining the Right to Organize*, which comprehensively examines union representation campaigns in metropolitan Chicago, complements Bronfenbrenner's seminal work. This study is significant because its findings show that the national trends exposed in *Uneasy Terrain* persist—or are even worse in many instances—when deeply explored at a local level.

Most alarmingly, when such trends are found in areas with a historically high concentration of union members within the workforce, as is the case in Chicago, one can only imagine how much worse the suppression of union organizing must be in other, less "union friendly" environments.

Above all else, the precarious state of the right to organize in the American workplace should be of concern because of the considerable consequences for labor standards within all American jobs. Research by the Economic Policy Institute confirms that the falling rate of unionization has lowered wages, not just because some workers no longer receive the higher union salaries, but also because there is less pressure on non-union employers to raise salaries. Beyond remuneration, many of the universal workplace standards defining basic health and safety protections, family and medical leave, and workplace conditions that have come to characterize "good American jobs" are modeled after terms set by union members and their employers at the bargaining table.

Ultimately, stemming the erosion of the right to organize in the American workplace must be an essential component of our nation's vision of economic security for all our nation's families.

4

# EXECUTIVE SUMMARY

*Undermining the Right to Organize* examines employer behavior when workers express their desire for a union at work and engage the National Labor Relations Board (NLRB) election process; and the impact of these actions on workers' ability to exercise their legal right to form unions. The findings of this report suggest that unions were unable to maintain worker support throughout the course of representation campaigns because employer interference eroded that support.

Employer interference, characterized by the comprehensive use of various legal and illegal anti-union campaigns, is both pervasive and effective. Among employers faced with organizing campaigns:

- 30 percent fired workers when they engaged in union activities.

- 49 percent threatened to close or relocate all or part of the business if workers elected to form a union.

- 82 percent used consultants to design and coordinate their anti-union campaigns.

The impact of employer anti-union campaigns on the success of union organizing drives has been substantial. For example, in 2002, labor unions filed 179 petitions with the National Labor Relations Board (NLRB) to represent previously unorganized workers at workplaces in the Chicago metropolitan area. In nearly all of the cases, when these petitions were filed, the majority of workers indicated they supported unionization before the election process began. In several cases, unions demonstrated more than 80 percent support. However, unions were victorious in only 31 percent of these campaigns. At some point after workers petitioned for union representation, pro-union workers lost their majority status. We find that:

- Employers frequently delay the NLRB election process, creating additional opportunities to execute anti-union campaigns.

- Penalties under the law for employers who violate workers' rights to organize are too weak to effectively deter misconduct.

- The NLRB has failed to regulate employer conduct in a way that would ensure a fair election process.

The considerable impact of employer anti-union campaigns on the success of union organizing drives in Chicago is not isolated. The findings in this report reaffirm earlier findings about the pervasive nature of employer interference.

The findings of this report are based on the Chicago Representation Campaign (CRC) Survey of 62 union-representation campaigns launched in 2002 and case studies conducted on select organizing drives. Region 13 of the NLRB provided data on all campaigns initiated by unions to represent previously unorganized workers in the Chicago metropolitan area. In addition to the survey data, investigators conducted case studies of 25 campaigns. Case studies include interviews with organizers, workers, and representatives of Region 13 of the NLRB, as well as analysis of public data from the NLRB and other sources.

In conclusion, the decline of union membership in Chicago and across the country must be understood in the context of employer interference and the failure of labor law to protect workers' rights.

# INTRODUCTION

Urban centers with large numbers of workers employed in union-dense industries are the primary battlegrounds for unions in their efforts to protect workers' right to organize. Nowhere is this more the case than Chicago. The Chicago metropolitan area is home to more than 400,000 union members and figures prominently in the history of organized labor. However, over the last several decades the share of the workforce belonging to a union has declined steadily to a point where unions currently represent only a small share of the workforce. In 1986, 19 percent of the private-sector workforce in the Chicago metropolitan area—439,697 workers—was covered by a union contract. (Hirsch and Macpherson 2005) By 2003, that figure had declined to just 12.9 percent (409,807 employed workers).

The decline in union density is a hotly debated topic among unions, workers, and employers, and there is no shortage of explanations. Some observers contend that economic restructuring has led to massive job losses in union-dense industries. Others argue that unions are no longer relevant to workers' needs or that workers have increasingly lost interest in joining unions. An alternative reason for the decline in union density is the impact of employer anti-union behavior during union organizing campaigns on the outcome of union elections. Employers are increasingly using sophisticated tactics to oppose unionization, often in violation of the spirit, if not the letter, of the laws intended to protect workers' right to organize.

The National Labor Relations Act (NLRA) provides the framework of regulations through which employees' legal rights to unionize and collectively bargain with their employer are exercised. The NLRA establishes the "right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Generally, employers are required to collectively bargain with workers over the terms and conditions of their employment if the majority of workers vote in favor of unionization in an election conducted by the NLRB, the federal agency charged with implementing and enforcing the NLRA. Importantly, the NLRA and the case law it has generated delineate the types of employer and union conduct that violate workers' rights during the election process. In cases where either party believes the other has engaged in behavior that violates established rules of fair conduct, an unfair labor practice charge (ULP) may be brought before the NLRB.

Workers and unions contend that the Taft-Hartley Labor Act of 1947, which amended the NLRA, opened the door for employers to routinely violate workers' right to organize and to do so within the scope of the law. Taft-Hartley established the employer free speech clause that permits employers' agents to openly campaign against worker self-organization so long as they do not discriminate against workers who support unionization. However, unions argue that given the considerable latitude employers have been granted to engage in anti-union campaigns, the NLRB election process has ceased to function as a means of democratically deciding whether or not workers want to collectively bargain with their employer.

Estimates from data provided by the NLRB indicate that there is a sound basis to the charge that employers routinely violate workers' right to organize. Employers are savvy in their anti-union activities, devising ways to pressure employees into voting no in representation elections. Some of these tactics fall within the bounds of legality. Many others exist in the gray areas of the law, making ULP charges difficult, if not impossible, for unions to substantiate. These include veiled threats of layoffs made during union organizing campaigns, as well as bogus warnings of plant closings and facility relocations should unions be victorious. Such tactics, as well as many other forms of employer free speech that are directed against unions, are protected under the NLRA, yet they serve

to create a workplace environment characterized by subtle—as well as overt—coercion of union supporters. Many employers take their anti-union tactics even further. For example, they might strategically fire known union supporters. In such cases, while unions may be unable to provide the NLRB with sufficient evidence demonstrating employer retaliation for union activities, these types of anti-union behavior can have a chilling effect on unionization campaigns at the worksite.

This report examines both legal and illegal employer behavior during the NLRB-sanctioned representation election process and the impact of this behavior on election outcomes in Chicago. The first section describes the tactics that employers use in their anti-union campaigns and the impact these tactics have on the outcome of representation elections. The second section examines employers' use of consultants to design and guide anti-union campaigns. The third section explains how labor law fails to deter employers from using illegal tactics that deny workers the opportunity to freely vote in NLRB elections. The final section provides a concluding discussion of the impact of employer interference in union organizing campaigns.

This study is based on the Chicago Representation Campaign (CRC) Survey of 62 campaigns launched in 2002. The year 2002 was chosen because of the likelihood that nearly all of the campaigns launched in that year would have reached a conclusion by 2005, when the study was conducted. The survey documents employer tactics, both legal and illegal. Region 13 of the NLRB provided data on all campaigns launched by unions to represent previously unorganized workers in the Chicago metropolitan area. In addition to the survey data, investigators conducted case studies of 25 campaigns. Case studies include interviews with organizers, workers, and representatives of Region 13 of the NLRB, as well as an analysis of public data from the NLRB and other sources. Appendix A provides a detailed explanation of the methodology used for data collection.

