Industrial Relations Journal 33:3
ISSN 0019-8692

# Consultants, lawyers, and the 'union free' movement in the USA since the 1970s

## John Logan

*This paper provides a qualitative analysis of the services that the anti-union consultants and law firms have provided to American employers during the past three decades and an account of the campaign tactics of several 'superstars' of the union-free movement. It describes a multi-million dollar industry that has helped employers to circumvent the intent of federal labour law through a vast array of union-busting tactics, implemented before the union arrives and continuing until after it is defeated: tactics that are designed, at every juncture, to undermine employees' free choice of bargaining representatives.*

The first few months of 2001 witnessed a flurry of activity in Washington, DC, on the issue of government regulation of anti-union consultants. Shortly before leaving office in January, the Clinton Labor Department announced an important change in the interpretation of the rules concerning the reporting requirements for consultants and lawyers. Under the Clinton rules, consultants would have had to report to the Labor Department if 'persuading employees [not to unionise] was an object (direct or indirect)' of their activities, even if they had made no direct contact with employees. Prior to this change, the Labor Department had interpreted the so-called 'advice exemption' of the 1959 Labor-Management Reporting and Disclosure Act (LMRDA) as requiring consultants to file reports only if they had made direct contact with employees. Justifying its controversial new policy, the Clinton Labor Department argued that the previous rules had 'led to the under-reporting of the activities that Congress believed should be disclosed to employees and the public, particularly given the apparent growth in the use of labor relations consultants beginning in the 1970s' (*Daily Labor Report*, 2001a).

Scheduled to take effect on 11 February 2001, the Clinton policy never saw the light of day. In one of its first actions in the arena of labour–management relations, the Bush Labor Department first delayed and then rescinded the Clinton interpret-

❑ John Logan is Lecturer in the Industrial Relations Department, London School of Economics; e-mail J.Logan@lse.ac.uk.

© Blackwell Publishers Ltd. 2002, 108 Cowley Road, Oxford OX4 1JF, UK and 350 Main St., Malden, MA 02148, USA.

ation of the law. To the delight of management associations and their allies, the Labor Department decided in April 2001 that the 'prior longstanding' advice exemption rule, which has operated since 1962, was the 'more appropriate one' (*Daily Labor Report*, 2001b). Once again, it appears, consultants and lawyers will be free to design and implement employers' anti-union campaigns, unhindered by all but the most minimal degree of government regulation.

Tightening the rules concerning the activities of anti-union consultants has been a major legislative goal of the American Federation of Labor and Congress of Industrial Organization (AFL-CIO) since the failure of its 1978 Labor Reform Bill. Having lobbied vigorously for greater regulation of consultants throughout the Clinton years, the AFL-CIO attacked the Bush reversal as a 'stunning move attacking worker protections'. On the other side of the debate, employer associations have been equally vociferous in resisting increased government regulation of the consultants. The Printing Industries of America, an organisation that provides printing firms with advice on how to fight union campaigns, claimed that the Clinton interpretation of the reporting requirements would have interfered with employers' free speech rights and put them in a 'very bad bind' (*Daily Labor Report*, 2001b).

But why have the rules surrounding the reporting requirements for anti-union consultants and lawyers attained such a prominent and fiercely contested status in US labour relations? What apparently devastating union-busting advice and tactics do the consultants provide employers with, and why does the AFL-CIO believe that public exposure would undermine their effectiveness? Previous studies of consultants have consisted largely of quantitative analyses of the impact of consultant activity on the outcome of organising campaigns (Brofenbrenner, 1994; Lawler, 1984). Most of these studies have concluded that anti-union consultants have become part of standard operating procedure, with over three-quarters of employers recruiting outside expertise when faced with a union drive. They argue, moreover, that firms that recruit consultants win more National Labor Relations Board (NLRB) elections than those that do not, and unions that win certification are much less likely to secure a first contract if a consultant is present (Hurd, 1996; Pavy, 1994). In these quantitative studies, however, the consultants themselves remain shadowy figures, practising their 'black art' well in the background, and while their basic anti-union tactics are well known, comprehensive descriptions of counter-organising campaigns are mostly lacking. This article provides a qualitative analysis of the services that the consultants have offered employers and an account of the campaign tactics of several 'superstars' of the union-free movement. It describes a multi-million dollar industry that has helped employers to circumvent the intent of the National Labor Relations Act (NLRA) through a vast array of union-busting tactics, implemented before the union arrives and continuing until after it is defeated: tactics that are designed, at every juncture, to undermine employees' free choice of bargaining representatives.

While modern-day consultants have operated since the 1940s, the anti-union consultant industry exploded in size during the 1970s and 1980s. When one prominent union buster, Martin Jay Levitt, first entered the field in the late 1960s, he knew of only about 100 consultants and a dozen law firms that specialised exclusively or predominantly in union avoidance or counter-organising.[1] But by the early 1980s, the AFL-CIO believed that over 1,500 anti-union consultants were operating in the US, and one of the nation's leading consultants, Herbert Melnick of Modern Management, told Congress that the industry had grown tenfold during the 1970s (BNA Special Report, 1985; US Congress, 1979). In 1990, one academic study calculated that, while employers were spending about $200m per year in direct payments to defeat organising drives, the true value of the anti-union industry increased to $1bn if one included the cost of management time off to fight unions and opposition following certification (Lawler, 1990). By 1997, then AFL-CIO organising director Richard Besinger believed that employers were spending 'between $2,000 and $4,000 per vote' to defeat unions in NLRB elections (Levine, 1997).

---

[1] Author's interview with Martin Jay Levitt, Las Vegas, 29 August, 2001.

    © Blackwell Publishers Ltd. 2002.

Consultants claim that the union-busting industry has grown tremendously in size since the 1970s in direct response to the desire of an increasing number of American firms to operate union free. They say that, in the context of a growing union/non-union wage differential, heightened international competition, deregulation, greater domestic non-union competition, and intensifying employer demands for workplace flexibility, requests for the services of anti-union consultants and law firms increased substantially in the 1970s and 1980s. But, despite their frequent protestations to the contrary, the consultants have not been passive participants in this process; rather, they have actively created demand for their services among employers, who often had little idea that such services existed and have helped popularise the 'union-free' ideology among American managers. Unions and their allies argue that, by making themselves an indispensable part of management's anti-union arsenal, the consultants have acted as a catalyst for militant opposition to unionisation. In reply to consultants' assertions that they are simply providing the anti-union services that employers have demanded, one NLRB official stated: 'It's a lot of hogwash that the union-busting attitude comes only from the client' (Doppelt, 1980).

