UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
1199SEIU, UNITED  HEALTHCARE   :
WORKERS EAST,                  :
                              :
               Plaintiff,    :
                              :
       v.                  :
                              :
RITE AID CORPORATION     :
                              :
             Defendant.  :
------------------------------------------------------X

**ECF CASE**
**ELECTRONICALLY FILED**

**07 Civ. 04816 (GBD)**

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION TO COMPEL ARBITRATION AND IN OPPOSITION TO DEFENDANT'S MOTION TO STAY ARBITRATION

**LEVY RATNER, P.C.**
Attorneys for Plaintiff 1199
80 Eighth Avenue, 8th Floor
New York, New York 10011
(212) 627-8100

{Worldox Files\1199\123\04\07038856.DOC}

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

ARGUMENT .......................................................................................................... 6

    A.   THE UNDERLYING DISPUTE IS ARBITRABLE UNDER THE BROAD
    ARBITRATION CLAUSES OF THE CBA AND THE NEUTRALITY AGREEMENT. ....... 7

    B.   THE AFTER-ACQUIRED CLAUSE IS LEGAL AND ENFORCEABLE ....................... 8

    C.   RITE AID SHOULD BE COMPELLED TO ARBITRATE ITS VIOLATIONS OF THE
    PARTIES' NEUTRALITY AGREEMENT. .............................................................. 10

CONCLUSION ..................................................................................................... 13

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*AT&T Technologies, Inc. v. Communications Workers of America,*
  475 U.S. 643, 106 S. Ct. 1415 (1986)............................................................................7

*Abram Landau Real Estate v. Bevona,*
  123 F.3d 69 (2nd Cir. 1997).................................................................................11, 12

*Aramark Sports and Entertainment,*
  04-1 Lab. Arb. Awards (CCH) 3676 (Dobry, 2003).......................................................9

*Beckett Paper Company,*
  95-2 Lab. Arb. Awards (CCH) 5344 (Goldman, 1995)..................................................9

*Bressette v. International Talc Co., Inc.,*
  527 F.2d 211 (2d Cir. 1975)...........................................................................................7

*Brotherhood of Teamsters and Automobile Truck Drivers Local #70 v. Interstate*
  *Distributing Co.,*
  832 F.2d 507 (9th Cir. 1987) .......................................................................................12

*Hotel Employees, Restaurant Employees, Local 2 v. Marriott Corp.,*
  961 F.2d 1546 (9th Cir. 1992) .......................................................................................9

*ITT World Communications, Inc. v. Communications Workers of America,*
  422 F.2d 77 (2d Cir. 1970).............................................................................................7

*International Association of Machinists v. General Electric Co.,*
  406 F.2d 1046 (2d Cir. 1968)......................................................................................7, 8

*International Associate of Machinists v. United States Potash Co.,*
  270 F.2d 496 (10th Cir. 1959) .......................................................................................9

*Kroger Co.,*
  219 N.L.R.B. 388 (1975) ..........................................................................................9, 10

*Pall Corp. v. NLRB,*
  275 F.3d 116 (D.C. Cir. 2002)......................................................................................9

*Rochdale Village, Inc. v. Public Service Employees Union,*
  605 F.2d 1290, 1295 (2d Cir. 1979)...........................................................................8, 12

*Transit Mix Concrete Corp. v. Local Union No. 282,*

809 F.2d 963 (2d Cir. 1987)..................................................................6, 7

*Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking Co., Inc.,*
944 F.2d 1037 (2d Cir. 1991)...............................................................7

*UMWA v. Rag America Coal Co.,*
392 F.2d 1233 (10th Cir. 2004) ............................................................9

*United Steelworkers of America v. American Manufacturing Co.,*
363 U.S. 565, 80 S. Ct. 1343 (1960).....................................................6, 7

*United Steelworkers of America v. Enterprise Wheel & Car Corp.,*
363 U.S. 593, 80 S. Ct. 1358 (1960)........................................................6

*United Steelworkers of America v. Warrior & Gulf Navigation Co.,*
363 U.S. 574, 80 S. Ct. 1347 (1960).....................................................6, 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
1199SEIU, UNITED  HEALTHCARE          :
WORKERS EAST,                                    :
                                                             :
                                 Plaintiff,         :                    07-Civ.-4816 (GBD)
                                                             :
                    v.                                    :
                                                             :
RITE AID CORPORATION                       :
                                                             :
                                 Defendant.       :
------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION TO COMPEL ARBITRATION AND IN OPPOSITION TO DEFENDANT'S MOTION TO STAY ARBITRATION

## INTRODUCTION

Plaintiff 1199SEIU, United Healthcare Workers East ("1199" or "Union") submits this Memorandum of Law in support of its Cross-Motion to compel Defendant Rite Aid Corporation ("Rite Aid" or "Employer") to arbitrate a dispute arising out of the parties' collective bargaining agreement and in opposition to Rite Aid's Motion to stay that arbitration.  In general terms, the underlying dispute involves the interpretation of contractual provisions concerning when, and under what circumstances, the collective bargaining agreement applies to new drug stores acquired by Rite Aid.

The dispute arises from Rite Aid's recent acquisition of Eckerd and Brooks drug stores ("Eckerd stores").  The parties have two (2) agreements which address union recognition at newly acquired stores.  The parties' collective bargaining agreement includes a provision, referred to in labor law lexicon as an "after-acquired clause," that requires Rite Aid to apply the terms and conditions of the collective bargaining agreement to employees at newly acquired

stores after the Union demonstrates majority support. The parties also negotiated and executed a separate agreement that provides for union recognition after a showing of majority support and, among other things, requires Rite Aid to remain neutral regarding the Union while that majority support is being collected (hereinafter referred to as "Neutrality Agreement"). By stating its intention to operate its newly acquired Eckerd stores pursuant to a union free business model, and by implementing a union avoidance campaign targeted at the employees of those stores, Rite Aid has violated both the after-acquired clause of the collective bargaining agreement and the Neutrality Agreement, both of which include broad arbitration provisions which clearly encompass the underlying dispute.

Rite Aid makes two main arguments in its attempt to wriggle out from under these broad arbitration provisions; both are entirely meritless. First, Rite Aid argues that the after-acquired clause is unlawful. That argument is directly counter to well-established precedent issued by both the National Labor Relations Board and federal courts.[1] Second, Rite Aid argues that the Neutrality Agreement expired. While the Union contends that the Neutrality Agreement remains in full force and effect to date, a determination of whether that agreement is expired or effective is a matter of contract interpretation and, therefore, is properly consigned to an arbitrator, not this Court.

Before turning to a review of the facts and legal arguments, it is important to point out that while this Court denied Plaintiff's request for a preliminary injunction in aid of arbitration

---

[1] On June 5, 2007 Rite Aid filed an unfair labor practice charge before Region 2 of the National Labor Relations Board ("NLRB") asserting that the after-acquired clause of the parties' collective bargaining agreement is unlawful and asking the NLRB to enjoin 1199's enforcement of that clause. To date, more than a month later, the NLRB has taken no action on Rite Aid's charge.

on June 19, 2007, in ruling on that request, it correctly noted that the merits of the Union's

underlying claims should be arbitrated. The Court stated,

> without injunctive relief, I don't anticipate that any further action by this
> Court would be taken with regard to the merits of the arbitrable dispute
> unless the nature of the dispute turns out to be something more than a
> dispute over enforcement of the collective bargaining agreement, which
> by its provisions is clearly enforceable by an arbitrator's determination
> and not a court's determination.

Exhibit A, Transcript of July 19, 2007 Conference before Hon. George B. Daniels ("Conf. Tr."),

p. 66.[2] Indeed, Defendant's motion to stay seems directly contrary to the Court's expectations,

as the Court warned that injunctive relief may be appropriate if Defendant takes actions to

impede the efficient progress of the arbitration proceeding. The Court stated,

> [i]f the arbitration begins to proceed immediately and efficiently, then I
> will obviously, to the extent appropriate, defer to that process. I will say
> that although defendant did not agree to expedite the arbitration, if at
> some point the plaintiff is in a position to argue to this Court that
> arbitration is somehow being delayed by defendant's actions and that in
> and of itself will cause the plaintiff some prejudice, I will factor that in
> whether or not some further appropriate relief by this court is necessary
> if the arbitration process is not moving along in an efficient and
> expeditious manner.

Exhibit A, Conf. Tr., p. 67.

For these reasons, and as more fully discussed below, the Court should, therefore,

issue an order compelling arbitration of this dispute and granting such further relief as it deems

appropriate.

### STATEMENT OF FACTS

1199 represents approximately 6,500 Rite Aid employees in various counties and cities in

New York and New Jersey. Exhibit B, Affidavit of Laurianne D. Vallone submitted in support

---

[2] Exhibits referred to herein are those attached to the Affirmation of Allyson L. Belovin that
accompanies this Memorandum of Law.

of Plaintiff's Motion for a Preliminary Injunction ("Vallone Aff."), ¶7. 1199 and Rite Aid have

been parties to several successive collective bargaining agreements, the most recent of which

was effective for the period October 11, 1998 through October 10, 2002 ("CBA"). Id. at ¶11,

Exhibit C, CBA. The CBA was extended, with certain modifications, by two (2) subsequent

Memoranda of Agreement, the first effective for the period October 13, 2002 through October

14, 2006 ("2002 MOA") and the second effective for the period October 14, 2006 through

October 13, 2010 ("2006 MOA"). Exhibits D and E, respectively.

