UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
1199SEIU, UNITED HEALTHCARE : 
WORKERS EAST, :
                        :
             Plaintiff, :           07-Civ.-4816 (GBD)
                        :
        v. :         **AFFIRMATION OF**
                        : **ALLYSON L. BELOVIN**
RITE AID CORPORATION :
                        :
           Defendant. :
-----------------------------------------------------X

        Allyson L. Belovin, an attorney admitted to practice in the State of New York, affirms

and states, under penalty of perjury that:

        1.      I am a member of the firm Levy Ratner, P.C., counsel for Plaintiff 1199SEIU,

United Healthcare Workers East.

        2.      I am fully familiar with the facts and circumstances of this action.

        3.      I make this affirmation in opposition to Defendant Rite Aid Corporation's Motion

to Stay Arbitration and in support of Plaintiff's Cross-Motion to Compel Arbitration.

        4.      Attached is an Exhibit Appendix which includes all of the documents referred to

in Plaintiff's Memorandum of Law in opposition to Defendant Rite Aid Corporation's Motion to

Stay Arbitration and in support of Plaintiff's Cross-Motion to Compel Arbitration.

        5.      I believe each exhibit included in the Exhibit Appendix to be true and correct

copies of the document.

Dated: New York, New York
        July 16, 2007

                              LEVY RATNER, P.C.

                   By: _Allyson L. Bel___
                         Allyson L. Belovin (AB 3702)
                         Attorneys for Defendant
                         80 Eighth Avenue, 8th Floor
                         New York, New York 10011
                         (212) 627-8100

## EXHIBIT APPENDIX

| Exhibit No. | Description |
|---|---|
| A | Transcript of July 19, 2007 Conference before Hon. George B. Daniels |
| B. | Affidavit of Laurianne D. Vallone submitted in support of Plaintiff's Motion for a Preliminary Injunction |
| C. | Collective Bargaining Agreement between 1199 and Rite Aid effective October 11, 1998 through October 10, 2002 |
| D. | Memorandum of Agreement between 1199 and Rite Aid effective October 13, 2002 through October 14, 2006 |
| E | Memorandum of Agreement between 1199 and Rite Aid effective October 14, 2006 through October 14, 2010 |
| F | Neutrality Agreement |
| G. | 1199's Demand for Arbitration |
| H. | 1199's Preliminary Statement to NLRB |
| I. | Agreement dated June 29, 1998 |

Exhibit A

# In The Matter Of:

*1199  SEIU UNITED HEALTHCARE v.*
*RITE AIDE*

---

*June  19, 2007*

---

*CONFERENCE*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 76jnseic.txt, Pages 1-73

**Word Index included with this Min-U-Script®**

**1199 SEIU UNITED HEALTHCARE v.**
**RITE AIDE**

June 19, 2007

---

Page 1

```
                      76jnseic
[1]  UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
[2]  -------------------------------x
[3]  1199 SEIU UNITED HEALTHCARE
     WORKERS EAST,
[4]               Plaintiff,          New York, N.Y.
[5]          v.                       07 Civ. 4816 (GBD)
[6]  RITE AID CORP. et al.,
[7]               Defendants.
[8]
[9]  -------------------------------x
                                      June 19, 2007
[10]                                  10:55 a.m.
[11] Before:
[12]               HON. GEORGE B. DANIELS,
[13]                              District Judge
[14]               APPEARANCES
[15] LEVY RATNER
          Attorneys for Plaintiff
[16] BY:  ALLYSON L. BELOVIN
          RICHARD DORN
[17]      SUSAN CAMERON
[18] MILES & STOCKBRIDGE
          Attorneys for Defendants
[19] BY:  STEPHEN M. SILVESTRY
               and
[20] THOMSON WIGDOR & GILLY
          Attorneys for Defendants
[21] BY:  SCOTT GILLY
[22]
[23] ALSO PRESENT:  TRACEY BIRCH
[24]
[25]
```

Page 2

```
[1]
[2]                  (Case called)
[3]       THE COURT:  I want to start with the plaintiff.
[4]       I note that the plaintiff, the union is requesting an
[5]  order to show cause and preliminary injunction.  I also
[6]  received a motion to dismiss, but it's not fully submitted.
[7]  I'm more concerned right now with addressing immediately the
[8]  application for the order to show cause.
[9]       Quite frankly, since this is really an arbitration
[10] case more than anything else, I assume that whatever ultimate
[11] resolution of the merits of this case is going to be is going
[12] to be before the arbitrator and not before the Court.  I'm not
[13] sure that this is concerned about taking much more action on
[14] this case substantively other than whether or not there is an
[15] injunction issued in support of arbitration to resolve the
[16] issues between the parties.
[17]      Let me start -- who wants to be heard?
[18]      MS. BELOVIN:  I will, your Honor.
[19]      THE COURT:  Ms. Belovin.
[20]      MS. BELOVIN:  We think the law and the facts in this
[21] case are fairly straightforward, your Honor.
[22]      The union has a collective bargaining agreement with
[23] Rite Aid.  That collective bargaining agreement has a broad
[24] grievance and arbitration provision allowing for the
[25] arbitration of any unresolved disputes between the parties
```

Page 3

```
[1]  arising out of the contract.
[2]       The contract includes what's known as an
[3]  after-acquired clause.  It provides that if Rite Aid acquires
[4]  any new stores, it will recognize the union as the collective
[5]  bargaining representative of the employees in those stores and
[6]  apply the terms of the contract to those employees.
[7]       Under federal labor law, clauses like the
[8]  after-acquired clause in this contract are valid and are
[9]  enforceable upon the union's showing of support among the
[10] majority of employees in the stores.  The contract also
[11] includes a neutrality agreement.  It governs the parties'
[12] conduct during the time in which the union is garnering the
[13] necessary support.
[14]      THE COURT:  They claim that there is no neutrality
[15] agreement.  Point me to the neutrality agreement in the
[16] collective bargaining agreement.
[17]      MS. BELOVIN:  It is not within the four corners of the
[18] collective bargaining agreement, your Honor.  In our
[19] supplemental affidavit that we submitted with our reply papers
[20] in this case, we submitted a copy of the neutrality agreement
[21] to you.
[22]      THE COURT:  I am not sure that I know specifically
[23] what language you are saying is the neutrality agreement,
[24] because I don't think I saw any language that said "neutrality
[25] agreement."
```

Page 4

[1]    **MS. BELOVIN:**  Certainly, your Honor.

[2]    In the supplemental affidavit of Laurie Vallone,

[3]  attached as Exhibit A to that affidavit is an agreement.

[4]    **THE COURT:**  I'm sorry.  Which exhibit?

[5]    **MS. BELOVIN:**  Exhibit A.  Paragraph 8 of that

[6]  agreement provides that --

[7]    **THE COURT:**  Just a second.  I have Exhibit 1.  I don't

[8]  have Exhibit A.  Which affidavit are you saying?

[9]    **MS. BELOVIN:**  The supplemental affidavit that we

[10] submitted with our reply papers.

[11]    **THE COURT:**  OK.  I don't have the supplemental

[12] affidavit -- wait a minute.  Exhibit A?

[13]    **MS. BELOVIN:**  Yes, your Honor.

[14]    **THE COURT:**  I'm sorry.  I don't have the supplemental

[15] affidavit in front of me.  I have Exhibit A attached to your

[16] motion.

[17]    **MS. BELOVIN:**  I can provide you with a copy if that

[18] would be easier for your Honor.

[19]    **THE COURT:**  When did you file the reply papers?

[20]    **MS. BELOVIN:**  The reply papers were filed yesterday.

[21]    **THE COURT:**  OK.  That's probably why.  When the

[22] lawyers tell me they filed their papers, it's usually after I

[23] have received and read the other papers.  Did you send a

[24] courtesy copy to chambers?

[25]    **MS. BELOVIN:**  We did, your Honor.  We dropped a

---

**Page 5**

courtesy copy off yesterday afternoon.

**THE COURT:** It is probably in the mail room.

**MS. BELOVIN:** Would you like me to provide you with a full set of those papers now?

**THE COURT:** Yes. I have not seen them.

**MS. BELOVIN:** These are the original papers, your Honor.

**THE COURT:** I'll give them back to you.

**MS. BELOVIN:** If you will note, there is a supplemental affidavit of Laurieanne D. Vallone, and Exhibit A to that affidavit is the neutrality agreement.

**THE COURT:** And Exhibit A --

**MS. BELOVIN:** If I can direct you, your Honor, specifically to paragraph 8.

**THE COURT:** 8?

**MS. BELOVIN:** Yes. That has the neutrality language.

**THE COURT:** OK.

**MS. BELOVIN:** If I can explain the circumstances under which we're submitting the neutrality agreement as part of our reply papers rather than as part of our initial submission. Our client had advised us that it had a neutrality agreement with Rite Aid, but hadn't been able to locate the actual document. After the submission of our initial papers and prior to the submission of our reply papers, the attorney who had represented the union in negotiations of this agreement

**Page 6**

in 1998 was able to locate the document and provide it to our client, so we submitted it along with our reply papers.

**THE COURT:** Well, let me ask another question, then, with regard to the other defendant, Coutu. I assume that any relief with regard to that independent company is moot at this point since all these employees are now Rite Aid employees.

**MS. BELOVIN:** If that's the case, your Honor, that might be true. We are a little bit unclear as to exactly the status of the acquisition of the Eckerd stores by Rite Aid at this point. If it's true that Rite Aid is now in complete control, then you might be right.

**THE COURT:** I am not sure exactly what the standing is either. I will get the defendants to respond to this, but my understanding is that the deal has been done but it has not yet gotten final approval by the regulatory authorities.

**MS. BELOVIN:** That's correct. Your Honor, there is a public comment period we might be in at this point. I imagine the defendant can clarify this for you.

**THE COURT:** You don't contend that, even with regard to the actions of Coutu prior to that, you don't contend that your client has any contractual agreement with the previous owners of Brooks and Eckerd drugstores. You can't force them into arbitration.

**MS. BELOVIN:** We do believe that the agents of the operative drugstores were acting as agents of Rite Aid during

**Page 7**

[1] the period of time when the union avoidance campaign was [2] ongoing.

[3] **THE COURT:** That gives you rights against Rite Aid. [4] That doesn't give you rights against them independently. You [5] can't take them to arbitration.

[6] **MS. BELOVIN:** Your Honor, under federal labor law [7] there's an ally doctrine that says when an employer gets [8] embroiled in a labor dispute and is acting with common purpose [9] with the employer that is subject to that labor dispute that [10] that other employer can be brought in.

[11] We believe under the circumstances of this case, by [12] virtue of its cooperation with Rite Aid in this antiunion [13] campaign and by virtue of merger agreement between Coutu and [14] Rite Aid that Coutu would be bound by the after-acquired clause [15] and the neutrality provisions as well.

[16] **THE COURT:** That may independently create some, it [17] could or could not independently create some kind of labor [18] violation and may be appropriate for the National Labor [19] Relations Board or some other entity, but it doesn't give you a [20] contractual right to enforce an arbitration agreement against a [21] company that's not a signatory to that arbitration agreement.

[22] **MS. BELOVIN:** I think that that's something that may [23] go to the merits of the case, and that's something that the [24] arbitrator can ultimately decide, whether Coutu is bound by the [25] terms of that collective bargaining agreement by virtue of its

**Page 8**

[1] actions.

[2] **THE COURT:** Do you know of some theory or case law [3] that says that the arbitration agreement itself, that you can [4] force the contractual agreement with Rite Aid against another [5] company simply because you say that they acted with Rite Aid? [6] You can't get any independent relief from them contractually; [7] they are not contractually bound to you.

[8] **MS. BELOVIN:** Well, regardless of whether ultimately [9] we will be successful in our arbitration in enforcing the [10] contract against Rite Aid, we certainly can have an injunction [11] against Coutu -- I'm sorry. We certainly could have an [12] injunction enforced against them. You certainly have the power [13] to do that.

[14] **THE COURT:** Not the way you just phrased it, because [15] only reason I have a right to do that is if you can demonstrate [16] the likelihood of success on the merits. If you can't [17] demonstrate that you likely have any cause of action, that you [18] can force an arbitration against Coutu, then you have no basis [19] and I have no basis to issue an injunction against that [20] company.

[21] At this point I am not sure what your position is. [22] Maybe because you just don't know factually exactly what the [23] situation is, but I am not sure, based on what the defense has [24] argued, on what basis that you believe that injunction is even [25] appropriate against Coutu now if all these people are Rite Aid

Page 9

[1] employees.

[2] **MS. BELOVIN:** You're right, your Honor. We don't have

[3] clarity on exactly what the facts are in terms of the

[4] completion of this acquisition of the Eckerd stores. But we

[5] certainly can demonstrate, your Honor, likelihood of success on

[6] the merits against Rite Aid. Unless we have assurance that the

[7] merger has been completed and that Rite Aid is in complete

[8] control of these stores, any preliminary injunction would be

[9] meaningless unless it applied to both Rite Aid and the

[10] management in these Eckerd stores.

[11] **THE COURT:** Well, I am not sure that you could argue

[12] that if Coutu wanted to tell its people that I'm trying to sell

[13] the company and I wish to sell the company to someone who

[14] doesn't want a union and we would encourage you not to have a

[15] union, what right wouldn't they have to say that?

[16] **MS. BELOVIN:** I think --

[17] **THE COURT:** Just because your collective bargaining

[18] agreement with Rite Aid or a potential buyer precludes the

[19] potential buyer from doing that? What right would I have to

[20] say you can't tell your employees?

[21] **MS. BELOVIN:** The facts in this case, your Honor, are

[22] quite different than that. I think the facts will bear out

[23] that it is Rite Aid that is directing this antiunion campaign.

[24] **THE COURT:** Then that gives you relief against Rite

[25] Aid.

Page 10

[1] **MS. BELOVIN:** Correct.

[2] **THE COURT:** I am talking about Coutu.

[3] **MS. BELOVIN:** Your Honor might be right. We may not

[4] need relief against Coutu. This may all be moot, because if

[5] the merger has been completed and Rite Aid controls these

[6] stores now, then it's really Rite Aid.

[7] **THE COURT:** Have you filed for arbitration at this

[8] point?

[9] **MS. BELOVIN:** We have, your Honor. We have actually

[10] asked for expedited arbitration.

[11] **THE COURT:** Against whom?

[12] **MS. BELOVIN:** Rite Aid.

[13] **THE COURT:** Just Rite Aid?

[14] **MS. BELOVIN:** Correct.

[15] **THE COURT:** All right. What's the status of that at

[16] this point? You have just done your filing, and they haven't

[17] responded yet?

[18] **MS. BELOVIN:** We've done our filing. Rite Aid has

[19] refused to agree to expedited arbitration, and the arbitrator

[20] selection process is ongoing right now.

[21] **THE COURT:** All right. At this point what kind of

[22] injunctive relief do you believe is appropriate, given that

[23] discussion?

[24] **MS. BELOVIN:** What we would like is an injunction that

[25] prohibits the defendants from engaging in communication and

Page 11

[1] conduct with the employees in this store that states or implies

[2] that they are opposed to unionization, that they're challenging

[3] 1199's collective bargaining mission or its status or creating

[4] any kind of negative impression about unionization or 1199 in

[5] particular pending the outcome of the arbitration.

[6] **THE COURT:** OK.

[7] **MS. BELOVIN:** We are essentially requesting

[8] neutrality.

[9] **THE COURT:** I assume your position is, as I see your

[10] reply and your affidavit in support of reply, your position is

[11] that you to enforce paragraph 8 of the neutrality agreement

[12] that's attached as Exhibit A.

[13] **MS. BELOVIN:** We are seeking to enforce the neutrality

[14] agreement in its entirety.

[15] **THE COURT:** The entirety is in 8?

[16] **MS. BELOVIN:** That's the essence of the dispute here

[17] is the neutrality, correct.

[18] **THE COURT:** All right.

[19] Let me hear from the other side.

[20] **THE COURT:** Mr. Sylvestry.

[21] I read your papers. They seem real compelling when

[22] you were telling me that there was no neutrality agreement.

[23] They don't seem so compelling now that they've shown me that

[24] there is a neutrality agreement.

[25] What is your position on that?

Page 12

[1] **MR. SILVESTRY:** Perhaps I can shed light on that. I

[2] got the union's last night. I didn't get into town until 7:00.

[3] I did some digging around, particularly with respect

[4] to this so-called agreement that got sent into the court

[5] yesterday. I have another affidavit on this that you need to

[6] see because I think it's pretty compelling.

[7] **THE COURT:** Is your position that there is a valid

[8] neutrality agreement or there isn't a valid one?

[9] **MR. SILVESTRY:** There is not, your Honor. This is

[10] expired. This recognition process, that's what the agreement

[11] really is that counsel is referring to, it is not a collective

[12] bargaining agreement. It is a recognition process agreement

[13] that occurred about ten years ago, in 1998.

[14] What counsel left out of the affidavit and the

[15] submission is a one-page signature page to this agreement that

[16] contains a sunset provision that expires in October of 1998.

[17] This agreement has already been completed. In fact,

[18] because that sunset provision exists, it's more compelling, the

[19] defendants' arguments are more compelling that there's no

[20] neutrality embedded into the current collective bargaining

[21] agreement.

[22] If this recognition process has its own

[23] self-expiration date, then there is no reason to have a -- if

[24] it doesn't have one there's, no reason to have a collective

[25] bargaining agreement that doesn't have neutrality. If this is

Page 13

an ongoing recognition process agreement, then we shouldn't even be here.

THE COURT: What do you say indicates that it is not an ongoing --

MR. SILVESTRY: If I can approach?

THE COURT: Unfortunately, because I haven't seen any of these documents, both sides focused my attention on something different.

MR. SILVESTRY: This is the original affidavit, your Honor. If you turn, your Honor, to page 16 of this affidavit, and the page is titled "Agreement."

THE COURT: I'm sorry. Which page?

MR. SILVESTRY: It is page 16. My pages are not enumerated. It is in Exhibit A.

THE COURT: 16 pages in?

MR. SILVESTRY: Yes. 16 pages in. It's a one-page document that says "Agreement."

It is actually attached, which I find to be amazing, it is attached to the agreement that counsel has produced yesterday to the Court. And I note, of course --

THE COURT: When you say it is attached, what do you mean?

MR. SILVESTRY: When I say it is attached, in this affidavit it's the page immediately preceding the agreement that counsel submitted.

Page 14

THE COURT: What does that mean? Wait a minute. Does that mean that that's the complete document as it was executed and exchanged --

MR. SILVESTRY: Yes.

THE COURT: -- or does it mean somebody just put this on top of it?

MR. SILVESTRY: It's the complete document as it's executed and exchanged. It is also the complete document as it was produced to us, to Rite Aid by the union in April of this year.

THE COURT: That complete document -- let me just get a clip. That complete document will start with that page and continue to --

MR. SILVESTRY: To the page that's also dated June 29, 1998, and signed by the same parties.

THE COURT: You are saying this is a four-page document, not a three-page document?

MR. SILVESTRY: Yes, sir. I'm saying it is a four-page document. I am saying the second part of that document contains the sunset provision where it states, The recognition process as agreed as well as the terms and conditions of the collective bargaining agreement --

THE COURT: Slow down.

