**Exhibit B**

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
1199SEIU, UNITED HEALTHCARE
WORKERS EAST,

                        Plaintiff,

        -against-

RITE AID CORPORATION and
THE JEAN COUTU GROUP (PJC), Inc.,
THE JEAN COUTU GROUP USA, INC.,
d/b/a BROOKS ECKERD DRUG STORES

                        Defendants.
------------------------------------------------------------X
```

**JUDGE DANIELS**

07 CV 4816

### AFFIDAVIT OF LAURIEANNE D. VALLONE
### IN SUPPORT PLAINTIFF 1199's
### MOTION FOR A PRELIMINARY INJUNCTION

STATE OF NEW YORK   )
                    ) ss:
COUNTY OF NEW YORK  )

LAURIE VALLONE, being duly sworn, deposes and says:

### BACKGROUND

1.  I am a Vice President of the Pharmacy/Drug Division of Plaintiff 1199SEIU Healthcare Workers East ("1199" or "Union"). I was elected to that position in 1999 and have held that position ever since.

2.  Prior to my election as Vice President, I was employed by 1199 as an Organizer in the Pharmacy/Drug Division, beginning in 1989.

3.  As Vice President of 1199's Pharmacy/Drug Division I am responsible, along with my staff of Organizers, for representing workers at numerous pharmacies and drug stores in the Greater New York-New Jersey region. Our responsibilities in representing those workers

include, among other things, monitoring compliance with 1199's collective bargaining agreements, filing and processing grievances, and preparing for arbitrations.

4. I report directly to 1199 Executive Vice President Michael Rifkin.

5. I submit this affidavit in support of 1199's motion for a preliminary injunction in the above-captioned matter. The following is based upon my personal knowledge, except where otherwise noted or clear from the context.

## THE PARTIES

6. Plaintiff 1199 is a labor organization with its principle place of business at 310 West 43rd Street, New York, New York 10036.

7. 1199 represents approximately 250,000 workers in New York and throughout the east coast of the United States, predominately in the health care industry. 1199 represents approximately 6,500 pharmacists, pharmacy technicians, pharmacy interns, clerks, stock persons, shift supervisors, assistant managers and other employees employed by Defendant Rite Aid Corporation ("Rite Aid").

8. Defendant Rite Aid operates retail drug stores and pharmacies across the United States.

9. Defendant The Jean Coutu (PJC), Inc. ("Coutu Inc.") is a publicly-traded corporation headquartered in Longueuil, Quebec, Candada.

10. Coutu Inc. is the parent corporation of Defendant The Jean Coutu Group USA, Inc., ("Coutu USA"), d/b/a Brooks Eckerd Drug Stores. Coutu USA owns and operates the Brooks Eckerd retail pharmacy chains in the Northeast and Mid-Atlantic regions of the United States ("Eckerd stores").

## THE COLLECTIVE BARGAINING AGREEMENT

11.     1199 and Defendant Rite Aid have been parties to a series of collective bargaining agreements and Memoranda of Agreement. The most recent collective bargaining agreement was effective for the period October 11, 1998 through October 10, 2002 ("CBA"), and was subsequently extended with modifications by Memoranda of Agreement for the period October 13, 2002 through October 14, 2006 ("2002 MOA") and for the period October 14 2006 through October 14, 2010 ("2006 MOA"). The CBA sets forth the terms and conditions of employment of covered employees. A copy of the CBA, 2002 MOA and 2006 MOA are attached as Exhibits 1, 2 and 3 respectively.

12.     Article 2 of the CBA, provides that 1199 is the sole and exclusive representative of all professional and non professional employees at the drug stores in the geographical area set forth in Article 1 ("Bargaining Unit"). Exhibit 1, CBA p. 2-4.