# EMPLOYER INTERFERENCE DURING REPRESENTATION CAMPAIGNS

*NLRB elections are not democratic. Imagine if you were voting in a municipal election and you are supporting the opposition. Imagine that for eight hours every day, for three to four months straight, you are being harassed. You have no right to free speech and you are constantly being threatened. Imagine that if you publicly say you are voting for the opposition, you lose your job. How can you vote freely in that situation? How is that democratic? [Leah Fried and Mark Meinster, organizers with UE, Interview 2004]*

The NLRB election process and the rules governing employer conduct during the election period are intended to allow workers the opportunity to freely decide whether they want to collectively bargain with their employer through the representative of their choosing. However, the NLRB election process also provides employers that are opposed to unionization with ample opportunity to tread on workers' right to a "free choice" before a vote. The findings of the CRC Survey indicate that most employers take full advantage of this opportunity and frequently and successfully use tactics to undermine support for unionization.

The employer refrained from using explicit anti-union tactics in just one of the representation campaigns in the CRC Survey. In the other 61 campaigns, employers used one or more tactics aimed at weakening union support within voting units. According to the NLRB (2005b), the following examples of employer conduct documented in the CRC Survey violate the NLRA:

- Threatening employees with loss of jobs or benefits if they join or vote for a union or engage in protected activity.

- Threatening to close the plant if employees select a union to represent them.

- Questioning employees about their union sympathies or activities in circumstances that tend to interfere with, restrain, or coerce employees in the exercise of their rights under the NLRA.

- Promising benefits to employees to discourage their union support.

- Transferring, laying off, terminating, or assigning more difficult work tasks to employees because they engaged in union or protected activity.

In most cases, employers engaged in a coordinated program of anti-union activity aimed at dissuading employees from voting with the union, often seemingly in violation of the protections afforded to workers by the NLRA. This section examines employer conduct during representation campaigns as well as the impact of this conduct on election outcomes.

## Employer Tactics

The CRC Survey shows that when employers use a broad set of tactics—legal or illegal—they substantially increase the likelihood that the union will lose its majority status within voting units. There is no apparent "tipping point" at which employers using a given number of tactics are assured victory. However, the evidence strongly indicates that employers using a multitude of tactics are more likely to be successful in their efforts to oppose unionization. Table 1 identifies the union success rate based on the number of different tactics that employers used. Nearly 80 percent (n=54) of employers used more than five tactics intended to convince workers to vote against union representation. Unions were victorious in 73 percent of their campaigns where employers used fewer than six out of a possible 30 tactics on which data was collected. The union success rate drops to less than 17 percent when employers used between 11 and 16 anti-union tactics.

**Table 1: Number of tactics used in campaign and union success rate**

| Number of tactics used in campaign | Union success rate |
|---|---|
| 1 to 5 | 73% |
| 6 to 8 | 56% |
| 9 to 10 | 50% |
| 11 to 16 | 17% |

No single tactic appears to dramatically reduce unions' rate of success. Rather, as Table 1 shows, employers are able to decrease the likelihood of union success when they use numerous tactics over the course of an election cycle. The specific tactics that appear to be most effective at undermining workers' support for unionization include promising to improve workers' wages, offering workers bribes and special favors, and threatening to shift production if workers elect for unionization. (Table 2) Through the use of these tactics, employers are able to markedly decrease the likelihood that workers will be successful in organizing.

**Table 2: Employer tactics and union success rate**

| Tactic | Percent of employers using tactic | Union success rate (overall average = 45%) |
|---|---|---|
| Promising to improve wages | 59% | 38% |
| Offering bribes or special favors | 51% | 40% |
| Threatening to close or relocate all or part of the business | 49% | 43% |

Employers' promises to improve wages and offers of bribes and special favors to dissuade workers from voting in favor of unionization are generally considered illegal tactics. Nevertheless, employers use these tactics most frequently, not only because they are effective, but because proving that employers have violated the law is difficult if they deliver their message verbally and if they are less than explicit about the connection between the promises and bribes and their opposition to the union.

The findings from the CRC Survey are consistent with national statistics on employer tactics during representation campaigns. Bronfenbrenner (2000) found that 48 percent of employers used promises of improvements, 34 percent used bribes or special favors, and 51 percent used the threat of full or partial plant closings to convince workers to vote against unionization. Dickens (1983) found that the probability of the average worker voting union is reduced by more than 15 percent in an election in which the employer has threatened or taken action against pro-union employees. Reed (1989) also found that interfering with workers' right to organize significantly reduces the number of pro-union votes.

*Discharging Workers*

The CRC Survey found that 30 percent of employers fired workers for their union activities. In total, employers dismissed at least 67 union activists during the course of the 62 union campaigns under examination. The rate at which employers were found to have fired workers during organizing campaigns in Chicago is comparable to rates nationwide. Bronfenbrenner (2000) found that workers were terminated in 25 percent of campaigns.

Discharging workers is particularly troublesome for unions when employers fire multiple workers in small voting units. One worker explained how he was fired from his job for leading a unionization drive that his union eventually lost:

> [The employer] was treating the other guys like crap. He would work them overtime and then not pay them time and a half. I didn't like that … and I did everything for my employer. Anything he wanted me to do, I did. But I had to fight to get a 25-cent raise. So I called the union. We organized a meeting on a Saturday and I had eight out of 11 guys sign cards right then. When we came into work on Monday, we all wore little union buttons and that's when the boss came up to me and told me to get my tools and get the hell off his property. He fired me and one other guy because he found out that we led the campaign. I just went numb. I couldn't believe it. When we signed those cards, I honestly thought he would sit down with us and listen to what we had to say. I didn't think he could fire me. [Interview Worker #1 2005]

In other cases, the employer discharged workers after they voted in favor of unionization as a form of punishment. Such an action does not change the fact that the union won the campaign, but it does mean that the workers who voted in favor of unionization will not be employed there and enjoy the benefits of a new contract and union representation:

> After the vote, we came into work and the owner told us all to turn in our radios and our T-shirts. He said if I wanted a union job, go to the union and tell them to get you a job because you don't have a job here anymore. He fired us just like that. Most of us now are working in factories making $6 per hour compared to $13 when we had our jobs at the landscaping company. [Interview Worker #6 2005]

*Plant-Closing Threats*

Employers are effective in discouraging workers from supporting unionization when they threaten to close the plant or relocate production if unions are successful. Bronfenbrenner (2000: 53) explained the power of this threat over workers:

> In the current climate of corporate restructuring, burgeoning trade deficits, constantly shifting production, and the fear of job loss they have engendered … most workers take even the most veiled employer plant closing threats very seriously. When combined with other anti-union tactics of employers, as they are in the overwhelming majority of employer campaigns, plant closing threats are extremely effective in undermining union organizing efforts, even in a context where the majority of workers in the unit seem predisposed to support the union at the onset of the organizing campaign.

Often, the threat of closing the company or a cutback in workload is enough to convince workers to withdraw their support for the union. The following accounts reflect the types of threats that employers routinely make during the election process:

> We had the majority of people sign cards when we filed for an election. But the employer was telling workers that they wouldn't be able to get work if there was a union and they would have to layoff people if they couldn't get work. We lost the first election as a result. [Interview Worker #5 2005]

> The owner, when he heard that we were thinking about organizing, he started spreading information that we will lose our jobs. He had some information, that we learned later was false, that workers at another big company in the industry had just organized with the same union and they lost their jobs. That kind of scared us. A lot of my coworkers were willing to give the owner another chance after we heard that. [Interview Worker #7 2005]

Employers recognize the value that plant-closing threats add to an overall anti-union strategy, and they frequently issue such threats even when they do not intend to carry them out. Bronfenbrenner (1997) found that half of all employers involved in union organizing campaigns nationally issued threats to close all or part of their operations should the union be victorious. Just three percent actually followed through on these threats after workers voted in favor of union representation. (Bronfenbrenner 2000)

*Promises and Favoritism*

In an effort to undermine support for the union, employers often promise employees that working conditions will improve or provide some workers with special favors to entice them into believing that conditions will improve without union representation. Sometimes, employers go so far as to provide unscheduled wage increases prior to the election to increase the likelihood that union supporters will change their vote. The following accounts provided by workers explain how employers dole out favors and promises in different ways to achieve similar results:

> At about the time of the election, [the owner] started promising people money. A couple of folks got raises before the election. That got a couple of workers to turn against the union and we lost the election. It took so long to get an election, the employer had time to hire a guy [to run his campaign]. He found out who is for and who is against the union. The time gave him an opportunity to play one group off another. If there was a rain day, his supporters would get work. If there was a shitty job, union supporters would get that work. [Interview Worker #1 2005]