As employers have watched consultants help their competitors defeat union drives or unload existing unions, moreover, they have been emboldened to adopt the same tactics. One prominent anti-union lawyer, Robert Ballow of Nashville-based King & Ballow, asserted that the consultants' startling success in promoting a union-free environment had encouraged cautious employers to fight vigorously against unions. Ballow believed that most firms in the newspaper industry were fighting aggressively against unionisation 'because they see that others have done it, and that they've been successful'.[2] By the 1990s, the consultants themselves, their anti-union ideology, and their vast armoury of counter-organising tactics had all become deeply ingrained in the fabric of labour–management relations, with disastrous consequences for unions and for employees intent on exercising their legal right to organise. In the late 1970s, one union infiltrator warned of the effectiveness of union-busting seminars in disseminating the consultants' ideology and tactics:

> The anti-union sentiment in this country is becoming increasingly apparent as evidenced by the phenomenal growth of seminars of this sort. Management has become much better prepared in promoting and maintaining a non-union environment as a direct result of these seminars. It is up to the labour movement to turn the tide by counteracting these philosophies before it is too late.[3]

## Anatomy of a counter-organising campaign

Over the past three decades, counter-organising campaigns have formed the bulk of most consultants' 'union business'. Through almost daily contact with NLRB regional offices, consultants frequently know about union petitions for recognition before the targeted companies do, thus convincing management that the consultants are indeed experts on union representation. One union attorney explained how Indiana consultant Rayford Blankenship procured new clients:

> Blankenship obtains his information by sending representatives to the NLRB Regional Offices to copy their daily docket book . . . Blankenship's letters typically get to the employers before those of the NLRB. This is why he asserts that he has 'insider information'. Based upon such representations, many small employers who are somewhat panicked by their situation retain Blankenship.[4]

Consultants encourage the employer to think of the union campaign as a failure on its part and to view the election as a referendum on management, telling them that

---

[2] 'An Interview with a Tough Negotiator', *Presstime*, October 1989, p. 19.
[3] 'De-Unionization: A Report on a Recent Seminar by Francis T. Coleman', Master Printers of America, (no date); Robert Kates, IAM Research Department, 'Report on '''Avoiding Unions''' Seminar', 15–16 March, 1979, Madison Hotel, Washington, DC. Records of the Industrial Union Department, AFL-CIO, unprocessed collection, George Meany Archives, Silver Spring, MD. Unless otherwise stated, manuscript sources are from this collection.
[4] Edward J. Fillenwarth, Jr, letter to Jules Bernstein, 15 February 1980.

employees vote for or against management, not for the union. They advise employers to give the consultant complete responsibility for the running of the anti-union campaign and most comply enthusiastically. Counter-organising campaigns range from sophisticated, lengthy and expensive campaigns conducted by several consultants, often costing thousands of dollars per day, to 'quick and dirty', low-budget, packaged campaigns for employers seeking the expertise of a consultant, but unable to afford the cost of a major operation.

### The opening salvos: authorisation cards, delays and the manipulation of bargaining units

Prior to a certification election, the union is required to submit to the NLRB authorisation cards signed by at least 30 per cent of the eligible bargaining unit. Consultants tell employers to write, publicise and enforce a clear policy against solicitation on company premises by non-employees that must be enforced against, for example, the Salvation Army as well as against the union. If a card drive does develop amongst employees, consultants encourage employers to act quickly and decisively against the campaign because 'no company has ever lost an election that wasn't held'. The tougher you are at the outset, the consultants advise, the better your chances at driving the union to another company that is easier for it to deal with. Before the union files the cards, consultants emphasise their critical importance, cautioning employees that signing an authorisation card is akin to signing over power of attorney to the union or signing a blank cheque.

Supervisors tell employees that the card campaign is going badly and warn that union organisers are using intimidation, harassment and pressure tactics to force employees to sign cards, thus placing the union on the defensive and making employees wary of approaches from union supporters. They also caution employees that their cards are not necessarily confidential, as organisers have promised, because the union may provide management with copies of the cards as proof of majority support. If employees have signed cards but the union has not yet filed the cards with the labour board, management advises employees to ask the union to return their cards; and to facilitate the process, it often distributes sample letters requesting the return of cards and envelopes addressed to the NLRB. By giving the impression that some employees wish to withdraw their cards, this tactic creates doubt among the employees about the level of support enjoyed by the union, especially among those who are not solid union supporters.

After the union has submitted the authorisation cards to the NLRB, management stresses the lack of importance of the cards, reassuring employees that even if they signed a card, they can, and should, *vote no* in the forthcoming election. Consultants tell management never to agree to examine the cards, but if the union is foolish enough to leave the originals, the employer should destroy them immediately because the union is required to supply the NLRB with originals. The company must convince the NLRB that it has 'good faith doubt' that a majority of employees desire union representation. If it were to agree to examine the cards, the union could later accuse the company of committing an unfair practice by refusing to bargain when it knew that a majority of the workforce desired union representation. When the NLRB organises a date for the election, the employer is required to provide the union with a list of employees' names and addresses—the so-called 'Excelsior' list. Consultants recommend that management provide the union with an incomplete, outdated and misleading list at the last moment permitted by law and tell employees that the NLRB compels them to provide this information to the union. The consequence could well be unwarranted intrusions on their privacy, such as union organisers calling on their homes. One former anti-union consultant remembered preparing lists that 'provided the minimum information legally required while withholding enough details to frustrate union officers in their hunt for employees' (Levitt, 1993).

Consultants advise employers on how to object to both the size and make-up of the bargaining unit, how to pack units with anti-union employees, exclude pro-union

employees, and reduce the number of employees eligible for collective bargaining. Santa Clara-based West Coast Industrial Relations Association (WCIRA)—the second largest firm during the 1970s and 1980s and one of the most ruthless—frequently advised employers to manipulate the composition of bargaining units. It told one client to 'pack the unit by hiring several permanent part time employees who are certain company votes' and to hire family members and friends shortly before the election.[5] Consultants often attempt to persuade the NLRB that union activists are, in fact, supervisors, thereby removing them from the union campaign and leading to possible charges that supervisors have unlawfully assisted an organising drive. By reclassifying ordinary employees as supervisors, part-time, contingent or temporary employees, or as independent contractors, employers can reduce significantly the number of employees who are eligible for unionisation. In healthcare facilities, consultants have frequently claimed the existence of three or four supervisors per ordinary employee. Herbert Melnick of Chicago-based Modern Management (the largest and most notorious firm during the 1970s and early 1980s) boasted that during one campaign:

> We got every single nurse excluded as a supervisor, every licensed practical nurse as a supervisor. And that's how we won it. Otherwise, if you went by the election there was no question. [The union] had 90% of the people signed up ... But you have to be prepared—you have to structure it now. And one way to do it is to get these people together and say, 'You are a supervisor ...Give them the job description and let them sign for it...*Paper impresses the government more than anything else.*[6]

Consultant use of the 'supervisory exemption' tactic has not been limited to the healthcare industry. After several skirmishes with one anti-union law firm that consistently sought to reclassify ordinary employees as supervisory personnel, the AFL-CIO warned that, if a company were 'not concerned with truthful testimony at the [NLRB] hearing, they can make anyone they wish supervisors'.[7]

Consultants have also developed a host of complex legal manoeuvres designed to delay NLRB proceedings. They stress that time is on the side of the employer and teach managers how to file frivolous complaints with the NLRB in order to delay the election process and prevent the expeditious enforcement of the law. Delays extend the duration and effectiveness of the employer campaign and undermine employee confidence in the effectiveness of both the union and the labour board. Chicago consultant John Sheridan explained that delay was critical to the success of his counter-organising campaigns: 'If a [certification] petition is filed today, and the election is in two weeks, we'll lose it' (Moberg, 1992).

### The 'foot soldiers' of the counter-organising campaign: supervisors, 'vote no' committees and company unions

In most counter-organising campaigns, consultants work surreptitiously and employees rarely see the firm's chief campaign strategist. Indeed, employees are often blissfully unaware of the consultant's presence in the workplace because consultants use first-line supervisors to spearhead their anti-union campaigns. This allows the consultant to remain in the background, avoid becoming the focus of union attacks, and side-step the reporting requirements of the LMRDA. New York lawyer Al DeMaria explained the importance of staying anonymous during counter-organising campaigns: 'I don't want the union to have the political advantage. They will tell the workers, "'Look, the company hired this guy from New York City.'" I try not to let the union take that potshot at me' (*AFL-CIO News*, 1982). Because consultants do not really trust supervisors—fearing that, deep down, they may be sympathetic to the

---

[5] Leonard C. Scott, Confidential memo to Ted Vieweg, BLK Steel Company, 25 October, 1979.
[6] Transcript of Modern Management seminar conducted by Herbert G. Melnick (1979), original emphasis.
[7] Michael Krivosh, IUD Staff Representative, AFL-CIO, letter to Dick Wilson, Assistant Director, Department of Organization & Field Services, 4 April 1980.