Article 1 of the CBA, entitled Coverage, provides that the CBA shall apply to any

existing stores that Rite Aid acquires within the geographical area covered by the agreement

("After-Acquired Clause"). Exhibit C, CBA, Article 1, p. 2. Specifically, the After-Acquired

Clause states:

> This Agreement shall be binding upon the Union, the Employer and its
> successors and assigns, but shall apply only to those drug stores operated
> by said Employer, *and to drug stores hereafter opened by Rite Aid*
> *Corporation (including but not limited to those stores in which the*
> *Employer directly or indirectly acquires an interest of 50% or more in*
> *existing stores )*, in the City of New York, and the New York Counties of
> Nassau, Suffolk, Westchester, Orange, Putnam, Ulster, Dutchess,
> Sullivan, and Rockland, and the City of Albany, and the Jew Jersey
> Counties of Passaic, Bergen, Essex, Hudson, and Union and the Cities of
> Edison, Perth Amboy, Carteret and Woodbridge in Middlesex County,
> New Jersey, regardless of the name or whether the drug store is operated
> individually or as a partnership or corporation.

Id. (emphasis added). The After-Acquired clause was not modified by either of the subsequent

MOAs. *See* Exhibits D and E.

Rite Aid and 1199 have also negotiated a separate agreement regarding the process by

which 1199 may obtain recognition as the representative of employees in Rite Aid's non-union

stores ("Neutrality Agreement"). Exhibit F. The Neutrality Agreement provides, among other

things, that at non-union stores -- including stores newly acquired by Rite Aid -- 1199 shall have

access to the stores for the purpose of meeting with employees and obtaining union authorization

cards, Rite Aid will remain entirely neutral with respect to unionization and 1199, and Rite Aid

will recognize 1199 as the collective bargaining representative upon an arbitrator's certification

that a majority of employees signed authorization cards.  Id.

Both the CBA and the Neutrality Agreement include broad arbitration provisions.  Article

31 of the CBA states:

> *All complaints or disputes* arising between the Union and the Employer
> under or out of this Agreement, or any breach or threatened breach of
> this Agreement (herein referred to as a "grievance") shall be adjusted
> pursuant to the terms and conditions of this grievance and arbitration
> procedure.

Exhibit C, CBA, Article 31, p. 54 (emphasis added).  Article 31, as modified by the 2006 MOA,

permits the Union to refer any unsettled grievance to arbitration before an Arbitrator designated

by the American Arbitration Association.  Exhibit E, 2006 MOA, p. 4.

Similarly, the Neutrality Agreement provides that an arbitrator

> will have the authority to decide *any disputed matters between the
> parties* with respect to the vote count or the application of this
> agreement, and to fashion appropriate remedies.

Exhibit F, Neutrality Agreement, ¶ 9 (emphasis added).

In or around August 2006, Rite Aid entered into an agreement with the Jean Coutu

Group, Inc. ("Coutu") pursuant to which Rite Aid acquired, in full, all Eckerd stores, including

those stores within the geographical area covered by the CBA.  Exhibit B, Vallone Aff., ¶¶ 17.

In direct contravention of the language of the After-Acquired Clause and the Neutrality

Agreement, Rite Aid informed the Union that it intended to operate the Eckerd stores pursuant to

a union free business model.  Id. at ¶44.  Moreover, in the early Spring of 2007, Rite Aid, in

conjunction with Eckerd management, launched a campaign directed at the Eckerd employees

designed to discourage and undermine the employees' support for the Union ("Union Avoidance Campaign"). Id. at ¶¶ 19-39, 45.

On May 31, 2007, 1199 filed a demand for arbitration regarding Rite Aid's stated intention not to apply the CBA to newly acquired stores and its Union Avoidance Campaign targeted at employees in those stores. Exhibit G. Rite Aid has refused to arbitrate the dispute and has sought a stay of the arbitration.

## ARGUMENT

Since the Supreme Court's decisions in the 1960 *Steelworkers Trilogy*,[3] the federal courts have uniformly held that arbitration should be compelled unless a court can say with "positive assurance" that the dispute is not arbitrable under any interpretation of the relevant contract. This Circuit has recognized that this legal standard sets "an imposing litany" on a party seeking to avoid arbitration. *Transit Mix Concrete Corp. v. Local Union No. 282*, 809 F.2d 963, 968 (2d Cir. 1987). The party opposing arbitration has the burden of demonstrating "that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior & Gulf*, 363 U.S. at 582-583. Here, as there are two relevant contracts between the parties (the CBA and the Neutrality Agreement), each of which includes a broad arbitration provision that clearly encompasses the underlying dispute, Rite Aid cannot and does not even come close to meeting this burden.

---

[3] *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 565, 80 S.Ct. 1343 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358 (1960).

**A.    THE UNDERLYING DISPUTE IS ARBITRABLE UNDER THE BROAD ARBITRATION CLAUSES OF THE CBA AND THE NEUTRALITY AGREEMENT.**

The broad principles governing arbitrability, announced by the Supreme Court in a trio of cases now known as the *Steelworkers Trilogy*, expressed a "national policy to encourage arbitration of labor disputes." *See Transit Mix Concrete Corp. v. Local Union 282*, 809 F.2d at 968, quoting *Int'l Ass'n of Machinists v. General Electric Co.*, 406 F.2d 1046 (2d Cir. 1968). The Second Circuit has recognized that the Supreme Court's "unequivocal command" was that an order to arbitrate must issue "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *ITT World Communications, Inc. v. Communications Workers of America*, 422 F.2d 77, 81 (2d Cir. 1970), quoting *Warrior & Gulf*, 363 U.S. at 582-83. *See also Transit Mix*, 809 F.2d at 968; *General Electric Co.*, 406 F.2d at 1048. Indeed, "doubts should be resolved in favor of coverage." *Transit Mix*, 809 F.2d at 968, quoting *Warrior & Golf*, 363 U.S. at 582-83. *See also AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415 (1986); *General Electric Co.*, 406 F.2d at 1048.

In determining whether a particular arbitration clause covers the asserted dispute, the role of the court is "very limited" and "is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is covered by the contract." *Bressette v. Int'l Talc Co., Inc.*, 527 F.2d 211 (2d Cir. 1975), quoting *American Mfg.*, 363 U.S. at 567-68. *See also Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking Co., Inc.*, 944 F.2d 1037 (2d Cir. 1991). Accordingly, disputes are properly consigned to an arbitrator where the relevant contract includes a broad arbitration clause in which, for example, the parties have

agreed to submit to arbitration "any and all disputes." *See, e.g., Rochdale Village, Inc. v. Public Service Employees Union*, 605 F.2d 1290 (2d Cir. 1979).

The CBA between the Union and Rite Aid contains a broad grievance and arbitration clause. See Exhibit C, Article 31(A), p. 54. Specifically, the arbitration clause covers "*all complaints or disputes* arising between the Union and the Employer under or out of this Agreement, or any breach or threatened breach of this Agreement . . ." Id. (emphasis added). The Neutrality Agreement includes a similarly broad provision that provides an arbitrator with the authority to decide "any disputed matters" regarding the application of the agreement. Exhibit F, p. 3, ¶9. The underlying dispute -- whether Rite Aid is required to recognize the Union at and apply the terms of the CBA to newly acquired stores once majority support is demonstrated, and whether Rite Aid is required to remain neutral with respect to the Union at those stores -- plainly falls within these broad clauses. Moreover, the dispute requires the interpretation of several key provisions of the CBA and the Neutrality Agreement, none of which are excluded from the arbitration provisions.[4]

Accordingly, the Union's claim is covered by the broad arbitration contractual clauses and the Court should order arbitration of the Union's claim.

**B.    THE AFTER-ACQUIRED CLAUSE IS LEGAL AND ENFORCEABLE**

Rite Aid's claim that the dispute is not arbitrable because the After-Acquired Clause -- which is otherwise clearly subject to arbitration -- is unlawful, is baseless. The National Labor Relations Board ("NLRB") has long held that clauses like the After-Acquired Clause are valid

---

[4] It is well settled that a dispute will be excluded from arbitration only where there is "clear and unambiguous" or "unmistakably clear" language of such exclusion. *General Electric Co.*, 406 F.2d at 1048. Here, there is no clear exclusionary language which would negate the strong presumption of arbitrability; indeed, there is no exclusionary language at all.

and enforceable upon a showing of majority support. *Kroger Co.*, 219 NLRB 388, 389 (1975). Federal Courts have upheld the validity of these clauses. *See, e.g., Pall Corp. v. NLRB*, 275 F.3d 116, 118 (D.C. Cir. 2002); *Hotel Employees, Restaurant Employees, Local 2 v. Marriott Corp.*, 961 F.2d 1546, 1468 (9th Cir. 1992)(Court upheld agreement whereby the employer agreed to waive its statutory right to demand NLRB certified election).

Accordingly, the Union's claim that the Employer has threatened to violate the After-Acquired Clause by, among other things, stating its intention to operate the newly acquired Eckerd stores pursuant to a union free business model, is arbitrable,[5] as is its claim that the Union Avoidance Campaign violates the clause's implied covenant of good faith and fair dealing. *See UMWA v. Rag Am. Coal Co.*, 392 F.2d 1233 (10th Cir. 2004); *International Assoc. of Machinists v. United States Potash Co.*, 270 F.2d 496 (10th Cir. 1959)(parties dispute over subcontracting -- a subject not expressly mentioned in the collective bargaining agreement -- is suitable for arbitration under a good faith and fair dealing theory).[6]

To the extent that Rite Aid argues that the dispute is not arbitrable because the Union seeks to enforce the After-Acquired Clause in an unlawful manner, that argument is entirely disingenuous. The Union has consistently acknowledged that the enforcement and application of the After-Acquired Clause requires a showing of majority support among the relevant bargaining

---

[5] The broad grievance and arbitration clause of Article 31 of the CBA includes any "threatened breach" of the agreement. CBA, Article 31(A), p. 54.