MR. SILVESTRY: -- to be negotiated shall be completed by October 31, 1998.

Page 15

[1] That's a sunset provision, your Honor.

[2] THE COURT: Wait a minute. Slow down.

[3] Where does it say that the neutrality agreement

[4] sunsets?

[5] MR. SILVESTRY: It says that the process that is part

[6] of this agreement, and that's the neutrality agreement, this

[7] agreement is a recognition process agreement whereby the union

[8] gets access to the certain stores, and these were new stores

[9] that were acquired nine years ago. So the process that

[10] occurred in this agreement is the union came in and asked for

[11] access to the stores and asked for neutrality.

[12] These were all newly acquired stores back in 1998.

[13] The company wanted its own consideration for this. If you look

[14] at the agreement, you will see consideration passed back and

[15] forth. The union promised not to boycott. The union promised

[16] to continue certain commercial arrangements that it had with

[17] the company. That was the quid pro quo for this agreement.

[18] The parties determined that the union would have until October

[19] 31, 1998, to organize its stores.

[20] That is the sunset provision. There is no reference

[21] to this agreement or any other agreement, any other agreement

[22] of neutrality in the collective bargaining agreement that

[23] exists right now, the very collective bargaining agreement that

[24] is really the sole basis for jurisdiction in this case.

[25] In fact, this particular agreement is not even

Page 16

[1] coterminous with the collective bargaining agreement. It's not

[2] even coterminous with the agreement.

[3] THE COURT: It doesn't have to be coterminous. The

[4] question is, even though it may have been executed

[5] independently, whether it was supposed to apply to a temporary

[6] period, whether it was supposed to apply to an original

[7] agreement, or whether it's supposed to apply to an original

[8] agreement and subsequent agreements.

[9] MR. SILVESTRY: Permanent, right; whether it's

[10] supposed to apply permanently.

[11] THE COURT: Right.

[12] MR. SILVESTRY: Yes.

[13] There is nothing in this recognition process agreement

[14] that says that it's to become part of the collective bargaining

[15] agreement between the parties. It is not encapsulated as part

[16] of collective bargaining agreement. It doesn't say in its own

[17] terms that it's incorporated into the collective bargaining

[18] agreement. It's a seriatim agreement for the organizing of

[19] certain acquired stores in 1998.

[20] THE COURT: Is there anything that I can look to in

[21] the current agreement that I can say that either there's

[22] language consistent with this neutrality agreement or language

[23] that is inconsistent with believing that a neutrality agreement

[24] is in play?

[25] MR. SILVESTRY: The agreement is totally silent. The

**1199 SEIU UNITED HEALTHCARE v.
RITE AIDE**

June 19, 2007

---

Page 17

[1] collective bargaining agreement is totally silent on whether or
[2] not the parties will remain neutral in connection with newly
[3] acquired stores.
[4]      **THE COURT:**  What makes you say that the intent of the
[5] parties was --
[6]      **MR. SILVESTRY:**  I am not saying -- I'm sorry.
[7]      **THE COURT:**  -- that the parties would not remain
[8] neutral beyond the initial unionization in 1998?
[9]      **MR. SILVESTRY:**  I am not saying it's a question of
[10] intent, your Honor.
[11]      **THE COURT:**  It is a question of intent.
[12]      **MR. SILVESTRY:**  It is a question of whether the
[13] language exists or not.
[14]      **THE COURT:**  The language only goes to the intent of
[15] the parties.
[16]      So the question is, I want to know, can it be what you
[17] are saying, are you saying that the parties did intend that
[18] there be neutrality by this agreement, or are you saying the
[19] parties did not intend that there be neutrality?
[20]      **MR. SILVESTRY:**  I am saying that the parties by their
[21] actions here in this particular case and as mirrored in the
[22] agreement that was submitted by counsel tell me that there was
[23] no intent.  Let me explain what I mean.
[24]      **THE COURT:**  You splice it so carefully.  It sounds
[25] like lawyer language to me, so it makes me a little suspect of

---

Page 18

[1] whether or not that's a direct, candid answer.  That's not a
[2] direct answer to my question.
[3]      My question is, do you believe that the parties during
[4] the course of their collective bargaining agreement intended
[5] that both sides would abide by a neutrality agreement?
[6]      **MR. SILVESTRY:**  No.
[7]      **THE COURT:**  That's --
[8]      **MR. SILVESTRY:**  No.  If you will permit, me I'll tell
[9] you why.
[10]      **THE COURT:**  I will always permit you.
[11]      **MR. SILVESTRY:**  Well, there's two reasons.  One is
[12] that this particular agreement applied to a particular
[13] acquisition, and it says so.
[14]      **THE COURT:**  Which particular agreement?
[15]      **MR. SILVESTRY:**  The one that counsel submitted, yes.
[16]      **THE COURT:**  The neutrality agreement?
[17]      **MR. SILVESTRY:**  Right.
[18]      The collective bargaining agreement that is the
[19] subject of this case contains no neutrality provision.  The
[20] parties' actions in this case are very similar to the
[21] circumstances surrounding these new stores.  In this case, it
[22] was, I think it's in the union's affidavit, the union came in
[23] and said, you know, we want an agreement of neutrality here,
[24] and Rite Aid said no.
[25]      **THE COURT:**  That is what I am saying.  Is there

---

Page 19

[1] something that I can look to that reflects that understanding?
[2]      **MR. SILVESTRY:**  Look at Ms. Vallone's first affidavit
[3] where she says that the union came in and asked for neutrality.
[4]      **THE COURT:**  Where are you pointing me to?
[5]      Her affidavit says that they came in and requested
[6] neutrality, and the store said no?  I don't think that's what
[7] the affidavit says.  I didn't see anything in the affidavit
[8] that said that she --
[9]      **MR. SILVESTRY:**  It is her recounting of the meeting
[10] that occurred between one of the union vice presidents and --
[11]      **THE COURT:**  She doesn't say that there wasn't a
[12] neutrality agreement, and she was trying to get one.
[13]      **MR. SILVESTRY:**  No.  She said that the agreement
[14] contained a neutrality.
[15]      **THE COURT:**  Right.  That is just the option.
[16]      **MR. SILVESTRY:**  Right.
[17]      **THE COURT:**  What are you pointing me to that you say
[18] supports your argument in her affidavit?
[19]      **MR. SILVESTRY:**  She is saying that the agreement
[20] contains a neutrality provision, which it doesn't.  There is no
[21] reference to this contract at the time that they came in and
[22] demanded neutrality.
[23]      **THE COURT:**  She says that independent contract is part
[24] of it.  You say it's not.  I am just trying to figure out where
[25] I look in the course of dealing, understanding the other

---

Page 20

[1] agreements to see what's consistent or inconsistent with your
[2] position or their position.
[3]      **MR. SILVESTRY:**  Well, so far all we have, your Honor,
[4] is one agreement.
[5]      **THE COURT:**  We have more than one agreement.  There
[6] were numerous agreements between '98 and today.  Right?
[7]      **MR. SILVESTRY:**  Yes.
[8]      **THE COURT:**  So I want to know whether any of those
[9] agreements between 1998 and now make reference to a neutrality
[10] agreement or would lend support to your argument or lend
[11] support to their argument or detract from their argument.
[12]      **MR. SILVESTRY:**  To my knowledge, no collective
[13] bargaining agreement that was in existence --
[14]      **THE COURT:**  Slow down.
[15]      **MR. SILVESTRY:**  No collective bargaining agreement
[16] that was in existence between the period of 1998 and now,
[17] 2007,that are the predecessor collective bargaining agreements
[18] to the one that is in this case, when I say the one that is in
[19] this case, the one upon which the lawsuit is based --
[20]      **THE COURT:**  Right.
[21]      **MR. SILVESTRY:**  -- contain neutrality provisions, or
[22] refer to this agreement as incorporated therein.
[23]      **THE COURT:**  All right.
[24]      So what are you saying is that this neutrality, what
[25] are you saying the intent of the parties was when they executed

---

Page 21

the neutrality agreement?

MR. SILVESTRY: Obviously, your Honor, the parties had a collective bargaining agreement at the time that they executed this recognition process document. Obviously they had a collective bargaining agreement. Obviously the collective bargaining agreement had an after-acquired stores clause because they made reference to it in here.

So, if the agreement -- and here's what my argument is. If that agreement stayed the same for years, why did they need one, if they had a neutrality agreement that's embedded in the collective bargaining agreement, why did they need this recognition process agreement.

THE COURT: That wasn't my question. You gave me a question to my question.

My question is what do you say that the parties intended when they executed this neutrality agreement?

MR. SILVESTRY: What I say the parties intended was they intended to it apply to a recognition process that occurred in newly acquired stores that the company acquired in 1998. That process would conclude by October 31 of 1998, because you can't have a recognition process and neutrality that lasts forever. The union has to have an opportunity to organize the stores. Fine. It has an opportunity to organize the stores. It can't say we want this opportunity for ten years, because ten years is simply not reasonable. That's not

Page 22

what the parties did. The parties said, Here's the stores, go get access to them but, complete your process by October 31, 1998 so we can move on. If you can't get them organized by then, then we move on to plan B, which is they are not organized. If you can't get a designation of the majority of the employees by October 31, 1998, you don't have one, and the agreement expires.

THE COURT: What is Rite Aid entitled to do?

MR. SILVESTRY: At that point in time Rite Aid would be entitled to exercise whatever rights it would have on communication of its employees that are embedded in the National Labor Relations Act, which are to lawfully express its opinions about whether or not the union is good for the employees or not good for the employees.

That's what the Rite Aid's rights would be. Rite Aid's rights would not be to violate the National Labor Relations Act by threatening the employees or coercing them, but they would have a right under the act to communicate with the employees.

The union would have a right thereafter also to communicate with the employees and to organize them under the provisions of Section 9 of the National Labor Relations Act whereby they go in and get cards and get a union election. No one was giving up those rights, and those rights aren't mentioned in this recognition process.

Page 23

[1]    THE COURT: You say that this agreement expired --

[2]    MR. SILVESTRY: I say -- I'm sorry.

[3]    THE COURT: You say the neutrality agreement expired

[4]  on October 31 of 1998?

[5]    MR. SILVESTRY: I say it is pretty clear that this is

[6]  a seriatim agreement.

[7]    THE COURT: I'm sorry?

[8]    MR. SILVESTRY: This is an agreement that applies to a

[9]  particular situation in 1998 on newly acquired stores.

[10]    THE COURT: You are giving me too many words to a

[11]  yes-or-no question.

[12]    MR. SILVESTRY: I'm sorry, your Honor.

[13]    THE COURT: You are saying --

[14]    MR. SILVESTRY: I'm sorry.

[15]    THE COURT: You are saying the neutrality agreement

[16]  expired on October 31, 1998.

[17]    MR. SILVESTRY: Yes, sir, I say that. Yes, sir, I say

[18]  that. I say that by its terms.

[19]    THE COURT: OK. I want to look at it more carefully

[20]  to the extent that I can find something that is either

[21]  consistent or inconsistent with it.

[22]    MR. SILVESTRY: I have one more point to make on this

[23]  issue before I move on to other issues.

[24]    THE COURT: Yes.

[25]    MR. SILVESTRY: That is to refer you to the second

Page 24

[1]  declaration of Niels Hanson that I just filed today. It also

[2]  goes to the discussion we have been having, your Honor, about

[3]  whether there is any other evidence that this particular

[4]  recognition process agreement only applies to that circumstance

[5]  in 1998.

[6]    If you look at paragraph 2 of Mr. Hanson's affidavit,

[7]  he sets up a fact that is important here. He says that when

[8]  the union, this year, 2007, sought to represent unrepresented

[9]  pharmacists of Rite Aid in New Jersey, in stores covered by the

[10]  collective bargaining agreement, they came to Rite Aid and they

[11]  asked for neutrality.

[12]    THE COURT: I'm sorry.

[13]    Where are you reading from?

[14]    MR. SILVESTRY: Paragraph 2 of the second declaration

[15]  of Niels Hanson. I will read it. It says, In late March 2007,

[16]  the union demanded that Rite Aid accept card-check recognition

[17]  of the union to become the collective bargaining representative

[18]  for Rite Aid pharmacists employed in stores located in northern

[19]  New Jersey.

[20]    They came in and they said we want card-check

[21]  recognition. They submitted this pile of documents to

[22]  Mr. Hanson in support of that.

[23]    THE COURT: Why is that at all related to a neutrality

[24]  agreement? Seeking card-check recognition doesn't tell me one

[25]  way or the other whether or not there is a neutrality

1199 SEIU UNITED HEALTHCARE v.
RITE AIDE

June 19, 2007

---

Page 25

[1] agreement. Having a neutrality agreement and asking for
[2] card-check recognition is not inconsistent.
[3]     MR. SILVESTRY: I think it is inconsistent.
[4]     THE COURT: Why would that be inconsistent?
[5]     MR. SILVESTRY: Because if the union wanted card-check
[6] recognition, it would want access and neutrality. That's why.
[7]     THE COURT: I don't follow you.
[8]     MR. SILVESTRY: OK.
[9]     THE COURT: The neutrality agreement has to do with
[10] what activity Rite Aid can engage in to discourage individuals
[11] from unionizing.
[12]     MR. SILVESTRY: Or the union.
[13]     THE COURT: What does this have to do with that?
[14]     MR. SILVESTRY: Or the union.
[15]     THE COURT: Right. Or the union. You are saying that
[16] this reflects their --
[17]     MR. SILVESTRY: Attempt to organize.
[18]     THE COURT: -- understanding that Rite Aid can do
[19] whatever they want to discourage people from unionizing. It
[20] doesn't say anything about that.
[21]     MR. SILVESTRY: Attempt to organize the unorganized
[22] pharmacists. That's correct, your Honor.
[23]     THE COURT: Right. But that doesn't say anything
[24] about whether or not Rite Aid can discourage or encourage or
[25] stay neutral or one way or the other just because they wanted

---

Page 26

[1] card-check recognition. Maybe I'm missing something.
[2]     MR. SILVESTRY: I guess I will put the tie in for you
[3] here. If the requirement for card check is contained in this
[4] recognition process agreement, which it is, it's contained in
[5] the recognition process agreement, the union was attempting to
[6] say that the agreement would apply and should apply to
[7] unrepresented pharmacists in northern New Jersey.
[8]     THE COURT: OK. So why is that inconsistent with
[9] their position that they are entitled to a card-check
[10] recognition.
[11]     MR. SILVESTRY: Because if the card-check recognition
[12] provision applies, the neutrality position applies.
[13]     THE COURT: That's their position.
[14]     MR. SILVESTRY: What they are saying is here's this
[15] agreement that evidences the fact that you are required to have
[16] a card check.
[17]     THE COURT: Right.
[18]     MR. SILVESTRY: What I am saying to your Honor is the
[19] card-check provision in this agreement is in the same agreement
[20] as neutrality. So, if they needed permission, they needed to
[21] talk to the company.
[22]     THE COURT: They didn't say they wanted permission.
[23] It said they demanded. That's not wanting permission. The
[24] things I demand are a little different than the things that I
[25] asked for.

---

Page 27

[1]     MR. SILVESTRY: Having filed a request for arbitration
[2] in that particular case, having filed a grievance saying that
[3] the company's refusal to provide card check in New Jersey was
[4] unlawful, we haven't seen a lawsuit in connection with that.
[5] We have only seen a lawsuit in connection with 3500 employees,
[6] new employees that Rite Aid acquired this past June.
[7]     THE COURT: There is nothing necessarily illogical
[8] about that. The main thing they are concerned about is if they
[9] can unionize. Once they have got the majority of the people to
[10] accept them as a union you don't have much choice.
[11]     MR. SILVESTRY: That's right.
[12]     THE COURT: That's the thing that they are most afraid
[13] of, that you are going to discourage that. The card check
[14] right now is not that significant as obviously their being
[15] afraid that you will discourage people from joining the union.
[16]     MR. SILVESTRY: I agree with you, sir. I think that
[17] they are concerned that we are going to somehow convince the
[18] employees that they shouldn't join the union.
[19]     THE COURT: Yes. That's exactly what they're
[20] concerned about.
[21]     MR. SILVESTRY: Let me just move on.
[22]     THE COURT: The question is whether or not you are
[23] entitled to do so.
[24]     MR. SILVESTRY: That's correct.
[25]     THE COURT: They say that pursuant to this neutrality

---

Page 28

[1] agreement you are not entitled to do so. You say, because the
[2] recognition process was supposed to end by October 31, that
[3] means everything that was in this agreement sunsetted October
[4] 31. It doesn't say it's null and void after October 31.
[5]     MR. SILVESTRY: I think we've just confirmed that
[6] neutrality is the essential part of that recognition process.
[7] If you don't have neutrality then the union is going to be
[8] concerned that we're going to make the process more difficult.
[9]     THE COURT: This agreement only is concerned about the
[10] process for unionizing those stores that everybody understood
[11] that Rite Aid was in the process of taking, of opening at the
[12] time.
[13]     MR. SILVESTRY: Yes, sir.
[14]     THE COURT: There is a specific process that Rite Aid
[15] wanted completed. Whether Rite Aid wanted the process
[16] completed doesn't say anything about whether or not particular
[17] rights and obligations of the parties still remained.
[18]     MR. SILVESTRY: I agree with you. The agreement is
[19] silent about whether or not there are -- the agreement doesn't
[20] say that the rights and obligations of the parties continue
[21] after the collective bargaining agreement is negotiated. The
[22] agreement doesn't contain a provision that says that it is
[23] incorporated into the collective bargaining agreement. It
[24] doesn't make reference to the collective bargaining agreement
[25] other than to say that there is going to be a collective

---

Page 29

bargaining process that will result in a CBA, which resulted in a CBA, the successor of which we have as the underlying collective bargaining agreement in this dispute.

There are other reasons why this injunction shouldn't issue here.

Let me just clarify something about Coutu before we move on.

The merger, the sale, the purchase of Coutu stores by Rite Aid is completed. There are no Brooks/Eckerd employees, which are the employees that are in dispute here, that remain Brooks/Eckerd employees. I think it was the first week of June. I don't know the exact date.

THE COURT: June 4.

MR. SILVESTRY: As of June 4 they are Rite Aid employees, and they are not Brooks/Eckerd employees. Coutu does not have any control over these employees. They are subject to Rite Aid's terms and conditions, and they will remain so subject to Rite Aid's terms and conditions.

THE COURT: Suppose the purchase is not approved?

MR. SILVESTRY: The purchase has been approved.

THE COURT: OK. That was my question.

MR. SILVESTRY: It's complete, sir.

THE COURT: When was the purchase approved? As of the submission of the papers that I got I don't think it was.

MR. SILVESTRY: As of the submissions maybe of the

Page 30

union's papers it may not have been. But I think it's been approved as of that June date. The merger is live. Legal day one has occurred.

THE COURT: I'm sorry.

MR. SILVESTRY: The purchase is live and legal day one has occurred as of early June.

THE COURT: OK.