13.     The CBA sets forth the negotiated terms and conditions of employment in the Bargaining Unit, including but not limited to wages (Article 5 as modified by Article 5 of the 2002 MOA and 2006 MOA), hours of work (Article 7 as modified by Article 7 of the 2006 MOA), vacations (Article 8 as modified by the 2002 MOA and 2006 MOA), holidays (Article 9 as modified by the 2006 MOA), seniority protection (Article 12), health insurance (Article 26 as modified by the 2006 MOA), and pension benefits (Article 27). See Exhibits 1, 2 and 3.

14.     Article 1 of the CBA, entitled Coverage, provides that the terms of the CBA shall apply to those drug stores in which Rite Aid acquires an interest of 50% or more ("After-Acquired Clause"). Exhibit 1, CBA, p. 2. Specifically, After-Acquired Clause provides

> This Agreement shall be binding upon the Union, the Employer and its successors and assigns, but shall apply only to those drug stores

> operated by said Employer, and to drug stores hereafter opened by Rite Aid Corporation (including, but not limited to those in which the Employer directly or indirectly acquires an interest of 50% or more in existing stores), in the City of New York, and the New York Counties of Nassau, Suffolk, Westchester, Orange, Putnam, Ulster, Dutchess, Sullivan, and Rockland, and the City of Albany, and the New Jersey Counties of Passaic, Bergen, Essex, Hudson, and Union and the Cities of Edison, Perth Amboy, Carteret and Woodbridge in Middlesex County, New Jersey, regardless of the name or whether the drug store is operated individually or as a partnership or corporation.
>
> * * *
>
> The words "Employer" or Employers," as whenever used in this Agreement, and the pronouns, "he" and "his," used in connection therewith, are intended to apply to the Employer, Rite Aid Corporation, and to each drug store covered hereunder, whether operated by an individual, copartnership or corporation.

Id. Article I of the CBA was not modified by any subsequent MOA. See Exhibits 2 and 3.

15.   Article 31 of the CBA contains a broad grievance and arbitration procedure for the resolution of all disputes between 1199 and Rite Aid. Exhibit 1, CBA p. 54. It provides:

> All complaints or disputes arising between the Union and the Employer under or out of this Agreement, or any breach or threatened breach of this Agreement (herein referred to as a "grievance" shall be adjusted pursuant to the terms and conditions of this grievance and arbitration procedure.

Id. Article 31 of the CBA was modified by the 2002 MOA and 2006 MOA, however the modifications are not relevant to this dispute. See Exhibits 2 and 3.

16.   The arbitration provision of Article 31, as modified by the 2006 MOA, permits the Union to refer unsettled grievances to arbitration before an Arbitrator designated by the American Arbitration Association. See Exhibit 3.

## THE MERGER AGREEMENT

17.     In or around August 2006, 1199 learned that Defendant Rite Aid entered into a merger agreement with Defendant Coutu Inc. pursuant to which Rite Aid will acquire all of Coutu USA's approximately 1,850 Eckerd stores ("Merger Agreement").

18.     It is the Union's understanding the Federal Trade Commission's approval of the Merger Agreement is currently pending.

## THE UNION AVOIDANCE CAMPAIGN

19.     In or around early April 2007 a Rite Aid employee told me that Rite Aid Labor Relations Director Neils Hansen told Eckerd store managers to strictly enforce Eckerd's no-solicitation policies against 1199 staff, to take any Union literature from employees and throw it out, to instruct employees to not sign Union authorization cards, and to make efforts to dissuade employees from supporting the Union.

20.     On or about April 18, 2007, 1199 Executive Vice President Michael Rifkin sent a letter to Hansen. Rifkin sent a copy of that letter to me. The letter stated that Rite Aid pharmacists had contacted the Union and reported that they were uncomfortable with conversations initiated by Rite Aid managers regarding their protected union activity. A copy of Rifkin's letter to Hansen is attached as Exhibit 4.