> They started making promises. The people who were on the fence were buying it. Even some workers who had signed cards in favor of the union. They thought, maybe we got his attention enough that he'll fix the problems and we don't have to go through with [getting a union]. He says he is going to give you a raise but he hasn't in the last three years. Why will he do it now? [Interview Worker #2 2004]

Promises of higher wages, better benefits, and improved working conditions can be effective in convincing workers to vote against unionization, especially when these promises are combined with explicit anti-union campaign tactics. Organizers explained that when faced with the choice of continued pressure and possible layoffs or believing that the employer will improve conditions if given another chance, workers frequently choose to believe the employer. David Mullin, business representative for the Automobile Mechanics Local 701 of the International Association of Machinists and Aerospace Workers (IAMAW), explained how in the automotive industry, employers use special favors combined with threats to withhold compensation to coerce workers into voting against the union:

> In this case, the promises were critical. We had a divided group. The promises work because it is so difficult to get to the point where you need to be, the hurdles are so high. It's easier for an employee to say let's give the boss a try. Yes he's screwed us before but maybe he's seen the light. Instead of continuing to go through the anxiety, let's give him another chance. When posed with all of this anxiety of the anti-union campaign, mechanics who work on commission, who depend on the volume of work given to them by their boss, where the employer is in complete control of how much money you make, will sometimes choose to believe the promises. Guys were cut off at the [company]. You are expected to be at work 40 hours per week. But you may only get 10 hours of work from the boss. Even union supporters eventually are going to say, "I've got a family to feed." [Interview Mullin 2005]

## Use of Racially Divisive Tactics in Multi-Racial Voting Units

When workforces are racially mixed, anti-union employers frequently use tactics intended to divide voting units based on racial differences—often successfully. Indeed, unions lost 62 percent (n=24) of all campaigns where no single racial group represented more than 80 percent of the bargaining unit. Employers frequently used racially divisive messages in these campaigns to break down employee solidarity. The following accounts shared by organizers typify the use of this tactic:

> Out of the 340 workers in the bargaining unit, 25 percent were Polish, 60 percent were Latino, and the rest were [native-born] white or African American. The company split the Polish workers and the Latino workers. They drove a wedge between them. The employer told the Polish workers who

11

had been around the longest that "the Latino workers were the newcomers, they were the troublemakers. [The Latinos] are not as invested in this company. We've never had problems until this rebel group of Latinos brought in the union." That killed us. We lost the election 2 to 1. [Interview Russow 2004]

The boss skillfully organized the black workers against the union and against the Latino workers. Some key black leaders were promoted to supervisors. The boss then used the black supervisors to recruit black workers against the union. The employer organized a "vote no" committee. It included black workers in the bargaining unit but it was run by black supervisors. The committee effectively argued that the union would only support the Latino workers and the black workers would be left behind. They were successful in silencing some of the key pro-union black workers. [Interview Fried and Meinster 2004]

## Employer Interference Undermines Majority Support

Employers have become adept at using concerted and comprehensive anti-union campaigns to systematically undermine workers' right to organize. The impact of comprehensive anti-union campaigns on the rate of unionization in the Chicago metropolitan area has been substantial. In 2002, labor unions filed 179 petitions with the NLRB to represent previously unorganized workers at private-sector workplaces in the Chicago metropolitan area. (NLRB 2004b) Unions were victorious in only 31 percent of those campaigns. That unions were not more successful in their efforts to represent workers using the NLRB election process (see Appendix B) is remarkable considering that, in most cases, the majority of workers indicated they supported unionization before the election process began. At some point between when unions petitioned for an election and when the election was actually held, unions lost their majority status.

In many cases, an election was never even held. The NLRB held an election in only 69 percent of the 179 petitions filed (124 campaigns). In all but one of the cases where an election was not held, unions withdrew their petitions because support for the union eroded to a point where they believed they could not win the election. Of the 124 campaigns where an election was held, the union was successful in only 45 percent. Even more sobering are the statistics on total workers organized. Of the approximate 8,000 workers petitioned for, unions eventually represented just 2,250 (28 percent) of them (authors' calculations based on NLRB 2004b).[1]

Unions were unable to maintain worker support throughout the course of representation campaigns because employer interference undermined that support. Nearly all of the unions had achieved majority support at the time they petitioned the NLRB for an election. In 91 percent of the cases in the CRC Survey, unions filed with at least 50 percent of workers signing cards or a petition in favor of unionization. In several cases, unions demonstrated more than 80 percent support. Nevertheless, unions lost elections in nearly half of the campaigns where the majority of workers indicated they supported the union at the time the union filed its petition with the NLRB.

These statistics show that unions are not losing campaigns because they were never able to build support among a majority of employees in a voting unit. Rather, support for the union was eroded between the time the union filed the petition and the day of the election—if an election was ever held. Darrin Nedrow, Grand Lodge Representative of the Midwest Territory of the IAMAW, explained why his union will not petition for an election without demonstrating support from a supermajority of workers:

---

[1] Many workers who won union representation are not currently covered by a union contract. CRC Survey data show that unions were unable to negotiate a contract in 16 percent (n=25) of the cases in which workers won the right to collectively bargain with their employer.

> We file with 65 percent, but in reality, we should raise that to 75 percent. In 42 days [the NLRB's target period for holding elections], that 65 percent will drop down to 55 percent by the time the election comes around because of the kinds of tactics employers are using. If we don't have 55 percent at the time of election, we'll lose … we'll pull the petition. [Interview D. Nedrow 2004]

The impact of any given tactic only partly explains the erosion of majority support in NLRB elections. The next section of this report examines the activities of consultants that are being hired to design and manage employers' anti-union campaigns. These consultants provide a program of illegal and legal employer interference tactics that have been proven to be successful in undermining majority support for organizing.

# EMPLOYER USE OF OUTSIDE CONSULTANTS HAS STANDARDIZED THE MESSAGE AND TACTICS

Employer campaigns against unionization have become standardized, almost formulaic, in large part because employers frequently turn to outside consultants and law firms to manage their anti-union efforts. In Chicago, 82 percent of employers used a labor relations consultant or law firm for this purpose. (See Bronfenbrenner 2000 for comparable national statistics) Indeed, outside consultants have become ubiquitous in representation elections. As IAMAW representative Darrin Nedrow explained, "Eighty to 90 percent of our campaigns have unionbusting consultants. That's probably up from 50 percent in 1999. And the [employers] that don't have a consultant, they'll get a hold of a manual and follow it." (Interview D. Nedrow 2004)

Organizers and workers reported that consultants are effective in helping employers erode the union's majority position within voting units because of the considerable time and expertise they dedicate to an anti-union campaign. Consultants provide employers with experience using the most effective anti-union tactics. They know how best to sequence the use of these tactics during the election process and how to avoid violating the law while achieving maximum impact. Arthur Mendelson, a leading consultant in the field, explained, "Management can do so much within the confines of the law to combat unionism that they need not and should not break the law." (Logan 2002: 208) The following example illustrates how quickly support for unionization can erode when a management consultant is involved:

> As soon as the employer found out the union was involved, they flew in their consultants. They had the consultant working in the nursing home for five straight weeks. We had 35 workers out of 43 who signed cards when we filed for an election. In the last week before the election, we had only 28 workers. Then, on the Monday night before the election, we had a meeting and no one showed up. We lost the election two days later by a landslide, 29 to 12. [Interview Russow 2004]

Consultants help their clients overcome a range of obstacles encountered in the weeks leading up to an election. One worker explained the role of a consultant at his workplace:

> [The employer's] biggest problem was communication with the workforce. About 80 percent didn't speak English. So he hired a guy out of California to come in at $500 per hour to run his campaign. He was slamming these guys. Just for this election alone, [the employer] took out a $100,000 loan just to make sure workers didn't vote with the union. [Interview Worker #1 2005]

## Consistent Message and Communication Strategy

The widespread involvement of anti-union consultants has led to the standardization of the set of tactics and messages that employers typically use. Data from the CRC Survey suggest that employers are frequently successful because they have a consistent message and a well-defined strategy for delivering that message. More than 70 percent of employers in the CRC Survey focused on the following messages in their communication strategy:

- Give the employer another chance.