© Blackwell Publishers Ltd. 2002.                    *'Union free' movement in the USA*   201

union—they have developed strategies to ensure absolute loyalty. The 'shock troops' in the war against unionisation, supervisors can be either bullied or brainwashed into supporting the consultant's campaign. Consultants gain the co-operation of supervisors by warning that unionisation will be a personal calamity for them because a union contract will undermine their authority on the shop-floor, and advise that, as part of management, supervisors can be terminated for refusing to participate in anti-union campaigns. Al DeMaria warned supervisors that they 'had the biggest stake in maintaining the company's non-union status',[8] while the Chamber of Commerce advised that it was 'not unlawful for an employer to discipline or terminate a supervisor who refuses to follow the employer's instructions to oppose unions' (Young and Stephenson, 1990). Thus, the consultants stress that both the authority and the jobs of supervisors are threatened by unionisation.

Supervisors are warned that their future and entire worth at the company is dependent on how many 'no' votes they deliver in the election. But counter-organising campaigns also present new opportunities for supervisors who demonstrate their worth to the consultant. Compliant and effective supervisors are flattered and their roles expanded, while unco-operative and ineffectual supervisors are fired or transferred to different facilities. Consultant Charles Hughes recommended that if any supervisor were unwilling or unable to commit fully to the anti-union campaign, 'get him a job with a competitor' (*Daily Labor Report*, 1979). As a gesture to disgruntled employees, 'problem' supervisors are sacked or transferred, and their positions are frequently offered to union activists, thereby removing them from the union campaign and forcing them to urge other workers to vote 'no'. To ensure that supervisors are not reluctant to engage in anti-union activities, consultants emphasise that the NLRB will hold the company, not the individual supervisor, responsible for any violation of the law during the employer campaign.

Supervisors serve as 'precinct captains' during counter-organising campaigns, and consultants advise appointing one supervisor for every 10–20 employees. Consultants hold regular meetings with individual supervisors to follow what is happening in every section of the facility. 'Personal' communication methods, such as individual meetings with employees, are management's most effective method of conveying their anti-union message to employees (Cornfield and Canak, 2000). Consultants require supervisors to talk daily to employees on a one-to-one basis and record their reactions to the conversations. These meetings become more frequent, and consultant pressure on supervisors and supervisor pressure on employees intensifies as the campaign progresses. Supervisors clearly have the ability to make employees' working lives pleasant or miserable and, because there are no witnesses to these meetings, it is difficult for the union to establish violations of the law, such as threats of reprisal or promises of benefit.

Towards the end of the campaign, supervisors report to the consultants on a daily basis or even more frequently. Based on information obtained from the supervisors' reports, consultants compile detailed lists of pro-union, anti-union and undecided workers, thereby allowing supervisors to target undecided workers more effectively. Pro-union workers are given unfavourable evaluations, transferred to undesirable jobs and physically isolated within the workplace—moved to areas where they have little opportunity to influence undecided workers—while supervisors psychologically isolate activists by spreading malicious rumours designed to undermine their credibility (US Congress, 1979).

Consultants teach supervisors how to identify and organise anti-union employees into 'vote no' committees to put pressure on undecided employees, even though direct management involvement in such groups is illegal. According to the AFL-CIO, 'vote no' committees 'somehow just seem to pop up' when the consultants are around.[9] Early in the employer campaign, anti-union employees play a leading role,

---

[8] Alfred DeMaria, Transcript of Tape from Supervisor's Guide to Maintaining a Union Free Plant, 'What Unionization Would Mean to You'.
[9] *Report on Union Busting (RUB) Sheet*, Issue No. 3 (April 1979), p. 1

    © Blackwell Publishers Ltd. 2002.

because they can engage in several activities that would be illegal if conducted by supervisors. Supervisors provide 'vote no' committees with resources, and encourage them to circulate statements opposing unionisation for other employees to sign. If necessary, management motivates anti-union employees by warning them of the dire consequences of a union victory; one consultant would instruct supervisors to tell 'vote no' committees, 'if the union wins, your ass will be out of here'.[10] Consultants also advise employers on how to encourage the formation of company unions and persuade the labour board that these are bona fide employee associations, rather than management-dominated organisations, which are illegal.

### Communicating with employees: anti-union propaganda and captive audience meetings

Consultants try to persuade employees that the company, not the union, is the sole source of credible information. Designed to create an atmosphere of fear, intimidation and confusion within the workplace, most 'impersonal' consultant communications (letters, newsletters, videos, etc.) stress similar themes—strikes, violence, insecurity and disruption (Cornfield and Canak, 2000). Anti-union literature attacks both the labour movement in general and the particular union involved in the organising campaign. Organisations such as the Houston-based PTI (Petro-Techno Industries) Labor Research provide consultants and law firms with a comprehensive clipping service of anti-union stories on particular international/local unions. But large consulting and law firms also maintain their own extensive files of counter-organising literature. One large firm, Southeastern Employees Service Corporation (SESCO), would assure clients that it assumed complete responsibility for all anti-union communications during the employer campaign:

> SESCO prepares all counter union speeches, small group meeting talks, letters to employees' homes, bulletin board posters, handouts to employees, etc., and schedules dates for each counter union communication media piece to be used. We have assembled a very large library of counter union materials, much of which is customised to a particular union.[11]

Consultant propaganda includes predictions of violent strikes and permanent replacements, restrictive clauses of the union constitution, salaries of union officials, union dues, allegations of corruption, charges that employees will surrender their right to deal directly with management, and warnings about the difficulty in decertifying unwanted unions. Intended to undermine the credibility of the union and its supporters, impersonal propaganda is relayed, whenever possible, through 'neutral', third-party sources—press clippings, publications of government departments and research organisations, and, perhaps most valuable, the testimony of former union members who are now hostile to unions. A common tactic is to distribute a list of recent union strikes compiled by the Bureau of National Affairs, with the outcome of each strike written beside each entry. One consultant advised that statistics on union strikes, salaries and corruption are 'available from the Bureau of National Affairs. Evidently they run a clipping service which fulfils this management need'.[12]

Consultants write or help employers to write anti-union letters signed by senior management, which are delivered to employees on the job by supervisors in order to witness each employee's response and to 'stimulate discussion' between supervisors and employees. Campaign literature is mailed to employees' homes less frequently because, consultants warn, 'nobody reads anything at home'. Consultant-scripted letters predict job losses, plant closures or relocations in the event of a union victory, and stress the general futility of unionisation—employers are not required to agree to the union's demands or even to sign a contract, and management hostility will continue long after the election campaign. Consultants recommend that manage-

---

[10] 'De-Unionization: A Report on a Recent Seminar by Francis T. Coleman'.
[11] Joseph Lawson, President, SESCO, letter to John Altano, Heck's Inc., 5 May 1983.
[12] 'De-Unionization: A Report on a Recent Seminar by Francis T. Coleman'.