[6] Arbitrators have routinely applied the doctrine of good faith and fair dealing to parties' collective bargaining agreements and have interpreted the requirements of the doctrine in the context of such agreements. *See, e.g., Aramark Sports and Entertainment*, 04-1 Lab. Arb. Awards (CCH) 3676 (Dobry, 2003); *Beckett Paper Company*, 95-2 Lab. Arb. Awards (CCH) 5344 (Goldman, 1995). Copies of these arbitration decisions are attached hereto as Exhibit 1.

unit.[7]  The Union has not yet demanded recognition under the After-Acquired Clause at any former Eckerd store, no less a store in which it does not have majority status, nor is the Union seeking to obtain recognition without majority status through the arbitration process.  Rather, the Union simply seeks an award requiring the lawful enforcement of its bargained-for guarantee that upon a showing of majority status, Rite Aid will recognize the Union at and apply the CBA to the newly acquired stores.  Such an award, like the Union's conduct, is entirely consistent with federal labor law.

Moreover, Rite Aid has filed an unfair labor practice charge with Region 2 of the National Labor Relations Board ("NLRB") alleging that the After-Acquired Clause and the Union's efforts at enforcing that clause violate federal labor law.  The NLRB is investigating those allegations and is empowered to issue an appropriate remedy if they are found true.

## C.  RITE AID SHOULD BE COMPELLED TO ARBITRATE ITS VIOLATIONS OF THE PARTIES' NEUTRALITY AGREEMENT.

In addition to its violations of the After-Acquired Clause, Rite Aid's violations of the Neutrality Agreement are arbitrable.  Rite Aid seeks to avoid arbitration by claiming that the Neutrality Agreement has expired.  Of course, the Union disagrees and maintains that the

---

[7] See, e.g., Exhibit A, Conf. Tr. (Union counsel stated, "under federal labor law, clauses like the after-acquired clause in this contract are valid and are enforceable upon the union's showing of support among the majority of employees in the stores); Exhibit H, 1199's Preliminary statement to the NLRB ("The Board held in *Kroger Co.* that clauses like the After-Acquired clause are valid and require the employer to recognize the union in a new store upon a showing of majority status.  219 NLRB 388, 389 (1975).  *Kroger* remains good law today and 1199 is seeking no more and no less than the lawful enforcement of this valid clause."); *see also*, 1199's Memorandum of Law in Support of its Motion for An Injunction In Aid of Arbitration, p. 10 ("Under federal labor law, in order for the After-Acquired clause to have effect, the employees in the newly acquired Eckerd stores must either be deemed an accretion to the Union's existing bargaining unit, or must demonstrate majority support for the Union")(footnotes omitted); 1199's Reply Memorandum of Law in Support of its Motion for a Preliminary Injunction In Aid of Arbitration, p. 7 ("clauses like the After-Acquired Clause are valid and require the employer to recognize the Union in a new store upon a showing of majority status")(citations omitted).

Neutrality Agreement remains in full force and effect.  A resolution of that disagreement requires interpretation of ambiguous contract language, making the question one for the arbitrator and not this Court.

As its sole evidence in support of its contention that the Neutrality Agreement has expired, Rite Aid points to a separate document, titled "Agreement," which states

> The Rite Aid Corporation recognizes 1199 National Health and Human Service Employees union as the collective bargaining representative of its employees at all stores located within the New York counties of Putnam, Dutchess, Orange, Sullivan, Ulster and the city of Albany and the New Jersey counties of Passaic, Bergen, Essex, Hudson, Union and the cities of Edison, Perth Amboy, Carteret and Woodbridge in Middlesex County

> AND

> The recognition process, as agreed, as well as terms and conditions of the Collective Bargaining Agreement to be negotiated shall be completed by October 31, 1998.

Exhibit I.

It is far from clear that this document terminates the Neutrality Agreement.  Rather, a determination as to whether this "Agreement" serves to terminate the Neutrality Agreement requires a review the language of both the Neutrality Agreement and the "Agreement", consideration of the parties' bargaining history with respect to both documents, and an ultimate conclusion as to the parties intent with respect to the continuation of the Neutrality Agreement. These are properly tasks for an arbitrator.

This Circuit has recognized that in instances where the question is whether a valid agreement has expired or been terminated (in contrast to a dispute over the substantive coverage of an arbitration clause or whether a valid agreement in the first place has ever existed), the situation calls for an arbitrator to interpret the contract.  *See Abram Landau Real Estate v. Bevona*, 123 F.3d 69 (2d Cir. 1997).  In *Abram Landau*, an Employer sought to vacate an

arbitration award issued pursuant to a collective bargaining agreement it claims had expired.  In

finding that the question of whether the agreement at issue had expired was properly one for the

arbitrator, the Court acknowledged that the question of whether there is a valid agreement to

arbitrate is generally one for the courts.  But, it recognized that

> [t]he question of whether an otherwise valid collective bargaining
> agreement has expired or has been terminated is different.   In these
> situations, the parties' dispute is not really over what an arbitration clause
> provides; rather, it is a dispute over the interpretation of other clauses of
> the collective bargaining agreement, e.g., termination clauses, or in [the
> employer's] case an "evergreen clause."   In determining whether an
> arbitrator or a court gets to interpret a termination clause or "evergreen
> clause," the dispositive question is whether the parties have agreed that
> an arbitrator should decide that question.  Where the agreement contains
> a sweeping arbitration clause covering all disputes involving the meaning
> of terms and provisions of the agreement and where the arbitration clause
> does not expressly exclude disputes over the termination provision or the
> "evergreen" clause, disputes over these matters should be submitted to
> arbitration.

123 F.3d at 73 (internal citations omitted).  *See also Brotherhood of Teamsters and Auto Truck*

*Drivers Local #70 v. Interstate Distrib. Co.*, 832 F.2d 507 (9th Cir. 1987)(Court compelled

arbitration over the question of whether a collective bargaining agreement had expired);

*Rochdale Village, Inc. v. Public Service Emp. Union*, 605 F.2d 1290, 1295 (2d Cir. 1979) (where

parties have agreed to submit to arbitration disputes of "any nature or character," or simply "any

and all disputes," all questions, including those regarding termination of the agreement, will be

properly consigned to the arbitrator).

Here, the Neutrality Agreement contains a broad arbitration clause which provides an

arbitrator with authority to hear and resolve "all disputes" regarding the application of the

agreement.  Therefore, the question of whether that agreement has expired must be submitted to

the arbitrator.

## **CONCLUSION**

As set forth above, rather than provide the kind of "positive assurances" required to deny

an order to arbitrate, the evidence shows that the contractual arbitration provisions are more than

susceptible to an interpretation that covers the underlying dispute.  Accordingly, in conformity

with the national policy of encouraging arbitration of labor disputes, we respectfully request that

the Court issue an order compelling Rite Aid to arbitrate the dispute and granting such further

relief as it deems proper.

Dated: New York, New York
      July 16, 2007

                          Respectfully submitted,

                          LEVY RATNER, P.C.

                          By: _____
                                Allyson L. Belovin (AB 3702)
                                80 Eighth Avenue, 8th Floor
                                New York, New York 10011
                                (212) 627-8100 (phone)
                                (212) 627-8182 (fax)
                                abelovin@lrbpc.com

EXHIBIT 1

Service: **Get by LEXSTAT®**
Citation: **04-1 Lab. Arb. Awards 3676**

*Copyright 2007 CCH Incorporated, All Rights Reserved*

Copyright 2007 CCH Incorporated, All Rights Reserved
CCH Labor Arbitration Awards

Labor Arbitration Awards---1987 -- Present
Admin Decision

04-1 Lab. Arb. Awards (CCH) P 3676

November 12, 2003

04-1 ARB P 3676 **Hotel Employees and Restaurant Employees and its Local Union No. 24** and **Aramark Sports and Entertainment, Inc Schedules, Work -- Contracting Out -- Assigning Work Outside Bargaining Unit.**-- Case No. 03-02544, (issued on November 12, 2003)

**Hotel Employees and Restaurant Employees and its Local Union No. 24** and **Aramark Sports and Entertainment, Inc**

STANLEY T. DOBRY, Arbitrator. Selected through FMCS. Case No. 03-02544. Hearing held in Detroit, Michigan, on May 14, 2003. Award issued on November 12, 2003

**Schedules, Work -- Contracting Out -- Assigning Work Outside Bargaining Unit**. -- An event caterer violated a bargaining agreement when it removed unionized food workers, who did not work a steady week but were assigned based on scheduled events, from the work schedule and had non-union workers from another classification perform the bargaining unit work. The employer's contention that it had the right to remove the workers from the next day's schedule after they refused overtime lacked merit -- especially where the food prep that needed to be done was not brought out by the executive chef until the non-union workers arrived, a mere 40 minutes before the end of the grievants' shift. Moreover, under the contract, the employer did not have the right to use non-union help for bargaining unit work unless the union hall was unable to supply additional help upon request. The employer never made such a request. The grievance therefore was sustained, and the appropriate bargaining unit members, as determined by the union (not necessarily the grievants), were to be compensated for the missed work.

Richard A. Buntele, Labor Relations Director, for the Employer. Renate Klass (Martens, Ice, Klass, Legghio, Israel and Gorchow, PC), for the Union.

TEXT:

**[Text of Award]**

**DOBRY** , Arbitrator: The parties to this dispute are ARAMARK Sports and Entertainment Inc. a subsidiary of ARAMARK Corporation (hereinafter "ARAMARK" or "Employer") and the Hotel Employees and Restaurant Employees Union, Local 24 (hereinafter the "Union"). ARAMARK Corporation is an international company engaged in providing various services to client companies and organizations. One of the services provided is that of food service. ARAMARK is providing food service to Cobo Hall, located in Detroit Michigan.

Grievance No. 12210 is dated October 11, 2002. It alleged:

"On Oct. 9, 2002, me [[A]], [B] and [C] [1], were not scheduled to work. We had 3 days in a pay period.

They said they didn't need us, but instead called in Food Team in a union house and had them do all Oct. 10 morning contract. If there was work to be done, and we did not have 5 days, we were supposed to work that day, they could [not] ² have took us off Saturday Oct. 12, 2002. When I spoke to [D] he said he did not know about this; 20 minutes later he say they can do this, and I could call the union. [B] and [C] have not been paid for the last grievance. We pay 30 dollars union dues but cannot get days due to us."