MR. SILVESTRY: We are not waiting on any regulatory approvals or comment periods to my knowledge, sir. There's no contingencies that may drop out these employees and return them back to Brooks/Eckerd. We've communicated with them that they are Rite Aid employees.

THE COURT: OK. You are right. I saw their representation that there was regulatory approval pending, but I don't think I saw a statement in your papers that said that that process had been completed other than the reference to --

MR. SILVESTRY: We may not have made it clear enough, sir. I apologize. It's clear as of now that they are Rite Aid employees for purposes of determining whether or not you need to include Coutu in the order.

THE COURT: The deal is done? They are all Rite Aid employees? There's no reason to think that's going to change?

MR. SILVESTRY: There is no reason to think that is going to change. There is no reason to think that Coutu retains any control over these employees or has any access to

Page 31

[1] them as an employer. It does not. In terms of the injunction
[2] part of this at least, the injunction shouldn't issue as to
[3] Coutu because there's really nothing they are going to be doing
[4] here that's going to affect the underlying proceeding.
[5]     THE COURT: What are you saying that Rite Aid should
[6] be entitled to do at this point that they are concerned about
[7] that they don't want you to do.
[8]     MR. SILVESTRY: I think Rite Aid should be entitled to
[9] respond to the union, sir. What the union's been doing here is
[10] they have been going into the stores and they have been telling
[11] the employees that you will become a member of the union. They
[12] have been going to the stores and they have been telling people
[13] that your store may close. They have been engaging in what
[14] labor lawyers called the ultimate act of coercion, going in and
[15] threatening somebody with their jobs.
[16]     THE COURT: You should be able to counter it with your
[17] coercion, is that it?
[18]     MR. SILVESTRY: We should be able to respond.
[19]     THE COURT: You have rights as an employer just as the
[20] union has rights to make sure that doesn't happen. That is not
[21] a basis for which I should give you some relief. That's a
[22] basis on which maybe the National Labor Relations Board should
[23] give you some relief.
[24]     MR. SILVESTRY: Absolutely. Both parties are pursuing
[25] charges with the National Labor Relations Board. They will

Page 32

[1] sort that out.
[2]     THE COURT: That is not the issue. The issue here is
[3] to the extent they can legally do what they are entitled to do,
[4] what is it that you want to do that you are legally entitled to
[5] do that you say is not prohibited by the collective bargaining
[6] agreement?
[7]     MR. SILVESTRY: Your Honor, in this situation, just to
[8] respond to the two things, I mentioned Rite Aid ought to be
[9] able to go in there and say the union is wrong. It is not
[10] correct. The store's not closing. The union is wrong. You
[11] are not correct. There is no automatic application of this
[12] agreement. You are not going to be forced to become a union
[13] member. You are going to have a right to determine that for
[14] yourself, whether it's by election or some other process. The
[15] company is going to work for that.
[16]     THE COURT: Even if there was a neutrality agreement,
[17] I am not sure if that is all they were claim you were doing
[18] that would in and of itself violate the neutrality agreement.
[19]     MR. SILVESTRY: If the union goes in and says we think
[20] we can help you and here's how, the company should be able to
[21] go in and say here's what it costs to help. You have to pay
[22] union dues, and here's how the union runs its operation. We
[23] can say that. It is part of the opinion process.
[24]     THE COURT: Let's go right to the heart of it. Your
[25] position is really a little broader than that and more specific

1199 SEIU UNITED HEALTHCARE v.
RITE AIDE

June 19, 2007

Page 33

[1] than that. If they say the union is going to be good for you,
[2] you want to be able to go in and say the union is going to be
[3] bad for you?
[4]     **MR. SILVESTRY:** Yes, sir.
[5]     **THE COURT:** That's basically what union politics is
[6] about.
[7]     **MR. SILVESTRY:** I want to be able to express our
[8] opinion that unions are not necessarily all favorable.
[9]     **THE COURT:** OK. That in and of itself, you would
[10] agree, would violate a neutrality agreement; that would be
[11] precluded by a neutrality agreement if one was in place?
[12]     **MR. SILVESTRY:** As would the union's statements to
[13] employees coercing them.
[14]     **THE COURT:** Yes, if they have agreed to the same
[15] neutrality.
[16]     **MR. SILVESTRY:** Yes. I guess what I would say is
[17] what's good for one is good for the other.
[18]     **THE COURT:** Let me back up. That's not true. That's
[19] not true. A neutrality agreement would preclude Rite Aid from
[20] saying that joining the union would be bad for you. It would
[21] not preclude the union from trying to organize members and
[22] asking the employees to join the union. That's not what a
[23] neutrality agreement binds the union to.
[24]     **MR. SILVESTRY:** I absolutely agree.
[25]     **THE COURT:** So, under the neutrality agreement, the

Page 34

[1] union has the right to say, look, Rite Aid employees are
[2] members of the union in New York and New Jersey. You have been
[3] taken over by Rite Aid. We would like you to also join the
[4] union. We are the collective bargaining agent for the
[5] employees of the union. We are asking you to vote and asking
[6] that the majority of you vote that you will unionize, and we
[7] will be the collective bargaining unit to represent you. They
[8] have the right to do that.
[9]     **MR. SILVESTRY:** Absolutely.
[10]     **THE COURT:** Even under the neutrality clause, they
[11] have a right to do that under the neutrality agreement. You
[12] don't have the right to come back and say under the neutrality
[13] agreement that, no, these are bad people. Don't join the
[14] union.
[15]     You wouldn't have the right to say that under a
[16] neutrality agreement, would you?
[17]     **MR. SILVESTRY:** We would not have a right to disparage
[18] the union. That's correct. That's correct.
[19]     **THE COURT:** OK.
[20]     **MR. SILVESTRY:** The reason why I'm using the word
[21] "disparage" --
[22]     **THE COURT:** I didn't use the word "disparage." When
[23] you say I am right, I assume you are saying I'm right the way I
[24] said it, not the way you said it. I didn't say it your way. I
[25] said it my way. You would not have the right to go in and say,

Page 35

[1] no, the union is bad for you --
[2]     **MR. SILVESTRY:** Yes.
[3]     **THE COURT:** -- don't join the union.
[4]     **MR. SILVESTRY:** Yes, I agree.
[5]     **THE COURT:** I assume that you would agree even under
[6] the example that you gave me, under a neutrality agreement,
[7] that Rite Aid would not have the right to say, You know what,
[8] let me tell you how much it's going to cost you to join this
[9] union and how much you are going to have to pay for this in
[10] order to discourage you from joining the union.
[11]     The bottom line is that I think we agree under the
[12] neutrality agreement you would not have the right to discourage
[13] the employees from joining the union. You could not take a
[14] position as to whether or not they should or should not join
[15] the union or whether it is good or bad for them to join the
[16] union.
[17]     **MR. SILVESTRY:** I agree, sir.
[18]     **THE COURT:** We don't have to splice the words.
[19]     **MR. SILVESTRY:** I agree. You don't have to splice the
[20] words. I agree. We would have to be right on the fence. We
[21] would have to stay on the fence.
[22]     But paragraph 8 doesn't just say we have to be on the
[23] fence. It also says that the union can't disparage Rite Aid.
[24]     **THE COURT:** OK. That is true.
[25]     **MR. SILVESTRY:** When you go into the stores and you

Page 36

[1] tell the employees that the stores may close for purposes of
[2] convincing them that they ought to join the union for
[3] protection that's disparaging Rite Aid, when --
[4]     **THE COURT:** You have other remedies for that. That's
[5] an employment practice that you can stop.
[6]     **MR. SILVESTRY:** We do have other remedies, yes, sir.
[7] But if this agreement is enforceable, if the union wants to
[8] enforce the agreement through an injunction proceeding, then
[9] what's good for one side has to be good for the other.
[10]     **THE COURT:** That's not true. What's good for one side
[11] may be what neither side has a right to do. The part of both
[12] your arguments where you are saying they are doing bad stuff,
[13] we should be able to do bad stuff to that --
[14]     **MR. SILVESTRY:** I am not saying that.
[15]     **THE COURT:** That's not the way it works.
[16]     **MR. SILVESTRY:** I am absolutely not doing that.
[17]     **THE COURT:** They can't say that.
[18]     You deny you are doing anything improper the way they
[19] characterize what you are doing, and they deny that they are
[20] doing anything improper the way you characterize what they are
[21] doing.
[22]     **MR. SILVESTRY:** I am not saying that, your Honor.
[23]     **THE COURT:** I can't resolve that part of it. I agree
[24] that if you or they are involved in inappropriate unlawful
[25] practices under the labor laws, then that is a different issue.

Page 37

But I can't resolve that the way you characterize they are doing all these bad things and they say they are not doing any of these bad things, and the way they characterize you as doing all these bad things you say Rite Aid isn't doing any of these bad things.

My question is not who's doing the bad things. My question is even, if they were good things, the question really remains whether or not there is a neutrality agreement that basically says that the union can go in and attempt to unionize the employees; and if they go in and do that in an appropriate way, they are entitled to do that, and that Rite Aid must remain neutral.

If there is such a provision, it doesn't matter to me whether or not you say they are doing bad things or they say you are doing bad things.

If there is no such provision, it doesn't matter to me whether you say they're doing bad things and they say they're doing bad things. Whatever bad things there are, then either the National Labor Relations Board will take care of it or you will go to arbitration and you will fight the merits of the case in arbitration and decide whether or not each side is really doing inappropriate conduct which violates the law or conduct which violates the contract.

That's what I am trying to focus on. The question really comes back to, look, if you could convince me that there

Page 38

is no neutrality agreement, that the parties have never acted as though there was a neutrality agreement, there is nothing that I can look to to say that this issue has come up before and one or the other side can say to me, look, obviously this is activity consistent with either a neutrality understanding and intent, that there was a neutrality agreement, or inconsistent or consistent with the understanding that there was no neutrality agreement in place, that's where I walk in, and that's where I resolve this issue.

Your position is fairly straightforward, that you said in the original papers there is no neutrality agreement. They say now in their reply that, yes, we have a neutrality agreement. You look at it and you say, no, that's not a neutrality agreement that's in place now. That agreement was never intended to bind the parties beyond October 31, 1998.

So you are going to have to explain why only this one agreement, side agreement executed in 1998 for this limited purpose of these stores that were opening at that point in time with the limited duration, why you say that should apply to all the collective bargaining agreements that were executed and reexecuted since then and none of those collective bargaining agreements make reference to a neutral provision.

MR. SILVESTRY: Yes, sir.

If I can make one more point on the underlying motion for injunctive relief. That is just to address the union's

Page 39

[1] arguments on irreparable harm. There are two things I am going
[2] to say to that.
[3]      One is there isn't any evidence, there is no evidence
[4] in the submission that any conduct has occurred with Rite Aid
[5] since it has acquired the stores. There is no evidence that
[6] since Rite Aid became the employer it has made any antiunion
[7] campaign statements to the Brooks/Eckerd employees.
[8]      THE COURT: That's why I asked you what is it that you
[9] want to do that you should be allowed to do. Do you want to do
[10] that? Do you intend to do that? Is Rite Aid intending to
[11] engage in such a campaign? Because if it is, that's a
[12] different question.
[13]      MR. SILVESTRY: I think at this point, your Honor,
[14] what Rite Aid is most concerned about is responding to any
[15] coercive statements the union states to the employees. I think
[16] that's what we're most concerned about.
[17]      THE COURT: The question is really how you want to
[18] respond. If they threw mud at you and you want to throw mud at
[19] them, that's a different question.
[20]      MR. SILVESTRY: I can't say, your Honor, that Rite Aid
[21] has no intention of expressing its opinion to the employees,
[22] because it will. It will express its opinion, particularly if
[23] the union says improper things to the employees, it will say
[24] the union is not telling the truth.
[25]      THE COURT: There's a difference between your

Page 40

[1] responding to a representation by the union and saying that
[2] that representation is false --
[3]      MR. SILVESTRY: Yes.
[4]      THE COURT: -- as opposed to an overall campaign to
[5] discourage people from joining the union. I mean, if you want
[6] to engage in activity to discourage people from unionizing --
[7]      MR. SILVESTRY: Let me say, if I can put it simply,
[8] rite Aid is not willing to give up a right to be nonneutral in
[9] connection with this proceeding unless a Court or an arbitrator
[10] says you don't have that right, because there are 3500
[11] employees. These are new employees of Rite Aid. They are
[12] going to have issues and discussion. The union has put itself
[13] out amongst these employees, and the employees are going to
[14] have questions about the union. They are going to have
[15] questions to the managers: What do you think about this union?
[16] Is this the right thing to do?
[17]      They are going to be put in that place.
[18]      THE COURT: You want the right to engage in activity
[19] to discourage people from unionizing --
[20]      MR. SILVESTRY: Yes, sir.
[21]      THE COURT: -- and/or having 1199 as their collective
[22] bargaining agent?
[23]      MR. SILVESTRY: Yes, sir.
[24]      THE COURT: OK.
[25]      MR. SILVESTRY: Yes, sir. Like I say, we haven't done

**1199 SEIU UNITED HEALTHCARE v.**
**RITE AIDE**

June 19, 2007

Page 41

[1] that yet.

[2]  **THE COURT:** Part of the problem is they say you have
[3] done that.

[4]  **MR. SILVESTRY:** They allege we have.

[5]  **THE COURT:** They say they have evidence that there
[6] have been meetings called and employees have been threatened
[7] and certain things have been said to employees about whether
[8] they should or should not discuss this or seriously consider
[9] that. They've made certain allegations that obviously go
[10] beyond --

[11]  **MR. SILVESTRY:** Yes, they did. The allegations that
[12] they are making are allegations that start with the Coutu
[13] stores when Coutu owned them.

[14]  There is no allegation that says a Rite Aid manager
[15] came in and did this to the Rite Aid employees or to the
[16] Brooks/Eckerd employees. There is no allegation on that.

[17]  If you go through an injunctive relief analysis, you
[18] have to demonstrate that nexus. Now they are saying that
[19] somehow we directed them, and, of course, there is a swearing
[20] contest in connection with that which I have to acknowledge.

[21]  But there is no evidence, the union doesn't have any
[22] evidence that Rite Aid has gone into its stores now and
[23] conducted an antiunion campaign because it hasn't.

[24]  So I question why you need to enjoin Rite Aid at this
[25] point for that, because it hasn't done it yet.

Page 42

[1]  **THE COURT:** Obviously, if you want a reason, the
[2] reason is that I don't want you to come back here the day after
[3] tomorrow if Rite Aid is planning to do it and does it tomorrow.

[4]  **MR. SILVESTRY:** One final point, your Honor.

[5]  Since 1930, the National Labor Relations Board has
[6] been addressing issues of improper statements by employers and
[7] unions and for almost that time arbitrators have been dealing
[8] with violations of the collective bargaining agreement.

[9]  In the union submissions they don't point to a single
[10] case, there's not one case they pointed to that supports their
[11] conclusion that somehow they are going to be irreparably harmed
[12] in this situation; that the arbitrator if the arbitrator hears
[13] this neutrality, if you order the parties to arbitration on
[14] neutrality, which is the underlying dispute, if the arbitrator
[15] hears that, the arbitrator cannot fashion some affirmative
[16] remedy to deal with the situation.

[17]  In fact, there is no deadline on organizing. There's
[18] no deadline like there was in this recognition process
[19] agreement. It is completely wide open. So the union is not
[20] suffering or laboring under some deadline for organizing or
[21] some limited time period. In fact, they have 180 stores to
[22] organize. It is going to take them time to do that.

[23]  **THE COURT:** I know what the argument is. The argument
[24] is that if you engage in an improper successful campaign to
[25] convince the majority of the employees not to unionize or not

Page 43

[1] to accept them as the collective bargaining unit on behalf of
[2] employees that it may be impossible for them at that point to
[3] successfully do what they would have had a right to do, which
[4] is to convince those people who had not yet made up their mind
[5] based on improper actions by the employer to join the union.
[6] That's the argument. You know that is the argument.

[7]  **MR. SILVESTRY:** Let's say for the sake of argument
[8] that we don't get enjoined and Rite Aid goes out and issues its
[9] opinion with respect to union organizing. It does it legally.
[10] There is no coercion, no threats, because if they do that then
[11] it's NLRB time.

[12]  Let's say we do that. Let's say it turns out that is
[13] a violation of the collective bargaining agreement. Well, the
[14] arbitrator can do a lot of things with respect to what those
[15] employees can think after that. Rite Aid could be ordered not
[16] to talk to the employees about this. Rite Aid could be ordered
[17] to retract it. It could be ordered to sanction the union. The
[18] Rite Aid could be ordered to sponsor the union at its
[19] facilities. Rite Aid could be ordered to communicate with the
[20] employees in writing on this. Rite Aid could be ordered to do
[21] a lot of things that would in essence just put the union right
[22] back to where it was, where it would be in a neutral situation.

[23]  **THE COURT:** Not necessarily so.

[24]  If Rite Aid said to an employee, look, if you decide
[25] to join the union, you are going to lose your job --

Page 44

[1]  **MR. SILVESTRY:** Well, that's not what we would be
[2] saying, because that's illegal.

[3]  **THE COURT:** I agree.

[4]  **MR. SILVESTRY:** OK.

[5]  **THE COURT:** I assume that is not what you are going to
[6] be saying.

[7]  **MR. SILVESTRY:** It would be the same thing that the
[8] union would be saying, which is, guess what, the store is going
[9] to close, so you better join us. My point is, my example to
[10] you was legal conduct, legal opinion conduct for the employees
[11] is certainly redressable by an arbitrator, certainly
[12] redressable by an arbitrator.

[13]  In fact, the union doesn't cite any case that says it
[14] is not. It doesn't cite a law case, it doesn't cite an
[15] injunction case, it doesn't cite any case at all. All it does
[16] is say ipsi dixit we think it is going to be irreparable harm.

[17]  I think there's been enough collective bargaining
[18] experience in the courts here, enough referral to arbitrations,
[19] if you look at the steelworkers trilogy, enough language from
[20] the United States Supreme Court that say the arbitrators have
[21] plenary authority to fashion relief here.

[22]  That, together with the fact that Rite Aid has not
[23] communicated to its employees any opinion since it took them on
[24] as employees, I hardly think this case is one that needs
[25] extraordinary relief at this point.

---

**CONFERENCE**                    Min-U-Script®                    **(11) Page 41 - Page 44**

Page 45

THE COURT: All right. Let me let them respond.

MR. SILVESTRY: Thank you.

MS. BELOVIN: Your Honor, I guess we'll start by responding on the issue of the neutrality agreement.

The so-called sunset provision is far from clear that it ends the neutrality agreement between the parties. At best it perhaps provides an end point for the recognition process with respect to the stores at issue, but it certainly doesn't deal with the ongoing nature of the parties' responsibilities and rights with respect to neutrality after that.

THE COURT: Why wouldn't that be reflected in any collective bargaining agreements either before or after?

MS. BELOVIN: It doesn't need to be reflected in any collective bargaining agreement. This 1998 agreement lived on. The neutrality obligations lived on. There was no need to reflect it in any the ongoing collective bargaining agreements.

In any event, that's really a question that goes directly to the merits of the union's claim here. It is a question that needs to be resolved by the arbitrator. It is a question that goes to likelihood of success on the merits, which is what I have to determine.