21.     On or about April 20, 2007 Hansen confirmed to me that he had conducted a meeting with Eckerd store managers at Eckerd headquarters in Melville, NY. He informed me that the purpose of this meeting was to orient store managers on the "union-free business model" that Rite Aid intends to apply to these to-be-acquired stores and explain to these managers how to "keep [the Union] out of these stores."

22. On or about May 2, 2007, Rich Bonelli, 1199 Organizer, and I visited Long Island Eckerd stores located in Middle Island, Shirley, and Medford in an attempt to provide workers in those stores with information regarding 1199. At most locations store managers denied us entry into the stores. We distributed 1199 literature to several employees outside of the Eckerd stores. On the sidewalk outside of the Middle Island Store, we saw the store manager taking this literature out of the hands of an employee.

23. On or about May 9, 2007, pharmacists and store managers at the to-be-acquired Eckerd stores received a document entitled "10 Minute Huddle" ("Huddle") and an accompanying message ("Instructions"). Copeis of the Huddle and the Instructions are attached as Exhibit 5 and 6, respectively.

24. The Instructions informed recipients that Eckerd is "in the process of scheduling union avoidance training" and explained to them that they were required to present the information contained in the Huddle to all employees at the to-be-acquired Eckerd stores. See Exhibit 6.

25. The Huddle is a "talk" that store managers were instructed to have with all employees at the to-be-acquired Eckerd stores regarding 1199. See Exhibit 5. As part of the "talk," supervisors told employees that they could vote against union representation, that management "prefer[s] to work directly with [employees] to address questions and concerns versus dealing with a third party," that under a union contract everyone normally received the same pay, regardless of performance, and that a union would undermine the success of the stores. Id.

26. On or about May 24, 2007, I met with fifteen pharmacists, pharmacy interns and pharmacy technicians from six (6) different Eckerd stores throughout Brooklyn, NY, to discuss

Rite Aid's upcoming acquisition of Eckerd stores. A copy of the sign-in sheet from that meeting is attached as Exhibit 7.

27. All Eckerd employees at the May 24, 2007 meeting informed me that they had been forced to attend an approximately 1-hour long meeting held by their store managers in which they were told that the union would take away their money, that employees should not talk to union representatives who may enter the stores, and that they should not sign any document that the union gives to them. These meetings were held in Eckerd stores.

28. In addition to in-store meetings, pharmacists who attended the May 24, 2007 Brooklyn meeting told me of a second meeting that they were forced to attend at various off-site locations in which store managers told them that they should not support 1199.

29. On or about May 31, 2007 I met with three (3) pharmacy technicians, one (1) clerk, and pharmacist Liz Decarlo, all employed at the Eckerd store in Mattituck, NY. A copy of the sign-in sheet from that meeting is attached as Exhibit 8.

30. All Eckerd employees at the May 31, 2007 meeting informed me that they had been forced to attend an approximately 1-hour long meeting held by their store managers in which they were told that the union would take away their money, that if the union comes into the store they are not to talk to them, that they should not sign any document that the union gives to them and that they would lose current benefits such as their seniority status. These meetings were held in Eckerd stores.

31. Employees at the May 31, 2007 meeting told me that they heard a store manager threaten to fire a pharmacy technician if that technician discussed the Union at work.

32. On or about June 1, 2007 I met with six (6) employees from three (3) different Eckerd Stores in Queens. A copy of the sign-in sheet from that meeting is attached as Exhibit 9.

33. All Eckerd employees at the June 1, 2007 meeting informed me that they had been forced to attend an approximately 1-hour long meeting held by their store managers in which they were told that the union would charge high dues which would greatly reduce their salaries, that employees should not talk to union representatives who may enter the stores, and that they should not sign any document that the union gives to them. These meetings were held in Eckerd stores.

34. In addition to an in-store meeting, pharmacists who attended the June 1, 2007 Queens meeting told me of a second meeting that they were forced to attend at various off-site locations in which store managers told them that they should not support 1199.