- The union will take you out on strike.

- Unions charge dues, fines, and assessments.

- Unions cannot guarantee anything.

- The union is a third party that interferes in the employment relationship.

- Unions need your money to survive.

- The employer will never agree to union demands.

Employers use three main techniques for getting their message across to workers: one-on-one meetings with supervisors, mandatory employee meetings, and leaflets. (Table 3)

**Table 3: Employer communication strategies**

| Communication strategy | Percent of employers using strategy |
|---|---|
| One-on-one meetings with supervisors | 91% |
| Mandatory employee meetings | 87% |
| Leaflets | 75% |

Organizers report that mandatory employee meetings are effective tools for undermining union support within voting units. These meetings are normally conducted during work hours, and employees are required to attend. In contrast, unions are rarely allowed to enter workplaces to talk to workers. Employers held an average (median) of six mandatory meetings during the election period, roughly one every week during the election process. Owners or supervisors use these meetings to present their case to workers as to why they should vote against unionization. The meetings are rarely an opportunity for workers to ask questions or engage in a meaningful debate with the employer over the pros and cons of union representation, and pro-union workers can be barred from speaking at the meeting. The meetings have impact not only because the employer has an opportunity to make the case against unionization without being challenged, but also because they demonstrate to workers that the employer is taking their decision to organize seriously. One worker explained her experience during these meetings:

> At the time, those meetings frustrated me so much I cried a lot. Oh my goodness, we had so many mandatory meetings. He had them at 9:00 a.m., 1:00 p.m., and 5:00 p.m. He paid us to sit there and hear him bash the union. We had anti-union meetings every other week. Our executive director had people coming in to talk to us that were from the outside. It's their job. They would tell us that the union was just going to take our money. It could take years to get a contract. The union is not going to get you a raise. They were really trying to scare us. The first meeting we had, the boss didn't want us to ask questions. He just got up there and degraded the union. [Interview Worker #4 2004]

Employers also frequently post flyers around the workplace that include reasons why workers should vote against unionization. A flyer provided by organizers in one of the case studies included in this investigation typifies the language included in employers' educational materials (see also Appendix D, Figure 1):

> Under the law, if the union gets in, you can't get them out for at least 1 year. Here are just a few things you could be facing during that year:
> - A year where current practices are frozen
> - A year where you can't speak for yourself
> - A year where you can't deal directly with us
> - A year of more tension and division
> - A strike, lockout, or boycott
> - Picketing, violence, and replacements
> - Union fines for crossing picket lines.

The use of supervisors in the communication strategy is both a common and effective tactic for discouraging workers from supporting the union. (Freeman and Kleiner 1990) The use of

15

supervisors to relay management's message about unionization is pervasive because employers recognize the value of the relationship between supervisors and the front-line workers:

> Let's be fair, we have our story and the employer has theirs. But where they cross the line is with the browbeating through their networks of supervisors, when they call a meeting and say they're going to close the plant if it goes union. Employers are smart. They'll have supervisors go out there, put their arm around the workers and say, hey, I just want to let you know that if you vote the union in, they'll close this place down. [Interview D. Nedrow 2004]

What frustrates unions and workers is that employer campaigns take place under the guise of a democratic election process organized by federal authorities. It would be one thing if unions failed to achieve majority status in the voting units they seek to represent. However, unions are demonstrating majority support in their election petitions only to see employers undermine that support using tactics that are, at a minimum, contrary to the spirit of the law. Employers frequently threaten, coerce, and otherwise use tactics to undermine workers trying to organize a union, as well as spend thousands of dollars to hire consultants to guide their campaigns, because the law does not adequately discourage such activities. The final section of this report explains how the NLRA regulates employer conduct during the election period and, in particular, how the law fails to deter employers from violating workers' right to organize.

## THE NLRB AND ITS FAILURE TO REGULATE EMPLOYER CONDUCT

*The dramatic rise in the frequency of discrimination against workers who try to organize (a four-fold increase since the 1960s) demonstrates that the labor law system has a rapidly diminishing deterrent effect on workers' rights violations. [Lance Compa, Human Rights Watch 2000: 46]*

*As an employer, you do whatever it takes and say whatever it takes to keep people from voting for the union. If it's particularly threatening, they say it one-on-one so that no one can witness it. That's an example of how they know the law and know how hard it is for us to prove they've broken it. [Interview Abman 2004]*

Fair functioning of the NLRB election process depends upon both unions and employers following the law. The NLRA contains a set of enforcement mechanisms that are designed to undo the damage created when either unions or employers break the law. However, this system of remedies is so woefully inadequate that employers have little incentive to abide by the law.

If unions believe that employers have violated the rules of fair conduct under the NLRA, they can file a ULP charge with the NLRB. When a charge is filed, the Board investigates whether there is merit to the charge. If it finds that the union has enough evidence to suggest that the employer may have violated the law, the General Counsel will issue a complaint against the employer. If the case is not settled, an administrative law judge (ALJ) will hold a hearing on the case. Based on the evidence collected during the hearing, the ALJ will determine whether the employer has in fact acted in violation of the NLRA.

Despite these provisions for holding employers accountable to the law that governs their conduct during representation elections, unions rarely charge employers with ULPs, especially in relation to the rate at which they reported what they believe to be illegal anti-union activity in the CRC. Unions filed ULP charges in 36 percent of the representation campaigns in the Chicago metropolitan area that began in 2002. (FAST Database 2004) Charges of discrimination against union supporters were most common (51 cases), followed by charges of coercion for union activity (39 cases), and charges that the employer was refusing to bargain in good faith (22 cases).

Even if a union believes it can succeed in bringing a ULP charge, it may still be hesitant to bring a charge. Providing sufficient evidence that employers have violated the NLRA is difficult, especially given the broad remit employers are given under Taft-Hartley and the increasing sophistication of employers acting with the assistance of consultants that can guide them along a razor-thin edge of legality. More importantly, when a union files a charge, the election date is usually postponed until the issue has been resolved.[2] Given the negative impact of delays on the likelihood of a union's success in an election, it is not surprising that unions are reluctant to pursue this path. Furthermore, even when the NLRB finds that an employer has violated the law, it rarely imposes remedies that effectively "make whole" the injured party, despite the latitude in doing so that the NLRA provides. For example, the Board rarely does more than impose cease and desist orders, and it rarely uses its power of injunctive relief under Section 10(j) to impose immediate reinstatement of a fired worker before an election occurs. The Board could more aggressively impose and enforce remedial relief. For example, in addition to more appropriate use of injunctions, the Board could order increased union access to employees or order additional damages as a part of backpay.

---

[2] The NLRB does have within its discretion the ability to proceed with the election without delay and address the charges afterwards, but this remedy has rarely been utilized in recent years.

**Most Employer Tactics Are Considered Legal or Difficult to Prove as "Unfair"**

At first glance, many of the tactics that employers use appear to violate the law. For example, the threat of company closings or relocations is one of the most common anti-union tactics used during organizing campaigns. The following are examples from the CRC Survey of the ways in which employers delivered the threat that avoid explicitly connecting the closure of the facility to employees' decision to join or vote for the union or engage in protected activity:

- "I can close this company if I want to."

- "I might have to close [the company] because we don't have money. I might shut down [the company] and re-open it under a different name."

- "The company is losing money and can't compete with a union in place."

- "The company next door closed because of a union. A lot of companies are closing down or leaving the U.S. because of the unions."

- "Unions make our business unviable."

Sometimes, as in the following example, employers go further than simply threatening workers, yet the NLRB does not consider it a ULP:

> On the first Friday of housecalling workers, employees were issued a memo saying due to economic slowdown [the company] may find it necessary to reduce employment. The employees were not deterred from supporting the union. On the Monday following the housecalling, the petition for election was filed with the NLRB. That day, the company laid off 13 people. Some of those folks were our key leaders. We also asked the company for recognition, which was turned down. About a week later, the company announced a plant-wide reduction in hours. [Interview C. Nedrow 2004]

In this case, the union overwhelmingly lost the election, even though 70 percent of workers in the voting unit signed a petition indicating they wanted union representation. The union filed a ULP charge in response to the actions taken by the employer. However, according to the organizer, the charge was dismissed because the union could not prove that the layoffs and reduction in hours were a result of workers' union activity.