© Blackwell Publishers Ltd. 2002.

ment organise 'going out of business' discussions—especially in manufacturing plants where the threat of closure or relocation is greatest—but caution on conducting these meetings carefully, so as to avoid unfair labour charges:

> You can't come out and threaten we are going out of business [in the event of a union victory]. But a threat is permissible providing you give a factual basis for it . . . We usually say assuming the union refuses certain needs we have to remain competitive and assuming that our competition will have no restrictions on it, we believe we will not be able to maintain the orders we now have and will go out of business.[13]

The purpose of these meetings is to convince employees that, instead of voting for the union or no union, the real choice they are facing is between the union and their jobs. Employees are told that they should vote against the union 'as if your jobs depend on it' (Hurd and Uehlein, 1994). Another common tactic is to distribute literature relating the story of a neighbouring business that has folded, shed jobs or relocated following a union victory, even if no evidence exists linking this development to the employees' decision to unionise. One Jackson–Lewis 'vote no' letter warned workers that a recently unionised competitor of the company facing the organising drive, 'now employs over 700 people in Nogales, Mexico—they are not represented by a union'.[14] In recent years, the threat of plant closures has become a standard feature of employer campaigns, and management in 'mobile' sectors of the economy can communicate its message to employees without directly threatening relocation (for example, by placing maps of Mexico around the workplace).

The consultant warns employees about the potentially disastrous consequences of collective bargaining. If the union were to win, employees are told, the company would be forced to abandon its flexible approach to work rules (such as versatile scheduling), negotiations would 'start from scratch', management would bargain 'hard' and employees may lose, rather than gain, as a result of the bargaining process. Consultants use the language of the law to legitimise their scare mongering about the negative consequences of bargaining. One company cautioned employees that 'the law on bargaining is very clear':

> The company is not required to agree to anything, including the continuation of present pay or present benefits . . The company has as much right to demand less as the union does to demand more. In other words, when bargaining begins the contract looks like a blank piece of paper and nothing goes on the paper until the company agrees, including the present pay and benefits.[15]

Management insists that the union will readily trade concessions in wages and benefits in return for those things it most covets—a dues check off, union security, super-seniority for union activists, and a lengthy contract. It stresses that 'management rights' clauses in collective agreements mean that the company will retain exclusive control over a broad range of important decisions at the workplace. And it cautions that if the union fails to negotiate its demands, it has two choices—accept an 'unacceptable' contract or call a strike and risk replacement. Employer communications frequently imply that strikes are all but inevitable if the union wins and warn that during strikes employees lose not only wages but health insurance, face the threat of permanent replacement, and have no automatic right to unemployment benefits.

To emphasise the precariousness of bargaining, management distributes NLRB decisions warning that collective bargaining can be potentially hazardous for employees and distributes fake pledges for the union to sign, stating that it guarantees job security, pay increases, and improvements in working conditions in the event of a union victory. The underlying message is that the union is afraid to back up its claims with a written guarantee and in its efforts to win the support of employees, is making empty and unobtainable promises. Promises are the union's stock in trade, but it cannot guarantee a single one. If the union could deliver on its promises, moreover, that would be even worse news for employees. During one campaign,

---

[13] *Ibid.*
[14] Jerome W. McCrea, President, Centre Engineering Inc., 15 September 1978.
[15] Dick Carl, A-1 Bit & Tool Company, letter to Mike Anglin, 13 August 1980.

                    © Blackwell Publishers Ltd. 2002.

the Sharp Manufacturing Company attacked the union's 'irrational and unrealistic'
demands and warned its employees:

> It would be absolutely impossible for Sharp to remain in business for very long if the union was
> sincere in its demands. The rates the union is promising would put Sharp in such an uncompeti-
> tive position it would be impossible for us to operate or sell our products. This is the danger to
> you—that is the danger to all of us here at the Sharp Manufacturing Company.[16]

In short, collective bargaining is no bargain.

Consultants also recommend that employer communications attack the labour
movement nationally. Management asks employees to question why unions are so
keen to represent them. It stresses that unions have been declining dramatically in
size, losing more NLRB elections than they have been winning, and are, therefore,
scrambling to gain new dues money to make up for lost members. Since most Amer-
ican workers recognise the hazards associated with collective bargaining and thus
are saying no to union representation, management asks, why would the company's
employees want to vote 'yes'?

Consultants utilise gimmicks such as anti-union comic books, cartoons, compe-
titions and 'vote no' t-shirts and buttons. Competitions typically include the 'Longest
Union Strike Contest' (the correct answer being the greatest of three possible choices)
or 'true or false' quizzes (sample question: 'The union president earns $150,000 per
year and has a chauffeur-driven limousine') with a cash prize worth six months
union dues money. The purpose of these gimmicks is to imply that the union is a
militant and disruptive influence and that union bosses enjoy lavish lifestyles off the
backs of employees' dues money. Some consultants practice 'over-communication'
or the 'saturation technique': by bombarding employees with literature, videos and
captive meetings, management offers new arguments against the union on a daily
basis and overwhelms and confuses employees by making the anti-union campaign
a constant and conspicuous presence in the workplace.

Consultants also employ 'interpersonal' methods—such as captive speeches and
ventilation meetings—of conveying management's anti-union message (Cornfield
and Canak, 2000). Apart from its superior financial resources, management's greatest
advantage during an organising campaign, consultants stress, lies with its exclusive
and unlimited access to employees at the workplace. Marty Levitt explained that,
during anti-union campaigns, he had enjoyed 'a captive audience a minimum of
eight hours a day', while the union's access to employees was 'very limited' (Moberg,
1992). Early in the campaign, consultants organise small group 'ventilation' meetings
that allow employees to 'let off steam', reduce dissatisfaction and discuss contentious
issues during the campaign. They advise employers on how to conduct captive audi-
ence meetings involving small groups of employees or the entire workforce, which
take place on company premises on paid time. A minority of consultants and lawyers
talk directly to employees. WCIRA campaigns frequently involved direct contact
with employees, while Indiana consultant Rayford Blankenship usually dealt directly
with employees, even conducting captive meetings himself. Although speaking
directly to employees legally requires consultants to report their activities and income
to the Labor Department, few actually do so. Marty Levitt recounted that during his
20-year career as a consultant, he 'never' reported his activities because as long as
the consultant deals only with supervisors and management, 'he can easily slide out
from under the scrutiny' of the Labor Department (Levitt, 1993). Most consultants
claim that one of the few emphatic policies that they adhere to during counter-organ-
ising campaigns is never to engage in reportable activities.

### Manufacturing dissent

Consultants deliberately create an atmosphere of divisiveness in the workplace,
especially when the workforce consists of white-collar or professional employees.

---

[16] Paul J. Hagusa, President, Sharp Manufacturing Company of America, letter to Sharp Employees,
24 May 1980.

They believe that confrontation and disruption are more effective than fear and intimidation in turning professional employees against the union (Cohen and Hurd, 1999). In these campaigns, employer communications stress that unionisation is incompatible with the employees' professional identity, that it would undermine the quality of their work, and that it would create an 'adversarial' relationship between management and employees. New York lawyer Al DeMaria stressed the differences between employer campaigns aimed at blue- and white-collar workers:

> The white-collar worker will express antipathy to strikes as a method of getting benefits. Corruption among union leaders also turns white-collar workers off more so than blue-collar workers . . . Mass meetings generally do not have the same effect on the white-collar workers as they do on the blue-collar man.[17]

Consultants want employees to blame the union for the new hostile tone in the work-place and to conclude that this hostility will become institutionalised if the union were to win. In 1979, one SEIU organiser explained how consultants foment dishar-mony in their efforts to turn employees against unions in healthcare facilities:

> The average worker is unaware of [the consultant's] existence. It is very easy to associate the transformation of the hospital into a nightmare with the existence of a union drive because, before the union drive happened, things may not have been great, but there wasn't the incredible press-ure . . . And, of course, if the union somehow does win, this hell might become permanent. (US Congress, 1979)

The consultant's intention is to disrupt the usual functioning of the firm and create the impression that the union is responsible for this unwanted upheaval. But if the employees were to reject the union, they are assured, the atmosphere in the work-place would return to normal.