The answer alleged:

"In response to grievance # 12210, submitted by [A], [C], and [B]. Executive Chef [E] and Executive Sous Chef [F] response is as follows:

"On October 9, 2002 the only function scheduled was a part of 25 guests for a buffet, a union cook was scheduled for this function and did work. In addition a cook from food team was scheduled based on the type prep work needed for the contracts. Work was assigned for these employees and by contract they are on an eight (8) hour minimum shift. As outlined in Article 12, Section 1, we have a right to direct the work force to do tasks and expect employees to be productive for the hours being paid. Our event driven business dictates when work is available and on Thursday the 10 nth of October all available seniority pantry employees worked. As the grievance outlined the employees did work the pay period in question, as it was available.

"As outlined in Section 7(b) of the contract there are no specified weekly hours or set schedules for the steady extra employees who have filed this grievance and there is -0- compensation owed."

Grievance No. 2981 is dated October 14, 2002 and alleged:

"On Oct. 12., Food Team were brought in to do Pantry Dessert for 2000 people for Tuesday. So they took me, [B] and [C] off for Monday and took [B] and [C] off for Tuesday. They put food team on for Tuesday. Not only are they getting our days but also our overtime, if it is available.. October 12 they only had a reception and 300 plate up. 2 cooks and 2 pantry or utility guy should normally do this,. Has got to stop. I refuse to pay union dues, and cannot get my days or hours, just because Chef [E], and Chef [F] are allowed to do this and get away with it."

The employer's Answer, dated October 24, alleged:

"In response to grievance #2981 submitted by [A], [C], and [B], Executive Chef [E] and Executive Sous Chef [F] response is as follows:

"I will begin by saying each of the above-mentioned employees worked on Saturday, October 12, 2002. The employees started the desserts on October 12, 2002 for the function of 2000 guest that was contracted. Culinary staff was scheduled based on the needs of functions which were throughout the day and evening. We asked the above named employees to stay and finish the desserts. Both Chef [F] and myself were told by one employee Ms. [B], 'You can have food team finish the desserts' 'I'm leaving' The other pantry employees followed suit. They were informed that we had to make adjustments to Monday's schedule due to a cancellation of an event on Tuesday. If an event is cancelled we certainly would have the right as outlined in Article 12 and [Article 2] Section 7(b) to adjust the work schedule as there was nothing to prepare for and loss of revenue for the company.

"As recently as today [October 24] the above mentioned employees refused to work past their scheduled eight hours and told both Chef [F] and myself we could 'get food team to finish the assigned work.' It is imperative that we manage our business to do this we must have employees that are willing to finish jobs

that they start. We have utilized our call list, and due to heavy activity in the building union employees are not always available. We do utilize union employees from other department when the level of skill needed can be met with the personnel that are available.

"There is no foundation for this grievance and ARAMARK followed standard procedures and did not violate the agreement. It is upsetting as an employer that these employees would file a grievance about hours available for work when they are the personnel who are refusing it when available and impairing our operations."

This proceeding is convened pursuant to the collective bargaining agreement (CBA) for the period December 1, 2001 to November 30, 2006, which calls for arbitration proceedings under the Rules of the Federal Mediation and Conciliation Service (FMCS). The Demand for Arbitration was properly processed and timely filed with the FMCS on April 13, 2002, and the arbitrator was duly appointed. The parties agreed that both the grievances should be heard by one arbitrator.

Under ARTICLE 15, GRIEVANCE PROCEDURE, Section 2 Arbitration Procedure. and Section 3 Final and Binding: "Any decision reached at any stage of these grievance proceedings or by the arbitration procedure shall be final and binding upon the parties as to the matter in dispute. ARAMARK, the Union and the aggrieved employee shall thereafter comply in all respects with the result of such decision reached."

On May 14, 2003, a hearing was held at the employer's offices in Cobo Hall in the City of Detroit, Michigan. Twenty-one exhibits were received into evidence. Two witnesses testified under oath or affirmation. **For the Union: [B]. For the Employer: [G].**

The parties stipulated that the matter is properly before the arbitrator for final and binding resolution. They were given a full opportunity for examination and cross examination. Oral arguments were duly made. All offered evidence was received and all relevant evidence has been considered in making this decision. The parties stipulated that the Arbitrator could retain jurisdiction as to disputes as to remedy, if any.

The record was declared closed at the hearing. A full transcript was produced by Jacquelyn S. Fleck (CSR-1352) of Bienenstock Court Reporting & Video. This was subject to the Union's initial objection; they were given access to the arbitrator's copy of the transcript.

However, the parties agreed that the arbitrator's opinion constitutes the official record.

Post hearing briefs were exchanged through the arbitrator as agreed.

Arbitrators, like other finders of fact, are often required to determine issues of weight and credibility. The entire record was brought to bear in analyzing those issues, taking into account the quality and quantity of evidence. All the record was carefully considered and analyzed, even though I found it unsuitable to specifically mention each item. I considered witnesses' demeanor, the plausibility and content of testimony, and their motives. I gave weight to the total record, not just pieces of it in isolation.

### III. ISSUES

The Parties were unable to agree on an issue and the arbitrator stated he would frame the issue.

**The Union proposes:**

Did the Employer violate Article 1(5), Article 1 (6)(c), Article 1 (6)(d), Schedule A and Article 2(7)(b) of the collective bargaining agreement when it:

1. Removed Grievants from the October 9, 2002 pantry work schedule and then utilized "non-union help" to prepare the cold-food for over four hundred Society of Women Engineers October 10, 2002 deluxe continental breakfasts? *and*

2. Removed Grievants from the October 14, 2002 pantry work schedule and then utilized "non-union help" to prepare the cold-food for almost two thousand Detroit Economic Club October 15, 2002 lunches?

### *The Employer proposes:*

3. Did the Company violate the terms and provisions of the collective bargaining agreement when it did not schedule employees classified as "Pantry" for work on October 9 and October 14, 2002?

### IV. PERTINENT CONTRACT CLAUSES

The following are cited by one or both of the parties in support of their positions.

### ARTICLE I


### RECOGNITION -- UNION MEMBERSHIP -- EMPLOYEE HIRING CHECK-OFF

\*\*\*

**Section 5** In order to facilitate the employment of new employees, to ensure ARAMARK of a regular source of available skilled labor, to assure culinary craft employees of an efficient system of locating employment and protecting job rights accrued while in the employ of various employers in the trade in this area, the Union herein undertakes to operate a job referral system for employees within their jurisdiction, as hereinafter set forth. ARAMARK agrees that said job referral system operated by the Union will be the exclusive source of hiring employees, and agrees to employ only such persons who have been referred to it by the Union.

\*\*\*

**Section 6 (c)** In the event the job referral system fails to supply qualified workers, when large numbers of workers are needed, to ARAMARK within forty-eight (48) hours after such request was made, ARAMARK may engage such new workers from any other source.

**(d)** ARAMARK agrees to hire all extra employees in the manner above first using the job referral system operated by the Union then, if the Union is unable to supply the sufficient number of workers, ARAMARK may go to any other source.

### ARTICLE 2

WORK WEEK-HOURS OF WORK -- DEFINITION OF 6TH AND 7TH DAYS REPORTING FOR WORK -- DEFINITION OF STEADY EMPLOYEES, STEADY EXTRA AND EXTRA EMPLOYEES

\*\*\*

**Section 7 (b)** A steady-extra employee is defined as an employee who is on a list maintained by ARAMARK and whose first obligation is to work for ARAMARK in its operation in the Civic Center buildings of Detroit. There shall be no specified weekly hours or set schedules for steady-extra employees. ARAMARK shall endeavor to notify steady-extra employees of their work schedule for the week by

Thursday of the preceding week.

\*\*\*

## ARTICLE 12

### RIGHTS OF ARAMARK -- RIGHTS OF EMPLOYEES

**Section 1** ARAMARK shall have the right to control and direct its employees. This right shall include, among others things, the right to hire, promote, lay-off, transfer, disciple, discharge, refuse to hire, set work schedules, make work assignments and direct and control its operations, provided the decision of ARAMARK is in conformity with the provisions of this Agreement. ARAMARK reserves the right to drug/alcohol test job applicants or for cause (e.g. those employees showing signs of intoxication or smell of alcohol). There shall be no random drug/alcohol testing allowed.

\*\*\*

## ARTICLE 15

### GRIEVANCE PROCEDURE

\*\*\*

**Section 2 Arbitration Procedure.**

(b) The expenses of the arbitrator shall be borne equally by the Union and ARAMARK; each party bearing the expense of its own representative, witnesses and other preparation and presentation expenses.

**Section 3 Final and Binding**

Any decision reached at any stage of these grievance proceedings or by the arbitration procedure shall be final and binding upon the parties as to the matter in dispute. ARAMARK, the Union and the aggrieved employee shall thereafter comply in all respects with the result of such decision reached.

**Section 4 Arbitrator Limited To Terms of Agreement**

The arbitrator shall not have any right or authority to add to, to modify or subtract from any of the terms, conditions or sections of this Agreement.

\*\*\*

**Letter of Understanding** [3]

This letter of understanding, entered into effective December 2, 2001, is between ARAMARK and Hotel Employees and Restaurant Employees Union, Local 24.