MS. BELOVIN: That's correct. I think there's more than enough in this agreement to show that the union has a likelihood of success on the merits here.

THE COURT: The arbitrator will get into the

Page 46

bargaining history and will get into the intent of the parties. I didn't hear any argument from you that any other provision or any other procedure laid out in this 1998 agreement is in force other than the neutrality paragraph. It has also provisions about how the union's activity would be conducted. You are not saying that either the union is conducting itself pursuant to those terms or that the union ever considered that it had conduct itself pursuant to those terms.

MS. BELOVIN: The union hasn't been permitted to conduct itself pursuant to many of the terms in this agreement. The union would like to follow all of the terms of this agreement.

THE COURT: The union hasn't followed any of the terms of this agreement, has it?

What has the union done that this agreement lays out for what would be done in 1998? What has the union done in terms of its organization that is consistent with what this provision says?

MS. BELOVIN: The union has sought access to the stores which has it been denied. We would have had the right to have meetings on the store premises, which we have been denied. This also provides for arbitration, which we are seeking.

THE COURT: But all of those provisions are in every collective bargaining agreement that you've signed since. The

Page 47

[1] only provision that is not in the collective bargaining
[2] agreement is the neutrality paragraph. As you say, it's not
[3] necessary. Why would everything else that's in this be in the
[4] collective bargaining agreement except the neutrality
[5] provision? Aren't all these terms in the collective bargaining
[6] agreements themselves?

[7]     MS. BELOVIN: The provision providing for a card check
[8] is not spelled out in the collective bargaining agreement
[9] either, your Honor, paragraph 9. And the provision providing
[10] for an arbitrator mutually agreed to by the parties to review
[11] the cards is not spelled out in the collective bargaining
[12] agreement either. That's paragraph 10.

[13]     THE COURT: How long have Rite Aid and 1199 had a
[14] collective bargaining agreement?

[15]     MS. BELOVIN: Decades, your Honor, I believe.

[16]     THE COURT: Are you saying that there is no agreement
[17] other than this agreement either subsequent to or prior to this
[18] agreement that addressed the takeover in 1998, there's no
[19] agreement anywhere that has a neutrality provision?

[20]     MS. BELOVIN: That's correct. This agreement has the
[21] neutrality agreement. This is an ongoing, valid, effective
[22] agreement.

[23]     THE COURT: So is it your position that before 1998
[24] this was no neutrality agreement?

[25]     MS. BELOVIN: As far as I know sitting here today,

Page 48

[1] your Honor, this is the only neutrality agreement I know of.

[2]     THE COURT: They had no neutrality obligations prior
[3] to '98?

[4]     MS. BELOVIN: As far as I know, your Honor.

[5]     THE COURT: Is it your position that there's never
[6] been a circumstance since 1998 where the union or Rite Aid had
[7] to determine whether or not it had an obligation to stay
[8] neutral or had a right to convince people that unionization or
[9] 1199 representation of the employees would not be in their best
[10] interest.

[11]     MS. BELOVIN: It is my understanding, your Honor, that
[12] since 1998 there have been a number of occasions on which Rite
[13] Aid has acquired new stores or opened new stores and that the
[14] union was permitted without any interference to organize the
[15] workers in the stores, present a majority of cards, and were
[16] thereafter recognized.

[17]     THE COURT: OK. The issue of Rite Aid's neutral
[18] obligation never arose?

[19]     MS. BELOVIN: It never arose.

[20]     Until now it was done entirely with cooperation.
[21] There was no dispute with Rite Aid's neutrality.

[22]     THE COURT: If they do what they legally have a right
[23] to do, not what you say contractually are prohibited from
[24] doing, if they do what they have a legal right to do in the
[25] absence of a neutrality agreement, what do you say they are

**1199 SEIU UNITED HEALTHCARE v.
RITE AIDE**

June 19, 2007

---

Page 49

[1] going to do that's going to constitute irreparable injury to
[2] the union?
[3]     MS. BELOVIN: Well, the repeated and sustained
[4] communication with employees that the union is bad for you, the
[5] union is going to hurt you, the union is going to affect your
[6] pay, the union is going to affect your benefits, the union is
[7] going to take away your job flexibility, change your work
[8] schedule, affect your relationship with managers.
[9]     THE COURT: If there was no neutrality agreement, why
[10] is that necessarily going to cause injury to the union that is
[11] not compensable?
[12]     If the union is saying, on the other hand, you know
[13] what, let's use some common sense here, ladies and gentlemen,
[14] they say it going to be bad for you, but let us show you what
[15] those employees who are represented by a union and by our
[16] union, what benefits you'll receive or what the cost is to you,
[17] and let's compare it to what you and nonunion employees get.
[18] Let's let you make a common sense judgment about that.
[19]     Why am I supposed to assume irreparable injury as a
[20] result of their saying that which most employers who don't have
[21] unionized employees say all the time, that, no, we don't want a
[22] union because the union is bad for us and bad for you.
[23]     Most times the union is saying, well, that's what the
[24] employers are obviously going to say, because that means that
[25] you are going to be in a position to bargain for better wages

Page 50

[1] and better benefits, and they don't want you in that strong a
[2] position so they don't want you in a union. People make an
[3] informed judgment that they do or do not want to unionize under
[4] those circumstances.
[5]     Why is this case so unique that their saying don't
[6] unionize is going to cause irreparable injury to 1199?
[7]     MS. BELOVIN: In some ways the case is not
[8] particularly unique. The workplace reality is that when an
[9] employer repeatedly disseminates this kind of one-sided message
[10] to employees --
[11]     THE COURT: It is never a one-sided message.
[12]     MS. BELOVIN: In this case it has been, because the
[13] union has also been denied access.
[14]     THE COURT: That is a different issue. The union
[15] should be entitled to access. Then your application for an
[16] injunction is conditioned. Your application is conditioned on
[17] whether or not you are denied access. Obviously, you are
[18] entitled to access. They shouldn't deny you access, and we
[19] have remedies to get access.
[20]     I am not supposed to assume that the reason I should
[21] give you an injunction is because you are denied access. You
[22] can get yourself some access.
[23]     MS. BELOVIN: Even with the access, though, your
[24] Honor, this repeated message from an employer who has control
[25] over the workers is much different than a message coming from

Page 51

[1] the union, who doesn't.
[2]     THE COURT: That's true in every case. Why is this
[3] different?
[4]     MS. BELOVIN: In this case also the parties have
[5] bargained, the union gave consideration for this neutrality
[6] agreement.
[7]     THE COURT: I understand that. That is a different
[8] question going to success on the merits. I am trying to
[9] examine the likelihood of success on the merits, and if I were
[10] to assume that you were correct on the merits, I assume that
[11] you are going to go to arbitration and an arbitrator right away
[12] is going to say, all right, you are entitled. They are bound
[13] by the neutrality agreement and they cannot discourage this.
[14] They can do nothing more than remain entirely neutral with
[15] respect to unionization, and 1199 is the union seeking to
[16] represent its employees.
[17]     Let's assume that you are right on that. How are you
[18] irreparably injured in this particular case if an injunction
[19] doesn't issue before that time?
[20]     MS. BELOVIN: The reality is, your Honor, that in
[21] these circumstances -- and we submitted with our response
[22] papers a number of academic studies that support this. If you
[23] want to have a hearing on this matter, we're willing to present
[24] expert testimony on this issue, that unions cannot and do not
[25] recover after a prolonged, sustained effort by an employer to

Page 52

[1] undermine support for the union. That's the reason why we've
[2] asked for expedited arbitration in this case, your Honor.
[3]     THE COURT: What do you say that Rite Aid is getting
[4] ready to do?
[5]     On what basis do I have to conclude that Rite Aid is
[6] going to, what is the sustained effective antiunion campaign
[7] that you are saying that I can find that is imminent in this
[8] case?
[9]     MS. BELOVIN: I think they are going to continue to do
[10] what they have already been instructing the Eckerd managers to
[11] do, which is to tell people, your pay is going to be affected,
[12] your benefits are going to be affected your relationship with
[13] your supervisors are going to be affected, your job flexibility
[14] is going to be eliminated, your work schedule is going to be
[15] changed, your life is going to be thrown into upheaval. Those
[16] are the lawful things. We also contend that they are
[17] committing unfair labor practices and making threats of
[18] disciplinary action and discharge.
[19]     THE COURT: I can't prohibit them in engaging in
[20] unfair labor practices. That's not the question.
[21]     MS. BELOVIN: Even those otherwise lawful messages
[22] that are being sent to the workers on a prolonged and sustained
[23] basis are going to make it impossible for use the union to
[24] secure the majority support that it needs to represent these
[25] workers.

---

**CONFERENCE**       Min-U-Script®       **(13) Page 49 - Page 52**

Page 53

[1]  THE COURT:  I am not sure you can even demonstrate
[2]  that with expert testimony.  No expert is going to be able to
[3]  come in and tell me and convince me that simply because the
[4]  employer engages in a continuous and aggressive campaign to
[5]  discourage people from joining the union at the same time the
[6]  union is trying to unionize that the inevitable or likely
[7]  result is going to be that the union is not going to be able to
[8]  unionize.  I don't think you have any expert that is going to
[9]  say that.
[10]  MS. BELOVIN:  I think there are many experts who will
[11]  say that, your Honor, and we will be able to produce one.  If
[12]  you examine the studies that we attach, that is what those
[13]  studies seem to indicate.
[14]  THE COURT:  I assume that 1199 has been in numerous
[15]  situations where there was no neutrality agreement, that the
[16]  employer aggressively discouraged people from joining the
[17]  union, that 1199 aggressively encouraged people to join the
[18]  union, and 1199 was able to unionize.
[19]  MS. BELOVIN:  I think those instances, while they
[20]  certainly have occurred are -- the far more current common
[21]  occurrence, your Honor, unfortunately is that when an employer
[22]  launches and persists with an aggressive antiunion campaign
[23]  that the union, 1199 included, is not successful in organizing
[24]  the workers.  That is true even in situations, particularly in
[25]  situations where, before the employer launches the antiunion

Page 54

[1]  campaign, the union had majority support.
[2]  THE COURT:  All right.  This is the final question:
[3]  What do you say at this point that, as they characterize it,
[4]  the sunset provision of the first page of this 1998 agreement
[5]  is supposed to mean?
[6]  MS. BELOVIN:  I think it means that the process with
[7]  respect to the stores that it acquired in 1998, in June of
[8]  1998, will be completed by October 31 of that year.  It does
[9]  not apply to other stores acquired thereafter.  Again, your
[10]  Honor, that is a determination that ultimately an arbitrator
[11]  will make.  Clearly this agreement exists and is arbitrable.
[12]  I can even direct you to paragraph 6 of the neutrality
[13]  agreement, which refers to all unorganized stores and goes on
[14]  to set forth the provisions, the process for those all
[15]  unorganized stores, not simply the new stores that were
[16]  acquired in 1998.
[17]  THE COURT:  It doesn't tell me whether or not it only
[18]  applies to all unorganized stores that were unorganized at the
[19]  time this agreement was entered into.
[20]  MS. BELOVIN:  No, it doesn't specifically say that.
[21]  But I think the intent of the parties is that this would
[22]  continue to apply to all unorganized stores.  Again, that
[23]  ultimately will be a question for the arbitrator.  It is why we
[24]  have requested expedited arbitration in this case, to which
[25]  Rite Aid has refused to agree.  It is because of that that we

Page 55

[1]  are before you today.
[2]  THE COURT:  Which is the most recent collective
[3]  bargaining agreement?  Is that attached?
[4]  MS. BELOVIN:  The most recent full collective
[5]  bargaining agreement is the 1998 agreement that's attached as I
[6]  believe Exhibit A --
[7]  THE COURT:  I'm sorry.
[8]  MS. BELOVIN:  -- to the affidavit of Laurieanne
[9]  Vallone.  There were two subsequent memoranda of agreements.
[10]  THE COURT:  I'm sorry.  Say that again.  It is Exhibit
[11]  which?
[12]  MS. BELOVIN:  I believe Exhibit A, the full -- Exhibit
[13]  1.  I'm sorry.
[14]  THE COURT:  1?
[15]  MS. BELOVIN:  Yes.
[16]  THE COURT:  OK.  Anything further?
[17]  MS. BELOVIN:  No, your Honor, except to say that we
[18]  have also argued in our papers and continued the argument that
[19]  even without the neutrality provision, there is an
[20]  after-acquired clause in the collective bargaining agreement.
[21]  On its face it is a lawful valid clause we are seeking to
[22]  enforce lawfully, and there is an implied covenant of good
[23]  faith in every collective bargaining agreement and we believe
[24]  that also entitles the union to the relief we are seeking.
[25]  THE COURT:  I am not sure I understood that argument.

Page 56

[1]  Good faith to do what?
[2]  If there is no neutrality clause, if there's no
[3]  neutrality agreement, the good-faith provision cannot be
[4]  interpreted as a neutrality agreement.  It can be interpreted
[5]  as a lot of things that they cannot do in bad faith, but not
[6]  being neutral is not one of them.
[7]  MS. BELOVIN:  Employer interference with the union's
[8]  ability to obtain the majority support that it needs to enforce
[9]  the clause is in our opinion bad faith.
[10]  THE COURT:  To enforce which clause?
[11]  MS. BELOVIN:  The after-acquired clause.
[12]  THE COURT:  What do you say would be bad faith
[13]  interference with that?  Not simply discouraging people from
[14]  joining the union.
[15]  MS. BELOVIN:  We do believe that, yes, your Honor,
[16]  discouraging people from joining the union.
[17]  THE COURT:  If that was the case, without a neutrality
[18]  clause, even if the parties deliberately tried to negotiate a
[19]  neutrality clause and failed to do so, you are saying that the
[20]  neutrality clause would be implicit in a good-faith clause?
[21]  MS. BELOVIN:  There is no evidence in this case that
[22]  the union sought a neutrality clause and failed to do it.  In
[23]  fact, there's evidence that there is a neutrality clause.  The
[24]  neutrality clause is sufficient basis for this injunction.  I
[25]  just wanted to remind you of our other argument.

Page 57

[1] **THE COURT:** I just want to make sure I understand.
[2] You are saying that even if I were to find no neutrality clause
[3] exists, I should find that they have an obligation to be
[4] neutral simply because there's language that says they cannot
[5] in good faith interfere with the union's representation of
[6] union members?

[7] **MS. BELOVIN:** There may be some neutral speech that
[8] would not interfere with that. That would not be considered
[9] bad faith. The speech that's gone on here, your Honor,
[10] certainly, though, would be.

[11] **THE COURT:** But you are saying that --

[12] **MS. BELOVIN:** There may be a line.

[13] **THE COURT:** You are saying there is illegal speech
[14] that's going on?

[15] **MS. BELOVIN:** No. I think even legal speech which
[16] tends to interfere with --

[17] **THE COURT:** That's what I am trying to understand.
[18] What are you saying that Rite Aid is saying or doing that is in
[19] bad faith that they should be told specifically that they
[20] shouldn't do?

[21] **MS. BELOVIN:** I think that by telling people that you
[22] are not going to be able to have the relationship with your
[23] supervisor that you used to have, by telling people that you
[24] are going to have no control over your work schedule anymore
[25] once the union comes in, by telling people that the union is

Page 58

[1] going to take more money from you in dues than it is going to
[2] get you in wage increases that crosses the line.

[3] **THE COURT:** Mr. Sylvestry, anything further?

[4] **MR. SILVESTRY:** Your Honor, just one point, if I may.
[5] I know the Court has been looking at the agreements.
[6] If you can, if you turn to page 2 of the main collective
[7] bargaining agreement that's attached to the affidavit of
[8] Ms. Vallone --

[9] **THE COURT:** Yes.

[10] **MR. SILVESTRY:** -- if you turn to the first full page
[11] of the recognition process agreement, I am going to make two
[12] points.

[13] **THE COURT:** I'm sorry. Page 2 of the.

[14] **MR. SILVESTRY:** Page 2 of the collective bargaining
[15] agreement. It would have "Article 1, Coverage."

[16] **THE COURT:** OK.

[17] **MR. SILVESTRY:** Then the first main page of the
[18] process agreement, the one that says at the top "Agreement,"
[19] and has subparagraphs on regional bargaining unit. Do you see
[20] that?

[21] **THE COURT:** Yes.

[22] **MR. SILVESTRY:** OK. The point here is this process
[23] agreement is not coextensive with the collective bargaining
[24] agreement. If you look at the counties and you look at the
[25] areas, you see that the collective bargaining agreement covers

Page 59

[1] a lot broader, a lot more counties and a lot more areas,
[2] another indication that this process agreement is not intended
[3] to attach to the collective bargaining agreement.

[4] In fact, if you even interpret it literally, which I
[5] don't think you should, but if you did, if there is a deal on
[6] neutrality, the deal is on these counties, not on the counties
[7] that are in the collective bargaining agreement, if there's a
[8] deal that lasts beyond October 31 of 1998. So that's a clear
[9] indication in the contracts.

[10] The second one is, if you look at the second paragraph
[11] of "Article 1, Coverage" --

[12] **THE COURT:** Yes.

[13] **MR. SILVESTRY:** It says, "Except that modifications to
[14] this agreement affecting those counties shall be set forth in a
[15] addendum attached to this agreement as schedule C by no later
[16] than December 31, 1998.

[17] If you look at C, and there's -- I think it is
[18] attached in Exhibit 2. I think these are the addenda that
[19] opposing counsel was referring to. If you look at the second
[20] one of those --

[21] **THE COURT:** I'm sorry. I am not sure I'm following
[22] you. You don't mean schedule C.

[23] **MR. SILVESTRY:** No, I think it is paragraph 2. These
[24] are the addenda. I am not sure they are all there. To be
[25] honest with you, I am not sure they are all there.

Page 60

[1] **THE COURT:** Go ahead.

[2] **MR. SILVESTRY:** One of them -- this is Exhibit 2.

[3] **THE COURT:** Exhibit 2?

[4] **MR. SILVESTRY:** Exhibit 2.

[5] **THE COURT:** OK.

[6] **MR. SILVESTRY:** Counsel referred to a series of
[7] addenda that have attached to the contracts. None of them are
[8] the representational process agreement; none of them refer to
[9] the representational process agreement. If there is anything
[10] that those facts, those provisions of the contract, these
[11] agreements establish, they establish that they are definitely
[12] not coterminous.

[13] The last point I would make is this: The union's
[14] first position in this case was that the contract that we are
[15] all interpreting, this collective bargaining agreement, should
[16] apply automatically to all of these 3500 employees.

[17] That's the demand they made to Rite Aid that was in
[18] the affidavit of Ms. Vallone. Once they realized that that was
[19] illegal, they have now taken the position that, of course, the
[20] contract can't apply until they get majority status. They know
[21] this goes to the underlying merits of that particular aspect of
[22] this case. That is not the neutrality issue. But if that's
[23] the union's position now, that grievance is not even ripe,
[24] because since they don't have majority status, they are not in
[25] a position to demand application of the contract.