35. Rafaat A-wahba, a pharmacist in Eckerd store number 5333 in Queens, reported to me that he gave union literature to a pharmacy technician employed at that same store. Upon seeing him do this, his store manager told him to "keep his opinions to himself." A-wahba was also called into a meeting in which he was told that he "should be careful what he says" and was told by an Eckerd manager "we do not want you to get into trouble." A-wahba told me that he understood this as a threat of reprisal if he continued to show support for the Union.

36. All attendees at the May 24th, May 31st, and June 1st meetings reported that the Huddle literature was prominently posted in Eckerd store break-rooms.

37. All pharmacists in attendance at the May 24th, May 31st, and June 1st meetings reported that they were told by store managers that they had to review literature which explained that if they were represented by the Union they would lose control over their work. These pharmacists consistently reported that both store managers and Regional Eckerd District Managers called them to insist that they submit signed documents attached to anti-union literature. The calls continued until they had submitted the signed documents. All the

pharmacists interpreted these relentless phone calls as purposeful intimidation to dissuade them from supporting the Union. All the pharmacists at these meetings signed documents after reviewing this literature.

38. All cashiers and other non-pharmacists in attendance at the May 24th, May 31st, and June 1st meetings reported that they were told they had to sign literature denouncing the Union.

39. Eckerd workers were told that Rite Aid has invited them to a meeting in Long Island in mid-June to discuss why the company does not need a union.

40. The Union has filed unfair labor practice charges against Rite Aid and Brooks Eckerd at the National Labor Relations Board in connection with some of these actions. A copy of these charges is attached as Exhibit 10.

## THE DEMAND FOR ARBITRATION

41. On or about May 10, 2007, 1199 President Dennis Rivera initiated a telephone call with Mary Sammons, President and CEO of Rite Aid, in which he protested Rite Aid's stated intention not to apply the CBA in the to-be-acquired Eckerd Stores.

42. In this conversation, Rivera also made it clear that, according to the Union, the anti-union campaign launched jointly by Rite-Aid and management in the Eckerd stores was a violation of Article 1 of the CBA. See Exhibit 1.

43. Sammons suggested to Rivera that Rifkin and Rite Aid Senior Vice President of Human Resources, Todd McCarty, meet in order to resolve the dispute.

44. On or about May 24, 2007, Rifkin met with McCarty. At that meeting, McCarty told Rifkin that Rite Aid intends to operate the to-be-acquired Eckerd Stores under a "union-free" business model.

45. McCarty further confirmed to Rifkin that Rite Aid, in conjunction with the management at the to-be-acquired Eckerd stores, had undertaken a union avoidance campaign targeting the workers in those stores.

46. Immediately following Rifkin's meeting with McCarty, he sent me an e-mail detailing their conversation to keep me abreast of the status of the dispute. A copy of Rifkin's e-mail to me is attached as Exhibit 11.

47. On or about May 31, 2007 I filed a demand for arbitration seeking a declaratory ruling from an arbitrator that Rite Aid's stated intention of keeping the to-be-acquired Eckerd Stores union-free is a violation of Article 1 of the CBA and further seeking a ruling that the union avoidance campaign launched by Rite Aid, in conjunction with management at the to-be-acquired Eckerd stores be enjoined violates the CBA. A copy of the Arbitration Demand is attached as Exhibit 12.

48. On or about May 31, 2007, I sent a letter to Rite Aid Labor Relations Director Niels Hansen, enclosing the Union's demand for arbitration (Exhibit 11) and requesting that Rite Aid agree to submit this dispute to expedited arbitration. A copy of the May 31, 2007 letter to Hansen is attached as Exhibit 13.

49. To date, Rite Aid has not responded to the Union's request for expedited arbitration.

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　Laurie Vallone

Sworn to before me this
____ day of June, 2007

_____
Notary Public

ALLYSON L. BELOVIN
Notary Public, State Of New York
No. 02BE6023223
Qualified In New York County
Commission Expires April 19, 20__