Section 8(a)(1) of the NLRA is intended to prevent employers from interfering with workers' right to organize. (See Appendix C for a detailed explanation of workers' rights under the NLRA.) However, in all of these examples, the employer was careful not to make the explicit connection between voting for unionization and the decision to close or relocate the business. Moreover, employers typically deliver threats verbally, so there is no documentation that the threat was ever made, or the threat is vague enough so as to avoid drawing action from the NLRB. Data from the CRC Survey indicate that most business-closing threats are verbal and veiled, leaving no paper trail of evidence and, oftentimes, no witnesses. Thus, unions filed ULP charges in only 21 percent of the cases where employers made such threats. Issuing threats that are verbal and thinly veiled confers two related advantages to employers. First, it coerces workers into voting against unionization. Second, it preempts unions from filing ULP charges because unions recognize that they will not be able to prove that the threat was a violation of the NLRA.

Consultants are critical in helping employers achieve their desired impact while avoiding action from the NLRB. One consultant explained how to avoid a ULP while still threatening a plant closure if workers vote to join the union:

> You can't come out and threaten we are going out of business [in the event of a union victory]. But a threat is permissible providing you give a factual basis for it... We usually say assuming the union refuses certain needs we have to remain competitive and assuming that our competition will have no restrictions on it, we believe we will not be able to maintain the orders we now have and will go out of business. [Logan 2002: 204]

Section 8(a)(1) of the NLRA is also intended to prevent employers from using interrogation tactics to determine whether or not workers favor unionization. Indeed, the purpose of holding an election is to provide workers with the freedom to choose whether they want a union without fear of reprisal. However, employers find creative ways to figure out which workers support the union and which workers are leaders, even when workers do not freely reveal that information. The following example shows how employers try to ascertain who among the workforce is pro-union without using tactics that the NLRB may consider an illegal form of interrogation:

> The first time the owner learned about the campaign, the boss started looking for the leaders. He started asking everyone who the leader was. We all kept very quiet. We didn't want him to know who the leadership was. He will fire the guys, he doesn't care. To try and figure out who was for the union, the owner printed up T-shirts for workers to wear that said "no union." So we all wore the T-shirts ... to keep the identity of the leaders a secret. [Interview Worker #3 2004, See Appendix D, Figure 2]

In another case that the union eventually lost, the employer openly interrogated an employee in front of his supervisor. The following text was included in the determination issued by the NLRB against the employer:

> On the day before the election, [the worker] was summoned to meet with the President [of the company], this time in an empty office... On this occasion, [the President] started talking about the union and asked if [the worker] was going to be with him or against him in the election. Before he could answer, [his supervisor] who was nearby outside the door to the office said, "this is going to be the worst place to work...for you." [The worker] declined to answer the question although he remained in the office to listen to [the President's] attempts to get him to vote against the union. In answer to the question [during his testimony in front of an Administrative Law Judge] as to the length of the meeting, [the worker] testified as follows: "for me, it was an eternity." [NLRB 2003]

While the union won the ULP case against the employer for interrogating the employee, the union lost the election because the employer posted bail for a former employee who was in detention for immigration violations up until a day before the election. The employee voted in the election against the union, deadlocking the results. (NLRB 2003)

Section 8(a)(3) of the NLRA intends to prevent employers from discharging or suspending workers for engaging in union activity. The CRC Survey found, however, that employers chose to take such action in 30 percent of the representation campaigns. Yet, despite the severity of the tactic, unions filed charges in fewer than half of the cases in which it occurred. Organizers expressed reservations about seeking remedies from the NLRB for alleged violations of Section 8(a)(3) because proving that employers fired workers for their union activity can be extremely difficult. The data collected from the CRC Survey lend credence to this argument. In most cases where an 8(a)(3) charge was filed, the Board either dismissed the union's charge or ruled in favor of the employer. The following case demonstrates that the Board sometimes actively discourages unions from filing charges in cases where workers are discharged:

> In the midst of a campaign, the employer fired a crew of seven union supporters. This was two weeks before the vote. Before we went to file unfair labor practice charges, the Labor Board agent calls me and tells me "these layoffs were going to happen and that it was a planned reduction. You

can file charges if you want, however, these are planned reductions," implying that the Board would likely find in favor of the employer. [Interview Albrecht 2004]

## Remedies Are Inadequate

Even in instances where the NLRB finds that employers have violated the NLRA, it has no authority to impose penalties on employers. Rather, the Act is remedial. In other words, an employer who commits a ULP is required to cease and desist from unlawful conduct. The NLRB does not provide for civil or criminal penalties in ULP cases.

Organizers are well aware of the limitations of the NLRA for punishing and deterring employers that engage in illegal anti-union activity. The following sentiment was shared by all of the organizers interviewed for this study:

> Even at times when the Board finds that the employer is guilty as sin, the punishment is a slap on the wrist. All they have to do is post a notice saying they won't do it again. Sometimes it takes years and years to get any remedy from the NLRB. It's like an eraser on a pencil, people get worn down during this process. And they can only last so long. [Interview Mullin 2005]

A good illustration of the inadequacy of the NLRA's remedial approach to violations of workers' right to organize can be seen in what it requires from employers that illegally fire workers for their union activity. These employers are simply required to reinstate fired workers, with backpay. However, there is no guarantee that workers will be reinstated prior to union elections. A worker fired from his job succinctly described the problem:

> The law needs to protect people like me when they try to organize a union. There needs to be some kind of penalty for employers who do what he did to me. If workers who are trying to get a union get fired, the Labor Board should order the employer to take them back until there is a hearing on the matter. That might force the employer to think twice before they fire anyone. [Interview Worker #5 2005]

Reinstatement in and of itself does not necessarily address the chilling effect of the unlawful tactic on the voting unit. Sometimes, the mere act of firing workers, regardless of whether the NLRB finds that it is a ULP, can neutralize a union campaign.

As to the efficacy of the backpay award as a deterrent, the amount of any interim earnings obtained by the worker from another employer is deducted from the amount that must be paid by the offending employer.[3] Given the inability of the NLRB to impose penalties on employers that violate the law, and considering the damaging effects to union majorities that are caused by election delays, it is not surprising that unions are hesitant to charge employers with ULPs, even in cases where employers have blatantly violated the law:

> When employers hire consultants, one of the first things they recommend is finding the committee of workers who started the campaign and fire them. Are employers violating the law when they do that? Yes, they are. But once they do that, it will take months, if not years, to get [these workers] back on the job with backpay. In the meantime, what kind of message does that send to the other workers? There's no way you can win under those circumstances. [Interview D. Nedrow 2004]

A complementary problem is that the NLRB rarely imposes remedies quickly enough to ensure that elections are held in a timely fashion. The NLRB data on the ULP caseload suggest that unions

---

[3] In rare circumstances, the NLRB may go beyond traditional remedies to undo damage caused by employers' unlawful activity. For example, in the case of a fired employee, if it can be demonstrated that the employer's behavior has irrevocably undermined the union's majority status, the NLRB can order the employer to bargain with the union.

must be prepared to wait months or years for a resolution to their charges. The Board's own goal for the length of time it takes to decide whether a charge has merit is seven to 12 weeks, depending on the nature of the charge. (NLRB 2004a) If the NLRB decides the charge has merit and a settlement between the parties cannot be reached, the Board aims to open hearings on the case 120 days after the charge was found to have merit. In most cases, the Board does not issue a complaint (a notice that the General Counsel finds merit in the charge). In FY 2003, 60 percent of all charges were either withdrawn by the charging party before the General Counsel issued a decision on the merits of the case or were dismissed by the General Counsel. (NLRB 2004a) Of the approximate 40 percent of charges that had merit, more than 90 percent were settled before a Board decision. The cases that go to a full Board decision typically take more than a year from the filing of the charge to a Board decision. (NLRB 2004a)

Thus, if a union files a charge at the beginning of a representation campaign, chances are that a ULP case that has been found to have merit will not be resolved until after the election is held, unless the union is willing to delay the election until the matter is adjudicated. In cases where the ULP swayed the outcome of the election, a determination will come too late in the process to undo the damage. By the time the NLRB issues a determination, the union has lost the election and workers in the voting unit have been demoralized in the process:

> Even though the Board issued a complaint, it took eight months to reach a settlement agreement. The company did have to pay the fired worker backpay. However, support for the union disappeared and the union withdrew the petition. The only other remedy was the requirement to post a flyer promising not to engage in the same activities they were found to have performed. In the end, the company is still non-union. [Interview Mullin 2005]

Of course, if the NLRB finds that employers violated the law to a sufficient degree, it could order a second election. But that is hardly an adequate remedy to deter employers from violating the law. A management consultant explained why violating the law is worth the risk: "You got to remember you only lose once. What happens if you violate the law? The probability is you will never get caught. If you do get caught, the worst thing that can happen to you is you get a second election and the employer wins 96 percent of second elections. So the odds are with you." (Logan 2002: 207)

## NLRB Elections Confer Unfair Advantages to Employers

The NLRB election process itself is partly responsible for why unions lose support among the majority of workers by the time elections are held. The most important advantage that the NLRB election process provides employers is the 42-day election period, the targeted length of time before the Board will conduct an election. For employers, having enough time before an election is critical for chipping away at the support built by the union (Cooke 1983; Reed 1989; Hunt and White 2001), and 42 days is usually enough time for employers to effectively run their anti-union campaigns. During this period, unions are at a distinct disadvantage in their ability to communicate with workers about how a union would affect their experience on the job. Nearly every organizer questioned about the role that time plays in a campaign provided some variation of the following comments:

> Forty-two days is too long given the tactics [employers] are using. They get [workers] eight hours a day. We get them for an hour or two a week after they're tired from working all day. [Interview D. Nedrow 2004]

> The problem is the time between when you file for an election and when you have a vote. Management can have meetings daily if they have to pound their message home. The only time we can have a meeting is after work or on weekends and that's if people want to come. [Interview Sarpolis 2004]

For 42 days, with varying degrees of ambiguity, employers remind workers that company ownership and management are the ones who ultimately control the wages and working conditions of employees, not unions. Through their words and actions, employers create an environment where the resoluteness of even staunchly pro-union workers is worn down and workers who oppose unionization are emboldened.

Most organizers contend that the NLRB should conduct an election within days after the voting unit has been established, but shortening the election process would be strongly opposed by employers. Chicago-based consultant John Sheridan predicted certain loss for his clients if employers are not provided with enough time to run their campaign: "If a [certification] petition is filed today, and the election is in two weeks, we'll lose it." (Logan 2002: 201)

Time works to the advantage of employers because they have access to the voting unit throughout the work day, five days a week, for the entire election period, while unions have to track down workers after hours or on the weekends. Indeed, sometimes even finding workers is difficult for unions. When unions are able to locate workers, sometimes it is difficult for them to convince workers to even listen to the case for unionization. One worker admitted that during the beginning of her campaign, "People were afraid to let the union into their house. They didn't want to get involved even though they knew how bad things were." (Interview Worker #4 2004) Employers do not share the same handicap. At the workplace, workers have no choice but to hear the employers' message.

In cases where unions are not able to make contact with the entire voting unit before filing a petition with the NLRB, the employer is required to turn over to the union the names and contact information of all workers in the voting unit within a limited amount of time after the petition is filed. However, unions report that employers do not always provide complete and accurate lists:

> Even getting the [list of workers] is an issue. Sometimes we get it seven days before the election. We don't really know the addresses and names until right before the election. Sometimes [the employer] provides you with inaccurate addresses. [Interview Avitia 2004]

If 42 days proves to be an insufficient amount of time for employers to run their anti-union campaign, they often manipulate the process to delay elections. The principal delay tactic is to challenge the composition of voting units, often delaying elections for weeks. When employers request changes to the list of eligible voters (i.e., the voting unit), unions are faced with a critical choice. Either they can acquiesce to the employer's request or they must accept the inevitable delays that accompany the process of settling such disputes. Not surprisingly, unions often opt to concede to employers' requests rather than delay the election. In 71 percent of the cases (n=49) included in the CRC Survey, unions accepted the modifications to the voting unit requested by the employer, even if it meant losing pro-union voters or including voters less likely to vote with the union.

Employers have become adept at using this stage in the election process to their fullest advantage. For this strategy to be effective, it is not even necessary for employers' requests to be reasonable. For example, in one case included in the CRC Survey, an employer attempted (unsuccessfully) to define a group of soil technicians—the primary group of workers the union was trying to organize— as security guards, thereby rendering them ineligible for inclusion in the voting unit. (Interview Worker #7 2005) In another case, the employer argued that some workers in the unit were supervisors, and therefore ineligible for inclusion in the voting unit. Again, these workers were among the primary group of workers the union was trying to organize:

> The company wanted to exclude lead workers claiming they were supervisors. We chose to fight it. The hearing added roughly two months to the campaign and that delay made all the difference. If we had the vote right away, we would have won 3 to 1. [Interview Fried and Meinster]

In the *EcoLab* case from 2002, according to documents obtained from the NLRB, the employer argued that the IAMAW was not a "labor organization," and, therefore, the Board should dismiss the union's petition. (NLRB 2002) According to the NLRB decision on the employer's request, the "employer contends that the IAMAW is not a 'labor organization'… because the petition filed in this case does not identify which organization or affiliate of the International—a local, district, or the International itself—would represent the employees in the petitioned-for unit." The union was formed in 1888, joined the American Federation of Labor in 1895, and moved its headquarters to Chicago that same year. Nonetheless, the Board actually held a hearing on the matter, which delayed the order of an election by one month. Eventually, worker support eroded and an election was never held.

Anti-union consultants are well aware of the advantages that the NLRB election process provides their clients, and they advise their clients on how to maximize their use of the time between the filing of a petition and the holding of an election. A recent study of the anti-union consulting industry explained, "[Consultants] stress that time is on the side of the employer and teach managers how to file frivolous complaints with the NLRB in order to delay the election process and prevent the expeditious enforcement of the law." (Logan 2002: 201)

The promise of the NLRA to provide workers with the opportunity to freely decide if they want to collectively bargain with their employer through the representative of their choosing does not exist for thousands of workers in the Chicago area. Given the degree to which employers are violating the law in letter or in spirit, and the degree to which the NLRA accommodates such behavior, it is surprising that approximately one-third of all representation campaigns in the Chicago metropolitan area resulted in union representation. In order to protect the rights of workers who choose to organize for union representation, changes will need to be made to the election process and to the system of enforcement so as to better deter employers from taking actions that violate workers' rights.

# CONCLUSION

### Restoring the Promise: Addressing Inadequacies in the NLRA

The NLRA states that employees in the United States have the right to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." This study has found that in Chicago, the law has failed to keep its promise. Majorities of workers are expressing their desire to collectively bargain with their employers. However, employers, under the protection of 'free speech,' effectively coerce workers into abandoning their unionization campaigns. Meanwhile, the NLRB has been ineffectual in preventing such actions during the election process. In this context of routine firings and dismissals, threats to close plants, and promises of improvements if workers set aside their desire to organize, union density in Chicago has declined.

The NLRA is in need of amendment to restore workers' right to organize. The election process should be overhauled to allow the NLRB to hold elections immediately after unions have filed petitions. In cases where a majority of workers have already signed a petition or card expressing their desire to collectively bargain with their employer through the union, requiring these workers to vote again is neither democratic nor fair. In these cases, the NLRB should be allowed to certify the union as the workers' bargaining representative and require employers to bargain. With regard to enforcement of workers' rights, the NLRA should be amended to allow the Board to impose penalties on employers for violating the law. Remedies that are simply intended to return cases to the status quo are insufficient, since a return to the status quo is impossible in most instances. Employer interference that crosses the line of legality injects an element of fear into workers' struggles, undermines the will of majorities, and, ultimately, has a chilling effect on organizing campaigns. Therefore, penalties are needed to deter employers from violating the law in the first place.

The decline of unionization in Chicago, a city dense with labor unions and rich with labor history, must be understood in the context of the types of employer interference outlined in this report and the failure of labor law to protect workers' rights.

## REFERENCES

Bronfenbrenner, Kate (1997) "The Role of Union Strategies in NLRB Certification Elections," *Industrial and Labor Relations Review*, 50:2, 195-212.