### Timing of the counter-organising campaign

The consultant times the employer campaign to ensure that anti-union sentiment peaks just before the election. Management organises a final captive speech 24 hours prior to the election (final day speeches are illegal) stressing that it has made mis-takes, that it has 'heard' the employees' complaints and intends to introduce improvements, and asks that it be given 'another chance'. During one organising drive in the South, the union reported on the evolution of the employer campaign (directed by the Nashville law firm Kullman & Lang) from threats and coercion to promises and offers of friendship:

> The general tone of the campaign was fear and intimidation. The company stressed issues of job loss, loss of existing benefits, strikes, and union violence. On the second shift, outright threats, intolerable production rates and severe disciplinary actions were practiced against employees likely to be pro-union . . . A final company tactic occurred the last few days of the campaign. The company switched its tone from fear and intimidation to sympathy and support.[18]

In last-minute captive speeches, the company president often pleads personally with employees: 'I am asking you to give us a chance. I am asking you to please *vote no*.' The message to employees is that though management is not perfect, it is here with the employees and shares their fate, while the union is an outside 'business' interested only in their dues money. Management tells employees that the union is not the answer to whatever problems exist in the workplace and, despite what the union might claim, *you* are not the union; *they* are the union and they can take important decisions that affect your job without your approval. Thus, instead of voting to rid themselves of one boss, employees will be voting in a second boss. Management's efforts to label the union an outside influence indicates the importance of keeping the consultant, obviously an out-sider, well hidden during the counter-organising campaign (Fulmer, 1982).

---

[17] Remarks by Alfred De Maria, New York State Management Attorney's Workshop Conference (no date).
[18] Joe Uehlein, Industrial Union Department, letter to Dick Wilson, Department of Organization and Field Services, AFL-CIO, 14 May 1981.

    © Blackwell Publishers Ltd. 2002.

Consultants try to schedule NLRB elections to coincide with pay-days, holiday periods, immediate after annual pay increases, or at other 'feel good' times. On pay-day elections, employees receive two pay cheques—one for the amount of the monthly union dues, the other for their regular amount minus the dues money. Employer opposition continues even during the voting process. WCIRA would instruct the company's election observers that 'your principal job is to guarantee only employees on the employer's eligibility list should be allowed to vote without challenge'.[19] Company observers object to all other voters on the grounds that they are not employees or no longer employed, that they are members of an excluded group, such as supervisors, or that they were not on the payroll on the designated eligibility date. If the union wins the election, the consultant files frivolous complaints against the union in an attempt to persuade the NLRB to overturn the result.

### Breaking the law to break the union: consultants and proliferation of unfair management practices

Allegations of discrimination against union activists—the 'single most potent wea-pon' in management's union-busting arsenal (US Congress, 1979)—have increased dramatically during the past three decades, and union advocates claim that the con-sultants are partially responsible for this great wave of managerial lawlessness. The AFL-CIO and its allies have also argued that the illegal anti-union tactics developed and popularised by the consultants have contributed significantly to unions' dismal win rate in NLRB elections (Cooke, 1984; Hurd and Uehlein, 1994). One senior union-ist conceded that the consultants' 'record of sabotage and obstruction of union cam-paigns is, from management's point of view, excellent'.[20] As more consultants and lawyers entered the lucrative union-busting industry in the 1970s and 1980s, more-over, no-holds-barred counter-organising campaigns increasingly became the norm.

The most ruthless consultants have advised their clients to take illegal actions to counteract union campaigns, especially if the outcome of the election is in any doubt. Some consultants tell employers to fire a few union activists, if possible, for 'just cause', and teach them how to make these terminations appear legitimate. Consult-ants assure employers that they are unlikely to get caught, that the penalties for violating the law are weak, and that the NLRB takes months to reinstate sacked workers. They stress, moreover, that the 'chilling effect' created by sacking activists can halt a union campaign in its tracks, as employees' fear of reprisal for union activity immediately loses all of its vagueness. If the employer engages in egregious unlawful conduct, the NLRB can organise a re-run election or order the certification of the union based on a card majority. But the labour board rarely orders certifi-cations based on card checks, while in re-run elections, unions are frequently unable to overcome the climate of intimidation created by the employers' illegal actions during the initial campaign. When WCIRA consultants feared that a counter-organising campaign was in trouble, they would 'routinely ignore the Act. Their philosophy is that [unions] may get a second election but we'll lose that one too.'[21]

All consultants deny that they recommend violating the law. But certain consult-ants have been caught at anti-union seminars articulating disdain for the NLRB and encouraging employers to commit illegal tactics. One union infiltrator taped Fred Long, president of WCIRA, telling participants at his seminar:

> You got to remember you only lose once. What happens if you violate the law? The probability is you will never get caught. If you do get caught, the worst thing that can happen to you is you get a second election and the employer wins 96% of second elections. So the odds are with you.[22]

---

[19] West Coast Industrial Relations Association, 'Notice for Election Observers' (no date).
[20] Harold McIver, 'Preliminary Report on Labor Consultants', p. 5.
[21] *RUB Sheet*, Issue No. 3 (April 1979), p. 1; Tom Geist, 'West Coast Industrial Relations Association Campaign' (no date).
[22] Transcript of Tape Recording Made by Joel D. Smith of Presentation of Fred R. Long, WCIRA, at Century Plaza Hotel, Los Angeles, 28 July 1976.

Long also advised attendees on how to backdate memos to justify pay increases during campaigns (a favourite WCIRA tactic), stack bargaining units by hiring family members and friends immediately before an election, and delay proceedings by filing bogus complaints with the NLRB.

But WCIRA's support for illegal tactics was not restricted to anti-union seminars. During one organising drive at a steel plant, a WCIRA consultant recommended that management conduct a 'hard hitting' campaign based on the firm's counter-organising techniques, and his 'proposed remedy' against future union activity was characteristically blunt:

> After the election, build cases on and terminate the following employees: [lists names of 12 pro-union employees]. These workers should be replaced with non-union prone employees. [WCIRA] would be happy to assist in screening employees for you and/or train your supervisors to screen out poor risks.