1. The parties agree that the following shall be considered departments as of this date, as that term is used in the collective bargaining agreement between the parties dated December 1, 2001:

Concession Department

Kitchen Department

Banquet Department

2. It is agreed between the parties that the following shall be considered the steady-extra list, and the number designated after each classification by ARAMARK and the Union:

***

Pantry -- 5
SCHEDULE "A"
***
KITCHEN EMPLOYEES

| Classifications | Effective 4/24/02 | Effective 4/24/03 | Effective 4/24/04 | Effective 4/24/05 | Effective 4/24/06 |
|---|---|---|---|---|---|
| Cooks | $ 12.30 | $ 12.55 | $ 12.80 | $ 13.05 | $ 13.30 |
| Pantry | 11.25 | 11.50 | 11.75 | 11.95 | 12.20 |
| Utility | 8.45 | 8.65 | 8.80 | 9.00 | 9.15 |

Cooks and Pantry employees shall be guaranteed eight (8) hours work or eight (8) hours pay. Utility employees shall be guaranteed six (6) hours work or six (6) hours pay.

Kitchen employees shall not be permitted to work a split shift.

Seniority shall be observed by ARAMARK. No non-union help will be used unless the Union shall cannot supply help.

## V. DISCUSSION

### A. Background

The Union represents employees who perform beverage and food work for the Employer, ARAMARK Sports Entertainment, Inc., Cobo Hall Unit No. 6243. As shown in the Letter of Understanding, these employees work in the Concession, Kitchen and Banquet Departments of ARAMARK. Grievants are employees who hold the pantry classification within the Kitchen Department.

Union-represented employees work in one of three categories: "steady" (regularly scheduled to work four or more days per week); "steady extra" (receive a weekly schedule every Thursday); and "extra" (called in for special work assignments). [4] The Letter of Understanding calls for five steady-extra employees in the pantry classification.

Three employees who work in the Pantry classification filed both grievances. Pursuant to the terms of the CBA they are Steady Extra employees. As Steady Extras they are scheduled to work when the Company has a scheduled event for the facility. They have no specified hours or set schedule. This classification handles cold food, *i.e.*, salads, desserts, and fruit trays.

Ms. [B] testified that Kitchen Department pantry employees prepare cold food for ARAMARK events at Cobo Hall. This work includes cutting up fruit and setting up cold food trays and plates. Typically, this prep work is performed the day before the food is to be served. The written schedule for steady extra employees is posted behind a glass door every Thursday pursuant to Article 2(7)(b) of the contract.

**B. Brievance No. 12210 -- The October 10, 2002 Breakfasts**

On Thursday, October 3, 2002, the Employer posted the schedule for the following week. As Ms. [B] testified, it showed that the three Grievants were all scheduled to work commencing at 6 a.m. on Wednesday, October 9, 2002. Although Ms. [B] had not seen the Employer's contracts at the time, she understood that the Grievants would be preparing the cold food components for hundreds of Society of Women Engineers continental breakfasts to be served on the morning of October 10, 2002.

However, on Tuesday, October 8, 2002, the Employer took down the posted schedule and replaced it with a new one which cancelled the Grievants' work scheduled for October 9, 2002. Because they knew about the big October 10 Society of Women Engineers breakfast, they questioned Executive Sous Chef [F] about why they had been taken off the October 9 schedule:

"We talked to [F]. When they took us off, we told them we hadn't gotten all our hours that week and we was available to do work that Wednesday, and we was told we was not needed."


The employer argues that the testimony of Ms. [B] is not corroborated by supporting documentary evidence. Her testimony stands alone, and is said to be "self serving." It concludes that the schedule is simply the product of unoin fabrication or wishful thinking.

However, union employees have no access to the schedules which are posted behind glass. So they are unable to photocopy them when they're posted.

The employer produced *no* contradictory evidence, testimonial or otherwise, if it exists about supporting the alleged contract loss (concerning Grievance No. 2991), or denying the prior posting (concerning Grievance No. 12210). If Ms. [B] got it wrong, one presumes the person in charge of posting these documents (or keeping track of corporate contracts and cancellations) would have said so. Indeed, the employer did not deny the changes, but implicitly admitted them when it opined that changes of schedule were permissible if there had been a loss of a contract. The expected witness, who was under the control of the employer, was absent. One can create an adverse inference. [5] The silence is as telling as the tale itself.

The services contract confirms that ARAMARK had contracted to prepare and serve over 400 continental breakfasts on the morning of October 10. Ms. [B] testified she and her co-workers would have done all the preparation for those breakfasts:

Q. Now, for October 10, the Employer's contracts show a series of deluxe continental breakfasts; for example, an assortment of breakfast pastries, including bagels, muffins, Danish's, croissants, cream cheese. Would you have done any of that work normally?

A. Yes.

Q. What would you have done?

A. We would have done the whole contract. We would have done the assorted breakfast, the pastries, the bagels, the muffins, the Danish's, croissants, the cream cheese, and the jelly and the butter. And we would have done the seasonal fruit platters, too.


When the Grievants arrived for work on October 10, 2002 at 5 a.m., they saw hundreds of continental breakfasts which were prepared and ready to serve. None of them had prepared or been given the

opportunity to prepare any of that food. When they complained, [F] ignored them.

The Union alleges that the pantry workers could have and should have been brought in to prepare for an event scheduled for October 10, 2003. Ms. [B] testified that when she arrived at work on October 10 nth she saw "hundreds of breakfasts" already prepared and ready to go. The 400 breakfasts had been prepared by someone else. The documents produced by the Employer indicate that Food Team employees did it. Ms [B] stated it would have taken eight hours and three people. [6]

It is undisputed that this work was not done by pantry employees. Ms. [B] testified without contradiction that although she and her co-workers had been scheduled to work on October 9, 2002 to prepare these breakfasts the day before they were to be served, the Grievants were inexplicably removed from the schedule. Although they were available and willing to work, they were not permitted to do so.

It is also undisputed that when they arrived for work at 5:00 a.m. on October 10, 2002, 400 deluxe continental breakfasts had already been prepared. Subcontractor Food Team employees worked a total of 18 1/2 hours [7] on October 9, 2002. Preparing continental breakfasts would normally be done by persons in Grievants' classification.

The Employer has not denied that Food Team personnel prepared the cold food October 10, 2002 breakfasts. Its October 24, 2002 answer to the grievance, like its testimony at the hearing, emphasized the hot food preparation for an October 9, 2002 buffet. Significantly, however, that grievance answer also conceded that Food Team worked on other contracts on October, 2002: "In addition, a cook from Food Team was scheduled based on the type of prep work needed for the contracts."

Nor did the Employer deny the use of Food Team at the hearing. In his testimony. The only Employer witness, [G], did not deny that Food Team employees had prepared the breakfasts for October 10, 2002. Rather, the sole subject of his testimony pertained to the breakfasts served on October 9, 2002 (not the subject of this case), which was essentially irrelevant.

### C. Grievance No. 2991 -- The October 15, 2002 Lunches

The week of October 7, the Employer posted the schedule that covered Monday and Tuesday, October 14 and 15, 2002. As [B] testified without contradiction, it showed [A], [B] and [C] scheduled for Monday, October 14, 2002. At the time they understood that they would be working on the almost 2,000 lunches that had been contracted for an October 15, 2002 Woman's Economic Club luncheon. This assumption was later confirmed by review of the Employer's contracts for October 15, 2002 which reflected 1,923 lunches to be set up at 11:30 a.m. on October 15, 2002 in connection with a meeting of the Economic Club of Detroit..

However, on Saturday, October 12, 2002, the Grievants were told by [F] that they had been removed from the Monday schedule:

A. I said, I thought it was 2000 Economic Club dinner. I said, nobody working a day before 2000? And he said, no, nobody is working.

Q. Now, if you had a lunch scheduled with fruit plates and dessert for Tuesday, October the 15th when would you normally have done the fruit preparation and the plating of the fruits and the desserts?

A. Monday. We would have plated that dessert Monday. And all that wasn't plated Monday, we would have plated Tuesday and did it -- did the fruit.

On Saturday, October 12 the Grievants observed Food Team working again. Between noon and 1 p.m. [F]

brought cakes out of the freezer and asked Food Team to start plating them. Then, a few minutes later, approximately 30 or 40 minutes before the Grievants were scheduled to go home at 2 p.m., they were asked whether they wanted to stay overtime. Because of the late notice, they were not able to do so. As a result of their refusal the preparation work was prepared by employees from Food Team.

They were not permitted to return to work on Monday, October 14. In fact, no employees were ultimately scheduled to work. The grievants contend that they should have worked on October 14th to prepare for an event scheduled for Tuesday October 15, 2002. The preparation for the October 15th event was performed on October 12th, 2002.

The following day, on October 15, 2002, ARAMARK served almost 2,000 lunches, with plated desserts and plated fruit trays, none of which the Grievants had prepared.

Documents produced by the Employer in this action show that Food Team personnel reportedly worked as follows on Saturday, October 12, 2002:

| EMPLOYEE | TIME IN | TIME OUT | TOTAL HOURS |
|---|---|---|---|
| [K] | 06:00 a.m. | 11:00 a.m. | 05.00 |
| [I] | 06:00 a.m. | 02:00 p.m. | 08.00 |
| [L] | 12:00 noon | 08:45 p.m. | 08.75 |
| [M] | 12:42 p.m. | 11:30 p.m. | 11.25 |
| [J] | 01:00 p.m. | 08.00 p.m. | 07.00 |

Additionally, two Food Team employees worked on Monday, October 14, 2002, the day on which Grievants were originally scheduled to work. While the Grievants were removed from the schedule for October 14, 2002, Food Team employees [I] and Walker each worked eight hours that day.

In response to the ensuing grievance, the Employer conceded that it cancelled the Grievants' scheduled work for Monday, October 14, 2002 and that Food Team prepared the desserts for the October 15, 2002 lunch. By way of justification, the Employer contended that the posted schedule was changed and Food Team employees were substituted because of the alleged cancellation of an October 15, 2002 event. At the hearing, the Employer presented no evidence of any cancelled event.