Page 61

If they are not in a position to demand application of the contract, there certainly can't be any grievance pending for Rite Aid not applying the contract. That part of this case should be dismissed. I know I am arguing the motion to dismiss, but I just need to say this because it responds to counsel. That part of this case is not even ripe at this point. Thank you, sir.

(Continued on next page)

Page 62

**THE COURT:** All right.

I have reviewed the papers and obviously heard extensive argument from the parties. Based on the record before me, I am going to deny the motion for injunctive relief at this time.

I don't think that the plaintiff has met its burden to demonstrate either a likelihood of success on the merits or irreparable injury. It has not sufficiently established based solely on this 1998 agreement, which applies to acquisition of particular stores at that time in particular counties, that the neutrality agreement in that instance is a neutrality agreement that extends beyond the specific circumstances of those acquisitions and expansions and was intended to convert what was the absence of the neutrality agreement for years in any of the collective bargaining agreements, to convert that in and of itself into a continuing neutrality agreement to be incorporated in all subsequent collective bargaining agreements without any specific reference to such an obligation and such an important obligation in the collective bargaining agreement itself.

That is not to say that the plaintiff may not be able to demonstrate to an arbitrator and convince an arbitrator that such a provision applies, but on the record here, given the burden that the plaintiff has to establish the likelihood of success on the merits, on that issue I don't believe that the

Page 63

[1] plaintiff has met the burden so that I can determine that there
[2] is such a likelihood of success that the defendant should be
[3] precluded from engaging in any lawful activity that would take
[4] a position with regard to unionization or with regard to 1199
[5] being the collective bargaining unit for new employees in
[6] stores that are not yet unionized.
[7] I also find that there is an insufficient record for
[8] me to determine there is a likelihood of irreparable injury
[9] here, given the fact that the nature of the activity that the
[10] plaintiff claims will constitute irreparable harm is mostly
[11] speculative at this point with regard to activity that the
[12] plaintiff says Rite Aid may take in opposing the unionization.
[13] Even if I were to attribute other lawful effective
[14] activity that the union fears, that in and of itself does not
[15] rise to the level that I can conclude that the union campaign
[16] cannot effectively and aggressively address those issues in its
[17] unionization campaign. Even if that was not successful in the
[18] first instance, that further relief would not give the union an
[19] opportunity to effectively unionize the further stores under
[20] these circumstances, particularly given the fact that this is
[21] not a situation where the union is coming in and trying to
[22] unionize in an area where no Rite Aid employees are represented
[23] by any union. There is an experience with the union,
[24] experience by the employer with the union and experience by the
[25] other employees with the union. So the record here clearly

Page 64

[1] demonstrates more than just what would otherwise be a campaign
[2] of a union attempting to unionize a shop which has no
[3] experience with unions.
[4] This is a different situation, where the union already
[5] represents employees of Rite Aid and is attempting to expand
[6] its representation to new employees in other stores of Rite
[7] Aid. There's no reason to conclude that if the union has the
[8] appropriate opportunity to communicate with the employees, as
[9] it is entitled to, that it cannot effectively demonstrate why
[10] the union has already been effective for Rite Aid employees and
[11] what the benefits are that those union members have received
[12] from union representation with Rite Aid and the experience of
[13] other union members and employees with regard to unionization
[14] and its advantages in a real-world sense as opposed to a
[15] speculative sense in a situation where the union might be
[16] attempting to unionize and both sides can only speculate as to
[17] what would be the benefits for those employees of unionization.
[18] So I cannot find on this set of facts that I can
[19] conclude that Rite Aid is engaged in or it will be imminently
[20] engaged in a course of conduct which would cause irreparable
[21] injury, even if I were to conclude that the evidence as to
[22] neutrality agreement is clear enough before this court that
[23] there is a likelihood that the union will be successful in
[24] convincing the arbitrator that they must be bound by that
[25] neutrality agreement, and, therefore, can take no legal action

Page 65

[1] in violation of that neutrality agreement pursuant to its
[2] contract.
[3]     So I am going to deny the injunction at this point in
[4] time. I am going to deny it without prejudice to allow, if
[5] appropriate, on some new significant change of circumstance, if
[6] the union can demonstrate that Rite Aid is engaged in a
[7] significant, prolonged campaign which one can demonstrate that,
[8] if they were to violate the neutrality agreement that's in
[9] place, the Court conclude that irreparable harm would occur.
[10] Also, I will also consider whether or not an appropriate
[11] injunction should issue depending on what the status of the
[12] arbitration is and whether the arbitration moves quickly enough
[13] and some determination is made by the arbitrator preliminarily
[14] or finally that such a provision is in force, and that the
[15] Court can aid the arbitrators, anticipating that it will
[16] enforce such a provision, provided this Court has sufficient
[17] grounds to issue an injunction in support of that arbitration
[18] procedure.
[19]     But unless something occurs in arbitration that moves
[20] forward that issue or some evidence is presented to the Court
[21] that would demonstrate a change of circumstances for me to
[22] reevaluate that there is a likelihood of success on the issue
[23] of neutrality agreement and that Rite Aid has begun a campaign
[24] which would clearly violate that neutrality agreement and such
[25] activity would be in comparison to the unionization activity

Page 66

[1] that I conclude that it would constitute irreparable injury,
[2] until and unless that is the case, an injunction is not
[3] appropriate in this case.
[4]     I am going to therefore deny the injunction based on
[5] the record before the Court at this time.
[6]     I think the parties should figure out whether or not
[7] any further relief, other than if I were to consider that as
[8] appropriate from this Court, whether or not Coutu is going to
[9] be an appropriate party one way or the other. You should
[10] determine that issue with regard to the defendant in this
[11] proceeding or somehow related to the arbitration proceeding.
[12]     If it is determined that Rite Aid is the only entity
[13] now that has any control over the Brooks and Eckerd drugstores
[14] and that process is fully complete, then the plaintiff should
[15] decide whether or not Coutu is a proper party to this or to the
[16] arbitration, and the defendants and the plaintiff should
[17] discuss whether or not further action should be taken with
[18] regard to a motion to dismiss with regard to Coutu, since
[19] without injunctive relief, I don't anticipate that any further
[20] action by this Court would be taken with regard to the merits
[21] of the arbitrable dispute unless the nature of the dispute
[22] turns out to be something more than a dispute over enforcement
[23] of the collective bargaining agreement, which by its provisions
[24] is clearly enforceable by an arbitrator's determination and not
[25] a court's determination.

Page 67

[1]     That's the ruling from the Court.
[2]     What I will do is I will wait to see what, if any,
[3] further relief or application or action that you believe should
[4] be taken by this Court.
[5]     If arbitration begins to proceed immediately and
[6] efficiently, then I will obviously, to the extent appropriate
[7] defer to that process. I will say that although defendant did
[8] not agree to expedite the arbitration, if at some point the
[9] plaintiff is in a position to argue to this Court that
[10] arbitration is somehow being delayed by defendant's actions and
[11] that in and of itself will cause the plaintiff some prejudice,
[12] I will factor that in whether or not some further appropriate
[13] relief by this Court is necessary if the arbitration process is
[14] not moving along in an efficient and expeditious manner.
[15]     MS. BELOVIN: Your Honor, if I may, with all due
[16] respect, I understand your ruling based on the insufficiency of
[17] the evidence, that the neutrality agreement extends beyond
[18] 1998, and the insufficiency of the evidence on irreparable
[19] harm. We would request that this Court hold an expedited
[20] hearing on those issues so that we have an opportunity to
[21] present you with that evidence.
[22]     THE COURT: What else would you present to me that you
[23] haven't submitted to me by affidavit if a hearing was held?
[24]     MS. BELOVIN: We certainly can present testimony from
[25] witnesses about the negotiation of the 1998 neutrality

Page 68

[1] agreement, the intent of that agreement, the application of
[2] that agreement beyond 1998.
[3]     THE COURT: Obviously, the plaintiff had a full
[4] opportunity to submit that evidence if you thought that
[5] evidence was appropriate to submit by affidavit. You've
[6] submitted other evidence by affidavit. You didn't even raise
[7] that issue until you filed a reply late last night, which I
[8] never even received before today.
[9]     The plaintiff has had a full opportunity to meet its
[10] burden and demonstrate all of that, and I have ruled on this
[11] case based upon the submission -- I have not limited those
[12] submissions -- and based on the evidence that you have
[13] submitted in this case.
[14]     Holding a hearing is not a substitute for the
[15] plaintiff submitting what you believed was in support of your
[16] application. I fully reviewed all of the evidence that you
[17] provided, even the belated evidence that you believe was in
[18] support of that application.
[19]     MS. BELOVIN: We didn't see the alleged sunset
[20] provision that was submitted by defendants until just this
[21] morning when I was sitting here at this table. The affidavit
[22] didn't include that information because we didn't understand
[23] that that was going to be an argument made by defendants.
[24]     THE COURT: They didn't understand either that the
[25] argument was going to be made by you that there was a

neutrality agreement until last night.

**MS. BELOVIN:** That's not true, your Honor. I notified defendants' counsel that we were going to be making this argument on Friday afternoon.

**THE COURT:** Their representation is that the agreement with its front page that they submitted was provided by the union. So I assume you are not saying that somehow your client was not in possession of the full document, that you submitted only a partial document?

**MS. BELOVIN:** I can't make a representation about that. I can tell you what I know.

**THE COURT:** Well, as I say, this --

**MS. BELOVIN:** I certainly wasn't aware that there was going to be an argument made by defendant, and we can present evidence on that issue which I think will clarify the matter for you.

**THE COURT:** If you believe that you have evidence that would be evidence that is a significant change of circumstance than what you had presented to me -- and I have only gone off what you have submitted to me on your initial application and then the different argument that you submitted to me late last night and I received and allowed, and I even considered that additional information even though that was submitted to the Court just last night and before the order to show cause that I set down today. So you have had a full opportunity to submit

all evidence that you felt was in support. You even submitted additional evidence, and you got a full opportunity to argue today.

Unless you feel that you have something that would clearly change the factual evaluation of this circumstance, then a further hearing or submissions in support of your argument is not appropriate.

If for some reason there is some clear evidence that you have that you did not have access to before today and that you feel that it would in and of itself clearly indicate that a neutrality provision was in effect, you can argue that that is a significant change of circumstance from what you were able to make your arguments on today and convince me that I should reconsider it and that it is reasonable for you not to have made that argument before today.

**MS. BELOVIN:** Your Honor, again, the reason we didn't make the argument before today was because we didn't understand that that was defendant's position. I notified defendants counsel on Friday of the neutrality agreement.

**THE COURT:** You raised the issue.

**MS. BELOVIN:** I wasn't given notice that they were going to dispute the effectiveness of that agreement. I am prepared to present you with evidence that the agreement is still effective.

**THE COURT:** If you have what you believe is clear

[1] evidence on which this Court can determine that there is a
[2] neutrality agreement that is in effect currently, then you can
[3] submit it to me. You can submit it to me. You can give me
[4] that piece of paper, and I will ask both sides whether there's
[5] any such piece of paper.
[6]     **MS. BELOVIN:** It would be testimony, your Honor, not
[7] documents.
[8]     **THE COURT:** That's what I assume. I assume it is not
[9] a piece of paper.
[10]     **MS. BELOVIN:** It is not.
[11]     **THE COURT:** So then you don't need to submit any
[12] further documentation. If you had a piece of paper that showed
[13] me that, I would have ruled in your favor on that. You don't
[14] have any other piece of paper other than the piece of paper
[15] that you gave me after you submitted your initial set of
[16] papers.
[17]     Secondly, if you have what you believe is clear other
[18] affidavit testimony other than this is what we think it should
[19] mean, if you have some evidence that the parties clearly
[20] discussed this and there is some clear representation that
[21] somebody can make that both sides understood that they had a
[22] neutrality agreement that was incorporated, although not
[23] referenced, in the collective bargaining agreement, that was
[24] clearly incorporated in the collective bargaining agreement and
[25] give me a clear basis for that belief, then I will consider it.

[1]     **MS. BELOVIN:** OK, your Honor.
[2]     **THE COURT:** At this point I have no evidence in this
[3] record that could convince me that you have met your burden for
[4] me to say that I can conclude that it is likely that there is
[5] evidence here that will clearly indicate that there is a
[6] neutrality agreement in place that applies to this collective
[7] bargaining agreement. No such document says that. No
[8] affidavit in front of me says that.
[9]     I have reviewed everything. Unless you have some
[10] further evidence of that that you believe that you did not in
[11] fairness have an opportunity or could not have anticipated that
[12] that you either had or should have been presented today, I will
[13] consider it.
[14]     But on this record I have proceeded on your burden
[15] given your application and considered everything that you have
[16] submitted in support of meeting that burden. What you have
[17] submitted is insufficient for my determination that it is
[18] appropriate to issue an injunction based solely on a 1998
[19] document that you didn't even rely upon when you first made
[20] your argument that you say is now the basis on which this Court
[21] should determine that the neutrality agreement that's not
[22] referenced anyplace is now incorporated simply by the 1998
[23] agreement, limited in duration and limited in scope of its
[24] geographic application.
[25]     I will I deny your application without prejudice to

**1199 SEIU UNITED HEALTHCARE v.
RITE AIDE**

June 19, 2007

Page 73

[1]   present whatever else you believe would enlighten my
[2]   determination --
[3]        **MS. BELOVIN:**  Thank you, your Honor.
[4]        **THE COURT:**  -- or persuade me to change that ruling
[5]   based on the change of circumstance or the discovery of some
[6]   smoking gun.
[7]        All right.  That's the application.
[8]        I will wait to hear from you with regard to the motion
[9]   to dismiss, with regard to that issue or any other application
[10]  you think is appropriate for this Court, understanding that the
[11]  most substantive issues should be resolved by arbitration.
[12]       **MR. SILVESTRY:**  Thank you, your Honor.
[13]       **MS. BELOVIN:**  Thank you, your Honor.
[14]       **MR. GILLY:**  Thank you, your Honor.
[15]       (Adjourned)
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**CONFERENCE**                    Min-U-Script®                    **(19) Page 73**

This Page Intentionally Left Blank

1199  SEIU UNITED HEALTHCARE v.
RITE AIDE

June 19, 2007

**1**

**1** 4:7;55:13,14;58:15;
59:11
**10** 47:12
**1199** 11:4;40:21;47:13;
48:9;50:6;51:15;53:14,17,
18,23;63:4
**1199's** 11:3
**16** 13:10,13,15,16
**180** 42:21
**1930** 42:5
**1998** 6:1;12:13,16;14:15,
25;15:12,19;16:19;17:8;
20:9,16;21:20,20;22:3,6;
23:4,9,16,24:5;38:15,17;
45:14;46:3,16;47:18,23;
48:6,12;54:4,7,8,16;55:5;
59:8,16;62:9;67:18,25;
68:2;72:18,22

**2**

**2** 24:6,14;58:6,13,14;
59:18,23;60:2,3,4
**2007** 24:8,15
**2007that** 20:17
**29** 14:14

**3**

**31** 14:25;15:19;21:20;
22:2,6;23:4,16;28:2,4,4;
38:15;54:8;59:8,16
**3500** 27:5;40:10;60:16

**4**

**4** 29:13,14

**6**

**6** 54:12

**7**

**7:00** 12:2

**8**

**8** 4:5;5:14,15;11:11,15;
35:22

**9**

**9** 22:22;47:9
**98** 20:6;48:3

**A**

abide 18:5
ability 56:8

able 5:22;6:1;31:16,18;
32:9,20;33:2,7;36:13;53:2,
7,11,18;57:22;62:21;70:12
absence 48:25;62:14
absolutely 33:24;36:16
Absolutely 31:24;34:9
academic 51:22
accept 24:16;27:10;43:1
access 15:8,11;22:2;
25:6;30:25;46:19;50:13,15,
17,18,18,19,21,22,23;70:9
acknowledge 41:20
acquired 15:9,12;16:19;
17:3;21:19,19;23:9;27:6;
39:5;48:13;54:7;56:6
acquisition 6:9;9:4;
18:13;62:9
acquisitions 62:13
act 22:18;31:14
Act 22:12,17,22
acted 8:5;38:1
acting 6:25;7:8
action 8:17;52:18;64:25;
66:17,20;67:3
actions 6:20;8:1;17:21;
18:20;43:5;67:10
activity 25:10;38:5;40:6,
18;46:5;63:3,9,11,14;
65:25,25
actual 5:23
actually 10:9;13:18
addenda 59:18,24;60:7
addendum 59:15
additional 69:23;70:2
address 38:25;63:16
addressed 47:18
addressing 42:6
Adjourned 73:15
advantages 64:14
advised 5:21
affect 31:4;49:5,6,8
affected 52:11,12,13
affecting 59:14
affidavit 4:2,3,8,9,12,15;
5:10,11,11:10;12:5,14;
13:9,10,24;18:22;19:2,5,7,
7,18;24:6;55:8;58:7;60:18;
67:23;68:5,6,21;71:18;72:8
affirmative 42:15
afraid 27:12,15
after-acquired 7:14;
21:6;55:20;56:11
afternoon 5:1;69:4
again 55:10;70:16
Again 54:9;22
against 7:3,4,20;8:4,10,
11,12,18,19,25;9:6,24;10:4
Against 10:11
agent 34:4;40:22
agents 6:24,25
aggressive 53:4,22
aggressively 53:16,17;
63:16

ago 12:13;15:9
agree 10:19;27:16;28:18;
33:10,24;35:4,5,11,17,19,
20;36:23;44:3;54:25;67:8
agreed 14:21;33:14;47:10
agreement 4:3,6;5:11,19,
22,25;6:21;7:13,20,21,25;
8:3,4;9:18;11:11,14,22,24;
12:4,8,10,12,12,15,17,21,
25;13:1,19,24;14:22;15:3,
6,6,7,7,10,14,17,21,21,21,
22,23,25;16:1,2,7,8,13,15,
16,18,18,21,22,23,25;17:1,
18,22;18:4,5,12,14,16,18,
23;19:12,13,19;20:4,5,10,
13,15,22;21:1,3,5,6,8,9,10,
11,12,16;22:7;23:1,3,6,8,
15;24:4,10,24;25:1,1,9;
26:4,5,6,15,19,19;28:1,3,9,
18,19,21,22,23,24;29:3;
32:6,12,16,18;33:10,11,19,
23,25;34:11,13,16;35:6,12;
36:7;37:8;38:1,2,6,8,11,
13,14,14,17,17;42:8,19;
43:13;45:4,6,14,14,23;
46:3,10,12,14,15,25;47:2,
4,8,12,14,16,17,18,19,20,
21,22,24;48:1,25;49:9;
51:6,13;53:15;54:4,11,13,
19;55:3,5,20,23;56:3,4;
58:7,11,15,18,23,24,25;
59:2,3,7,14,15;60:8,9,15;
62:9,11,11,14,16,19;64:22,
25;65:1,8,23,24;66:23;
67:17;68:1,1,2;69:1,5;
70:19,22,23;71:2,22,23,24;
72:6,7,21,23
Agreement 13:11,17;
58:18
agreements 16:8;20:1,6,
9,17;38:20,22;45:12,16;
47:6;55:9;58:5;60:11;
62:15,17
ahead 60:1
aid 65:15
Aid 5:22;6:6,9,10,25;7:3,
12,14;8:4,5,10,25;9:6,7,9,
7,18;24:5;10:5,6,12,13,18;
14:9;18:24;22:8,9;24:9,10,
16,18;25:10,18,24;27:6;
28:11,14,15;29:9,14;30:12,
18,21;31:5,8;32:8;33:19;
34:1,3;35:7,23;36:3;37:4,
11;39:4,6,10,14,20;40:8,
11;41:14,15,22,24;42:3;
43:8,15,16,18,19,20,24;
44:22;47:13;48:6,13;52:3,
5;54:25;57:18;60:17;61:3;
63:12,22;64:5,7,10,12,19;
65:6,23;66:12
Aid's 22:15,16;29:17,18;
48:17,21
allegation 41:14,16