Bronfenbrenner, Kate (2000) "Uneasy Terrain: The Impact of Capital Mobility on Workers, Wages, and Union Organizing," Submitted to the U.S. Trade Deficit Review Commission.

Compa, Lance (2000) "Unfair Advantage: Workers' Freedom of Association in the United States," *Human Rights Watch*.

Cooke, William N. (1983) "Determinants of the Outcomes of Union Certification Elections," *Industrial and Labor Relations Review*, 36:3, 402-414.

Dickens, William (1983) "The Effect of Company Campaigns on Certification Elections: Law and Reality Once Again," *Industrial and Labor Relations Review*, 36:4, 560-575.

Freeman, Richard and Kleiner, Morris (1990) "Employer Behavior in the Face of Union Organizing Drives," *Industrial and Labor Relations Review*, 43:4, 351-365.

Hirsch, Barry and Macpherson, David (2005) "The Union Membership and Coverage Database," downloaded from www.unionstats.com, April 19, 2005.

Hunt, Janet and White, Rudolph A. (2001) "The Effects of Management Practices on Union Election Returns," *Journal of Labor Research*, VI: 4, 389-403.

Lawler, John J. (1984) "The Influence of Management Consultants on the Outcome of Union Certification Elections," *Industrial and Labor Relations Review*, 38:1, 38-51.

Logan, John (2002) "Consultants, lawyers, and the 'union free' movement in the USA since 1970s," *Industrial Relations Journal*, 33:3, p. 197-214.

NLRB (2002) "National Labor Relations Board Region 13, Decision and Direction of Election, Ecolab Elk Grove Equipment Operations, Employer, and International Association of Machinists and Aerospace Workers, Petitioner," Case 13-RC-20909, downloaded from www.nlrb.gov/nlrb/shared_files/decisions/dde/2002dde.asp on April 19, 2005.

NLRB (2003) "United States of America Before the National Labor Relations Board, Division of Judges, Chicago Future, Incorporated, and International Brotherhood of Teamsters Local Union No. 727 AFL-CIO, Decision," Case 13-CA-40392, downloaded from www.nlrb.gov/nlrb/shared_files/decisions/alj/JD-23-03.pdf on April 19, 2005.

NLRB (2004a) "Fiscal Year 2004 Performance and Accountability Report," downloaded from www.nlrb.gov/nlrb/shared_files/reports/NLRB.pdf#search='nlrb%20fiscal %20Year%202004%20Performance%20and%20Accountability%20Report.

NLRB (2004b) National Labor Relations Board Representation Case Petitions from 2002, response from Region 13 of the NLRB to a request made under the Freedom of Information Act, March 23, 2004.

NLRB (2005a) "Basic Guide to the National Labor Relations Act: General Principles of Law Under the Statute and Procedures of the National Labor Relations Board," downloaded from www.nlrb.gov/nlrb/shared_files/brochures/basicguide.asp on April 19, 2005.

NLRB (2005b) "The National Labor Relations Board and You: Unfair Labor Practices," downloaded from www.nlrb.gov/nlrb/shared_files/brochures/engulp.asp on April 19, 2005.

Reed, Thomas F. (1989) "Do Union Organizers Matter? Individual Differences, Campaign Practices, and Representation Election Outcomes," *Industrial and Labor Relations Review*, 43:1, 103-119.

**Interviews**

Anonymous Worker #1, January, 20, 2005.

Anonymous Worker #2, December 8, 2004.

Anonymous Worker #3, September 27, 2004.

Anonymous Worker #4, December 6, 2004.

Anonymous Worker #5, March 29, 2005.

Anonymous Worker #6, March 30, 2005.

Anonymous Worker #7, April 5, 2005.

Cristina Nedrow, Grand Lodge Representative, Midwest Territory, International Association of Machinists and Aerospace Workers, October 18, 2004.

Darrin Nedrow, Grand Lodge Representative, Midwest Territory, International Association of Machinists and Aerospace Workers, October 18, 2004.

Matt Russow, Organizing Director, United Food and Commercial Workers Local 1546, September 15, 2004.

Richard Albrecht, Business Representative/Organizer, Chicago and Northeast Illinois District Council of Carpenters Local 1027, September 20, 2004.

Miguel Avitia, Organizer, United Chicago and Northeast Illinois District Council of Carpenters Local 1027, September 20, 2004.

Oscar Sandoval, Organizer, Service Employees International Union Local 1, September 22, 2004.

Mark Meinster, International Representative, United Electrical, Radio & Machine Workers of America, September 21, 2004.

Leah Fried, Field Organizer, United Electrical, Radio & Machine Workers of America Local 1159, September 21, 2004.

Tracy Abman, Director of Organizing, American Federation of State, County and Municipal Employees, AFL-CIO, September 28, 2004.

Joel Pagose, Lead Organizer, Chicago and Northeast Illinois District Council of Carpenters Local 250, February 8, 2005.

David Mullin, Business Representative, Automobile Mechanics' Local 701, International Association of Machinists and Aerospace Workers, AFL-CIO, March 30, 2005.

Karl Sarpolis, Business Representative, District 8 of the International Association of Machinists and Aerospace Workers, AFL-CIO, November 16, 2004.

## APPENDIX A: RESEARCH METHODOLOGY AND SAMPLE CHARACTERISTICS

*CRC Survey Methodology and Sample Characteristics*

Investigators limited the universe of representation campaigns included in this study to NLRB elections petitioned for in 2002 by unions in the Chicago metropolitan area. That year was chosen because campaigns launched later than 2002 may not have reached a conclusion yet given the delays that often occur in elections. Data for all petitions filed by unions in 2002 were obtained from Region 13 of the NLRB. Investigators then filtered out all petitions for elections among workers outside the Chicago metropolitan area and for workers who were previously organized. After filtering the list to only include petitions for elections among workers who were previously unorganized and who worked in the Chicago metropolitan area, there were 179 petitions in total.

Investigators approached leaders of all union locals to recruit them to participate in the survey. Data were collected for 62 out of the 179 campaigns included in the universe. The data included an over-sample of campaigns where an election was held relative to the universe and an over-sample of campaigns where the union won the election relative to the universe. Board elections were held in 76 percent of the cases in our sample—higher than the 69 percent in the universe. Of the campaigns where an election was held, unions won in 61 percent of those cases—substantially higher than the 45 percent success rate in the universe. Moreover, as a result of a low response rate from unions that tend to represent workers in the manufacturing sector, the data includes an over-sample of workers in the construction industry. African Americans and Latinos make up more than 75 percent of the workers in the campaigns included in the sample.

*Case Studies*

To help understand the results of the CRC Survey, investigators interviewed 25 lead organizers and 11 workers involved in 30 different campaigns included in the sample. Investigators attempted to recruit lead organizers on 40 different campaigns. Investigators recruited workers to participate by first getting names and contact information from lead organizers. Investigators then contacted workers directly and attempted to recruit them to participate. The identity of workers was kept confidential.

*Confidentiality*

In the interest of minimizing risk to research subjects, investigators have kept the identity of all union organizers who responded to the CRC Survey and workers who participated in the case studies confidential. Union organizers who participated in interviews for the case studies signed release forms allowing us to interview them on the record and to attribute data collected from their interviews directly to them.

27

## APPENDIX B: ORGANIZING WORKERS USING AN NLRB ELECTION

Secret-ballot elections are intended to determine whether the majority of workers in a voting unit want to collectively bargain with their employer through a union. To trigger an NLRB election, a union must present the Board with a petition demonstrating that at least 30 percent of the proposed unit wants to be represented by the union. Most elections are conducted on a single day and usually at the worksite. Workers are not required to vote in elections. As long as a simple majority of workers voting in the election vote for unionization, the employer is required to bargain in good faith with the union over most terms and conditions of employment for all workers who are included in the voting unit.