And the steel campaign appeared fairly representative of the firm's counter-organising strategy. After encountering WCIRA in numerous campaigns, one union-ist concluded that the firm 'can be expected to ignore the law unless it suits their interests'.[23]

Consultants also tutor management and supervisors on how to engage in unlawful activities—such as surveillance, interrogation, unscheduled pay increases, and threats of dismissal—without fear of facing unfair labour charges. During one of his sem-inars, Herbert Melnick of Modern Management explained how to spy on pro-union employees without violating the law:

> You know that a union meeting is going to be held at the Holiday Inn, and you decide, 'I am going to ride down to the Holiday Inn, and I'm going to park my car in the lot and I'm going to watch everybody who comes into the parking lot'. You may not do that. Now, if you just happen to be coming to the Holiday Inn to attend another function and you just happen to see certain people go in, you have every right to do that. That's not surveillance . . . Everything is fair game.[24]

Consultants have defended their right to mount aggressive anti-union campaigns. In the early 1980s, Arthur Mendelson, a partner with one of the nation's oldest and largest anti-union law firms, Littler & Mendelson of San Francisco, justified militant campaign tactics: 'Our clients pay a lot of money . . . If they want aggressiveness, they are entitled to it.' And Rayford Blankenship would boast to prospective clients that his consultant firm had adopted 'every tactic that a company can and must use to remain non-union'.[25]

But consultants have dismissed the increase in allegations of unfair management practices as 'meaningless statistics' and reject the charge that they have contributed to illegal campaigns or that such actions are responsible for unions' declining victory rates in NLRB elections. Arthur Mendelson stressed that management 'can do so much within the confines of the law to combat unionism that they need not and should not break the law',[26] while WCIRA president Fred Long argued that consult-ants don't have to 'violate the law to defeat the union. All you have to do is portray its track record' (US Congress, 1979). Consultants claim that unions are seeking a 'scapegoat for their own failures' and attempting to stifle legitimate and desirable communication between management and employees (BNA Special Report, 1985). John Sheridan has also dismissed the accusation that consultants were responsible for unions' election loses, stating, 'faced with statistics like these, I would be looking

---

[23] Leonard C. Scott, Vice President, Personal and Confidential memo to Ted Vieweg, Plant Manager, BLK Steel Company, 25 October 1979; Michael Fanning, House Counsel, International Union of Operating Engineers, memo to Charlie McDonald, AFL-CIO Organization Department, 29 October 1980.

[24] Transcript of Modern Management seminar by Herbert Melnick (1979).

[25] Quoted in Paul Shineoff, 'Specialist Law Firm that Labor Loves to Hate', *San Francisco Examiner*, 21 September 1980; Ray Blankenship, letter to clients, 15 April 1980.

[26] 'Report on American Management Association Union Busting Seminar', 16–18 April 1980, San Fran-cisco.

for a scapegoat, too'. Instead, Sheridan insisted that consultants had prevailed over unions during numerous organising campaigns because they had 'worked harder and made fewer mistakes' (Moberg, 1992).

Consultants contend, moreover, that far from encouraging illegality, by educating employers and supervisors as to what anti-union tactics are lawful, they have reduced the number of unfair management practices committed during organising campaigns. If more firms were to engage consultants, they argue, we would be forced to endure fewer rogue employers such as the notorious textile giant, J.P. Stevens (though Stevens itself was advised by several anti-union consultants in its bitter struggle against the textile union). John Sheridan claimed that a campaign in which the company hired a consultant was 'probably going to be—in spite of what the unions say—a cleaner election because [consultants] come in and they tell the supervisors, "'You can't do this and you can't do this'" (BNA Special Report, 1985). Thus, consultants teach supervisors how to *inform* employees about unionisation, not how to *interfere* with employees. In its landmark *St. Francis Hospital* decision (1981), the NLRB appeared to accept Sheridan's argument concerning unfair practices by rejecting the union's accusation that Modern Management was directly responsible for the illegal employer campaign. If it had issued a complaint against the consultant, the labour board argued, employers would be discouraged from recruiting external expertise, and the result 'could very well be the commission of more, rather than fewer, unfair labour practices by uninformed parties' (263 NLRB 109).

### Consultant activities following a union victory: bargaining to impasse and tactics leading to decertification

After the certification election, consultants continue to advise management on anti-union hiring practices. With the termination of pro-union employees, high labour turnover, and the recruitment of carefully selected anti-union employees, the company can engineer a sea change in the union sentiment of the workforce. After defeating a union campaign, one employer explained that he had remained vigilant about the union sentiment of his workforce: 'Six months later, we had weeded out the malcontents and were operating smoothly and profitably.'[27]

If the union wins the NLRB election, employer opposition continues, often assisted by the consultant. You haven't lost until you sign a contract, consultants tell employers. Consultants advise management on how to stall or prolong the bargaining process, almost indefinitely—bargaining to the point of boredom, in consultant parlance. Delays in bargaining allow more time for labour turnover, create employee dissatisfaction with the union and prevent the signing of a contract. Without a contract, the union is unable to improve working conditions, negotiate wage increases or represent the workers effectively with grievances; and by exhausting every conceivable legal manoeuvre, certain firms have successfully avoided signing contracts with certified unions for several decades. Consultants tutor management on how to appear responsive to employees' complaints, and simultaneously make the union appear unresponsive by allowing union-sponsored grievances to accumulate and forcing simple grievances to go to arbitration. Employees are thus encouraged to take their complaints directly to management for a quick and easy resolution rather than going through an acrimonious and lengthy union procedure.

The culmination of this part of the consultant campaign is the decertification election—'the final link in a chain designed to destroy employees' rights' (US Congress, 1979). One consultant told his seminar attendees that bargaining to impasse provided the 'perfect situation' for the employer to trigger a decertification campaign, because the 'frustration, the hopelessness, the failure of the union to win a new contract will lead the workers to vote against their own organisation'.[28] As with counter-organising

---

[27] Harry Gaffney, 'We Beat the Union', *Inc.*, November 1980, p. 68.
[28] Donald E. Sommer, Executive Vice-President, Master Printers Association, 'Decertification Seminar' (no date).

campaigns, other decertification tactics include efforts to undermine the credibility of the union and the harassment of union leaders and activists within the plant.

Consultants tutor employers on the two methods of gaining a decertification election. First, employees can send directly to the NLRB a request for a decertification election signed by at least 30 per cent of the bargaining unit. Secondly, employees can send a letter signed by at least 30 per cent to the company, stating that they no longer wish to be represented by the union, thereby allowing management to request that the NLRB organise a decertification election because of its 'good faith doubt' over the union's representativeness. Consultants prefer the second method, because it allows company lawyers to handle all dealings with the NLRB and informs the employer which employees signed the decertification request and which ones did not. According to the Master Printers of America, such a letter provides the employer with 'an important and interesting' document, even if no election is held.[29]

Although the employer cannot itself initiate a decertification election, consultants help employers to create the conditions necessary to encourage decertification. One consultant told the participants at his seminar on de-unionisation:

> You have to create the proper atmosphere. Perhaps there are employees who have vocalised disdain for the union . . . Provide them with an opportunity to ask you about decertification . . . Train supervisors to generate such inquiries and to provide information.[30]

But if that subtle approach failed to achieve the desired result, he advised a more direct method of engineering a decertification drive:

> Say that one employee has asked how to decertify. Then call a meeting and tell all the employees that 'we are going to give all of you the information that we are going to give that one employee'. Do it on company time since you should be able to get away with doing anything you want on company time . . .[31]

Other consultant firms have engineered decertification campaigns from start to finish. One former WCIRA consultant explained how his old employer would manipulate decertifications: 'They identify unhappy workers. Help them write a petition. Hold captive meetings in which promises are made about what will happen when the union is gone. Pro-union workers are also identified and laid off when possible.' Again, first-line supervisors are key to the success of the decertification campaign because 'if anyone knows the mood of the employees, it is the supervisor'.[32]

In the 1960s and early 1970s, relatively few consultants advocated unloading existing unions through decertification campaigns. By the late-1970s, however, a growing number of consultants and lawyers were starting to specialise in the 'process of decertification'. A decade later, the AFL-CIO reported that decertification seminars were taking place across the country 'at the rate of at least one per week', and it lamented that these seminars 'mark a growing dedication by businessmen to all forms of union-busting and the general philosophy of de-unionisation'.[33] At decertification seminars, consultants have frequently taught model firms that have successfully reversed the trend of union representation at their operations, including General Electric and DuPont. And anti-union groups such as the National Right to Work Committee and American Employers for Free Enterprise (established by Chicago consultant John Sheridan) have assisted numerous employers with decertification campaigns. Although never quite approaching the heights hoped for by the consultants, union decertifications reached significant levels in the 1980s, especially in small bargaining units and at workplaces with rapid labour turnover (Logan, 2001).