### D. Analysis

The arbitrator seeks to discern the parties' intent in negotiating, ratifying and administering this collective bargaining agreement. It is not a bare commercial contract; it is a collective bargaining agreement, which should be subject to different rules of construction and interpretation. As such, it is an external rule book for an ongoing symbiotic relationship. [8]

The arbitrator considered the interplay of the contract as an integrated whole. The interaction of conflicting or parallel contractual provisions created structural ambiguity, which needed to be interpreted. I examined the language that is there, and considered the absence of language that isn't. While words are primary, voids and interstices merit consideration, too. The cross-links are entitled to respect. The arbitrator noted the past practice as relevant and established as an authentic mutual construction of the CBA's meaning.

In totality, the CBA creates an ongoing obligation. It requires the Employer always endeavor to have bargaining unit members do the work, and, if their numbers are insufficient, by employees referred by the Union:

1. ARAMARK agrees that the Union's job referral system "will be the exclusive source of hiring employees, and agrees to employ only such persons who have been referred to it by the Union." Art 1(5);

2. "In the event the job referral system fails to supply qualified workers, when large numbers of workers are needed, to ARAMARK within forty-eight (48) hours after such request was made, ARAMARK may engage such new workers from any other source." Art 1(6)(c); and

3. "ARAMARK agrees to hire all extra employees in the manner above first using the job-referral system operated by the Union, then, if the Union is unable to supply the sufficient number of workers, ARAMARK may go to any other source." Art 1(6)(d).

The contract expressly prohibits use of non-Union help in the Kitchen Department unless the Employer can demonstrate an inability to get personnel from the Union hall: "No non-union help will be used unless the Union hall cannot supply help." Schedule A.

Further, the CBA contains explicit recognition, seniority and wage clauses that protect Grievants. Article 1 (1) recognizes the Union as the sole and exclusive bargaining agent for these employees. Article 2(7)(b), the December 2, 2001 Letter of Understanding and Schedule A in the collective bargaining agreement recognize that steady extra pantry employees have seniority rights. Additionally, the contract spells out the wage rates for steady extra pantry employees. Therefore, this collective bargaining agreement must be interpreted to protect the rights of the pantry employees to do bargaining unit work. As discussed below, this fundamental right is further buttressed by explicit language in the contract that limits the Employer's right to use "non-union help."

"Non-union" help, namely Food Team employees, did pantry work in connection with both the October 10, 2002 Society of Women Engineers breakfasts and the October 15, 2002 Economic Club lunches. While Employee witness [G] testified that he typically uses the Union referral hall for chefs, he did not claim that ARAMARK attempted to obtain any union hall pantry help for either the October 10, 2002 breakfasts or the October 15, 2002 lunches.

It is well recognized that collective bargaining agreements with recognition, seniority and wage clauses will be interpreted to include a covenant of good faith and fair dealing with respect to the integrity of bargaining unit work. Archibald Cox, "The Legal Nature of Collective Bargaining Agreements." [9]

The Union cited to Arbitrator Whalen. He commented in *New Britain Machine Co.*, 8 LA 720, 722, 1947:

Job security is an inherent element of the labor contract, a part of its very being. If wages is at the heart of the labor agreement, job security may be considered its soul. The transfer of work customarily performed by employees in the bargaining unit to others outside the unit must, therefore, be regarded as an attack on the job security of the employees who the agreement covers and, therefore, on one of the contract's basic purposes.

For these reasons, arbitrators refuse to permit routine subcontracting of bargaining unit work. [10]

This arbitrator agrees with that principle. Moreover, it is inherent in the parties' bargain and the language they used.

While the Employer has the right to schedule its work, it does not contractually have the right to have "non-union help" do that work unless the pantry classification employees are unavailable and the union hall is unable to supply help after being asked to do so. Here the Employer made no showing that the pantry employees were unavailable, that it asked the Union for help or that the Union was unable to supply help.

The Employer violated the contract with respect to the October 10, 2002 breakfasts for the Society of

Women Engineers. Pantry Workers were scheduled for the breakbast, and were summarily denied the opportunity without cause and without explanation (at least that as supported by the record. Non-Unon help did the preparation work instead.

This brings us to the October 15 Detroit Economic Club luncheon.

The Employer's argument that the Union forfeited its right to have this bargaining unit work done by bargaining unit employee has no merit. While it is true that at the very end of the October 12 shift the Grievants were asked and declined to work overtime, that did not waive the Union's rights to enforce Schedule A's "non-union help" prohibition. The Employer has not demonstrated that it asked the Union for additional help, or that the Union was unable to supply additional help for Grievants on October 12.

As the Employer's own records show, the Employer planned on having Food Team employees plate the desserts on October 12, 2002. That Food Team plan is revealed by the Employer's posting of a revised schedule on October 12, 2002 that removed the pantry employees from the October 14, 2002 roster at a time when ARAMARK'S contracts called for almost two thousand lunches for October 15, 2002. That plan is also reflected in the Food Team time records, which show that they came in on October 12, 2002 at noon, 12:42 and 1 p.m., respectively. As [B] testified, that was precisely when [F], the chef, brought the cakes out of the freezer for plating. [F] then assigned the Food Team employees to start plating those desserts on the afternoon of October 12 -- at the very end of the Grievants' shift.

While the Employer's witness made a claim that it would take 72 hours for the individual slices of cake to defrost, that claim was without substance and, in any event, immaterial to this case. As Ms. [B] testified, the cakes do not arrive whole and are not typically plated for three or four days before being served. Rather, the cakes arrive pre-sliced. Pantry employees simply place the pre-cut slices on individual plates. Typically, this work is done one day ahead, not three, before they are served. Thus, there was no management "need" to plate the desserts on Saturday, October 12.

Management could move the dates when the work was performed. However, it does not follow that it could transfer the work to non-union personnel.

It is also undisputed that the fruit platters and dessert plating for the October 15 Economic Club lunches was pantry classification work. [B] testified that the contracts for that day, would have included both a fruit platter and dessert, both of which would have been pantry classification work. The only Employer witness, [G], did not contravert [B]'s testimony.

The Grievants were originally scheduled to prepare a lunch fruit and dessert on October 14 for the October 15 luncheon, their names were taken off the schedule and they were not permitted to do that work on October 14. Instead, much of the work, by the Employer's own admission, was done by Food Team employees on Saturday, October 12, 2002.

The Employer is certainly free to schedule its work as it sees fit. Nor are Steady Extra employees guaranteed a minimum number of hours, since there employment is strictly event drive.

However, it is not free to deliberately cancel Union-represented employees' schedules and plan to use "non-union help" to substitute and perform their work. Under the express language of this contract, ARAMARK may only bring in "non-union help" where it can demonstrate that it has first requested the Union for additional help and that the Union has been unable to supply it. The Employer has not even claimed that it requested that help or that the Union failed to supply it. In the circumstances, it was not entitled to use Food Team to prepare and plate the cold food for the October 15, 2002 luncheon.

This was inconsistent with the parties' past practice.

In short, the Employer is not relieved of its contractual duty to request referrals for a job merely by asking an individual union member (or members) to work late at the end of their shift.

Thus, Grievants were entitled to work their posted October 9 and 14 schedules unless an event cancelled and the Employer has "nothing" for them to do. Although the Employer's grievance answer asserted this rationale for removing Grievants from their schedule, it presented no evidence of any cancellations at the hearing. The Employer's representative made no mention of any cancelled event. The Employer's only witness made no mention of a cancelled event. None of the Employer's exhibits showed any alleged cancellation. The Employer has not established this defense.

To be sure, management has broad control of its enterprise. These rights are inherent and also expressed in the contract. It may schedule work and provide services as it decides.

Further, as Steady Extras these employees are not guaranteed a specific number of hours per week.

However, even the management right is qualified, not absolute. It may make decisions "provided the decision of Aramark is in conformity with the provisions of this agreement." Art. 12. Management's general right to schedule work does not defuse its specific obligations to use bargaining unit labor to do bargaining unit work.

Here management improperly contracted out bargaining unit work

The arbitrator believes that the appropriate bargaining unit members should receive payment commensurate with the work which was actually performed by non-Union help on October 9. As to October 14, they are entitled to a full day's pay.

## VI. AWARD

For all the foregoing reasons, the issues (page 6) are each answered, "Yes."

The Grievances and relief requested in them are **GRANTED**. The Union is entitled to complete relief for the work which it improperly lost. Therefore, the affected employees [11] shall be made whole as that term is commonly understood. As to October 10, the remedy should be commensurate with the work that was improperly transferred, and is not necessarily limited to a single day's pay. The matter is remanded to the parties for consultation and agreement on the precise monetary award required. As stipulated by the parties, I retain jurisdiction in the event of a dispute as to remedy or as to the implementation or meaning of this award.

## FOOTNOTES:

n1 [A], [B] (now [B]),and [C] (now [C]).

n2 The copy given to the arbitrator is cut off at this point. The "not" was inferred from context.

n3 Dated December 2, 2001.

n4 Art 2(7).

n5 See*Missing Witneeses, Missing Testimony and Missing Theories*Cf.*Witnesses in Arbitration* Howard R. Sacks & Lewis S. Kurlatzick, , (Butterworth, 1987) p.22; , Edward Levin and Donald Grody, , (BNA, 1987),

pp. 125-126.

🕊n6 This large amount of continental breakfasts did not magically appear. One can safely presume that the elves did not do it.

🕊n7 [H] worked 9-1/2 hours, [I] worked 6 hours and [J] worked 3 hours.

🕊n8 An expression of a statutorily-sanctioned interconnection, namely collective bargaining.

🕊n9 57 Mich L Rev 31(1958)

🕊n10 *See Reynolds Metals Co.Ormet Corp.Uniroyal Inc.Suland Tool & Mfg., Inc.* , 42 LA 333, 334 (Coffey 1963); , 86 LA 705 (Baroni 1986); , 76 LA 1049 (Nolan 1981); , 71 LA 120 (Lipson 1978).

🕊n11 *Remdies in Arbitration (2nd Ed)* It does not necessarily follow that the three employees who filed the grievances were the affected employees. Trying to discern who lost opportunities which were not offered is problematical at best. This is something that the Union should decide. See Marvin Hill and Anthony Sinicropi, , (BNA, 1981), pp 329-369.