allegations 41:9,11,12
allege 41:4
alleged 68:19
allow 65:4
allowed 39:9;69:22
ally 7:7
almost 42:7
along 6:2;67:14
although 67:7;71:22
always 18:18
amazing 13:18
amongst 40:13
analysis 41:17
and/or 40:21
anticipate 66:19
anticipated 72:11
anticipating 65:15
antiunion 7:12;9:23;39:6;
41:23;52:6;53:22,25
anymore 57:24
anyplace 72:22
apologize 30:18
application 32:11;50:15,
16;60:25;61:1;67:3;68:1,
16,18;69:20;72:15,24,25;
73:7,9
applied 9:9;18:12
applies 23:8;24:4;26:12,
12;54:18;62:9,23;72:6
apply 16:5,6,7,10;21:18;
26:6,6;38:19;54:9,22;
60:16,20
applying 61:3
approach 13:5
appropriate 7:18;8:25;
10:22;37:10;64:8;65:5,10;
66:3,8,9;67:6,12;68:5;70:7;
72:18;73:10
approval 6:15;30:14
approvals 30:9
approved 29:19,20,23;
30:2
April 14:9
arbitrable 54:11;66:21
arbitration 6:23;7:5,20,
21;8:3,9,18;10:7,10,19;
11:5;27:1;37:20,21;42:13;
46:22;51:11;52:2;54:24;
65:12,12,17,19;66:11,16;
67:5,8,10,13;73:11
arbitrations 44:18
arbitrator 7:24;10:19;
40:9;42:12,12,14,15;43:14;
44:11,12;45:19,25;47:10;
51:11;54:10,23;62:22,22;
64:24;65:13
arbitrators 42:7;44:20;
65:15
arbitrator's 66:24
area 63:22
areas 58:25;59:1
argue 9:11;67:9;70:2,11
argued 8:24;55:18

arguing 61:4
argument 19:18;20:10,
11,11;21:8;42:23,23;43:6,
6,7;46:2;55:18,25;56:25;
62:3;68:23,25;69:4,14,21;
70:7;51:15,17;72:20
arguments 12:19;36:12;
39:1;70:13
arose 48:18,19
around 12:3
arrangements 15:16
Article 58:15;59:11
aspect 60:21
assume 6:4;11:9;34:23;
35:5;44:5;49:19;50:20;
51:10,10,17;53:14;69:7;
71:8,8
assurance 9:6
attach 53:12;59:3
attached 4:3,15;11:12;
13:18,19,21,23;55:3,5;
58:7;59:15,18;60:7
attempt 37:9
Attempt 25:17,21
attempting 26:5;64:2,5,
16
attention 13:7
attorney 5:24
attribute 63:13
authorities 6:15
authority 44:21
automatic 32:11
automatically 60:16
avoidance 7:1
aware 69:13
away 49:7;51:11

**B**

back 5:8;15:12,14;30:11;
33:18;34:12;37:25;42:2;
43:22
bad 33:3,20;34:13;35:1,
15;36:12,13;37:2,3,4,5,6,
14,15,17,18,18;49:4,14,22,
22;56:5,9,12;57:9,19
bargain 49:25
bargained 51:5
bargaining 7:25;9:17;
11:3;12:12,20,25;14:22;
15:22,23;16:1,14,16,17;
17:1;18:4,18;20:13,15,17;
21:3,5,6,11;24:10,17;
28:21,23,24;29:1,3;32:5;
34:4,7;38:20,21;40:22;
42:8;43:1,13;44:17;45:12,
14,16;46:1,25;47:1,4,5,8,
11,14;55:3,5,20,23;58:7,
14,19,23,25;59:3,7;60:15;
62:15,17,19;63:5;66:23;
71:23,24;72:7
based 8:23;20:19;43:5;
62:8;66:4;67:16;68:11,12;

:8;73:5
ically 33:5;37:9
is 8:18,19,24;15:24;
  11,22;52:5,23;56:24;
  25;72:20
r 9:22
:ame 39:6
:ome 16:14;24:17;
  1;32:12
ins 67:5
om 65:23
alf 43:1
ef 68:17
ef 71:25
eving 16:23
OVIN 4:1,5,9,13,17,
  5;5:3,6,9,13,16,18;6:7,
  4;7:6,22;8:8;9:2,16,21;
  ,3,9,12,14,18,24;11:7,
  6;45:3,13,22;46:9,19;
  ,15,20,25;48:4,11,19;
  ;50:7,12,23;51:4,20;
  :21;53:10,19;54:6,20;
  ,8,12,15,17;56:7,11,
  1;57:7,12,15,21;67:15,
  8:19;69:2,10,13;70:16,
  1:6,10;72:1;73:3,13
efits 49:6,16;50:1;
  2;64:11,17
t 45:6;48:9
er 44:9;49:25;50:1
ond 17:8;38:15;41:10;
  ;62:12;67:17;68:2
I 38:15
:8
ls 33:23

rd 7:19;31:22,25;
  9;42:5
n 9:9;13:7;18:5;36:11;
  6;71:4,21
n 31:24
om 35:11
nd 7:14,24;8:7;51:12;
  0;72:3,14,16
er 9:18,19

C

ed 31:14;41:6
e 15:10;18:22;19:3,5,
  :10,20;41:15
paign 7:1,13;9:23;
  11;40:4;41:23;42:24;
  53:4,22;54:1;63:15,

17;64:1;65:7,23
can 4:17;5:13,18;6:18;
  7:10,24;8:3,10,15,18;9:5;
  12:1;13:5;16:20,21;17:16;
  19:1;22:3;23:20;25:18,
  24;27:9;32:3,20,23;36:5;
  37:9;38:3,4,24;40:7;43:14,
  15;50:22;51:14;52:7;53:1;
  54:12;56:4;58:6;63:1,15;
  64:16,18,25;65:6,7,15;
  67:24;69:11,14;70:11;71:1,
  2,3,3,21;72:4
candid 18:1
card 26:3,16;27:3,13;47:7
card-check 24:16,20,24;
  25:2,5;26:1,9,11,19
cards 22:23;47:11;48:15
care 37:19
carefully 17:24;23:19
case 6:7;7:11,23;8:2;9:21;
  15:24;17:21;18:19,20,21;
  20:18,19;27:2;37:21;42:10,
  10;44:13,14,15,15,24;50:5,
  7,12;51:2,4,18;52:2,8;
  54:24;56:17,21;60:14,22;
  61:3,6;66:2,3;68:11,13
cause 8:17;49:10;50:6;
  64:20;67:11;69:24
CBA 29:1,2
certain 15:8,16;16:19;
  41:7,9
certainly 8:10,11,12;9:5;
  44:11,11;45:8;53:20;57:10;
  61:2;67:24;69:13
Certainly 4:1
challenging 11:2
chambers 4:24
change 30:22,24;49:7;
  65:5,21;69:18;70:5,12;
  73:4,5
changed 52:15
characterize 36:19,20;
  37:1,3;54:3
charges 31:25
check 26:3,16;27:3,13;
  47:7
choice 27:10
circumstance 24:4;48:6;
  65:5;69:18;70:5,12;73:5
circumstances 5:18;
  7:11;18:21;50:4;51:21;
  62:12;63:20;65:21
cite 44:13,14,14,15
claim 32:17;45:18
claims 63:10
clarify 6:18;29:6;69:15
clarity 9:3
clause 7:14;21:6;34:10;
  55:20,21;56:2,9,10,11,18,
  19,20,20,22,23,24;72:5
clear 23:5;30:17,18;45:5;
  59:8;64:22;70:8,25;71:17,
  20,25

clearly 63:25;65:24;
  66:24;70:5,10;71:19,24;
  72:5
Clearly 54:11
client 5:21;6:2,21;69:7
clip 14:12
close 31:13;36:1;44:9
closing 32:10
coercing 22:17;33:13
coercion 31:14,17;43:10
coercive 39:15
coextensive 58:23
collective 7:25;9:17;11:3;
  12:11,20,24;14:22;15:22,
  23;16:1,14,16,17;17:1;
  18:4,18;20:12,15,17;21:3,
  5,5,11;24:10,17;28:21,23,
  24,25;29:3;32:5;34:4,7;
  38:20,21;40:21;42:8;43:1,
  13;44:17;45:12,14,16;
  46:25;47:1,4,5,8,11,14;
  55:2,4,20,23;58:6,14,23,
  25;59:3,7;60:15;62:15,17,
  19;63:5;66:23;71:23,24;
  72:6
coming 50:25;63:21
comment 6:17;30:9
commercial 15:16
committing 52:17
common 7:8;49:13,18;
  53:20
communicate 22:18,21;
  43:19;64:8
communicated 30:11;
  44:23
communication 10:25;
  22:11;49:4
company 6:5;7:21;8:5,
  20;9:13,13,15;13,17;21:19;
  26:21;32:15,20
company's 27:3
compare 49:17
comparison 65:25
compelling 11:21,23;
  12:6,18,19
compensable 49:11
complete 6:10;9:7;14:2,
  7,8,11,12;22:2;29:22;66:14
completed 9:7;10:5;
  12:17;14:24;28:15,16;29:9;
  30:16;54:8
completely 42:19
completion 9:4
concerned 27:8,17,20;
  28:8,9;31:6;39:14,16
conclude 21:20;52:5;
  63:15;64:7,19,21;65:9;
  66:1;72:4
conclusion 42:11
conditioned 50:16,16
conditions 14:22;29:17,
  18
conduct 11:1;37:22,23;

39:4;44:10,10;46:8,10;
  64:20
conducted 41:23;46:5
conducting 46:6
confirmed 28:5
connection 17:2;27:4,5;
  40:9;41:20
consider 41:8;65:10;
  66:7;71:25;72:13
consideration 15:13,14;
  51:5
considered 46:7;57:8;
  69:22;72:15
consistent 16:22;20:1;
  23:21;38:5,7;46:17
constitute 49:1;63:10;
  66:1
contain 20:21;28:22
contained 19:14;26:3,4
contains 12:16;14:20;
  18:19;19:20
contend 6:19,20;52:16
contest 41:20
contingencies 30:10
continue 14:13;15:16;
  28:20;52:9;54:22
continued 55:18
Continued 61:8
continuing 62:16
continuous 53:4
contract 8:10;19:21,23;
  37:23;60:10,14,20,25;61:2,
  3;65:2
contracts 59:9;60:7
contractual 6:21;7:20;
  8:4
contractually 8:6,7;
  48:23
control 6:11;9:8;29:16;
  30:25;50:24;57:24;66:13
controls 10:5
convert 62:13,15
convince 27:17;37:25;
  42:25;43:4;48:8;53:3;
  62:22;70:13;72:3
convincing 36:2;64:24
cooperation 7:12;48:20
copy 4:17,24;5:1
cost 35:8;49:16
costs 32:21
coterminous 16:1,2,3;
  60:12
counsel 12:11,14;13:19,
  25;17:22;18:15;59:19;
  61:6;69:3;70:19
Counsel 60:6
counter 31:16
counties 58:24;59:1,6,6,
  14;62:10
course 13:20;18:4;19:25;
  41:19;60:19;64:20
court 12:4;64:22
Court 13:20;40:9;44:20;

58:5;65:9,15,16,20;66:5,8,
  20;67:1,4,9,13,19;69:24;
  71:1;72:20;73:10
COURT 4:4,7,11,14,19,
  21;5:2,5,8,12,15,17;6:3,12,
  19;7:3,16;8:2,14;9:11,17,
  24;10:2,7,11,13,15,21;
  11:6,9,15,18,20;12:7;13:3,
  6,12,15,21;14:1,5,11,16,
  23;15:2;16:3,11,20;17:4,7,
  11,14,24;18:7,10,14,16,25;
  19:4,11,15,17,23;20:5,8,
  14,20,23;21:13;22:8;23:1,
  3,7,10,13,15,19,24;24:12,
  23;25:4,7,9,13,15,18,23;
  26:8,13,17,22;27:7,12,19,
  22,25;28:9,14;29:13,19,21,
  23;30:4,7,13,21;31:5,16,
  19;32:2,16,24;33:5,9,14,
  18,25;34:10,19,22;35:3,5,
  18,24;36:4,10,15,17,23;
  39:8,17,25;40:4,18,21,24;
  41:2,5;42:1,23;43:23;44:3,
  5;45:1,11,25;46:13,24;
  47:13,16,23;48:2,5,17,22;
  49:9;50:11,14;51:2,7;52:3,
  19;53:1,14;54:2,17;55:2,7,
  10,14,16,25;56:10,12,17;
  57:1,11,13,17;58:3,9,13,
  16,21;59:12,21;60:1,3,5;
  62:1;67:22;68:3,24;69:5,
  12,17;70:20,25;71:8,11;
  72:2;73:4
courtesy 4:24;5:1
courts 44:18
court's 66:25
Coutu 6:4,20;7:13,14,24;
  8:11,18,25;9:12;10:2,4;
  29:6,8,15;30:20,24;31:3;
  41:12,13;66:8,15,18
covenant 55:22
Coverage 58:15;59:11
covered 24:9
covers 58:25
create 7:16,17
creating 11:3
crosses 58:2
current 12:20;16:21;
  53:20
currently 71:2

D

date 12:23;29:12;30:2
dated 14:14
day 30:2,5;42:2
deadline 42:17,18,20
deal 6:14;30:21;42:16;
  45:9;59:5,6,8
dealing 19:25;42:7
Decades 47:15
December 59:16
decide 7:24;37:21;43:24;

**1199 SEIU UNITED HEALTHCARE v.
RITE AIDE**

June 19, 2007

66:15
**declaration** 24:1,14
**defendant** 6:4,18;63:2;
66:10;67:7;69:14
**defendants** 6:13;10:25;
66:16;68:20,23;70:18
**defendant's** 67:10;70:18
**defendants'** 12:19;69:3
**defense** 8:23
**defer** 67:7
**definitely** 60:11
**delayed** 67:10
**deliberately** 56:18
**demand** 26:24;60:17,25;
61:1
**demanded** 19:22;24:16;
26:23
**demonstrate** 8:15,17;
9:5;41:18;53:1;62:7,22;
64:9;65:6,7,21;68:10
**demonstrates** 64:1
**denied** 46:20,22;50:13,
17,21
**deny** 36:18,19;50:18;
62:4;65:3,4;66:4;72:25
**depending** 65:11
**designation** 22:5
**determination** 54:10;
65:13;66:24,25;72:17;73:2
**determine** 32:13;45:21;
48:7;63:1,8;66:10;71:1;
72:21
**determined** 15:18;66:12
**determining** 30:19
**detract** 20:11
**difference** 39:25
**different** 9:22;13:8;26:24;
36:25;39:12,19;50:14,25;
51:3,7;64:4;69:21
**difficult** 28:8
**digging** 12:3
**direct** 5:13;18:1,2;54:12
**directed** 41:19
**directing** 9:23
**directly** 45:18
**discharge** 52:18
**disciplinary** 52:18
**discourage** 25:10,19,24;
27:13,15;35:10,12;40:5,6,
19;51:13;53:5
**discouraged** 53:16
**discouraging** 56:13,16
**discovery** 73:5
**discuss** 41:8;66:17
**discussed** 71:20
**discussion** 10:23;24:2;
40:12
**dismiss** 61:5;66:18;73:9
**dismissed** 61:4
**disparage** 34:17,21,22;
35:23
**disparaging** 36:3
**dispute** 7:8,9;11:16;29:3,

66;42:14;48:21;66:21,21,
22;70:22
**disseminates** 50:9
**dixit** 44:16
**doctrine** 7:7
**document** 5:23;6:1;
13:17;14:2,7,8,11,12,17,
17,19,20;21:4;69:8,9;72:7,
19
**documentation** 71:12
**documents** 13:7;24:21;
71:7
**done** 6:14;10:16,18;
30:21;40:25;41:3,25;46:15,
16,16;48:20
**down** 14:23;15:2;20:14;
69:25
**drop** 30:10
**dropped** 4:25
**drugstores** 6:22,25;
66:13
**due** 61:8
**dues** 32:22;58:1
**duration** 38:19;72:23
**during** 6:25;18:3

**E**

**early** 30:6
**easier** 4:18
**Eckerd** 6:9,22;9:4,10;
52:10;66:13
**effect** 70:11;71:2
**effective** 47:21;52:6;
63:13;64:10;70:24
**effectively** 63:16,19;64:9
**effectiveness** 70:22
**efficient** 67:14
**efficiently** 67:6
**effort** 51:25
**either** 6:13;16:21;23:20;
37:18;38:5;45:12;46:6;
47:9,12,17;62:7;68:24;
72:12
**election** 22:23;32:14
**eliminated** 52:14
**else** 47:3;67:22;73:1
**embedded** 22:20;21:10;
22:11
**embroiled** 7:8
**employed** 24:18
**employee** 43:24
**employees** 6:6,6;9:1,20;
11:1;22:6,11,14,14,17,19,
21;27:5,6,18;29:9,10,11,
15,15,16;30:10,12,19,22,
25;31:11;33:13;22;34:1,5;
35:13;36:1;37:10;39:7,15,
21,23;40:11,11,13,13;41:6,
7,15,16;42:25;43:2,15,16,
20;44:10,23,24;48:9;49:4,
15,17,21;50:10;51:16;
60:16;63:5,22,25;64:5,6,8,

10,13,17
**employer** 7:7,9,10;31:1,
19;39:6;43:5;50:9,24;
51:25;53:4,16,21,25;63:24
**Employer** 56:7
**employers** 42:6;49:20,24
**employment** 36:5
**encapsulated** 16:15
**encourage** 9:14;25:24
**encouraged** 53:17
**end** 28:2;45:7
**ends** 45:6
**enforce** 7:20;11:11,13;
36:8;55:22;56:8,10;65:16
**enforceable** 36:7;66:24
**enforced** 8:12
**enforcement** 66:22
**enforcing** 8:9
**engage** 25:10;39:11;40:6,
18;42:24
**engaged** 64:19,20;65:6
**engages** 53:4
**engaging** 10:25;31:13;
52:19;63:3
**enjoin** 41:24
**enjoined** 43:8
**enlighten** 73:1
**enough** 30:17;44:17,18,
19;45:23;64:22;65:12
**entered** 54:19
**entirely** 48:20;51:14
**entirety** 11:14,15
**entitled** 22:8,10;26:9;
27:23;28:1;31:6,8;32:3,4;
37:11;50:15,18;51:12;64:9
**entitles** 55:24
**entity** 7:19;66:12
**enumerated** 13:14
**essence** 11:16;43:21
**essential** 28:6
**essentially** 11:7
**establish** 60:11,11;62:24
**established** 62:8
**evaluation** 70:5
**even** 6:19;8:24;13:2;
15:25;16:2,4;35:5;37:7;
53:1,24;54:12;55:19;56:18;
57:2,15;59:4;60:23;61:6;
64:21;68:6,8,17;69:22,23;
70:1;72:19
**Even** 32:16;34:10;50:23;
52:21;63:13,17
**event** 45:17
**everybody** 28:10
**evidence** 24:3;39:3,3,5;
41:5,21,22;56:21,23;64:21;
65:20;67:17,18,21;68:4,5,
6,12,16,17;69:15,17,18;
70:1,2,8,23;71:1,19;72:2,5,
10
**evidences** 26:15
**exact** 29:12
**exactly** 6:8,12;8:22;9:3;