Before scheduling an election, the Board must define which workers are eligible for inclusion in the voting unit. Generally, unions can define the group of workers by the occupation that they intend to represent. As long as those workers share a sufficient "community of interest," the Board considers the voting unit appropriate. Employers are given an opportunity to challenge the definition of the unit if they believe that the inclusion or exclusion of certain workers renders the proposed voting unit inappropriate. Once disagreements over the definition of the voting unit have been resolved, the NLRB prepares to hold the election. The Board aims to hold elections 42 days after the voting unit has been defined. However, nationwide in FY 2003, it took the Board an average of 56 days to hold elections. (NLRB 2004a)

After the election is held, the losing party has the option to challenge the results. Upon the filing of objections by the losing party, the Board is responsible for deciding whether campaign behavior by either party has tainted the election results. If it has, the Board has the authority to order a rerun election or issue a bargaining order. Sometimes, it can take months for the Board to sort through the objections and reach a decision. In cases where unions have won an election and employers have filed objections, bargaining cannot begin until the Board has reached a decision on the objections.

## Appendix C: Workers' Rights Under the NLRA

The following is a summary of the rights of employees guaranteed by the NLRA.

### Section 8(a)(1)-Interference with Section 7 Rights (the rights of employees guaranteed by the Act)

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in Section 8(a)(3)."

Examples of the rights protected by this section are the following:

- Forming or attempting to form a union among the employees of a company
- Joining a union whether the union is recognized by the employer or not
- Assisting a union to organize the employees of an employer
- Going out on strike to secure better working conditions
- Refraining from activity on behalf of a union

### Section 8(a)(3)-Discrimination Against Employees

Section 8(a)(3) makes it a ULP for an employer to discriminate against employees "in regard to hire or tenure of employment or any term or condition of employment" for the purpose of encouraging or discouraging membership in a labor organization. In general, the Act makes it illegal for an employer to discriminate in employment because of an employee's union activity. A banding together of employees, even in the absence of a formal organization, may constitute a labor organization for the purposes of Section 8(a)(3). It also prohibits discrimination because an employee has refrained from taking part in union activity except where a valid union-security agreement is in effect. Discrimination within the meaning of the Act would include such action as refusing to hire, discharging, demoting, assigning to a less desirable shift or job, or withholding benefits.

### Section 8(a)(4)-Discrimination for NLRA Activity

Section 8(a)(4) makes it a ULP for an employer "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act." This provision guards the right of employees to seek the protection of the Act by using the processes of the NLRB. Like the previous section, it forbids an employer to discharge, layoff, or engage in other forms of discrimination in working conditions against employees who have filed charges with the NLRB, given affidavits to NLRB investigators, or testified at an NLRB hearing. Violations of this section are in most cases also violations of Section 8(a)(3).

**Section 8(a)(5)-Refusal to Bargain in Good Faith**

The Act requires an employer and the representative of their employees to meet at reasonable times, to confer in good faith about certain matters, and to put into writing any agreement reached if requested by either party. The parties must confer in good faith with respect to wages, hours, and other terms or conditions of employment, the negotiation of an agreement, or any question arising under an agreement.

Bargaining obligations are imposed equally on the employer and the representative of their employees. It is a ULP for either party to refuse to bargain collectively with the other. The obligation does not, however, compel either party to agree to a proposal by the other, nor does it require either party to make a concession to the other.

## APPENDIX D: ANTI-UNION MATERIALS

Figure 1: Anti-union flyers



# IN THE UNION, BREAKING UP IS HARD TO DO

**There's no such thing as trying out the union for a little while.**
Organizers encourage employees to "just try the union out for a while," but once the union is voted in, it's usually there to stay.

**The union is hard to get rid of if you later change your mind.**
Employees who want to throw their union out—this is called decertification—must raise funds, get legal help, secure signatures, and campaign—all within a limited time. Their employer can't help them in any way—that's against the law. Then there's the threat of union harassment, trials, and fines.

**The union would not take a decertification effort lying down.**
Most union constitutions state that this is a crime. Here's an example: *"Sec. 1. Any member may be penalized for committing one or more of the following offenses: ...(d) advocating or attempting to bring about the withdrawal from the International Union of any local union or any member or group of members."*

**Each year, disappointed members vote to get rid of their union.**
Thousands of union members become so dissatisfied that they are willing to run the risk. From 1994 through 1998, more than *63,000 people succeeded in returning to their union-free status.* The experiences of those former union members need to be considered when you decide how to vote.

# Once they're in, they're in

## NO Vote ☑

## The *FACTS* About Collective Bargaining

You will hear promises from the union about all the benefits they will get for you from collective bargaining, if they win the election. You should remember the enormous differences between what the union *promises*. . . and the *FACTS*.

- In **collective bargaining** neither side has to agree to anything.

- **Collective bargaining** does not automatically mean a contract, increased wages, or improved benefits.

- **Collective bargaining** could result in less wages and/or benefits than you now receive.

- In **collective bargaining**, many subjects do not have to be discussed, like who is the supervisor or whether new equipment will be purchased.

- **Collective bargaining** is frequently used by the union as a way to seek special privileges for a few employees at the expense of many.

- **Collective bargaining** could take a long time to complete, even though ▓ ▓ would bargain in good faith.

- ▓ cannot and would not agree to any unreasonable or uneconomical union proposal or proposition.

- If agreement cannot be reached in **collective bargaining**, the union would likely call a strike.

▓ would never want a strike here. But, if there is a strike, you should know that:

- Strikers receive <u>no pay</u>.

- Strikers do <u>not</u> qualify for unemployment compensation.

- Strikers must pay the entire cost of <u>health insurance</u> -- out of their own pockets.

- Strikers can be <u>temporarily</u> or <u>permanently</u> replaced.

These are *FACTS* the union probably won't tell you. If you have any questions about these *FACTS*, just see your supervisor.

# COLLECTIVE BARGAINING
## IS A GAMBLE



### No one knows what the outcome might be...



**YOU COULD LOSE**—The union could use your current wages and benefits as bargaining chips. After negotiations, you might end up with more, the same thing you have today (plus union dues), or less.



**NO AGREEMENT IS REQUIRED**—Whether or not a labor agreement would be successfully negotiated is a roll of the dice. The company doesn't have to agree to anything that is not in its best interest.



**EVERYTHING IS NEGOTIABLE**—If the union got in, even the benefits and work rules you like could be open to negotiation. You might have to live with whatever hand the union deals you.



**NO GUARANTEE**—What you actually get can be very different from what the union promises. The only "sure bet" is that a union contract will control your life on the job, whether you like it or not.

## Stay Secure & Union-Free



Vote **NO** ☑

## IMPORTANT NOTICE ABOUT THE UNION ORGANIZING DRIVE

As you know, the                                                          has been
actively attempting to organize our employees. Last week, the union presented
the Company with a "demand for recognition" asking the Company to recognize
the union as your bargaining representative WITHOUT your having the right to
vote in a secret ballot election.

When we told the union that we would not do that, they went to the NLRB and
filed a petition for an election.

The reason we said "NO" was to protect YOUR right to vote. We are now in the
process of working with the NLRB to arrange the details of the election that will
take place here at our distribution center. As soon as the details of the election
are worked out (date, time, who is eligible to vote, etc.) we will let you know. In
the meantime, we feel it is important that you realize several things.

FIRST, this election is very important--to the Company and to you and your
family. It can have a significant impact on your pay, your benefits, your job
security, and your future. BECAUSE OF THE IMPORTANCE, WE URGE YOU
TO VOTE BASED ONLY ON *FACTS*, not on promises, pressures, threats,
misinformation, or half-truths. During the next few weeks we will provide you with
ACCURATE, FACTUAL information about this union and why we believe it is so
important for you to vote "NO".

SECOND, this election is by SECRET BALLOT. That means that NOBODY will
know how you vote and you are free to vote "NO" even if you signed the union
petition, even if you promised someone you would vote for the union---even if
your picture appeared in a union handout.

THIRD, no matter what the union may have told you, NO union can guarantee
your job, NO union can guarantee you more money or better benefits, and NO
UNION CAN EVEN GUARANTEE THAT YOU WILL KEEP WHAT YOU NOW
HAVE.
As we said, in the next few weeks we will be giving you a great deal of factual
information to help make your decision easier. In the meantime, if you have any
question about this very important matter, please feel free to ask me--or you can
ask any supervisor or manager. We just want to make sure that your vote is
based on FACTS, not worthless union rhetoric.

10/21/02

34

Figure 2:  T-shirt used in anti-union campaign