---

[29] Quoted in Dick Wilson, Director, Labor Division, Midwest Academy, 'Report on Decertification Seminar Presented by the Master Printers of America on December 1, 1977 at the Ramada-O'Hare Airport Motel, Chicago'.

[30] 'De-Unionization: A Report on a Recent Seminar by Francis T. Coleman'.

[31] Ibid.

[32] Bill Domarotsky, Field Representative, Region 6, AFL-CIO, letter to Charles McDonald, 20 February 1980.

[33] 'De-Unionization: A Report on a Recent Seminar by Francis T. Coleman'.

    © Blackwell Publishers Ltd. 2002.

### Getting rid of established unions: 'management strikes', permanent replacements, and decertifications

In the 1960s and early 1970s, most consultant activity was restricted to assisting non-union companies remain union free or helping to decertify recently unionised workplaces. By the late 1970s, however, consultants and trade associations started to advise firms on how to dislodge unions with whom they had enjoyed long collective-bargaining relationships. One unionist reported on a new type of anti-union seminar conducted by the Master Printers of America:

> Until this time, [the MPA] has concentrated on preventing organisation of non-union shops . . . The difference in this seminar is that the MPA is now reaching out to union employers . . . in order to destroy union contracts that have been long established. In some cases, this involves union/employer relationships that date back many decades.[34]

The MPA claimed that it was simply responding to employer demand. This new line of work, it argued, had resulted from a 'stiffening of the positions of union employers' that was evident in 'their opening non-union satellite operations and by hard bargaining often leading to strikes and the replacement of the strikers by non-union employees'.[35]

The consultant campaign to get rid of an established union requires detailed planning, typically lasts for at least six to nine months and, as with newly organised units, its culmination is the decertification election. The decertification tactics described in the previous section work best during the period immediately following certification of a new union, but are much less effective when the union is well established in the workplace. In these cases, consultants advise the employer to bargain to impasse in order to engineer a 'management strike'—an economic strike provoked by the employer, followed by the recruitment of striker replacements—a tactic given considerably respectability by Ronald Reagan's permanent replacement of 12,000 air traffic controllers in 1981.

Consultants plan and orchestrate every detail of a management strike with the purpose of permanently replacing pro-union employees and, ultimately, of decertifying the union. Prior to the strike, consultants advise firms on strike insurance, inventories of supervisory personnel, and practice strike drills. Then comes the real event. First, by demanding drastic cuts in existing wages, benefits, or working conditions, management ensures that the union has little option but to call an economic strike. Consider the following description by the Newspaper Guild of the tactics deployed by King & Ballow, notorious for its union-busting activities in the publishing industry:

> The firm's bargaining tactic is to make wholesale, impossible demands to cut the contract, knowing that even if it were to accede to the demands, the union would not long survive. The firm sticks to its bad-faith bargaining, moving if at all, only on trivial non-economic matters. As a consequence, a strike occurs since that is the only hope the union has for surviving. Once the strike starts, the firm is very happy indeed.[36]

Likewise, WCIRA would frequently bargain to impasse in order to force the union into catastrophic economic strikes. According to one Teamsters' officer, the firm's true objective during contract negotiations was not to reach an agreement, 'but to reach a bargaining impasse quickly and force the union to go on strike'.[37]

Next, the consultant gives advice on preparations to ensure that operations will continue during the strike—shifting production to non-union plants or to other com-

---

[34] Dick Wilson, Director, Labor Division, Midwest Academy, 'Report on Decertification Seminar Presented by the Master Printers of America on December 1, 1977 at the Ramada-O'Hare Airport Motel, Chicago'.
[35] Master Printers of America, *Unions and the Future* (1977), Introduction.
[36] Richard J. Ramse, Executive Secretary, Newspaper Guild, letter to Gordon Brehm, United Paper-workers International Union, 8 June 1984.
[37] Report of John F. Murphy, Secretary-Treasurer, Teamsters Local Union No. 122, 'The Problem of Union Busters at the International Level', March 1992.

© Blackwell Publishers Ltd. 2002.

panies, cross-training supervisors, recruiting carefully screened permanent replacements, and enlisting the services of a strike-breaking firm to provide security for the plant and transportation for the replacements. In response to the great upsurge in management strikes, strike-breaking security firms, such as Vance International, Wackenhut, Alternative Work Force, and BE&K, have proliferated during the past three decades. Several consultant firms have developed close working relationships with particular strike-breaking security firms. The AFL-CIO reported that WCIRA would work 'hand in hand with a security force known as ALERT. This group provides the '"muscle"', strong arm or intimidation when needed.'[38] High-profile management strikes, such as the Washington Post strike, in which supervisors and high-level management were trained in Oklahoma to run the presses, are taught as model cases. If normal production proves impossible, consultants and trade associations identify local employers who will take care of customers for the duration of a strike. Under the Master Printers' Mutual Assistance Plan, for example, the MPA boasted it could recommend 'hundreds of shops' that would 'help your customers get their work done'.[39] Finally, following the expiration of 12 months, after which economic strikers are ineligible to vote, consultants create the conditions necessary for a decertification election.

The fundamental tactics of the counter-organising campaigns have remained remarkably stable since the 1970s. The most significant innovations in recent years include the greater use of information technology, the growing sophistication of anti-union videos, and the increasing diversity of consultant personnel. Information technology has allowed consultants to identify more easily media stories denigrating a particular union and enabled employers to relay their anti-union message almost instantaneously. Several firms now specialise exclusively in the production of anti-union videos that, according to one company, range from videos providing 'detailed wage and benefit comparisons' to those that 'simply launched all-out attacks on unions—especially each client's would be union—to destroy the union's attractiveness in the eyes of employees'.[40] Although the overwhelming majority of prominent consultants have been white, several African-American firms have specialised in offering union-busting services to employers of predominantly black workforces, especially in the South, and consultants have frequently used racial divisions at the workplace to undermine employee support for unionisation. In 1979, a senior AFL-CIO official warned of the activities of African-American consultants in the South:

> Newly arrived on the scene is a rash of black consultants who pose as advisors on affirmative action and equal opportunities problems. Rather than defenders of the rights of black workers, these consultants are actually lackeys of management. [They] visit black workers at their homes, question them about union activity, and advise them to stick to the company.[41]

Other firms have employed consultants who specialised in counter-organising campaigns involving minority workers. In the late 1970s, a former union officer was appointed 'Director of Alien Affairs' at WCIRA, where his principal duties were to 'work with companies in Southern California that have a high Mexican-American work force'.[42] The past decade has seen the increasing diversification of consultant personnel; today, large consulting firms frequently employ multilingual male and female consultants from a broad range of racial and ethnic backgrounds.

---

[38] Edward McElroy, President, Rhode Island, AFL-CIO, letter to Local Affiliate Presidents, Executive Board Members, 29 November 1988.
[39] Quoted in Dick Wilson, 'Seminar on Union-Busting: An MPA Special', p. 4.
[40] William C. Vail, Vice President of Labor Relations, Projections Audiovisual Productions, 26 May 1987.
[41] Harold McIver, 'Preliminary Report on Labor Consultants', 16 March 1979.
[42] Thomas F. Miechur, President, United Cement, Lime and Gypsum Workers International Union, letter to Presidents and Recording Secretaries of All Local Unions in District Council No. 3, 24 July 1980.