**UPDATE-DATE:** July 13, 2007

Service: **Get by LEXSTAT®**
Citation: **04-1 Lab. Arb. Awards 3676**
View: Full
Date/Time: Monday, July 16, 2007 - 11:22 AM EDT



About LexisNexis  |  Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service:  **Get by LEXSTAT®**
Citation:  **95-2 Lab. Arb. Awards (CCH) P 5344**

*Copyright 2007 CCH Incorporated, All Rights Reserved*

Copyright 2007 CCH Incorporated, All Rights Reserved
CCH Labor Arbitration Awards

Labor Arbitration Awards---1987 -- Present
Admin Decision

95-2 Lab. Arb. Awards (CCH) P 5344

June, 22, 1995

95-2 ARB P 5344 **Beckett Paper Company, a Division of International Paper Company** and **United Paperworkers International Union, Local 1968 Contracting Out -- Rights, Management -- Subcontracting Janitorial Work.**-- Case No. 52 300 00511-94, (issued on June, 22, 1995)

**Beckett Paper Company, a Division of International Paper Company** and **United Paperworkers International Union, Local 1968**

ALVIN L. GOLDMAN, Arbitrator. Selected through AAA. Case No. 52 300 00511-94. Hearing held in Hamilton, Ohio, May 4, 1995. Posthearing briefs filed June 12, 1995. Award issued on June, 22, 1995

**Contracting Out: Rights, Management: Subcontracting Janitorial Work**. -- An employer had the express contractual authority to subcontract janitorial work. Under the parties' agreement, management had the right "to sub-contract work at the discretion of the company..."; however, the company was prohibited from subcontracting maintenance work if it had sufficient qualified manpower and facilities available to perform such work. The employer decided to "subcontract" out the janitorial work and discussed with the union what transfers would be made so that those working as janitors would remain employed with the company. Although the employer's contract with another company to perform janitorial work did not literally constitute a "subcontract", it was concluded that the parties intended the term "subcontract" to include all forms of contracting work to be done outside the unit . Moreover, the union's grievance characterized a "subcontract" as the arrangement under which the outside business provided janitorial services for the company. Also, the evidence established that the use of the term maintenance work referred to the work of the skilled trades that maintained and repaired machinery and not janitorial work. Thus, the grievance was denied.

Thomas A. Swope, Atty., for the Company.

Kenneth C. Stanifer, International Representative, for the Union.

TEXT:

**[ Text of Award ]**

**GOLDMAN** , Arbitrator; **PROCEEDINGS AND ISSUE**: Was the collectively bargained agreement violated by the Company's action in sub-contracting out janitorial work in late October 1994; if so, what should be the remedy?

**BACKGROUND FACTS**

The paper mill at which the bargaining unit is located produces fine quality paper. Approximately 344 bargaining unit workers are employed at the mill where, since October 26, 1966, the Union has been certified as the bargaining agent of "all production and maintenance employees, including leadmen."

The parties' collective agreement has a separate pay rate for Office Janitor which is listed under the Sheet Process Department. At the time this dispute arose, the Company employed one full time employee who was assigned to that position. It also employed four full time employees and one half time employee who were assigned to the position of Plant Janitor, a job classification not specified in the parties' collective agreement. The latter full time employees were paid at the Laborer rate, which listed in the Maintenance Department and the Mill Service Department, and the half time Plant Janitor was paid at the Warehouse/Loader rate, a job classification listed in the Sheet Process Department. All janitorial positions were bid jobs at the time of this grievance. At all times during the course of the parties' collective bargaining relationship, up to the change giving rise to this grievance, the janitorial work was performed by bargaining unit members.

The Management Rights provision of every collective agreement negotiated by the parties has included the statement that Management has the right "to sub-contract work at the discretion of the Company (subject Paragraph "c" ...)" of the provision. The first sentence of Paragraph (c) of the Management Rights provision, which has also been in every contract between the parties, states: "Maintenance work will not be subcontracted if the Company has sufficient qualified manpower and facilities available to perform such work." That sentence stood by itself until recent years when two sentences were added expressing Management's intention to use its Maintenance employees when such work is done and committing the Company, except in emergencies, to discuss with the Union the reasons for intended subcontracting prior to making such arrangements.

Over the years, in a variety of situations the Company has contracted for work to be done for it by other companies. Although it has a small group that builds and repairs skids, the Company contracts out the work of building special types of skids requested by customers. It began using an outside contractor on a regular basis starting around 1982 and since that time the number of its employees who do that work has declined from five to two even though there has not been a decline in the number of skids used by the Company.

The Company has contracted out sheet cutting work. Some of that contracting was for a period when it was installing new, automated equipment in the mill. However, since 1988 it has contracted out some of its sheet cutting needs.

At one time the Company did all of its print testing and the assembling of promotional material in the mill. The number of employees involved in this and related work has been reduced since the early 1980s as a result of turning some of the work over to its advertising agency and contracting with a specialty company to handle its print testing.

When its knife grinder retired in 1992, the Company contracted out this work to a company that has specialized high-tech equipment to do the sharpening work.

The Company also often contracts for maintenance and repair work to be performed in the mill under the conditions specified in Paragraph (c) of the collective agreement's Management Rights provision.

Finally, the record shows that the Company has contracted out some of the truck haulage of materials and product between its mill and warehouses. As a result, even though it has increased the number of warehouses and the amount of haulage, it now has three truck drivers even though at one time it had four.

In July of 1994 Management met with Union representatives and informed them that it was considering contracting out janitorial and trucking work. The Union said it would resist such action on the ground that

the work belonged to the bargaining unit. The parties thereafter engaged in negotiations for a new collective agreement. Neither side proposed any changes in the language of the agreement relating to Management's authority or lack of authority to contract out trucking or janitorial work. On October 14, 1994, Management informed the Union that it was dropping the idea of contracting out trucking work because it found that it would not be cost effective but that it was "subcontracting" out the janitorial work and discussed what transfers would be made so that those working as janitors would remain in the Company's employ. The Union immediately filed its grievance and the matter was brought to arbitration.

The record shows that the contract for the performance of janitorial work in the mill is based on a fixed monthly fee and is substantially less expensive than the Company's cost estimates of having the work done by its own employees. The contractor assigns workers to do the janitorial work and they are present for only about four hours a day. Under the arrangement, the contractor provides some but not all supplies. The contractor provides its own tools and equipment and supervises its workers who are performing the janitorial services at the mill. The record does not establish whether the contract provides for continuity in the personnel assigned by the contractor to do this work at the mill. Finally, the Company does not know what the terms and conditions of employment are for the janitorial service company's workers.

## DISCUSSION

Employers rely on workers other than their own for many different purposes. A variety of reasons may motivate an employer to purchase materials, supplies and services that it theoretically could produce or provide for itself. The employer may not have the capital needed to invest in the equipment required to process such materials or supplies or it may feel that it can more profitably invest that capital elsewhere. An employer may also decide to buy rather than produce needed materials, supplies or services because it lacks the managerial expertise for such production or for the direction of such work or because it estimates that its needs would not generate the economies of scale necessary to enable it to efficiently use the equipment or skilled personnel that would be required to provide the materials, supplies or services for itself.

In addition, an employer may decide to look to outside sources so that it can cope with temporary or transitional situations such as those resulting from a sudden surge in customer demand or an unexpected machinery breakdown, or to deal with the delays in delivery, installation and training involved in adapting to new machinery and the like.

Still another reason an employer may decide to buy materials, supplies or services from other sources is that the sellers operate in a cheaper labor market and, therefore, can sell the items or services for less than the buyer's cost of doing it itself. To the extent that the latter reason is the primary explanation for purchasing materials, supplies or services from other sources, management's decision poses a particular threat to its work force's ability to preserve both their job security and their negotiated standard of compensation.

A core employee motivation for establishing terms and conditions of employment through collective bargaining is to provide increased job security at improved benefit levels. Therefore, the interpretation of a collective agreement should seek to understand the extent to which the achievement of such goals is implicit in the collective agreement's provisions.

It is in part for this last reason that labor arbitrators generally take the position that a broad contractual provision recognizing management's authority to assign work and direct the work force does not give management unbridled discretion to transfer work normally performed by the bargaining unit. Thus, a long line of arbitration decisions finds that contract recognition provisions, seniority provisions, and the like, implicitly impose restrictions on contracting away work if done under circumstances that would enable management to use the employees of other employers to undercut its commitment to abide by the terms and conditions of employment established by the collective agreement. [Elkouri & Elkouri, *How Arbitration Works*, 4th ed. pp. 538-40 (1985); S. Wolf, "Subcontracting" in *Labor and Employment Arbitration* (A.

Gosline & T. Bornstein, eds.) sec. 41.04(6)(b).] This same implied restriction on Management's authority to contract out bargaining unit work has been explained as being dictated by the covenant of good faith and fair dealing that is imputed into most contracts. [A. Cox, "The Legal Nature of Collective Bargaining Agreements", 57 Mich. L. Rev. 1, 31-32 (1958).] Accordingly, numerous arbitration decisions require the employer to justify decisions to contract out work by showing that they were reasonable and made for a good faith business purpose. [Perhaps the best summary of the tests variously applied by arbitrators in such cases is Professor Nolan's decision in *Uniroyal, Inc.,* 76 LA 1049 (1981), a case in which the contracting out of janitorial work was held to be unjustified.]

On the other hand, where the parties have expressly addressed the issue of contracting out work, that contractual language must control. In the present case, the Company's brief asserts that the contractual language is "strikingly clear and explicit" and is the determinative basis for dismissing the grievance.