27:19
**examine** 51:9;53:12
**example** 35:6;44:9
**except** 47:4;55:17
**Except** 59:13
**exchanged** 14:3,8
**executed** 14:2,8;16:4;
20:25;21:4,16;38:17,20
**exercise** 22:10
**exhibit** 4:4
**Exhibit** 4:3,5,7,8,12,15;
5:10,12;11:12;13:14;55:6,
10,12,12;59:18;60:2,3,4
**existence** 20:13,16
**exists** 12:18;15:23;17:13;
54:11;57:3
**expand** 64:5
**expansions** 62:13
**expedite** 67:8
**expedited** 10:10,19;52:2;
54:24;67:19
**expeditious** 67:14
**experience** 44:18;63:23,
24,24;64:3,12
**expert** 51:24;53:2,2,8
**experts** 53:10
**expired** 12:10;23:1,3,16
**expires** 12:16;22:7
**explain** 5:18;17:23;38:16
**express** 22:12;33:7;39:22
**expressing** 39:21
**extends** 62:12;67:17
**extensive** 62:3
**extent** 23:20;32:3;67:6
**extraordinary** 44:25

**F**

**face** 55:21
**facilities** 43:19
**fact** 12:17;15:25;24:7;
26:15;42:17,21;44:13,22;
56:23;59:4;63:9,20
**factor** 67:12
**facts** 9:3,21,22;60:10;
64:18
**factual** 70:5
**factually** 8:22
**failed** 56:19,22
**fairly** 38:10
**fairness** 72:11
**faith** 55:23;56:1,5,9,12;
57:5,9,19
**false** 40:2
**far** 20:3;45:5;47:25;48:4;
53:20
**fashion** 42:15;44:21
**favor** 71:13
**favorable** 33:8
**fears** 63:14
**federal** 7:6
**feel** 70:4,10
**felt** 70:1

**fence** 35:20,21,23
**fight** 37:20
**figure** 19:24;66:6
**file** 4:19
**filed** 4:20,22;10:7;24:1;
27:1,2;68:7
**filing** 10:16,18
**final** 6:15;42:4;54:2
**finally** 65:14
**find** 13:18;23:20;52:7;
57:2,3;63:7;64:18
**Fine** 21:23
**first** 19:2;29:11;54:4;
58:10,17;60:14;63:18;
72:19
**flexibility** 49:7;52:13
**focus** 37:24
**focused** 13:7
**follow** 25:7;46:11
**followed** 46:13
**following** 59:21
**force** 6:22;8:4,18;46:3;
65:14
**forced** 32:12
**forever** 21:22
**forth** 15:15;54:14;59:14
**forward** 65:20
**four-page** 14:16,19
**Friday** 69:4;70:19
**front** 4:15;69:6;72:8
**full** 5:4;55:4,12;58:10;
68:3,9;69:8,25;70:2
**fully** 66:14;68:16
**further** 55:16;58:3;63:18,
19;66:7,17,19;67:3,12;
70:6;71:12;72:10

**G**

**gave** 21:13;35:6;51:5;
71:15
**gentlemen** 49:13
**geographic** 72:24
**gets** 7:7;15:8
**GILLY** 73:14
**given** 10:22;62:23;63:9,
20;70:21;72:15
**gives** 7:3;9:24
**giving** 22:24;23:10
**goes** 17:14;24:2;32:19;
43:8;45:17,20;54:13;60:21
**good** 22:13,14;33:1,17,
17;35:15;36:9,9,10;37:7;
55:22;57:5
**Good** 56:1
**good-faith** 56:3,20
**grievance** 27:2;60:23;
61:2
**grounds** 65:17
**guess** 26:2;33:16;44:8;
45:3
**gun** 73:6

## H

d 49:12
son 24:1,15,22
son's 24:6
pen 31:20
dly 44:24
m 39:1;44:16;63:10;
;67:19
ned 42:11
r 11:19;46:2;73:8
rd 62:2
ring 51:23;67:20,23;
4;70:6
rs 42:12,15
rt 32:24
l 67:23
> 32:20,21
e's 21:8;26:14;32:20,
2
e's 22:1
ory 46:1
l 67:19
ding 68:14
est 59:25
or 4:1,13,18,25;5:7,
:7,16;7:6;9:2,5,21;
,9;12:9;13:10,10;15:1;
0;20:3;21:2;23:12;
,25:22;26:18;32:7;
2;39:13,20;42:4;45:3;
;15;48:1,4,11;50:24;
);52:2;53:11,21;54:10;
7;56:15;57:9;58:4;
5;69:2;70:16;71:6;
;73:3,12,13,14
;49:5

## I

al 44:2;57:13;60:19
ical 27:7
gine 6:17
ediately 13:24;67:5
nent 52:7
inently 64:19
icit 56:20
ied 55:22
ies 11:1
rtant 24:7;62:19
ossible 43:2;52:23
ession 11:4
oper 36:18,20;39:23;
;24;43:5
oropriate 36:24;

de 30:20;68:22
ded 53:23
nsistent 16:23;20:1;
;25:2,3,4;26:8;38:7
rporated 16:17;
28:23;62:17;71:22,

24;72:22
increases 58:2
independent 6:5;8:6;
19:23
independently 7:4,16,
17;16:5
indicate 53:13;70:10;72:5
indicates 13:3
indication 59:2,9
individuals 25:10
inevitable 53:6
information 68:22;69:23
informed 50:3
initial 5:20,23;17:8;69:20;
71:15
injunction 8:10,12,19,24;
9:8;10:24;29:4;31:1,2;
36:8;44:15;50:16,21;51:18;
56:24;65:3,11,17;66:2,4;
72:18
injunctive 10:22;38:25;
41:17;62:4;66:19
injured 51:18
injury 49:1,10,19;50:6;
62:8;63:8;64:21;66:1
instance 62:11;63:18
instances 53:19
instructing 52:10
insufficiency 67:16,18
insufficient 63:7;72:17
intend 17:17;19:39:10
intended 18:4;21:16,17,
18;38:15;59:2;62:13
intending 39:10
intent 17:4,10,11,14,23;
20:25;38:6;46:1;54:21;
68:1
intention 39:21
interest 48:10
interfere 57:5,8,16
interference 48:14;56:7,
13
interpret 59:4
interpreted 56:4,4
interpreting 60:15
into 6:23;12:2,4,20;16:17;
28:23;31:10;35:25;41:22;
45:25;46:1;52:15;54:19;
62:16
involved 36:24
ipsi 44:16
irreparable 39:1;44:16;
49:1,19;50:6;62:8;63:8,10;
64:20;65:9;66:1;67:18
irreparably 42:11;51:18
issue 8:19;23:23;29:5;
31:2;32:2,2;36:25;38:3,9;
45:4,8;48:17;50:14;51:19,
24;60:22;62:25;65:11,17,
20,22;66:10;68:7;69:15;
70:20;72:18;73:9
issues 23:23;40:12;42:6;
43:8;63:16;67:20;73:11

## J

Jersey 24:9,19;26:7;27:3;
34:2
job 43:25;49:7;52:13
jobs 31:15
join 27:18;33:22;34:3,13;
35:3,8,14,15;36:2;43:5,25;
44:9;53:17
joining 27:15;33:20;
35:10,13;40:5;53:5,16;
56:14,16
judgment 49:18;50:3
June 14:14;27:6;29:12,13,
14;30:2,6;54:7
jurisdiction 15:24

## K

kind 7:17;10:21;11:4;50:9
knowledge 20:12;30:9

## L

labor 7:6,8,9,17;31:14;
36:25;52:17,20
Labor 7:18;22:12,16,22;
31:22,25;37:19;42:5
laboring 42:20
ladies 49:13
laid 46:3
language 5:16;16:22,22;
17:13,14,25;44:19;57:4
last 12:2;60:13;68:7;69:1,
21,24
lasts 21:22;59:8
late 24:15;68:7;69:21
later 59:15
launches 53:22,25
Laurie 4:2
Laurieanne 5:10;55:8
law 7:6;8:2;37:22;44:14
lawful 52:16,21;55:21;
63:3,13
lawfully 22:12;55:22
laws 36:25
lawsuit 20:19;27:4,5
lawyer 17:25
lawyers 4:22;31:14
lays 46:15
least 31:2
left 12:14
legal 30:5;44:10,10;48:24;
57:15;64:25
Legal 30:2
legally 32:3,4;43:9;48:22
lend 20:10,10
level 63:15
life 52:15
light 12:1
likelihood 8:16;9:5;
45:20,24;51:9;62:7,24;

63:2,8;64:23;65:22
likely 8:17;53:6;72:4
limited 38:17,19;42:21;
68:11;72:23,23
line 35:11;57:12;58:2
literally 59:4
little 6:8;17:25;26:24;
32:25
live 30:2,5
lived 45:14,15
locate 5:22;6:1
located 24:18
long 47:13
look 15:13;16:20;19:1,25;
23:19;24:6;34:1;37:25;
38:3,4,13;43:24;44:19;
58:24,24;59:10,17,19
Look 19:2
looking 58:5
lose 43:25
lot 43:14,21;56:5;59:1,1,1

## M

mail 5:2
main 27:8;58:6,17
majority 22:5;27:9;34:6;
42:25;48:15;52:24;54:1;
56:8;60:20,24
makes 17:4,25
making 41:12;52:17;69:3
management 9:10
manager 41:14
managers 40:15;49:8;
52:10
manner 67:14
many 23:10;46:10;53:10
March 24:15
matter 37:13,16;51:23;
69:15
may 7:16,18,22;10:3,4;
16:4;30:1,10,17;31:13;
36:1,11,13;42:3;57:7,12;58:4;
62:21;63:12;67:15
maybe 29:25;31:22
Maybe 8:22;26:1
mean 13:22;14:1,2,5;
17:23;40:5;54:5;59:22;
71:19
meaningless 59:4
means 28:3;49:24;54:6
meet 68:9
meeting 19:9;72:16
meetings 41:6;46:21
member 31:11;32:13
members 33:21;34:2;
57:6;64:11,13
memoranda 55:9
mentioned 22:25;32:8
merger 7:13;9:7;10:5;
29:8;30:2
merits 7:23;8:16;9:6;
37:20;45:18,20,24;51:8,9,

10;60:21;62:7;25;66:20
message 50:9,11,24,25
messages 52:21
met 62:6;63:1;72:3
might 6:8,11,17;10:3;
64:15
mind 43:4
minute 4:12;14:1;15:2
mirrored 17:21
missing 26:1
mission 11:3
modifications 59:13
money 58:1
moot 6:5;10:4
more 6:11;19:20:5;
23:19,22;28:8;32:25;38:24;
45:22;51:14;53:20;58:1;
59:1,1;64:1;66:22
morning 68:21
most 72:12;39:14,16;
49:20;55:2,4;73:11
Most 49:23
mostly 63:10
motion 4:16;38:24;61:4;
62:4;66:18;73:8
move 22:3,4;23:23;27:21;
29:7
moves 65:12,19
moving 67:14
much 27:10;35:8,9;50:25
mud 39:18,18
must 37:11;64:24
mutually 47:10

## N

National 7:18;22:12,16,
22;31:22,25;37:19;42:5
nature 45:9;63:9;66:21
necessarily 27:7;33:8;
43:23;49:10
necessary 47:3;67:13
need 10:4;12:5;21:10,11;
30:19;41:24;45:13,15;61:5;
71:11
needed 26:20,20
needs 44:24;45:19;52:24;
56:8
negative 11:4
negotiate 56:18
negotiated 14:24;28:21
negotiation 67:25
negotiations 5:25
neither 36:11
neutral 17:2,8;25:25;
37:12;38:22;43:22;48:8,17;
51:14;56:6;57:4,7
neutrality 5:11,16,19,21;
7:15;11:8,11,13,17,22,24;
12:8,20,25;15:3,6,11,22;
16:22,23;17:18,19;18:5,16,
19,23;19:3,6,12,14,20,22;
20:9,21,24;21:1,10,16,21;

23:3,15;24:11,23,25;25:1,
6,9;26:12,20;27:25;28:6,7;
32:16,18;33:10,11,15,19,
23,25;34:10,11,12,16;35:6,
12;37:8;38:1,2,5,6,8,11,12,
14;42:13,14;45:4,6,10,15;
46:4;47:2,4,19,21,24;48:1,
2,21,25;49:9;51:5,13;
53:15;54:12;55:19;56:2,3,
4,17,19,20,22,23,24;57:2;
59:6;60:22;62:11,11,14,16;
64:22,25;65:1,8,23,24;
67:17,25;69:1;70:11,19;
71:2,22;72:6,21
**new** 15:8;18:21;27:6;
40:11;48:13,13;54:15;63:5;
64:6;65:5
**New** 24:9;19;26:7;27:3;
34:2,2
**newly** 15:12;17:2;21:19;
23:9
**next** 61:8
**nexus** 41:18
**Niels** 24:1,15
**night** 12:2;68:7;69:1,22,
24
**nine** 15:9
**NLRB** 43:11
**none** 38:21;60:8
**None** 60:7
**nonneutral** 40:8
**nonunion** 49:17
**northern** 24:18;26:7
**note** 5:9;13:20
**notice** 70:21
**notified** 69:2;70:18
**null** 28:4
**number** 48:12;51:22
**numerous** 20:6;53:14

**O**

**obligation** 48:7;18;57:3;
62:18,19
**obligations** 28:17,20;
45:15;48:2
**obtain** 56:8
**obviously** 27:14;38:4;
41:9;49:24;62:2;67:6
**Obviously** 21:2,4,5;42:1;
50:17;68:3
**occasions** 48:12
**occur** 65:9
**occurred** 12:13;15:10;
19:10;21:19;30:3,6;39:4;
53:20
**occurrence** 53:21
**occurs** 65:19
**October** 12:16;14:25;
15:18;21:20;22:2,3;23:4,
16;28:2,3,4;38:15;54:8;
59:8
**off** 5:1;69:19

**OK** 4:11,21;5:17;11:6;
23:19;25:8;26:8;29:21;
30:7,13;33:9;34:19;35:24;
40:24;44:4;48:17;55:16;
58:16,22;60:5;72:1
**once** 57:25
**Once** 27:9;60:18
**one** 12:8,24;18:15;19:10,
12;20:4,5,18,18,19;21:10;
22:6,24;23:22;24:24;25:25;
30:3,5;33:11,17;36:9,10;
38:4,16,24;42:10;44:24;
53:11;56:6;58:4,18;59:10,
20;65:7;66:9
**One** 18:11;39:3;42:4;60:2
**one-page** 12:15;13:16
**one-sided** 50:9,11
**ongoing** 7:2;10:20;13:1,
4;45:9,16;47:21
**only** 8:15;17:14;24:4;
27:5;28:9;38:16;47:1;48:1;
54:17;64:16;66:12;69:9,19
**open** 42:19
**opened** 48:13
**opening** 28:11;38:18
**operation** 32:22
**operative** 6:25
**opinion** 32:23;33:8;
39:21,22;43:9;44:10,23;
56:9
**opinions** 22:13
**opportunity** 21:22,23,24;
63:19;64:8;67:20;68:4,9;
69:25;70:2;72:11
**opposed** 11:2;40:4;64:14
**opposing** 59:19;63:12
**option** 19:15
**order** 30:20;35:10;42:13;
69:24
**ordered** 43:15,16,17,18,
19,20
**organization** 46:17
**organize** 15:19;21:23,23;
22:21;25:17,21;33:21;
42:22;48:14
**organized** 22:3,5
**organizing** 16:18;42:17,
20;43:9;53:23
**original** 5:6;13:9;16:6,7;
38:11
**otherwise** 52:21;64:1
**ought** 32:8;36:2
**out** 9:22;12:14;19:24;
30:10;32:1;40:13;43:8,12;
46:3,15;47:8,11;66:6,22
**outcome** 11:5
**over** 29:16;30:25;34:3;
50:25;57:24;66:13,22
**overall** 40:4
**own** 12:21;15:13;16:16
**owned** 41:13
**owners** 6:22

**P**

**page** 12:15;13:10,11,12,
13,24;14:12,14;54:4;58:6,
10,17;61:8;69:6
**Page** 58:13,14
**pages** 13:13,15,16
**paper** 71:4,5,9,12,14,14
**papers** 4:10,19,20,22,23;
5:4,6,20,23,24;6:2;11:21;
29:24;30:1,15;38:11;51:22;
55:18;62:2;71:16
**paragraph** 5:14;11:11;
24:6;35:22;46:4;47:2,9,12;
54:12;59:10,23
**Paragraph** 4:5;24:14
**part** 5:19,20;14:19;15:5;
16:14,15;19:23;28:6;31:2;
32:23;36:11,23;61:3,6
**Part** 41:2
**partial** 69:9
**particular** 11:5;15:25;
17:21;18:12,12,14;23:9;
24:3;27:2;28:16;51:18;
60:21;62:10,10
**particularly** 12:3;39:22;
50:8;53:24;63:20
**parties** 14:15;15:18;
16:15;17:2,5,7,15,17,19,
20;18:3;20:25;21:2,15,17;
22:1,1;28:17,20;31:24;
38:1,15;42:13;45:6;46:1;
47:10;51:4;54:21;56:18;
62:3;66:6;71:19
**parties'** 18:20;45:9
**party** 66:9,15
**passed** 15:14
**past** 27:6
**pay** 32:21;35:9;49:6;52:11
**pending** 11:5;30:14;61:2
**people** 8:25;9:12;25:19;
27:9,15;31:12;34:13;40:5,
6,19;43:4;48:8;52:11;53:5,
16,17;56:13,16;57:21,23,
25
**People** 50:2
**perhaps** 45:7
**Perhaps** 12:1
**period** 6:17;7:1;16:6;
20:16;42:21
**periods** 30:9
**Permanent** 16:9
**permanently** 16:10
**permission** 26:20,22,23
**permit** 18:8,10
**permitted** 46:9;48:14
**persists** 53:22
**persuade** 73:4
**pharmacists** 24:9,18;
25:22;26:7
**phrased** 8:14
**piece** 71:4,5,9,12,14,14