    © Blackwell Publishers Ltd. 2002.

## Conclusion

In 1980, Reginald Newell, research director of the Machinists union, attended a seminar run by two prominent union busters, Richard Hays, a partner in the anti-union law firm, Sullivan & Hayes, and Kenneth Winters, president of the consulting firm, Winters Associates. Hays asked attendees to examine whether they were 'really committed to a union-free environment' and cautioned that attendees with 'fuzzy' thoughts on unionisation were wasting their time at the seminar. After completing the intensive three-day seminar, attended by dozens of company directors and high-level personnel officers, Newell offered the following warning:

> Anyone who thinks that . . . Corporate America has accepted trade unionism as a fact of life with which they can live should attend a seminar like this. Our enemies now wear button-down collars and Brooks Brothers' clothes. They are well educated and speak the jargon of social science management. They are lawyers, psychologists and human resource specialists using the latest, most sophisticated methods. Yet, their goals are not different from those 19th century industrialists who espoused the Gospel of Wealth and gave American labour history such names as Haymarket, Homestead and Pullman. I have to agree with one thing stressed by both Hayes and Winters. This is not a game, it is war and the side which attempts to play fair and follows the rules is going to end up the loser.[43]

Consultants, too, have frequently employed the 'war' metaphor to describe union organising campaigns. One company specialising in the production of anti-union videos, Projections Audiovisual Productions, warned companies that an organising campaign was a 'Declaration of War' and asked: 'Are you using the most powerful weapon in your arsenal?' And the New York law firm, Jackson-Lewis, is currently running an anti-union seminar, titled 'Union Avoidance War Games', which invites participants to 'practice and perfect' their anti-union tactics 'before your workplace becomes a labour relations battlefield'.[44]

During the past three decades, militant employer opposition to unionisation in the US has effectively turned organising campaigns into 'war', a war in which unions have frequently been on the losing side and one in which anti-union consultants and law firms have often played a central role. The Clinton Labor Department's limited and belated effort to tighten the reporting requirements of the LMRDA probably would have helped unions, but it would not have solved entirely the AFL-CIO's 'consultant problem'. Now, without the assistance of government intervention, the labour movement once again must devise new and imaginative tactics to counteract the threat posed by the union-busting consultants and lawyers.

The real problem facing American unions, however, is not only the tremendous size and scope of the professional union-busting industry, but the general intensification of management hostility to collective bargaining since the 1970s. Most corporate law firms now offer union avoidance and counter-organising advice as part of their legal services, and most employers have adopted as their own the tactics pioneered and developed by the consultants in the 1950s–1980s. In the early 1990s, one prominent consultant, John Sheridan, explained that 'a lot of companies now don't use consultants. They just got tougher on their own' (Moberg, 1992). The institutionalisation of the consultants' practices and the internalisation of the consultants' anti-union philosophy by employers throughout the nation, rather than the activities of consultants and lawyers themselves, are ultimately likely to prove more intractable problems for American unions and ones more damaging to their long-term chances for survival.

---

[43] Reginald Newell, letter to George J. Poulin, International Association of Machinists and Aerospace Workers, 5 March 1980.
[44] William C. Vail, Vice President of Labor Relations, Projections Audiovisual Productions, 26 May 1987; Executive Enterprises web page, 5 November 2001.

© Blackwell Publishers Ltd. 2002.

## Acknowledgements

The author would like to thank Adriana Craciun, Sheldon Friedman, Sanford Jacoby, Brian Towers and Hoyt Wheeler for comments on previous drafts of this article.

## References

*AFL-CIO News* (1982), 'The Union-Buster's Shadowy World', 11 December (Washington, DC, AFL-CIO), pp. 2–3.

BNA Special Report (1985), *Labor Relations Consultants: Issues, Trends and Controversies* (Washington, DC, BNA).

Bronfenbrenner, K. (1994), 'Employer Behavior in Certification Elections and First Contract Campaigns: Implications for Labor Law Reform', in S. Friedman *et al.* (eds), *Restoring the Promise of American Labor Law* (Ithaca, NY, Cornell UP), pp. 75–89.

Cohen, L. and R. Hurd. (1999), 'Fear, Conflict and Union Organizing', in K. Brofenbrenner *et al.* (eds), *Organizing to Win* (Ithaca, NY, Cornell UP), pp. 181–196.

Cooke, W. (1984), 'The Rising Toll of Discrimination Against Union Activists', *Industrial Relations*, **24**, 421–442.

Cornfield D. and W. Canak. (2000), 'Employer Resistance to Unionization in Union Organizing Campaigns at Two Catholic Hospitals', Paper prepared for the AFL-CIO, 28 April.

*Daily Labor Report* (1979), 'Union Decline has Tapered Off, Consultant Tells Non-Union Operators', 2 October (Washington, DC, BNA), pp. 1–6.

*Daily Labor Report* (2001a), 'DOL Narrows LMRDA Exemption Shielding Labor Relations Consultants', 11 January (Washington, DC, BNA), p. AA1.

*Daily Labor Report.* (2001b), 'Broadened LMD Reporting Requirements for Labor Relations Consultants Rescinded', 11 April (Washington, DC, BNA), p. AA1.

Doppelt, J. (1980), 'When Does Representing Management Become Union Busting?' *Student Lawyer*, May, 33–36.

Fulmer, W. (1982), 'Resisting Unionization: How Outsiders Working for You Can Work Against You', *Business Horizons*, January/February, 19–22.

Hurd, R. (1996), 'Union Free Bargaining Strategies and First Contract Failures', in P. Voos (ed.), *Proceedings of the 48th Annual Meeting of the Industrial Relations Research Association* (Madison, WI, IRRA), pp. 145–152.

Hurd, R. and J. Uehlein (1994), *The Employer Assault on the Legal Right to Organize: Case Studies Collected by the Industrial Union Department* (Washington, DC, AFL-CIO).

Lawler, J. (1984), 'The Influence of Management Consultants on the Outcome of Union Certification Elections', *Industrial and Labor Relations Review*, **38**, 38–51.

Lawler, J. (1990), *Unionization and Deunionization* (Columbia, SC, University of South Carolina Press).

Levine, D. (1997), 'Interview with Richard Besinger', *Disgruntled: The Business Magazine for People Who Work for a Living* (on-line journal located at www.disgruntled.com).

Levitt, M. with T. Conrow. (1993), *Confessions of a Union Buster* (New York, Crown Publishers).

Logan, J. (2001), 'Is Statutory Union Recognition Bad News for British Unions? Evidence from the History of North American Industrial Relations', *Historical Studies in Industrial Relations*, **11**, 63–108.

Moberg, D. (1992), 'Union Buster', *Chicago Reader*, 24 July.

Pavy, G. (1994), 'Winning NLRB Elections and Establishing Collective Bargaining Relationships', in S. Friedman *et al.* (eds), *Restoring the Promise of American Labor Law* (Ithaca, NY, Cornell UP), pp. 110–121.

US Congress. (1979), *Pressures in Today's Workplace*. Oversight Hearings Before the Subcommittee on Labor–Management Relations. 96th Congress, 1st session (Washington, DC, Government Printing Office).

Young, K. and T. Stephenson (1990), *Remaining Union Free: A Practical Guide for Management, Prepared for the South Carolina Chamber of Commerce* (Columbia, SC, Wentworth Printing Corporation).

*John Logan, Institute of Labor and Employment, UCLA and Industrial Relations Department, LSE, Houghton Street, London WC2A 2AE, UK, j.logan@lse.ac.uk*

    © Blackwell Publishers Ltd. 2002.