I find, however, that the application of the Management Rights provision of the parties' collective agreement to the facts of this case is not as clear and straight forward as the Company contends. The Company's position asserts that the discretion given to it "to subcontract work" encompasses the authority to displace its current janitors by contracting with an outside entity to do their work. Underlying that position are three assumptions: First, that the phrase "to subcontract work" encompasses a broader range of activities than simply those entailed in arranging for other entities to perform part or all of a Company contract (the precise meaning of "sub-contract"); second, that janitorial work is not maintenance work covered by the restrictions of paragraph (c) of the parties' Management Rights provision; and third, that the contractual discretion "to contract out work" (the broader reading the Company gives to the phrase "to subcontract work") includes the authority to displace bargaining unit jobs within the mill by permanently turning their work over to an outside entity.

At the core of the Company's contractual argument is the meaning of the phrase "to subcontract work". If that phrase is being used with care and precision in the parties' collective agreement, it would not cover the contracting out of the work of providing janitorial services for the mill or mill office.

When used with precision, the term "to subcontract work" does not cover all forms of contracting out. In order for there to be a "subcontract", there must be a "contract". For example, if the Company has a contract to produce a particular grade of fine paper for a customer and, because it is operating at or near capacity the Company arranges for another mill to produce the paper needed to fill the order, that arrangement with the other mill is a "subcontract". Similarly, if the Company has undertaken to deliver paper stacked on a particular type of skid and arranges for another Company to build those skids, the skid building is a subcontract.

On the other hand, work involved in servicing and maintaining the Company's equipment, machinery, premises or work force is work that the Company does to perpetuate its own existence. The Company does not have a contract to do that work. It does the work because it is essential to the Company's operations. Although some of that work may be contracted out for others to perform, the work is not being "subcontracted", at least not if the word "subcontract" is being used with precision. For example, if the Company uses skids for transferring stacks of paper within the mill, or between the mill and its warehouse, and arranges for another entity to build those skids rather than have them built by mill employees, it is purchasing the skids from an outside firm or is contracting out the work of building those skids; it is not, however, subcontracting that skid construction because it does not have a contract to supply those skids to another. Thus, if the phrase "to subcontract work" is being used with literal precision in the parties' collective agreement, it cannot be understood to encompass janitorial work. Since the Company does not have a contract to perform that work, its contract with another company to perform janitorial work in place of its being performed by bargaining unit employees is a contracting out or contracting away of the work, but it is not the granting of a "subcontract" of the work.

Experience, however, informs us that judges, lawyers, negotiators, arbitrators, and commentators often fail to use the term "subcontract" with precision. Frequently the term "to subcontract work" is used to connote all forms of obtaining materials, supplies and services from sources outside of the employer's own work force. [ *See International Union v. Webster,* 299 F.2d 195, 197 n.2 (7th Cir. 1962) observing that in

industrial relations the word "subcontract" often is used inaccurately.]

In the case before us there is significant evidence that the parties used the term "subcontract" to encompass all forms of contracting work to be done outside the bargaining unit. Perhaps the best evidence of this is the language of the parties' Management Rights provision. In that provision the parties grant Management discretion to "subcontract" work and then carved out an exception for maintenance work. This is evidence of an intent to give the term "subcontract" a broad meaning because if the collective agreement was using the term with precision there would have been no need to make an exception for maintenance work. The reason for reaching this conclusion is that since maintenance work does not involve the Company's performance of a contract, an arrangement for another entity to do that work does not literally constitute a "subcontract". Accordingly, because the parties did include an exception for maintenance work, they must have assumed that when such work is performed by an outside entity it is a "subcontract". Hence, the parties were using the phrase "to subcontract work" as having a meaning that is broader than its literal meaning. Therefore, while the Management Rights provision uses the phrase "to subcontract work", the fact that an exception for maintenance work has been carved out indicates that the parties understood the phrase to mean "to contract out work". Accordingly, there is a foundation in the language of the Management Rights provision of the parties' collective agreement to support the Company's contention that it has express contractual authority to contract out at its discretion.

Further evidence that the parties understood their contractual use of the term "subcontract" as having a broad meaning encompassing all contracting out is found in the Union's grievance. There the Union characterized as a "subcontract" the arrangement under which the outside business provides janitorial service for the Company.

The above conclusion, however, does not remove all hurdles to the Company's position. A second hurdle to the Company's interpretation of the collective agreement is the relationship between janitorial work and maintenance work. The bargaining unit was described by the NLRB as consisting of production and maintenance employees. Janitors do not produce the Company's product but they do help to maintain the mill. Therefore, in the ordinary dictionary meaning of the term "maintenance", and as it is used in describing bargaining units, the janitors were maintenance employees. Nevertheless, in industrial relations, just as the term "subcontract" often is used by parties to connote a broader meaning than its literal definition, the term "maintenance work" often is understood to describe a narrower range of activity than is denoted by its literal meaning. Thus, the Company presented undisputed testimony to the effect that use of the term "maintenance work" in this mill is understood to refer to the work of the skilled trades that maintain and repair machinery and equipment and that janitorial work is not understood to be within the term "maintenance work". I am inclined to give weight to this testimony not only because it is undisputed but also because it is supported by the fact that the supervision of the janitors did not fall within the Maintenance Department and because in the only place in the collective agreement where there is a specific job classification designated as janitor it is listed under a production department and not under the Maintenance Department. Therefore, I find myself in the same situation as did Professor Merrifield when he concluded in *Reichhold Chemical, Inc.,* 78 LA 259 (1982), that although janitorial work is maintenance in the dictionary meaning of the term, that was not the parties' contractual understanding when they used the words maintenance work in their collective agreement.

Based on the above analysis, I conclude that the contracting out of janitorial work came under the Management Rights language recognizing the Company's discretion over such decisions and that such contracting out was not limited by the restrictions imposed on that discretion in the provision's paragraph (c). However, that conclusion does not end the inquiry into this grievance because even contractually assigned discretion can be reviewed to determine if there had been a clear abuse of that discretion and the grievance and arbitration provisions of the parties' collective agreement encompasses the interpretative question of whether the particular exercise of a delegated discretion constituted such a clear abuse.

Discretionary authority is not absolute. The concept of exercising discretion implies that the decision maker will act in a reasoned, lawful manner. Hence, decisions that are arbitrary, capricious or fanciful are a clear abuse of discretion. Accordingly, it is a clear abuse of discretion if a decision is based on improper or extraneous considerations. [B. Schwartz, *Administrative Law,* 3d Ed. secs. 10.14-10.16 (1991).]

The test of abuse of discretion, of course, is more deferential to the decision maker than is the requirement imposed in an ordinary contracting out case. As previously noted, in an ordinary contracting out case the burden is upon the employer to show that it had a good faith business purpose for contracting out the work. Under that test, some arbitrators have found a contract violation where the contracting out of janitorial work was for no other apparent purpose than getting the job done by cheaper labor. [ *Mead Corp,* 75 L.A. 665 (J. Gross 1980); *Uniroyal, Inc.,* 76 LA 1049 (D. Nolan 1981).]

In contrast, to show a clear abuse of discretion it is necessary to show that it was exercised dishonestly or without a rational or legitimate basis; that is, that it was exercised not for the legitimate purpose for which the discretionary power is given but for an illegitimate ulterior purpose or for no purpose at all. Accordingly, when discretion is contractually reposed in Management's judgment, as it is in this case, the burden is on the Union to show that there has been a clear abuse by proving that Management's purpose in contracting out was not based on legitimate business concerns but rather was without any legitimate purpose or was designed to undermine the bargaining unit or the lawful bargaining representative, or was to bypass the collective bargaining agreement or process, or was to evade the core commitments of the collective agreement. I find that the Union has not demonstrated such a clear abuse of discretion in this case.

Although Management's motivation obviously was to save money, as contrasted, for example, with getting the job done more effectively [see, for comparison, *Singer Co.,* 71 LA 204 (S. Kossoff, 1978)], that of itself does not demonstrate an illegitimate purpose of undermining or evading the core commitments of the collective agreement. That Management did not act to thwart the Union or bargaining unit interests is demonstrated by the fact that Management gave the Union prior notice of its plan and arranged to retain the affected workers in the bargaining unit. It is also demonstrated by the fact that it abandoned its plan to contract out additional truck hauling when it found that it would not result in the expected savings.

Moreover, there is no evidence that all or even some of the cost savings enjoyed by the Company is attributable to the contractor providing lower compensation and benefits to its employees. The Company disclaimed knowledge regarding the pay, benefits or union status of the contractor's work force and the Union has not offered any evidence respecting such matters. What we do know is that the janitorial crew is present for only about four hours a day. This indicates that the lower cost is due, at least in part, to the contractor being able to use its work force more efficiently. A number of reasons can account for this. Included would be that the contractor's employees may be working with greater effort or concentration, or that they are using better equipment, or that their work efforts are being directed and coordinated in a more rational manner, or that they have been better trained to perform the work efficiently. Also, because the contract is on a fixed price arrangement, and includes some supplies that the contractor as a large quantity buyer purchases for less than the Company would have to pay, there is only an indirect relationship in the respective total costs between the compensation and benefits of the former bargaining unit janitors and those received by the contractor's work force. Hence, it has not been established in this case that the Company undermined the collective agreement by doing nothing other than bring a lower paid work force into the domain of the bargaining unit.

For the above reasons I conclude that the Union has not shown that the contracting out of the janitorial work, in the circumstances of this case, was for the purpose of undermining or evading the core commitments of the collective agreement or the collective bargaining relationship. Therefore, I find that there is no proof that the contracting out of janitorial work was a clear abuse of discretion. Accordingly, I hold that on the record of this case there is no reason to set aside Management's exercise of its contractually recognized authority to contract out the disputed janitorial work.

**AWARD**

The grievance is denied and is dismissed.

**UPDATE-DATE:** July 13, 2007


Service: **Get by LEXSTAT®**
Citation: **95-2 Lab. Arb. Awards (CCH) P 5344**
View: Full
Date/Time: Monday, July 16, 2007 - 11:23 AM EDT



About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.