**pile** 24:21
**place** 33:11;38:8,14;
40:17;65:9;72:6
**plaintiff** 62:6,21,24;63:1,
10,12;66:14,16;67:9,11;
68:3,9,15
**plan** 22:4
**planning** 42:3
**play** 16:24
**plenary** 44:21
**point** 6:6,10,17;8:21;10:8,
16,21;22:9;23:22;31:6;
38:18,24;39:13;41:25;42:4,
9;43:2;44:9,25;45:7;54:3;
58:4,22;60:13;61:7;63:11;
65:3;67:8;72:2
**pointed** 42:10
**pointing** 19:4,17
**points** 58:12
**politics** 33:5
**position** 8:21;11:9,10,25;
12:7;20:2,2;26:9,12,13;
32:25;35:14;38:10;47:23;
48:5;49:25;50:2;60:14,19,
23,25;61:1;63:4;67:9;70:18
**possession** 69:8
**potential** 9:18,19
**power** 8:12
**practice** 36:5
**practices** 36:25;52:17,20
**preceding** 13:24
**preclude** 33:19
**precluded** 33:11;63:3
**precludes** 9:18
**predecessor** 20:17
**prejudice** 65:4;67:11;
72:25
**preliminarily** 65:13
**preliminary** 9:8
**premises** 46:21
**prepared** 70:23
**present** 48:15;51:23;
67:21,22,24;69:14;70:23;
73:1
**presented** 65:20;69:19;
72:12
**presidents** 19:10
**pretty** 12:6;23:5
**previous** 6:21
**prior** 5:24;6:20;47:17;48:2
**pro** 15:17
**probably** 4:21;5:2
**problem** 41:2
**procedure** 46:3;65:18
**proceed** 67:5
**proceeded** 72:14
**proceeding** 31:4;36:8;
40:9;66:11,11
**process** 10:20;12:10,12,
22;13:1;14:21;15:5,7,9;
16:13;21:4,12,18,20,21;
22:2,2,25;24:4;26:4,5;28:2,6,
8,10,11,14,15;29:1;30:16;

32:14,23;42:18;45:7;54:6,
14;58:11,18,22;59:2;60:8,
9;66:14;67:7,13
**produce** 53:11
**produced** 13:19;14:9
**prohibit** 52:19
**prohibited** 32:5;48:23
**prohibits** 10:25
**prolonged** 51:25;52:22;
65:7
**promised** 15:15,15
**proper** 66:15
**protection** 36:3
**provide** 4:17;5:3;6:1;27:3
**provided** 65:16;68:17;
69:6
**provides** 4:6;45:7;46:22
**providing** 47:7,9
**provision** 12:16,18;
14:20;15:1,20;18:19;20;
26:12,19;28:22;37:13,16;
38:22;45:5;46:2,18;47:1,5,
7,9,19;54:4;55:19;56:3;
62:23;65:14,16;68:20;
70:11
**provisions** 7:15;20:21;
22:22;46:4,24;54:14;60:10;
66:23
**public** 6:17
**purchase** 29:8,19,20,23;
30:5
**purpose** 7:8;38:18
**purposes** 19;39:6:1
**pursuant** 27:25;46:6,8,
10;65:1
**pursuing** 31:24
**put** 14:5;26:2;40:7,12,17;
43:21

**Q**

**quickly** 65:12
**quid** 15:17
**quite** 9:22
**quo** 15:17

**R**

**raise** 68:6
**raised** 70:20
**rather** 5:20
**read** 4:23;11:21;24:15
**reading** 24:13
**ready** 52:4
**real** 11:21
**reality** 50:8;51:20
**realized** 60:18
**really** 10:6;12:11;15:24;
31:3;32:25;37:7,22,25;
39:17;45:17
**real-world** 64:14
**reason** 8:15;12:23,24;
30:22,23,24;34:20;42:1,2;

ne 19, 2007

20;52:1;64:7;70:8,16
sonable 21:25;70:14
sons 18:11;29:4
eive 49:1
eived 4:23;64:11;68:8;
22
ent 55:2,4
ognition 12:10,12,22;
;14:21;15:7;16:13;
,12,18,21;22:25;24:4,
1,24;25:2,6;26:1,4,5,
;28:2,6;42:18;45:7;
1
ognized 48:16
onsider 70:14
ord 62:3,23;63:7,25;
;72:3,14
ounting 19:9
over 51:25
ressable 44:11,12
valuate 65:22
ecuted 38:21
r 20:22;23:25;60:8
rrence 15:20;19:21;
;21:7;28:24;30:16;
2;62:18
renced 71:23;72:22
rral 44:18
rred 60:6
rring 12:11;59:19
rs 54:13
ect 45:16
ected 45:11,13
ects 19:1;25:16
sal 27:3
sed 10:19;54:25
ard 64:5,19;63:4,4,11;
3;66:10,18,18,20;73:8,

rdless 8:8
onal 58:19
larity 65:30:8,14
ted 24:23;66:11
tions 7:19;22:12,17,
1:22,25;37:19;42:5
ionship 49:8;52:12;
72:19
f 6:5;8:6;9:24;10:4,
1:21,23;38:25;41:17;
1,25;55:24;62:4;63:18;
19;67:3,13
ain 17:2,7;29:10,18;
;;51:14
ained 28:17
ins 37:8
edies 36:4,6;50:19
edy 42:16
nd 56:25
ated 49:3;50:24
atedly 50:9
r 4:10,19,20;5:20,24;
1:10,10;38:12;68:7

represent 24:8;34:7;
51:16;52:24
representation 30:14;
40:1,2;48:9;57:5;64:6,12;
69:5,10;71:20
representational 60:8,9
representative 24:17
represented 5:25;49:15;
63:22
represents 64:5
request 27:1;67:19
requested 19:5;54:24
requesting 11:7
required 26:15
requirement 26:3
resolve 36:23;37:1;38:9
resolved 45:19;73:11
respect 12:3;43:9,14;
45:8,10;51:15;54:7;67:16
respond 6:13;31:9,18;
32:8;39:18;45:1
responded 10:17
responding 39:14;40:1;
45:4
responds 61:5
response 51:21
responsibilities 45:9
result 29:1;49:20;53:7
resulted 29:1
retains 30:25
retract 43:17
return 30:17
review 47:10
reviewed 62:2;68:16;72:9
right 6:11;7:20;8:15;9:2,
15,19;10:3,15,20,21;11:18;
15:23;16:9;20:23;22:18,20;
27:11,14;30:13;32:13,24;
34:1,8,11,12,15,17,23,23,
25;35:7,12,20;36:11;40:8,
10,16,18;43:3,21;45:1;
46:20;48:8,22,24;51:11,12,
17;54:2;62:1;73:7
Right 16:11;18:17;19:15,
16;20:6,20;25:15,23;26:17
rights 7:3,4;22:10,15,16,
24,24;28:17,20;31:19,20;
45:10
ripe 60:23;61:6
rise 63:15
rite 40:8
Rite 5:22;6:6,9,10,25;7:3,
12,14;8:4,5,10,25;9:6,7,9,
18,23,24;10:5,6,12,13,18;
14:9;18:24;22:8,9,15,15;
24:9,10,16,18;25:10,18,24;
27:6;28:11,14,15;29:9,14,
17,18;30:12,18,21;31:5,8;
32:8;33:19;34:1,3;35:7,23;
36:3;37:4,11;39:4,6,10,14,
20;40:11;41:14,15,22,24;
42:3;43:8,15,16,18,19,20,
24;44:22;47:13;48:6,12,17,

21;52:3,5;54:25;57:18;
60:17;61:3;63:12,22;64:5,
6,10,12,19;65:6,23;66:12
room 5:2
ruled 68:10;71:13
ruling 67:1,16;73:4
runs 32:22

S

sake 43:7
sale 29:8
same 14:15;21:9;26:19;
33:14;44:7;53:5
sanction 43:17
saw 30:13,15
saying 4:8;14:16,18,19;
17:6,9,17,17,18,20;18:25;
19:19;20:24,25;23:13,15;
25:15;26:14,18;27:2;31:5;
33:20;34:23;36:12,14,22;
40:1;41:18;44:2,6,8;46:6;
47:16;49:12,20,23;50:5;
52:7;56:19;57:2,11,13,18,
18;69:7
schedule 49:8;52:14;
57:24;59:15,22
scope 72:23
second 4:7;14:19;23:25;
24:14;59:10,10,19
Secondly 71:17
Section 22:22
secure 52:24
seeking 11:13;46:23;
51:15;55:21,24
Seeking 24:24
seem 11:21,23;53:13
selection 10:20
self-expiration 12:23
sell 9:12,13
send 4:23
sense 49:13,18;64:14,15
sent 12:4;52:22
seriatim 16:18;23:6
series 60:6
seriously 41:8
set 5:4;54:14;59:14;64:18;
69:25;71:15
sets 24:7
shall 14:24;59:14
shed 12:1
shop 64:2
show 45:23;49:14;69:24
showed 71:12
shown 11:23
side 11:19;36:9,10,11;
37:21;38:4,17
sides 13:7;18:5;64:16;
71:4,21
signatory 7:21
signature 12:15
signed 14:15;46:25
significant 27:14;65:5,7;

69:18;70:12
silent 26:15;17:1;28:19
SILVESTRY 12:1,9,13;5,
9,13,16,23;14:4,7,14,18,
24;15:5;16:9,12,25;17:6,9,
12,20;18:6,8,11,15,17;
19:2,9,13,16,19;20:3,7,12,
15,21;21:2,17;22:9;23:2,5,
8,12,14,17,22,25;24:14;
25:3,5,8,12,14,17,21;26:2,
11,14,18;27:1,11,16,21,24;
28:5,13,18;29:14,20,22,25;
30:5,8,17,23;31:8,18,24;
32:7,19;33:4,7,12,16,24;
34:9,17,20;35:2,4,17,19,
25;36:6,14,16,22;38:23;
39:13,20;40:3,7,20,23,25;
41:4,11;42:4;43:7;44:1,4,7;
45:2;58:4,10,14,17,22;
59:13,23;60:2,4,6;73:12
similar 18:20
simply 8:5;21:25;40:7;
53:3;54:15;56:13;57:4;
72:22
single 42:9
sitting 47:25;68:21
situation 8:23;23:9;32:7;
42:12,16;43:22;63:21;64:4,
15
situations 53:15,24,25
Slow 14:23;15:2;20:14
smoking 73:6
so-called 12:4;45:5
sole 15:24
solely 62:9;72:18
somebody 14:5;31:15;
72:21
somehow 27:17;41:19;
42:11;66:11;67:10;69:7
someone 9:13
sorry 4:4,14;8:11;13:12;
17:6;23:2,7,12,14;24:12;
30:4;55:7,10,13;58:13;
59:21
sort 32:1
sought 24:8;46:19;56:22
sounds 17:24
specific 28:14;32:25;
62:12,18
specifically 5:14;54:20;
57:19
speculate 64:16
speculative 63:11;64:15
speech 57:7,9,13,15
spelled 47:8,11
splice 17:24;35:18,19
sponsor 43:18
standing 6:12
start 14:12;41:12;45:3
statement 30:15
statements 33:12;39:7,
15;42:6
states 11:1;14:20;39:15

States 44:20
status 6:9;10:15;11:3;
60:20,24;65:11
stay 25:25;35:21;48:7
stayed 21:9
steelworkers 44:19
still 28:17;70:24
stop 36:5
store 11:1;19:6;31:13;
44:8;46:21
stores 6:9;9:4,8,10;10:6;
15:8,8,11,12,19;16:19;
17:3;18:21;21:6,19,23,24;
22:1;23:9;24:9,18;28:10;
29:8;31:10,12;35:25;36:1;
38:18;39:5;41:13,22;42:21;
45:8;46:20;48:13,13,15;
54:7,9,13,15,15,18,22;
62:10;63:6,19;64:6
store's 32:10
straightforward 38:10
strong 50:1
studies 51:22;53:12,13
stuff 36:12,13
subject 7:9;18:19;29:17,
18
submission 5:20,23,24;
12:15;29:24;39:4;68:11
submissions 29:25;42:9;
68:12;70:6
submit 68:4,5;69:25;71:3,
3,11
submitted 4:10;6:2;
13:25;17:22;18:15;24:21;
51:21;67:23;68:6,13,20;
69:6,8,20,21,23;70:1;
71:15;72:16,17
submitting 5:19;68:15
subparagraphs 58:19
subsequent 16:8;47:17;
55:9;62:17
substantive 73:11
substitute 68:14
success 8:16;9:5;45:20,
24;51:8;9;62:7,25;63:2;
65:22
successful 8:9;42:24;
53:23;63:17;64:23
successfully 43:3
successor 29:2
suffering 42:20
sufficient 56:24;65:16
sufficiently 62:8
sunset 12:16,18;14:20;
15:1,20;45:5;54:4;68:19
sunsets 15:4
sunsetted 28:3
supervisor 57:23
supervisors 52:13
supplemental 4:2,9,11,
14;5:10
support 11:10;20:10,11;
24:22;51:22;52:1,24;54:1;



56:8;65:17;68:15,18;70:1,
6;72:16
**supports** 19:18;42:10
**Suppose** 29:19
**supposed** 16:5,6,7,10;
28:2;49:19;50:20;54:5
**Supreme** 44:20
**sure** 6:12;8:21,23;9:11;
31:20;32:17;53:1;55:25;
57:1;59:21,24,25
**surrounding** 18:21
**suspect** 17:25
**sustained** 49:3;51:25;
52:6,22
**swearing** 41:19
**Sylvestry** 11:20;58:3

**T**

**table** 68:21
**takeover** 47:18
**talk** 26:21;43:16
**talking** 10:2
**telling** 11:22;31:10,12;
39:24;57:21,23,25
**temporary** 16:5
**ten** 12:13;21:24,25
**tends** 57:16
**terms** 7:25;9:3;14:21;
16:17;23:18;29:17,18;31:1;
46:7,8,10,11,13,17;47:5
**testimony** 51:24;53:2;
67:24;71:6,18
**theory** 8:2
**thereafter** 22:20;48:16;
54:9
**therefore** 64:25;66:4
**therein** 20:22
**though** 16:4;38:2;50:23;
57:10;69:23
**thought** 68:4
**threatened** 41:6
**threatening** 22:17;31:15
**threats** 43:10;52:17
**three-page** 14:17
**threw** 39:18
**throw** 39:18
**thrown** 52:15
**tie** 26:2
**times** 49:23
**titled** 13:11
**today** 20:6;24:1;47:25;
55:1;68:8;69:25;70:3,9,13,
15,17;72:12
**together** 44:22
**told** 57:19
**tomorrow** 42:3,3
**took** 44:23
**top** 14:6;58:18
**totally** 16:25;17:1
**town** 12:2
**tried** 56:18
**trilogy** 44:19

**true** 6:8,10;33:18,19;
35:24;36:10;51:2;53:24;
69:2
**truth** 39:24
**trying** 9:12;19:12,24;
33:21;37:24;51:8;53:6;
57:17;63:21
**turn** 13:10;58:6,10
**turns** 43:12;66:22
**two** 18:11;32:8;39:1;55:9;
58:11

**U**

**ultimate** 31:14
**ultimately** 7:24;8:8;
54:10,23
**unclear** 6:8
**under** 5:18;7:6,11;22:18,
21;33:25;34:10,11,12,15;
35:5,6,11;36:25;42:20;
50:3;63:19
**underlying** 29:2;31:4;
38:24;42:14;60:21
**undermine** 52:1
**understood** 28:10;55:25;
71:21
**unfair** 52:17,20
**unfortunately** 53:21
**Unfortunately** 13:6
**union** 5:25;7:1;9:14,15;
14:9;15:7,10,15,15,18;
18:22;19:3,10;21:22;22:13,
20,23;24:8,16,17;25:5,12,
14,15;26:5;27:10,15,18;
28:7;31:9,11,20;32:9,10,
12,19,22,22;33:1,2,5,20,
21,22,23;34:1,2,4,5,14,18;
35:1,3,9,10,13,15,16,23;
36:2,7;37:9;39:15,23,24;
40:1,5,12,14,15;41:21;
42:9,19;43:5,9,17,18,21,
25;44:8,13;45:23;46:6,7,9,
11,13,15,16,19;48:6,14;
49:2,4,5,5,6,6,10,12,15,16,
22,22,23;50:2,13,14;51:1,
5,15;52:1,23;53:5,6,7,17,
18,23;54:1;55:24;56:14,16,
22;57:6,25,25;63:14,15,18,
21,23,23,24,25;64:2,4,7,
10,11,12,13,15,23;65:6;
69:7
**unionization** 11:2,4;
17:8;48:8;51:15;63:4,12,
17;64:13,17;65:25
**unionize** 27:9;34:6;37:9;
42:25;50:3,6;53:6,8,18;
63:19,22;64:2,16
**unionized** 49:21;63:6
**unionizing** 25:11,19;
28:10;40:6,19
**unions** 33:8;42:7;51:24;
64:3

**union's** 12:2;18:22;30:1;
31:9;33:12;38:25;45:18;
46:5;56:7;57:5;60:13,23
**unique** 50:5,8
**unit** 34:7;43:1;58:19;63:5
**United** 44:20
**unlawful** 27:4;36:24
**unless** 9:9;40:9;65:19;
66:2,21
**Unless** 9:6;70:4;72:9
**unorganized** 25:21;
54:13,15,18,18,22
**unrepresented** 24:8;
26:7
**up** 22:24;24:7;33:18;38:3;
40:8;43:4
**upheaval** 52:15
**upon** 20:19;68:11;72:19
**use** 34:22;49:13;52:23
**used** 57:23
**using** 34:20
**usually** 4:22

**V**

**valid** 12:7,8;47:21;55:21
**Vallone** 4:2;5:10;55:9;
58:8;60:18
**Vallone's** 19:2
**vice** 19:10
**violate** 22:16;32:18;
33:10;65:8,24
**violates** 37:22,23
**violation** 7:18;43:13;65:1
**violations** 42:8
**virtue** 7:12,13,25
**void** 28:4
**vote** 34:5,6

**W**

**wage** 58:2
**wages** 49:25
**wait** 4:12;67:2;73:8
**Wait** 14:1;15:2
**waiting** 30:8
**walk** 38:8
**wants** 36:7
**way** 8:14;24:25;25:25;
34:23,24,24,25;36:15,18,
20;37:1,3,11;66:9
**ways** 50:7
**week** 29:11
**what's** 20:1;33:17;36:9
**What's** 10:15;36:10
**whereby** 15:7;22:23
**who's** 37:6
**wide** 42:19
**willing** 40:8;51:23
**wish** 9:13
**without** 48:14;55:19;
56:17;62:18;65:4;66:19;
72:25

**witnesses** 67:25
**word** 34:20,22
**words** 23:10;35:18,20
**work** 32:15;49:7;52:14;
57:24
**workers** 48:15;50:25;
52:22,25;53:24
**workplace** 50:8
**works** 36:15
**writing** 43:20
**wrong** 32:9,10

**Y**

**year** 14:10;24:8;54:8
**years** 12:13;15:9;21:9,25,
25;62:14
**yes-or-no** 23:11
**yesterday** 4:20;5:1;12:5;
13:20
**York** 34:2